UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                :

In re:                        :     Chapter 11

INNER CITY MEDIA CORPORATION,   :     Case No. 11-[_____] ([___])

             Alleged Debtor. [1]   :

-------------------------------------------------------------------x

## AFFIDAVIT OF JEFF JOHNSON PURSUANT
## TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 1003

STATE OF CONNECTICUT   )
                       ) ss:
COUNTY OF FAIRFIELD    )

       JEFF JOHNSON, being duly sworn, deposes and says:

      1.     I make this affidavit on behalf of Yucaipa Corporate Initiatives Fund II, L.P.

("Yucaipa CI Fund"), a petitioning creditor in the above-captioned involuntary chapter 11

bankruptcy cases (the "Bankruptcy Cases") filed by Yucaipa CI Fund and other petitioning

creditors against Inner City Media Corporation and its affiliated debtors (collectively, the

"Debtors").  I am fully familiar with the facts set forth herein either through my own personal

knowledge or through a review of documents related to Yucaipa CI Fund's claims against the

Debtors.  If called to testify in connection with the involuntary bankruptcy cases, the following

would constitute my testimony.

---

[1] The Debtors in these involuntary chapter 11 cases are Inner City Media Corporation, ICBC Broadcast
Holdings, Inc., Inner-City Broadcasting Corporation of Berkeley, ICBC Broadcast Holdings–CA, Inc.,
ICBC-NY, L.L.C., ICBC Broadcast Holdings–NY, Inc., Urban Radio, L.L.C., Urban Radio I, L.L.C.,
Urban Radio II, L.L.C., Urban Radio III, L.L.C., Urban Radio IV, L.L.C., Urban Radio of Mississippi,
L.L.C., and Urban Radio of South Carolina, L.L.C.

2.     I hold the title of partner as it relates to Yucaipa CI Fund, and am authorized to make this affidavit and to execute a petition commencing the Bankruptcy Cases on its behalf. Yucaipa CI Fund has its principal place of business at 9130 West Sunset Boulevard, Los Angeles, California. Yucaipa CI Fund is a creditor of the Debtors based upon its status as a lender under that certain Credit Agreement dated August 13, 2004 among ICBC Broadcast Holdings, Inc., as borrower, General Electric Capital Corporation as administrative agent,[2] and certain lenders and other loan parties signatory thereto from time to time (as amended, restated, modified, or supplemented from time to time, the "Credit Agreement"; and together with the guarantees, security agreements, pledge agreements and other documents executed and delivered in connection therewith, the "Senior Loan Facility").

## The Senior Loan Facility

3.     On or about August 13, 2004, the Debtors, the administrative agent and certain lenders entered into the Credit Agreement pursuant to which the lenders extended (or committed to extend) term and revolving loans to the Debtors in the original principal amount of approximately $197,000,000. Due to the periodic capitalization of paid-in-kind interest and the accrual of ordinary and default interest, the current outstanding aggregate amount of the Obligations (as defined in the Credit Agreement) is approximately $254,075,278.94. A copy of the Credit Agreement will be annexed to a declaration in support of a statement contemporaneously filed by the petitioning creditors.

---

[2] On July 1, 2011, General Electric Capital Corporation resigned as administrative agent and was succeeded by Cortland Capital Market Services LLC.

4. Pursuant to the Credit Agreement, the lenders' commitments under the term and revolving loans are evidenced by certain promissory notes. <u>See</u> Credit Agreement § 1.1(a)(ii). The claims of Yucaipa CI Fund and the other petitioning creditors derive from these notes.

5. The Obligations are secured by first priority liens in substantially all of the Debtors' assets, including, but not limited to, real property, equipment, cash or cash equivalents on deposit in certain of the Debtors' deposit accounts, intellectual property, and certain pledged equity interests.

6. The Obligations are guaranteed by Inner City Media Corporation and several subsidiaries of ICBC Broadcast Holdings, Inc., the borrower under the Credit Agreement. Each of the guarantors is also an involuntary Debtor. Copies of these guarantees will be annexed to a declaration in support of a statement contemporaneously filed by the petitioning creditors.

<u>**The Assignments**</u>

7. By virtue of the execution of several Assignment and Assumption Agreements Yucaipa CI Fund received an unconditional transfer and assignment of Loans (as defined in the Credit Agreement) (the "<u>Assigned Claims</u>"). Redacted copies of the assignment documentation are annexed hereto as <u>**Exhibit A**</u>.

8. The Assigned Claims were not assigned to Yucaipa CI Fund for the purposes of commencing the Bankruptcy Cases.

9. As of the date hereof, the Debtors are indebted to Yucaipa CI Fund in the amount of at least $118,229,165.50. This amount exceeds the value of all collateral securing such Obligations by not less than $14,425.00.

Dated: August 19, 2011
      Greenwich, Connecticut

_____
JEFF JOHNSON

Sworn to and subscribed before me
This 19th day of August, 2011

_____
Notary Public

Leigh A. Holmes
My Commission Expires: 10/31/2014

# Exhibit A

# ASSIGNMENT AGREEMENT

This Assignment Agreement (this "Agreement") is made as of ███████ by and between ████████████████ ("Assignor Lender") and YUCAIPA CORPORATE INITIATIVES FUND II, LP ("Assignee Lender") and acknowledged and consented to by GENERAL ELECTRIC CAPITAL CORPORATION, as agent ("Agent"). All capitalized terms used in this Agreement and not otherwise defined herein will have the respective meanings set forth in the Credit Agreement as hereinafter defined.

## RECITALS:

WHEREAS, ICBC BROADCAST HOLDINGS, INC., a Delaware corporation ("Borrower"), Agent, Assignor Lender and other Persons signatory thereto as Lenders have entered into that certain Credit Agreement dated as of August 13, 2004 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") pursuant to which Assignor Lender has agreed to make certain Loans to, and incur certain Letter of Credit Obligations for, Borrower;

WHEREAS, Assignor Lender desires to assign to Assignee Lender a portion of its interest in the Loans (as described below), the Letter of Credit Obligations and the Collateral and to delegate to Assignee Lender a portion of its Commitments and other duties with respect to such Loans, Letter of Credit Obligations and Collateral;

WHEREAS, Assignee Lender desires to become a Lender under the Credit Agreement and to accept such assignment and delegation from Assignor Lender; and

WHEREAS, Assignee Lender desires to appoint Agent to serve as agent for Assignee Lender under the Credit Agreement;

NOW, THEREFORE, in consideration of the premises and the agreements, provisions, and covenants herein contained, Assignor Lender and Assignee Lender agree as follows:

## 1. ASSIGNMENT, DELEGATION, AND ACCEPTANCE

1.1     _Assignment._ Assignor Lender hereby transfers and assigns to Assignee Lender, without recourse and without representations or warranties of any kind (except as set forth in Section 3.2), such percentage of Assignor Lender's right, title, and interest in the Loans, Commitments, the Letter of Credit Obligations, Loan Documents and Collateral as will result in Assignee Lender having as of the Effective Date (as hereinafter defined) a Pro Rata Share thereof, as follows:



## PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the LSTA Standard Terms and Conditions for Purchase and Sale Agreement for Distressed Trades published by the LSTA as of August 6, 2010 (the "Standard Terms"). The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement for Distressed Trades governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.



### TRANSACTION SUMMARY

| | |
|---|---|
| **Trade Date:** | |
| **Agreement Date:** | |
| **Seller:** | |
| **Seller MEI[1]:** | |
| **Buyer:** | Yucaipa Corporate Initiatives Fund II, LP |
| **Buyer MEI[2]:** | N/A |
| **Credit Agreement:** | Credit Agreement, dated as of August 13, 2004, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, as borrower, Goldman Sachs Specialty Lending Group, L.P., as syndication agent, General Electric Capital Corporation, as agent, and the other lenders signatory thereto from time to time. |
| **Borrower:** | ICBC Broadcast Holdings, Inc. |
| **Purchase Amount(s):** | (i) $3,332,825.25 of Term Loan<br>(ii) $40,317.86 of Revolving Loan Commitment |

REDACT

---

[1] Insert Markit Entity Identifier for Seller, if available.

[2] Insert Markit Entity Identifier for Buyer, if available.

LSTA EFFECTIVE AUGUST 6, 2010    Copyright © LSTA 2010. All rights reserved.



## DEFINITIONS

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"<u>Agent</u>" means General Electric Capital Corporation, as Agent.

"<u>Assignment</u>" means the Assignment Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment.

"<u>Bankruptcy Case</u>" select one:
☒ not applicable.
☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

---

[3] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H. Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[4] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H. Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[5] Specify the Shift Date only if "Yes" is specified opposite "Step-Up Provisions" and if the second box is selected in the definition of Covered Prior Seller. The Shift Date is the date published by the LSTA and is that date determined by the LSTA to be the date on which market convention for transferring the Debt shifted from par documentation to distressed documentation (the "<u>Shift Date</u>"). The Parties shall include the Shift Date published by the LSTA, or, if the Shift Date has not been published by the LSTA, either party may request in writing (a "<u>Shift Date Request</u>") that the LSTA determine whether market convention for transferring the Debt has shifted from par documentation to distressed documentation and, if it so determines, to select and publish the Shift Date. To submit a Shift Date Request, send a request that includes the name of Borrower, the title and date of the Credit Agreement, the deal CUSIP (or facility CUSIP, if appropriate), and name of the administrative agent under the Credit Agreement to the LSTA at lstashiftdates@lsta.org. The Shift Date published by the LSTA shall be binding on the parties.

[6] "Yes" can be elected only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.

NYC:228175.1

"Bankruptcy Court" select one:
- ☒ not applicable.
- ☐ means [the United States Bankruptcy Court for the _____ District of _____ (and, if appropriate, the United States District Court for that District)].

"Bar Date" select one:
- ☒ not applicable.
- ☐ none has been set.
- ☐ means [specify applicable date, if any].

"Buyer Purchase Price" select one:
- ☒ not applicable.
- ☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
- ☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"Commitments" select one:
- ☐ none.
- ☒ means Revolving Loan Commitment in the principal amount of ███████ all of which is fully funded in the form of Revolving Loans.

"Covered Prior Seller" select one:
- ☒ not applicable.
- ☐ means each Prior Seller that transferred the Loans and Commitments (if any)[7] on or after the Shift Date [but prior to the transfer pursuant to which _____[8] transferred such Loans and Commitments (if any) on a distressed documentation basis pursuant to the Purchase and Sale Agreement for Distressed Trades dated as of _____, as set forth in the Annex].[9]

"Filing Date" select one:
- ☒ not applicable.
- ☐ means [identify date on which Borrower filed Bankruptcy Case].

"Loans" means (i) Revolving Loans in the outstanding principal amount of ███████ and (ii) Term Loans in the outstanding principal amount of $3,332,825.25.

"Netting Letter" select one:
- ☒ not applicable.
- ☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:
- ☒ not applicable.

---

[7] If applicable to only a portion of the Loans and Commitments (if any), specify the portion that applies, _e.g._, "each Prior Seller that transferred the [Name of applicable Covered Prior Seller] Loans (as defined in Section 1 of the Annex)."

[8] Specify the first Entity that transferred the Loans and Commitments (if any) on a distressed documentation basis on or after the Shift Date.

[9] The bracketed language applies where the relevant Predecessor Transfer Documents include a distressed trade that settled after the par/near par trade which settled on or after the Shift Date.

☐ means [specify original buyer in the netting arrangement].

"Penultimate Buyer" select one:
    ☒ not applicable.
    ☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
    ☐ means [_____].

"Required Consents" means the consent of the Agent.

"Seller Purchase Price" select one:
    ☒ not applicable.
    ☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" means the ▮▮▮▮ transfer or other similar fee payable to the Agent in connection with the Assignment.

"Unfunded Commitments" means that part of the Commitments that has not been funded in the form of loans, advances, letter of credit disbursements or otherwise under the Credit Agreement, which is in the principal amount of $0.

## B.   SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)

The following specified terms shall apply to the sections referenced in this Section B:

| | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
| | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (Purchase Price); Netting Arrangements.
   If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

   "(k) [intentionally omitted]."[10]

---

[10] Seller should add, and Buyer should cause Original Buyer or Penultimate Buyer, as applicable, to add, a comparable representation to the Netting Letter in lieu of this representation.

Section 4.1(r) (Predecessor Transfer Agreements).
☒ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.
☐ Not applicable.

Section 4.1(u) (Other Documents).
☒ None.
☐ The following: _____.

Section 4.1(v) (Proof of Claim).
☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
     ☐ the Agent on behalf of the Lenders.
     ☐ Seller or a Prior Seller.
☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.
☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.
☒ Not applicable.

## C.     SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)

C.1     Section 5.1(n) (Buyer Status).

☒ Buyer is not a Lender.
☐ Buyer is a Lender.
☐ Buyer is an Affiliate [substitute Credit Agreement defined term if different] (as defined in the Credit Agreement) of a Lender.
☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

C.2     If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

## D.     SECTION 6 (INDEMNIFICATION)

Section 6.1 (Seller's Indemnities); Step-Up Indemnities.

(i)     If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

(ii)     If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

## E.     SECTION 7 (COSTS AND EXPENSES)

☐ The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.

☐ The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
  ☐ one-half thereof.
  ☐ other relevant fraction or percentage, _____, thereof.
☐ The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☒ The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☐ There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

**F.**     **SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)**

**F.1**     Section 8.2 (Distributions); Step-Up Distributions Covenant.

   (i)     If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

   (ii)     If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

**F.2**     Section 8.5 (Wire Instructions).

Buyer's Wire Instructions:

BANK:                    Union Bank of California
                         Corporate Deposit Services
                         445 South Figueroa St
                         Los Angeles, CA 90071
ABA #                    REDACT
ACCOUNT #:               REDACTE
ACCOUNT NAME:            YUCAIPA CORPORATE INITIATIVES FUND II, LP
REFERENCE:               ███████████████████████

Seller's Wire Instructions:



## G.  SECTION 9 (NOTICES)

<u>Buyer's Address for Notices and Delivery</u>:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069
Attention:  Robert P. Bermingham
Telephone:  (310) REDAC
Facsimile:  (310) REDAC
Electronic Mail Address: REDACTED

<u>Seller's Address for Notices and Delivery</u>:



## H.  SECTION 27 (ADDITIONAL PROVISIONS)

1. Seller and Buyer agree that the following representation shall be added to the Standard Terms as Section 4.1(x) thereof:

"As indicated by the Agent to the Seller, there is at least REDACT 1 of interest that has accrued, but not been paid, in respect of the Loans and Commitment as of REDACTE ."

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**



**BUYER**

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By:_____

      Name:

      Title:

**IN WITNESS WHEREOF,** Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**



**BUYER**

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By: _____

Name:   Robert P. Bermingham
Title:    Vice President and Secretary

**ANNEX TO PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES[1]**

1.  If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements[2] and principal amount, as of the Settlement Date, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.

     Assignment Agreement, dated as of ▨▨▨▨▨▨▨ by and among ▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨ as assignor, Seller, as assignee, and the Agent, relating to par/near par loans.

2.  List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.[3]

     Credit Agreement, dated as of August 13, 2004, among ICBC Broadcast Holdings, Inc., as Borrower, the other Credit Parties signatory thereto from time to time, as Credit Parties, the Lenders party thereto from time to time, as Lenders, and General Electric Capital Corporation, as Administrative Agent, Goldman Sachs Specialty Lending Group, L.P., as Syndication Agent, GECC Capital Markets Group, Inc. and Goldman Sachs Specialty Lending Group, L.P., as Lead Arrangers.

     The First Amendment to the Credit Agreement, dated as of September 27, 2004, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

     The Second Amendment to the Credit Agreement, dated as of November 11, 2004, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

     The Third Amendment to the Credit Agreement, dated as of May 5, 2005, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

     The Fourth Amendment to the Credit Agreement, dated as of October 20, 2006, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

     The Fifth Amendment to the Credit Agreement, dated as of June 22, 2007, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory

---

[1] For purposes of Sections 1 through 6 in this Annex, terms such as "none", "not applicable", "n/a", "irrelevant" and "zero" should be given the same meaning.

[2] List (i) any Predecessor Transfer Agreement to which Seller is a party, (ii) any Predecessor Transfer Agreement of Prior Sellers relating to distressed loans delivered to Seller by Immediate Prior Seller and (iii) any Predecessor Transfer Agreement of Prior Sellers relating to par loans listed in any Predecessor Transfer Agreement described in the preceding clause (ii).

[3] If not applicable, so state.

thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

Waiver Letter Agreement, dated as of November 15, 2007, between the Borrower, the other Credit Parties signatory thereto, the Agent, and the lenders signatory thereto.

Waiver Letter Agreement, dated as of April 10, 2008, between the Borrower, the other Credit Parties signatory thereto, the Agent, and the lenders signatory thereto.

3.    Description of Proof of Claim (if any).[4]

      N/A

4.    Description of Adequate Protection Order (if any).[5]

      N/A

5.    List any exceptions to Section 4.1(w) (Notice of Impairment).[6] None.

6.    The amount of any PIK Interest that accreted to the principal amount of the Loans on or after the Trade Date but on or prior to the Settlement Date is ███████.[7]

---

[4] May apply only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary. If not applicable, so state. If applicable, note that according to the Standard Terms, failure to state is not failure to convey rights or obligations with respect thereto.

[5] May apply only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary. If not applicable, so state. If applicable, note that according to the Standard Terms, failure to state is not failure to convey rights or obligations with respect thereto.

[6] If none, so state.

[7] In addition to the terms listed in footnote 1 of this Annex, amounts listed as 0 or 0.00, with or without a currency sign, should be given the same meaning.

**Yucaipa Corporate Initiatives Fund II, LP**
The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069



Re:     *ICBC Broadcast Holdings, Inc.*

Ladies and Gentlemen:

Reference is made to the Purchase and Sale Agreement, dated as of the date hereof (the "Agreement"), between ████████████████ ("Seller") and Yucaipa Corporate Initiatives Fund II, LP ("Buyer"), pursuant to which Buyer is purchasing from Seller the Transferred Rights. Capitalized terms used herein, but not otherwise defined herein, shall have the meanings ascribed to such terms in the Agreement.

This letter is the Purchase Price Letter referred to in the Agreement. In accordance with the terms of the Agreement, Buyer shall pay to Seller the Purchase Price by wire transfer of immediately available funds to Seller's wire instructions set forth in the Agreement.

The Purchase Price for the Transferred Rights is set forth on Schedule A hereto.

Please evidence your agreement to the foregoing by executing and returning a copy of this letter.

Sincerely,

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By: _____

Name:    Robert P. Bermingham

Title:     Vice President and Secretary

Please evidence your agreement to the foregoing by executing and returning a copy of this letter.

Sincerely,

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By:_____
     Name:
     Title:



# SCHEDULE A

*See attached spreadsheet*

Seller
Buyer:
Funding Date:

**Yucaipa Corporate Initiatives Fund II, LP**

Trade Date:
Price:
T+20

Borrower: **ICBC Broadcast**
Facility:                          Term Loan        Revolving Commitment
Original Global:                 REDACT
Original Trade Amount:           REDACT
                                 $3,332,825.25
Current Global:                  REDACT
Current Trade Amount:                            $40,317.86
Pro-rata %:

| | Paydowns | Date | Global Amt | Trade Amt | Benefit |
|---|---|---|---|---|---|
| | | | | $ - | $ - |

| Cost of Carry: | Accrual Start Date | Accrual End Date | T+20 Purchase Price | Delay Days | LIBOR | Basis | Delay Comp |
|---|---|---|---|---|---|---|---|
| Term Loan | | | | | | | |
| Revolving Commitment | | | | | | | |

| Interest: | Accrual Start Date | Accrual End Date | Face | Days | All-In Rate | Basis | Delay Comp |
|---|---|---|---|---|---|---|---|
| Term Loan | | | | | | | |
| Revolver Commitment | | | | | | | |

| | |
|---|---|
| Price x Outstanding Loans | $ |
| Benefit of Paydowns | |
| Interest | |
| Cost of Carry | |
| **Total Purchase Price** | $ |

# ASSIGNMENT AGREEMENT

This Assignment Agreement (this "Agreement") is made as of ███████ by and between ██████████████████████████████████ ("Assignor Lender") and YUCAIPA CORPORATE INITIATIVES FUND II, LP ("Assignee Lender") and acknowledged and consented to by GENERAL ELECTRIC CAPITAL CORPORATION, as agent ("Agent"). All capitalized terms used in this Agreement and not otherwise defined herein will have the respective meanings set forth in the Credit Agreement as hereinafter defined.

## RECITALS:

WHEREAS, ICBC BROADCAST HOLDINGS, INC., a Delaware corporation ("Borrower"), Agent, Assignor Lender and other Persons signatory thereto as Lenders have entered into that certain Credit Agreement dated as of August 13, 2004 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") pursuant to which Assignor Lender has agreed to make certain Loans to, and incur certain Letter of Credit Obligations for, Borrower;

WHEREAS, Assignor Lender desires to assign to Assignee Lender a portion of its interest in the Loans (as described below), the Letter of Credit Obligations and the Collateral and to delegate to Assignee Lender a portion of its Commitments and other duties with respect to such Loans, Letter of Credit Obligations and Collateral;

WHEREAS, Assignee Lender desires to become a Lender under the Credit Agreement and to accept such assignment and delegation from Assignor Lender; and

WHEREAS, Assignee Lender desires to appoint Agent to serve as agent for Assignee Lender under the Credit Agreement;

NOW, THEREFORE, in consideration of the premises and the agreements, provisions, and covenants herein contained, Assignor Lender and Assignee Lender agree as follows:

## 1. ASSIGNMENT, DELEGATION, AND ACCEPTANCE

1.1     Assignment. Assignor Lender hereby transfers and assigns to Assignee Lender, without recourse and without representations or warranties of any kind (except as set forth in Section 3.2), such percentage of Assignor Lender's right, title, and interest in the Loans, Commitments, the Letter of Credit Obligations, Loan Documents and Collateral as will result in Assignee Lender having as of the Effective Date (as hereinafter defined) a Pro Rata Share thereof, as follows:

| Assignee Lender's Loans | Principal Amount of Loans/Commitments held by all Lenders | Principal Amount of Loans and Commitment assigned by Assignor Lender to Assignee Lender | Pro Rata Share |
|---|---|---|---|
| Revolving Loan |  | $115,229.44 |  |
| Term Loan | | $9,525,296.82 | |

1.2     Delegation.  Assignor Lender hereby irrevocably assigns and delegates to Assignee Lender a portion of its Commitments and its other duties and obligations as a Lender under the Loan Documents equivalent to REDACTED of Assignor Lender's Revolving Loan Commitment (such percentage representing a commitment of $115,229.44), and REDACT of Assignor Lender's Term Loan (such percentage representing a loan amount of $9,525,296.82).

1.3     Acceptance by Assignee Lender.  By its execution of this Agreement, Assignee Lender irrevocably purchases, assumes and accepts such assignment and delegation and agrees to be a Lender with respect to the delegated interest under the Loan Documents and to be bound by the terms and conditions thereof.  By its execution of this Agreement, Assignor Lender agrees, to the extent provided herein, to relinquish its rights and be released from its obligations and duties under the Credit Agreement.

1.4     Effective Date.  Such assignment and delegation by Assignor Lender and acceptance by Assignee Lender will be effective and Assignee Lender will become a Lender under the Loan Documents as of the date of this Agreement ("Effective Date") and upon payment of the Payment Amount (as such term is defined below).  Interest and Fees accrued prior to, on and after the Effective Date are for the account of Assignee Lender.

2.  INITIAL PAYMENT AND DELIVERY OF NOTES

2.1     Payment of the Payment Amount.  Assignee Lender will pay to Assignor Lender, in immediately available funds, not later than 11:00 a.m. (New York time) on the Effective Date, an amount equal to the purchase price as set forth in the Purchase Price Letter dated as of ████████ between the Assignor Lender and the Assignee Lender (the "Payment Amount").

2.2     Reserved.

2.3     Execution and Delivery of Notes.  Following payment of the Payment Amount, and upon Assignee Lender's request, Agent will obtain from Borrower for delivery to Assignee Lender, new executed Notes evidencing Assignee Lender's Pro Rata Share in the Loans after giving effect to the assignment described in Section 1.  Each new Note will be issued in the aggregate maximum principal amount of the Commitment of the Assignee Lender.

3. REPRESENTATIONS, WARRANTIES AND COVENANTS

3.1          <u>Assignee Lender's Representations, Warranties and Covenants</u>. Assignee Lender hereby represents, warrants, and covenants the following to Assignor Lender and Agent:

(a)        This Agreement is a legal, valid, and binding agreement of Assignee Lender, enforceable according to its terms;

(b)        The execution and performance by Assignee Lender of its duties and obligations under this Agreement and the Loan Documents will not require any registration with, notice to, or consent or approval by any Governmental Authority;

(c)        Assignee Lender is familiar with transactions of the kind and scope reflected in the Loan Documents and in this Agreement;

(d)        Assignee Lender has made its own independent investigation and appraisal of the financial condition and affairs of each Credit Party, has conducted its own evaluation of the Loans and Letter of Credit Obligations, the Loan Documents and each Credit Party's creditworthiness, has made its decision to become a Lender to Borrower under the Credit Agreement independently and without reliance upon Assignor Lender or Agent, and will continue to do so;

(e)        Assignee Lender is entering into this Agreement in the ordinary course of its business, and is acquiring its interest in the Loans and Letter of Credit Obligations for its own account and not with a view to or for sale in connection with any subsequent distribution; provided, however, that at all times the distribution of Assignee Lender's property shall, subject to the terms of the Credit Agreement, be and remain within its control;

(f)        No future assignment or participation granted by Assignee Lender pursuant to Section 9.1 of the Credit Agreement will require Assignor Lender, Agent, or Borrower to file any registration statement with the Securities and Exchange Commission or to apply to qualify under the blue sky laws of any state;

(g)        Assignee Lender has no loans to, written or oral agreements with, or equity or other ownership interest in any Credit Party;

(h)        Assignee Lender will not enter into any written or oral agreement with, or acquire any equity or other ownership interest in, any Credit Party without the prior written consent of Agent; and

(i)        As of the Effective Date, Assignee Lender (i) is entitled to receive payments of principal and interest in respect of the Obligations without deduction for or on account of any taxes imposed by the United States of America or any political subdivision thereof, (ii) is not subject to capital adequacy or similar requirements under Section 1.16(a) of the Credit Agreement, (iii) does not require the payment of any increased costs under Section 1.16(b) of the Credit Agreement, and (iv) is not unable to fund LIBOR Loans under Section 1.16(c) of the Credit Agreement, and Assignee Lender will indemnify Agent from and against all

liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, or expenses that result from Assignee Lender's failure to fulfill its obligations under the terms of Section 1.15(c) of the Credit Agreement or from any other inaccuracy in the foregoing.

3.2 <u>Assignor Lender's Representations, Warranties and Covenants</u>. Assignor Lender hereby represents, warrants and covenants the following to Assignee Lender:

(a) Assignor Lender is the legal and beneficial owner of the Loans and Commitments assigned hereunder;

(b) This Agreement is a legal, valid and binding agreement of Assignor Lender, enforceable according to its terms;

(c) The execution and performance by Assignor Lender of its duties and obligations under this Agreement and the Loan Documents will not require any registration with, notice to or consent or approval by any Governmental Authority;

(d) Assignor Lender has full power and authority, and has taken all action necessary to execute and deliver this Agreement and to fulfill the obligations hereunder and to consummate the transactions contemplated hereby;

(e) Assignor Lender is the legal and beneficial owner of the interests being assigned hereby, free and clear of any adverse claim, lien, encumbrance, security interest, restriction on transfer, purchase option, call or similar right of a third party; and

(f) This Assignment by Assignor Lender to Assignee Lender complies, in all material respects, with the terms of the Loan Documents.

4. LIMITATIONS OF LIABILITY

Neither Assignor Lender (except as provided in <u>Section 3.2</u>) nor Agent makes any representations or warranties of any kind, nor assumes any responsibility or liability whatsoever, with regard to (a) the Loan Documents or any other document or instrument furnished pursuant thereto or the Loans, Letter of Credit Obligations or other Obligations, (b) the creation, validity, genuineness, enforceability, sufficiency, value or collectability of any of them, (c) the amount, value or existence of the Collateral, (d) the perfection or priority of any Lien upon the Collateral, or (e) the financial condition of any Credit Party or other obligor or the performance or observance by any Credit Party of its obligations under any of the Loan Documents. Neither Assignor Lender nor Agent has or will have any duty, either initially or on a continuing basis, to make any investigation, evaluation, appraisal of, or any responsibility or liability with respect to the accuracy or completeness of, any information provided to Assignee Lender which has been provided to Assignor Lender or Agent by any Credit Party. Nothing in this Agreement or in the Loan Documents shall impose upon the Assignor Lender or Agent any fiduciary relationship in respect of the Assignee Lender.

5. FAILURE TO ENFORCE

No failure or delay on the part of Agent or Assignor Lender in the exercise of any power, right, or privilege hereunder or under any Loan Document will impair such power, right, or privilege or be construed to be a waiver of any default or acquiescence therein. No single or partial exercise of any such power, right, or privilege will preclude further exercise thereof or of any other right, power, or privilege. All rights and remedies existing under this Agreement are cumulative with, and not exclusive of, any rights or remedies otherwise available.

## 6. NOTICES

Unless otherwise specifically provided herein, any notice or other communication required or permitted to be given will be in writing and addressed to the respective party as set forth below its signature hereunder, or to such other address as the party may designate in writing to the other.

## 7. AMENDMENTS AND WAIVERS

No amendment, modification, termination, or waiver of any provision of this Agreement will be effective without the written concurrence of Assignor Lender, Agent and Assignee Lender.

## 8. SEVERABILITY

Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. In the event any provision of this Agreement is or is held to be invalid, illegal, or unenforceable under applicable law, such provision will be ineffective only to the extent of such invalidity, illegality, or unenforceability, without invalidating the remainder of such provision or the remaining provisions of the Agreement. In addition, in the event any provision of or obligation under this Agreement is or is held to be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions or obligations in any other jurisdictions will not in any way be affected or impaired thereby.

## 9. SECTION TITLES

Section and Subsection titles in this Agreement are included for convenience of reference only, do not constitute a part of this Agreement for any other purpose, and have no substantive effect.

## 10. SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

## 11. APPLICABLE LAW

THIS AGREEMENT WILL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE.

## 12. COUNTERPARTS

This Agreement and any amendments, waivers, consents, or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which, when so executed and delivered, will be deemed an original and all of which shall together constitute one and the same instrument.

[remainder of this page intentionally left blank]

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**ASSIGNEE LENDER:**                                    **ASSIGNOR LENDER:**

YUCAIPA CORPORATE INITIATIVES FUND II, LP

By: _____

Title: _____Vice President and Secretary_____

Notice Address:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069


ACKNOWLEDGED AND CONSENTED TO:

GENERAL ELECTRIC CAPITAL
CORPORATION


By: _____

        Authorized Signatory

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**ASSIGNEE LENDER:**                    **ASSIGNOR LENDER:**

YUCAIPA CORPORATE INITIATIVES FUND II,
LP

By: _____
Title: _____

Notice Address:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069


ACKNOWLEDGED AND CONSENTED TO:

GENERAL ELECTRIC CAPITAL
CORPORATION

By: _____
      Authorized Signatory

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**ASSIGNEE LENDER:**                    **ASSIGNOR LENDER:**

YUCAIPA CORPORATE INITIATIVES FUND II, LP

By: _____
Title: _____

Notice Address:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069

ACKNOWLEDGED AND CONSENTED TO:

GENERAL ELECTRIC CAPITAL
CORPORATION

By: _____
        Authorized Signatory



## PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the LSTA Standard Terms and Conditions for Purchase and Sale Agreement for Distressed Trades published by the LSTA as of August 6, 2010 (the "Standard Terms"). The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement for Distressed Trades governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
|---|---|
| **Trade Date:** | |
| **Agreement Date:** | |
| **Seller:** | |
| **Seller MEI[1]:** | |
| **Buyer:** | Yucaipa Corporate Initiatives Fund II, LP |
| **Buyer MEI[2]:** | N/A |
| **Credit Agreement:** | Credit Agreement, dated as of August 13, 2004, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, as borrower, Goldman Sachs Specialty Lending Group, L.P., as syndication agent, General Electric Capital Corporation, as agent, and the other lenders signatory thereto from time to time. |
| **Borrower:** | ICBC Broadcast Holdings, Inc. |
| **Purchase Amount(s):** | (i) $9,525,296.82 of Term Loan<br>(ii) $115,229.44 of Revolving Loan Commitment |
| **Tranche(s):** | (i) Term Loan<br>(ii) Revolving Loan Commitment |
| REDACTED | |
| | ☐ ☒ |
| | ☐ ☒ |
| | ☐ ☒ |

[1] Insert Markit Entity Identifier for Seller, if available.

[2] Insert Markit Entity Identifier for Buyer, if available.



## A.    DEFINITIONS

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means General Electric Capital Corporation, as Agent.

"Assignment" means the Assignment Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment.

"Bankruptcy Case" select one:
☒ not applicable.
☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

"Bankruptcy Court" select one:

---

[3] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H. Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[4] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H. Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[5] Specify the Shift Date only if "Yes" is specified opposite "Step-Up Provisions" and if the second box is selected in the definition of Covered Prior Seller. The Shift Date is the date published by the LSTA and is that date determined by the LSTA to be the date on which market convention for transferring the Debt shifted from par documentation to distressed documentation (the "Shift Date"). The Parties shall include the Shift Date published by the LSTA, or, if the Shift Date has not been published by the LSTA, either party may request in writing (a "Shift Date Request") that the LSTA determine whether market convention for transferring the Debt has shifted from par documentation to distressed documentation and, if it so determines, to select and publish the Shift Date. To submit a Shift Date Request, send a request that includes the name of Borrower, the title and date of the Credit Agreement, the deal CUSIP (or facility CUSIP, if appropriate), and name of the administrative agent under the Credit Agreement to the LSTA at lstashiftdates@lsta.org. The Shift Date published by the LSTA shall be binding on the parties.

[6] "Yes" can be elected only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.

☒ not applicable.
☐ means [the United States Bankruptcy Court for the _____District of _____ (and, if appropriate, the United States District Court for that District)].

"Bar Date" select one:
    ☒ not applicable.
    ☐ none has been set.
    ☐ means [specify applicable date, if any].

"Buyer Purchase Price" select one:
    ☒ not applicable.
    ☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
    ☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"Commitments" select one:
    ☐ none.
    ☒ means Revolving Loan Commitment in the principal amount of $115,229.44, all of which is fully funded in the form of Revolving Loans.

"Covered Prior Seller" select one:
    ☒ not applicable.
    ☐ means each Prior Seller that transferred the Loans and Commitments (if any)[7] on or after the Shift Date [but prior to the transfer pursuant to which _____[8] transferred such Loans and Commitments (if any) on a distressed documentation basis pursuant to the Purchase and Sale Agreement for Distressed Trades dated as of _____, as set forth in the Annex].[9]

"Filing Date" select one:
    ☒ not applicable.
    ☐ means [identify date on which Borrower filed Bankruptcy Case].

"Loans" means (i) Revolving Loans in the outstanding principal amount of $115,229.44 and (ii) Term Loans in the outstanding principal amount of $9,525,296.82.

"Netting Letter" select one:
    ☒ not applicable.
    ☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:
    ☒ not applicable.
    ☐ means [specify original buyer in the netting arrangement].

---

[7] If applicable to only a portion of the Loans and Commitments (if any), specify the portion that applies, e.g., "each Prior Seller that transferred the [Name of applicable Covered Prior Seller] Loans (as defined in Section 1 of the Annex)."

[8] Specify the first Entity that transferred the Loans and Commitments (if any) on a distressed documentation basis on or after the Shift Date.

[9] The bracketed language applies where the relevant Predecessor Transfer Documents include a distressed trade that settled after the par/near par trade which settled on or after the Shift Date.

"Penultimate Buyer" select one:
- ☒ not applicable.
- ☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
- ☐ means [_____].

"Required Consents" means the consent of the Agent.

"Seller Purchase Price" select one:
- ☒ not applicable.
- ☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" means the ███████ transfer or other similar fee payable to the Agent in connection with the Assignment.

"Unfunded Commitments" means that part of the Commitments that has not been funded in the form of loans, advances, letter of credit disbursements or otherwise under the Credit Agreement, which is in the principal amount of $0.

## B.     SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)

The following specified terms shall apply to the sections referenced in this Section B:

|  | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
|  | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (Purchase Price); Netting Arrangements.

If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

"(k) [intentionally omitted]."[10]

Section 4.1(r) (Predecessor Transfer Agreements).

☒ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.

☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.

☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.

☐ Not applicable.

Section 4.1(u) (Other Documents).

☒ None.

☐ The following: _____.

Section 4.1(v) (Proof of Claim).

☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
    ☐ the Agent on behalf of the Lenders.
    ☐ Seller or a Prior Seller.

☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.

☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.

☒ Not applicable.

**C.    SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)**

**C.1**    Section 5.1(n) (Buyer Status).

☒ Buyer is not a Lender.

☐ Buyer is a Lender.

☐ Buyer is an Affiliate [substitute Credit Agreement defined term if different] (as defined in the Credit Agreement) of a Lender.

☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

**C.2**    If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

**D.    SECTION 6 (INDEMNIFICATION)**

Section 6.1 (Seller's Indemnities); Step-Up Indemnities.

(i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

---

[10] Seller should add, and Buyer should cause Original Buyer or Penultimate Buyer, as applicable, to add, a comparable representation to the Netting Letter in lieu of this representation.

(ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

## E.    SECTION 7 (COSTS AND EXPENSES)

☐  The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to
    ☐  one-half thereof.
    ☐  other relevant fraction or percentage, _____, thereof.
☐  The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
    ☐  one-half thereof.
    ☐  other relevant fraction or percentage, _____, thereof.
☐  The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☒  The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☐  There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

## F.    SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)

**F.1**    Section 8.2 (Distributions); Step-Up Distributions Covenant.

(i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

(ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

**F.2**    Section 8.5 (Wire Instructions).

Buyer's Wire Instructions:

| | |
|---|---|
| BANK: | Union Bank of California |
| | Corporate Deposit Services |
| | 445 South Figueroa St |
| | Los Angeles, CA  90071 |
| ABA # | REDACT |
| ACCOUNT #: | REDACTE |
| ACCOUNT NAME: | YUCAIPA CORPORATE INITIATIVES FUND II, LP |
| REFERENCE: | ██████████████████ |

Seller's Wire Instructions:

████████████████████████



**G.** **SECTION 9 (NOTICES)**

<u>Buyer's Address for Notices and Delivery</u>:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069
Attention: Robert P. Bermingham
Telephone: (310) REDAC
Facsimile: (310 REDAC
Electronic Mail Address: REDACTED

<u>Seller's Address for Notices and Delivery</u>:



**H.** **SECTION 27 (ADDITIONAL PROVISIONS)**

1. Seller and Buyer agree that the following representation shall be added to the Standard Terms as Section 4.1(x) thereof:

"As indicated by the Agent to the Seller, there is at least REDACTE of interest that has accrued, but not been paid, in respect of the Loans and Commitment as of REDACTE ."

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

SELLER



BUYER

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By:_____
     Name:
     Title:

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**



**BUYER**

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By: _____

    Name:     Robert P. Bermingham
    Title:      Vice President and Secretary

# ANNEX TO PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES[1]

1.  If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements[2] and principal amount, as of the Settlement Date, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.

**REDACTED**

2.  List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.[3]

    Credit Agreement, dated as of August 13, 2004, among ICBC Broadcast Holdings, Inc., as Borrower, the other Credit Parties signatory thereto from time to time, as Credit Parties, the Lenders party thereto from time to time, as Lenders, and General Electric Capital Corporation, as Administrative Agent, Goldman Sachs Specialty Lending Group, L.P., as Syndication Agent, GECC Capital Markets Group, Inc. and Goldman Sachs Specialty Lending Group, L.P., as Lead Arrangers.

    The First Amendment to the Credit Agreement, dated as of September 27, 2004, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

    The Second Amendment to the Credit Agreement, dated as of November 11, 2004, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

    The Third Amendment to the Credit Agreement, dated as of May 5, 2005, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

    The Fourth Amendment to the Credit Agreement, dated as of October 20, 2006, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

    The Fifth Amendment to the Credit Agreement, dated as of June 22, 2007, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory

---

[1] For purposes of Sections 1 through 6 in this Annex, terms such as "none", "not applicable", "n/a", "irrelevant" and "zero" should be given the same meaning.

[2] List (i) any Predecessor Transfer Agreement to which Seller is a party, (ii) any Predecessor Transfer Agreement of Prior Sellers relating to distressed loans delivered to Seller by Immediate Prior Seller and (iii) any Predecessor Transfer Agreement of Prior Sellers relating to par loans listed in any Predecessor Transfer Agreement described in the preceding clause (ii).

[3] If not applicable, so state.

thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

Waiver Letter Agreement, dated as of November 15, 2007, between the Borrower, the other Credit Parties signatory thereto, the Agent, and the lenders signatory thereto.

Waiver Letter Agreement, dated as of April 10, 2008, between the Borrower, the other Credit Parties signatory thereto, the Agent, and the lenders signatory thereto.

3.      Description of Proof of Claim (if any).[4]

        N/A

4.      Description of Adequate Protection Order (if any).[5]

        N/A

5.      List any exceptions to Section 4.1(w) (Notice of Impairment).[6] None.

6.      The amount of any PIK Interest that accreted to the principal amount of the Loans on or after the Trade Date but on or prior to the Settlement Date is $0.00[7]

---

[4] May apply only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary. If not applicable, so state. If applicable, note that according to the Standard Terms, failure to state is not failure to convey rights or obligations with respect thereto.

[5] May apply only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary. If not applicable, so state. If applicable, note that according to the Standard Terms, failure to state is not failure to convey rights or obligations with respect thereto.

[6] If none, so state.

[7] In addition to the terms listed in footnote 1 of this Annex, amounts listed as 0 or 0.00, with or without a currency sign, should be given the same meaning.

**Yucaipa Corporate Initiatives Fund II, LP**
The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069



Re:    *ICBC Broadcast Holdings, Inc.*

Ladies and Gentlemen:

Reference is made to the Purchase and Sale Agreement, dated as of the date hereof (the "Agreement"), between █████████████████████ ("Seller") and Yucaipa Corporate Initiatives Fund II, LP ("Buyer"), pursuant to which Buyer is purchasing from Seller the Transferred Rights. Capitalized terms used herein, but not otherwise defined herein, shall have the meanings ascribed to such terms in the Agreement.

This letter is the Purchase Price Letter referred to in the Agreement. In accordance with the terms of the Agreement, Buyer shall pay to Seller the Purchase Price by wire transfer of immediately available funds to Seller's wire instructions set forth in the Agreement.

The Purchase Price for the Transferred Rights is set forth on Schedule A hereto.

Please evidence your agreement to the foregoing by executing and returning a copy of this letter.

Sincerely,

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By: _____

    Name:    Robert P. Bermingham
    Title:    Vice President and Secretary

Please evidence your agreement to the foregoing by executing and returning a copy of this letter.

Sincerely,

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By:_____
    Name:
    Title:



# SCHEDULE A

*See attached spreadsheet*

# DISTRESSED FUNDING MEMORANDUM

Seller:
Buyer: Yucaipa Corporate Initiatives Fund II, LP
Funding Date:

Trade Date:
Price: T+20

Borrower: **ICBC Broadcast**

|  | Term Loan | Revolving Commitment |
|---|---|---|
| Facility: | | |
| Original Global: | REDACT | REDACT |
| Original Trade Amount: | REDACT | REDACT |
| Pro-rata %: | REDACT | REDACT |
| Current Global: | $9,525,295.82 | $115,229.44 |
| Current Trade Amount: | REDACT | REDACT |
| Pro-rata %: | | |

| | Paydowns | Date | Global Amt | Trade Amt | Benefit |
|---|---|---|---|---|---|
| | | | | $ | $ - |

## Cost of Carry:

| | Accrual Start Date | Accrual End Date | T+20 Purchase Price | Delay Days | LIBOR | Basis | Delay Comp |
|---|---|---|---|---|---|---|---|
| Term Loan | | | | | | | |
| Revolving Commitment | | | | | | | |

## Interest:

| | Accrual Start Date | Accrual End Date | Face | Days | All-in Rate | Basis | Delay Comp |
|---|---|---|---|---|---|---|---|
| Term Loan | | | | | | | |
| Revolver Commitment | | | | | | | |

| | |
|---|---|
| Price x Outstanding Loans | $ |
| Benefit of Paydowns | |
| Interest | |
| Cost of Carry | |
| **Total Purchase Price** | $ |

# ASSIGNMENT AGREEMENT

This Assignment Agreement (this "Agreement") is made as of ▇▇▇▇▇▇▇ by and between ▇▇▇▇▇▇▇▇▇▇▇ ("Assignor Lender") and YUCAIPA CORPORATE INITIATIVES FUND II, LP ("Assignee Lender") and acknowledged and consented to by CORTLAND CAPITAL MARKET SERVICES LLC, as agent ("Agent"). All capitalized terms used in this Agreement and not otherwise defined herein will have the respective meanings set forth in the Credit Agreement as hereinafter defined.

## RECITALS:

WHEREAS, ICBC BROADCAST HOLDINGS, INC., a Delaware corporation ("Borrower"), Agent, Assignor Lender and other Persons signatory thereto as Lenders have entered into that certain Credit Agreement dated as of August 13, 2004 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") pursuant to which Assignor Lender has agreed to make certain Loans to, and incur certain Letter of Credit Obligations for, Borrower;

WHEREAS, Assignor Lender desires to assign to Assignee Lender a portion of its interest in the Loans (as described below), the Letter of Credit Obligations and the Collateral and to delegate to Assignee Lender a portion of its Commitments and other duties with respect to such Loans, Letter of Credit Obligations and Collateral;

WHEREAS, Assignee Lender desires to become a Lender under the Credit Agreement and to accept such assignment and delegation from Assignor Lender; and

WHEREAS, Assignee Lender desires to appoint Agent to serve as agent for Assignee Lender under the Credit Agreement;

NOW, THEREFORE, in consideration of the premises and the agreements, provisions, and covenants herein contained, Assignor Lender and Assignee Lender agree as follows:

1. ASSIGNMENT, DELEGATION, AND ACCEPTANCE

    1.1  <u>Assignment</u>. Assignor Lender hereby transfers and assigns to Assignee Lender, without recourse and without representations or warranties of any kind (except as set forth in <u>Section 3.2</u>), such percentage of Assignor Lender's right, title, and interest in the Revolving Loan, Commitments, the Term Loan, Loan Documents and Collateral as will result in Assignee Lender having as of the Effective Date (as hereinafter defined) a Pro Rata Share thereof, as follows:

1.2

| Type of Loans | Principal Amount of Loans/Commitments by all Lenders | Principal Amount of Loans/Commitments assigned by Assignor Lender to Assignee Lender | Pro Rata Share |
|---|---|---|---|
| Term Loan | REDACTED | $4,026,377.57 | REDACTED |

1.3 _Delegation._ Assignor Lender hereby irrevocably assigns and delegates to Assignee Lender a portion of its Commitments and its other duties and obligations as a Lender under the Loan Documents equivalent to  of Assignor Lender's Term Loan (such percentage representing a commitment of $4,026,377.57.

1.4 _Acceptance by Assignee Lender._ By its execution of this Agreement, Assignee Lender irrevocably purchases, assumes and accepts such assignment and delegation and agrees to be a Lender with respect to the delegated interest under the Loan Documents and to be bound by the terms and conditions thereof. By its execution of this Agreement, Assignor Lender agrees, to the extent provided herein, to relinquish its rights and be released from its obligations and duties under the Credit Agreement.

1.5 _Effective Date._ Such assignment and delegation by Assignor Lender and acceptance by Assignee Lender will be effective and Assignee Lender will become a Lender under the Loan Documents as of the date of this Agreement ("_Effective Date_") and upon payment of the Assigned Amount and the Assignment Fee (as each term is defined below). Interest and Fees accrued prior to, on and after the Effective Date are for the account of Assignee Lender.

2. INITIAL PAYMENT AND DELIVERY OF NOTES

2.1 _Payment of the Assigned Amount._ Assignee Lender will pay to Assignor Lender, in immediately available funds, not later than 11:00 a.m. (New York time) on the Effective Date, an amount equal to the purchase price as set forth in the Purchase Price Letter, dated as of July ___, 2011, by and between the Assignor Lender and the Assignee Lender (the "_Assigned Amount_").

2.2 _Payment of Assignment Fee._ Assignor Lender will pay to Agent, for its own account in immediately available funds, not later than 11:00 a.m. (New York time) on the Effective Date, the assignment fee in the amount of ▮▮▮ (the "_Assignment Fee_") as required pursuant to Section 9.1(a) of the Credit Agreement.

2.3 _Execution and Delivery of Notes._ Prior to payment of the Assigned Amount and the Assignment Fee, Assignor Lender will deliver to Agent the Notes previously delivered to Assignor Lender for redelivery to Borrower and Agent will obtain from Borrower for delivery to Assignee Lender, new executed Notes evidencing Assignee Lender's Pro Rata Share in the Loans

DOC ID-16792232.4

after giving effect to the assignment described in <u>Section 1</u>. Each new Note will be issued in the aggregate maximum principal amount of the Commitment of the Assignee Lender.

3.    REPRESENTATIONS, WARRANTIES AND COVENANTS

    3.1    <u>Assignee Lender's Representations, Warranties and Covenants</u>. Assignee Lender hereby represents, warrants, and covenants the following to Assignor Lender and Agent:

        (a)    This Agreement is a legal, valid, and binding agreement of Assignee Lender, enforceable according to its terms;

        (b)    The execution and performance by Assignee Lender of its duties and obligations under this Agreement and the Loan Documents will not require any registration with, notice to, or consent or approval by any Governmental Authority;

        (c)    Assignee Lender is familiar with transactions of the kind and scope reflected in the Loan Documents and in this Agreement;

        (d)    Assignee Lender has made its own independent investigation and appraisal of the financial condition and affairs of each Credit Party, has conducted its own evaluation of the Loans and Letter of Credit Obligations, the Loan Documents and each Credit Party's creditworthiness, has made its decision to become a Lender to Borrower under the Credit Agreement independently and without reliance upon Assignor Lender or Agent, and will continue to do so;

        (e)    Assignee Lender is entering into this Agreement in the ordinary course of its business, and is acquiring its interest in the Loans and Letter of Credit Obligations for its own account and not with a view to or for sale in connection with any subsequent distribution; provided, however, that at all times the distribution of Assignee Lender's property shall, subject to the terms of the Credit Agreement, be and remain within its control;

        (f)    No future assignment or participation granted by Assignee Lender pursuant to Section 9.1 of the Credit Agreement will require Assignor Lender, Agent, or Borrower to file any registration statement with the Securities and Exchange Commission or to apply to qualify under the blue sky laws of any state;

        (g)    Assignee Lender has no loans to, written or oral agreements with, or equity or other ownership interest in any Credit Party;

        (h)    Assignee Lender will not enter into any written or oral agreement with, or acquire any equity or other ownership interest in, any Credit Party without the prior written consent of Agent; and

        (i)    As of the Effective Date, Assignee Lender (i) is entitled to receive payments of principal and interest in respect of the Obligations without deduction for or on account of any taxes imposed by the United States of America or any political subdivision thereof, (ii) is not subject to capital adequacy or similar requirements under Section 1.16(a) of the

Credit Agreement, (iii) does not require the payment of any increased costs under Section 1.16(b) of the Credit Agreement, and (iv) is not unable to fund LIBOR Loans under Section 1.16(c) of the Credit Agreement, and Assignee Lender will indemnify Agent from and against all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, or expenses that result from Assignee Lender's failure to fulfill its obligations under the terms of Section 1.15(c) of the Credit Agreement or from any other inaccuracy in the foregoing.

3.2 <u>Assignor Lender's Representations, Warranties and Covenants</u>. Assignor Lender hereby represents, warrants and covenants the following to Assignee Lender:

(a)     Assignor Lender is the legal and beneficial owner of the Loans and Commitment assigned hereunder;

(b)     This Agreement is a legal, valid and binding agreement of Assignor Lender, enforceable according to its terms;

(c)     The execution and performance by Assignor Lender of its duties and obligations under this Agreement and the Loan Documents will not require any registration with, notice to or consent or approval by any Governmental Authority;

(d)     Assignor Lender has full power and authority, and has taken all action necessary to execute and deliver this Agreement and to fulfill the obligations hereunder and to consummate the transactions contemplated hereby;

(e)     Assignor Lender is the legal and beneficial owner of the interests being assigned hereby, free and clear of any adverse claim, lien, encumbrance, security interest, restriction on transfer, purchase option, call or similar right of a third party; and

(f)     This Assignment by Assignor Lender to Assignee Lender complies, in all material respects, with the terms of the Loan Documents.

4.     LIMITATIONS OF LIABILITY

Neither Assignor Lender (except as provided in <u>Section 3.2</u>) nor Agent makes any representations or warranties of any kind, nor assumes any responsibility or liability whatsoever, with regard to (a) the Loan Documents or any other document or instrument furnished pursuant thereto or the Loans, Letter of Credit Obligations or other Obligations, (b) the creation, validity, genuineness, enforceability, sufficiency, value or collectability of any of them, (c) the amount, value or existence of the Collateral, (d) the perfection or priority of any Lien upon the Collateral, or (e) the financial condition of any Credit Party or other obligor or the performance or observance by any Credit Party of its obligations under any of the Loan Documents. Neither Assignor Lender nor Agent has or will have any duty, either initially or on a continuing basis, to make any investigation, evaluation, appraisal of, or any responsibility or liability with respect to the accuracy or completeness of, any information provided to Assignee Lender which has been provided to Assignor Lender or Agent by any Credit Party. Nothing in this Agreement or in the Loan Documents shall impose upon the Assignor Lender or Agent any fiduciary relationship in respect of the Assignee Lender.

5. FAILURE TO ENFORCE

No failure or delay on the part of Agent or Assignor Lender in the exercise of any power, right, or privilege hereunder or under any Loan Document will impair such power, right, or privilege or be construed to be a waiver of any default or acquiescence therein. No single or partial exercise of any such power, right, or privilege will preclude further exercise thereof or of any other right, power, or privilege. All rights and remedies existing under this Agreement are cumulative with, and not exclusive of, any rights or remedies otherwise available.

6. NOTICES

Unless otherwise specifically provided herein, any notice or other communication required or permitted to be given will be in writing and addressed to the respective party as set forth below its signature hereunder, or to such other address as the party may designate in writing to the other.

7. AMENDMENTS AND WAIVERS

No amendment, modification, termination, or waiver of any provision of this Agreement will be effective without the written concurrence of Assignor Lender, Agent and Assignee Lender.

8. SEVERABILITY

Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. In the event any provision of this Agreement is or is held to be invalid, illegal, or unenforceable under applicable law, such provision will be ineffective only to the extent of such invalidity, illegality, or unenforceability, without invalidating the remainder of such provision or the remaining provisions of the Agreement. In addition, in the event any provision of or obligation under this Agreement is or is held to be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions or obligations in any other jurisdictions will not in any way be affected or impaired thereby.

9. SECTION TITLES

Section and Subsection titles in this Agreement are included for convenience of reference only, do not constitute a part of this Agreement for any other purpose, and have no substantive effect.

10. SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

11. APPLICABLE LAW

THIS AGREEMENT WILL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE.

## 12. COUNTERPARTS

This Agreement and any amendments, waivers, consents, or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which, when so executed and delivered, will be deemed an original and all of which shall together constitute one and the same instrument.

[remainder of this page intentionally left blank]

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

ASSIGNEE LENDER:                              ASSIGNOR LENDER:

YUCAIPA CORPORATE INITIATIVES
FUND II, LP
                                              
By: _____
Title: _____

Notice Address:
The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069
Attention: Robert P. Bermingham


ACKNOWLEDGED AND CONSENTED TO:

CORTLAND CAPITAL MARKET SERVICES LLC

By: _____
      Authorized Signatory



## PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the LSTA Standard Terms and Conditions for Purchase and Sale Agreement for Distressed Trades published by the LSTA as of August 6, 2010 (the "Standard Terms"). The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement for Distressed Trades governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
|---|---|
| Trade Date: | |
| Agreement Date: | |
| Seller: | |
| Seller MEI: | |
| Buyer: | YUCAIPA CORPORATE INITIATIVES FUND II, LP |
| Buyer MEI: | N/A |
| Credit Agreement: | Credit Agreement, dated as of August 13, 2004 among ICBC Broadcast Holdings, Inc., as Borrower, General Electric Capital Corporation, as Administrative Agent, Goldman Sachs Specialty Lending Group, L.P., as Syndication Agent, GECC Capital Markets Group, Inc. and Goldman Sachs Specialty Lending Group, L.P., as Lead Arrangers, and the Lenders party thereto. |
| Borrower: | ICBC Broadcast Holdings, Inc. |
| Purchase Amount(s): | $4,026,377.57 |
| Tranche(s): | Term Loan |
| REDACTED | |

DOC ID-16852841.8
LSTA EFFECTIVE August 6, 2010      Copyright © LSTA 2010. All rights reserved.

662853v.1 2717/00016



REDACTED

## A.    DEFINITIONS

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means Cortland Capital Market Services LLC (as successor to General Electric Capital Corporation), as Agent under the Credit Agreement.

"Assignment" means an Assignment Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment.

"Bankruptcy Case" select one:
- ☒ not applicable.
- ☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

"Bankruptcy Court" select one:
- ☒ not applicable.
- ☐ means [the United States Bankruptcy Court for the _____District of _____ (and, if appropriate, the United States District Court for that District)].

"Bar Date" select one:
- ☒ not applicable.
- ☐ none has been set.
- ☐ means [specify applicable date, if any].

"Buyer Purchase Price" select one:
- ☒ not applicable.
- ☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
- ☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"Commitments" select one:
- ☒ none.
- ☐ means [identify applicable commitment tranche(s) using Credit Agreement definitions] in the principal amount of $/£/€_____ [in each case specify the aggregate amount of the Loans, the

Unfunded Commitments and the portion, if any, of the Commitments that is irrevocably "frozen" (i.e., that is not subject to future drawing)].

"Covered Prior Seller" select one:
☒ not applicable.
☐ means each Prior Seller that transferred the Loans and Commitments (if any) on or after the Shift Date.

"Filing Date" select one:
☒ not applicable.
☐ means [identify date on which Borrower filed Bankruptcy Case].

"Loans" means Term Loans in the outstanding principal amount of $4,026,377.57.

"Netting Letter" select one:
☒ not applicable.
☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:
☒ not applicable.
☐ means [specify original buyer in the netting arrangement].

"Penultimate Buyer" select one:
☒ not applicable.
☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
☐ means [_____].

"Required Consents" means the consent of the Agent.

"Seller Purchase Price" select one:
☒ not applicable.
☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" means the ███████ transfer or other similar fee payable to the Agent in connection with the Assignment.

"Unfunded Commitments" means that part of the Commitments that has not been funded in the form of loans, advances, letter of credit disbursements or otherwise under the Credit Agreement, which is in the principal amount of $0.00.

662853v.1 2717/00016

**B.**    **SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)**

The following specified terms shall apply to the sections referenced in this Section B:

| | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
| | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (Purchase Price); Netting Arrangements.
    If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

        "(k) [intentionally omitted]."

Section 4.1(r) (Predecessor Transfer Agreements).
    ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.
    ☒ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.
    ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.
    ☐ Not applicable.

Section 4.1(u) (Other Documents).

662853v.1 2717/00016

☒ None.
☐ The following: _____.

Section 4.1(v) (Proof of Claim).
☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
    ☐ the Agent on behalf of the Lenders.
    ☐ Seller or a Prior Seller.
☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.
☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.
☒ Not applicable.

## C.    SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)

**C.1**    Section 5.1(n) (Buyer Status).

    ☐ Buyer is not a Lender.
    ☒ Buyer is a Lender.
    ☐ Buyer is an Affiliate of a Lender.
    ☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

**C.2**    If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

## D.    SECTION 6 (INDEMNIFICATION)

Section 6.1 (Seller's Indemnities); Step-Up Indemnities.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

## E.    SECTION 7 (COSTS AND EXPENSES)

☒ The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to ███████████████████████████████████

☐ The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.
☐ The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☐ The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☐ There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

**F.  SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)**

**F.1**  Section 8.2 (Distributions); Step-Up Distributions Covenant.

(i)  If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

(ii)  If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

**F.2**  Section 8.5 (Wire Instructions).

Buyer's Wire Instructions:

| | |
|---|---|
| BANK: | Union Bank of California |
| | Corporate Deposit Services<br>445 South Figueroa St<br>Los Angeles, CA 90071 |
| ABA # | REDACTED |
| ACCOUNT #: | REDACTED |
| ACCOUNT NAME: | YUCAIPA CORPORATE INITIATIVES FUND II, LP |



**G.  SECTION 9 (NOTICES)**

Buyer's Address for Notices and Delivery:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069
Attention: Robert P. Bermingham
Telephone: (310) REDAC
Facsimile: (310) REDAC
Electronic Mail Address: REDACTED

Seller's Address for Notices and Delivery:



| CREDIT CONTACTS | | |
|---|---|---|
| **Credit Contact:** | ██████████████ | ████████ |
| OPERATIONS | | |
| **Notice Contact:** | ██████████████ | ████████ |

## H.   SECTION 27 (ADDITIONAL PROVISIONS)

Section 4.1(u)(i) of the Standard Terms is hereby deleted in its entirety and replaced with the following provision:

"Seller is not a party to, or bound by, any document or agreement (other than (A) the Credit Documents to which all Lenders are party, or by which all Lenders are bound, which have been made reasonably available to all Lenders and (B) the Predecessor Transfer Agreements) that could materially and adversely affect the Transferred Rights, the Assumed Obligations or Buyer's rights and remedies under this Agreement."

DOC ID-16852841.8
LSTA EFFECTIVE August 6, 2010          Copyright © LSTA 2010.  All rights reserved.

662853v.1 2717/00016

**IN WITNESS WHEREOF,** Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

SELLER



BUYER

YUCAIPA CORPORATE INITIATIVES FUND II, LP

By:
Name: Robert Bermingham
Title: V.P.

**ANNEX TO PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES**

1.      If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements and principal amount, as of the Settlement Date, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.



REDACTED

2.      List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.

      None.

3.      Description of Proof of Claim (if any).

      None.

4.      Description of Adequate Protection Order (if any).

      None.

5.      List any exceptions to Section 4.1(w) (Notice of Impairment).

      None.

6.  The amount of any PIK Interest that accreted to the principal amount of the Loans on or after the Trade Date but on or prior to the Settlement Date is ▮▮▮▮▮▮▮



Yucaipa Corporate Initiatives Fund II, LP
9130 West Sunset Boulevard
Los Angeles, CA 90069

### Re: ICBC Broadcast Holdings, Inc.

Ladies and Gentlemen:

    Reference is made to that certain Purchase and Sale Agreement for Distressed Trades of even date herewith (the "Agreement"; terms not otherwise defined herein are used as defined in the Agreement) between ████████████████████ ("Seller"), and Yucaipa Corporate Initiatives Fund II, LP ("Buyer"). This is the Purchase Price Letter referred to in the Agreement.

    The Purchase Price is calculated as set forth on Schedule 1 hereto. The parties hereto agree that, upon satisfaction of the terms and conditions set forth in the Agreement, the Purchase Price shall be paid in dollars by wire transfer to the account of the Seller as set forth in the Agreement.

*[remainder of page left blank intentionally]*

Please indicate your acceptance of the terms of this letter by signing below as indicated.



Accepted and agreed:

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By: _____
    Name:
    Title

Please indicate your acceptance of the terms of this letter by signing below as indicated.



Accepted and agreed:

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By: _____
Name:    Robert P. Bermingham
Title     Vice President and Secretary

# SCHEDULE 1

*(See attached spreadsheet)*

Seller:
Buyer: Yucaipa Corporate Initiatives Fund II, LP
Funding Date:

Trade Date:
Price:
T+20

Borrower: **ICBC Broadcast**
Facility: Term Loan          Revolving Commitment
Original Global:          $51,385,144.56          $583,572.85  REDACTED
Original Trade Amount:
Pro-rata %:
Current Global:
Current Trade Amount:
Pro-rata %:

| | Paydowns | | Global Amt | Trade Amt | Benefit |
|---|---|---|---|---|---|
| | | | | $          -          - | $          - |

| Cost of Carry: | Accrual Start Date | Accrual End Date | T-20 Purchase Price | Delay Days | LIBOR | Basis | Delay Comp |
|---|---|---|---|---|---|---|---|
| Term Loan | | | | | | | |
| Revolving Commitment | | | | | | | |

| Interest Credit: | Accrual Start Date | Accrual End Date | Face | Delay Days | All-in Rate | Basis | Delay Comp |
|---|---|---|---|---|---|---|---|
| Term Loan | | | | | | | |
| Revolving Commitment | | | | | | | |

Price x Outstanding Loans
Benefit of Paydowns
Interest Credit
Cost of Carry
**Total Purchase Price**

# ASSIGNMENT AGREEMENT

This Assignment Agreement (this "Agreement") is made as of ▮▮▮▮▮▮ by and between ▮▮▮▮▮▮▮▮▮▮▮▮ ("Assignor Lender") and YUCAIPA CORPORATE INITIATIVES FUND II, LP ("Assignee Lender") and acknowledged and consented to by GENERAL ELECTRIC CAPITAL CORPORATION, as agent ("Agent"). All capitalized terms used in this Agreement and not otherwise defined herein will have the respective meanings set forth in the Credit Agreement as hereinafter defined.

## RECITALS:

WHEREAS, ICBC BROADCAST HOLDINGS, INC., a Delaware corporation ("Borrower"), Agent, Assignor Lender and other Persons signatory thereto as Lenders have entered into that certain Credit Agreement dated as of August 13, 2004 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") pursuant to which Assignor Lender has agreed to make certain Loans to, and incur certain Letter of Credit Obligations for, Borrower;

WHEREAS, Assignor Lender desires to assign to Assignee Lender a portion of its interest in the Loans (as described below), the Letter of Credit Obligations and the Collateral and to delegate to Assignee Lender a portion of its Commitments and other duties with respect to such Loans, Letter of Credit Obligations and Collateral;

WHEREAS, Assignee Lender desires to become a Lender under the Credit Agreement and to accept such assignment and delegation from Assignor Lender; and

WHEREAS, Assignee Lender desires to appoint Agent to serve as agent for Assignee Lender under the Credit Agreement;

NOW, THEREFORE, in consideration of the premises and the agreements, provisions, and covenants herein contained, Assignor Lender and Assignee Lender agree as follows:

1. ASSIGNMENT, DELEGATION, AND ACCEPTANCE

1.1 Assignment. Assignor Lender hereby transfers and assigns to Assignee Lender, without recourse and without representations or warranties of any kind (except as set forth in Section 3.2), such percentage of Assignor Lender's right, title, and interest in the Loans, Commitments, the Letter of Credit Obligations, Loan Documents and Collateral as will result in Assignee Lender having as of the Effective Date (as hereinafter defined) a Pro Rata Share thereof, as follows:

| Assignee Lender's Loans | Principal Amount of Loans/Commitments held by all Lenders | Principal Amount of Loans and Commitment assigned by Assignor Lender to Assignee Lender | Pro Rata Share |
|---|---|---|---|
| Revolving Loan |  | $194,172.61 |  |
| Term Loan | | $8,305,546.90 | |

1.2     Delegation.  Assignor Lender hereby irrevocably assigns and delegates to Assignee Lender a portion of its Commitments and its other duties and obligations as a Lender under the Loan Documents equivalent to ▉REDACT▉ of Assignor Lender's Revolving Loan Commitment (such percentage representing a commitment of $194,172.61), and ▉REDACT▉ of Assignor Lender's Term Loan (such percentage representing a loan amount of $8,305,546.90).

1.3     Acceptance by Assignee Lender.  By its execution of this Agreement, Assignee Lender irrevocably purchases, assumes and accepts such assignment and delegation and agrees to be a Lender with respect to the delegated interest under the Loan Documents and to be bound by the terms and conditions thereof.  By its execution of this Agreement, Assignor Lender agrees, to the extent provided herein, to relinquish its rights and be released from its obligations and duties under the Credit Agreement.

1.4     Effective Date.  Such assignment and delegation by Assignor Lender and acceptance by Assignee Lender will be effective and Assignee Lender will become a Lender under the Loan Documents as of the date of this Agreement ("Effective Date") and upon payment of the Payment Amount (as such term is defined below).  Interest and Fees accrued prior to, on and after the Effective Date are for the account of Assignee Lender.

2.  INITIAL PAYMENT AND DELIVERY OF NOTES

2.1     Payment of the Payment Amount.  Assignee Lender will pay to Assignor Lender, in immediately available funds, not later than 11:00 a.m. (New York time) on the Effective Date, an amount equal to the purchase price as set forth in the Purchase Price Letter dated as of ▉▉▉ between the Assignor Lender and the Assignee Lender (the "Payment Amount").

2.2     Reserved.

2.3     Execution and Delivery of Notes.  Following payment of the Payment Amount, and upon Assignee Lender's request, Agent will obtain from Borrower for delivery to Assignee Lender, new executed Notes evidencing Assignee Lender's Pro Rata Share in the Loans after giving effect to the assignment described in Section 1.  Each new Note will be issued in the aggregate maximum principal amount of the Commitment of the Assignee Lender.

## 3. REPRESENTATIONS, WARRANTIES AND COVENANTS

3.1     <u>Assignee Lender's Representations, Warranties and Covenants</u>. Assignee Lender hereby represents, warrants, and covenants the following to Assignor Lender and Agent:

(a)     This Agreement is a legal, valid, and binding agreement of Assignee Lender, enforceable according to its terms;

(b)     The execution and performance by Assignee Lender of its duties and obligations under this Agreement and the Loan Documents will not require any registration with, notice to, or consent or approval by any Governmental Authority;

(c)     Assignee Lender is familiar with transactions of the kind and scope reflected in the Loan Documents and in this Agreement;

(d)     Assignee Lender has made its own independent investigation and appraisal of the financial condition and affairs of each Credit Party, has conducted its own evaluation of the Loans and Letter of Credit Obligations, the Loan Documents and each Credit Party's creditworthiness, has made its decision to become a Lender to Borrower under the Credit Agreement independently and without reliance upon Assignor Lender or Agent, and will continue to do so;

(e)     Assignee Lender is entering into this Agreement in the ordinary course of its business, and is acquiring its interest in the Loans and Letter of Credit Obligations for its own account and not with a view to or for sale in connection with any subsequent distribution; provided, however, that at all times the distribution of Assignee Lender's property shall, subject to the terms of the Credit Agreement, be and remain within its control;

(f)     No future assignment or participation granted by Assignee Lender pursuant to Section 9.1 of the Credit Agreement will require Assignor Lender, Agent, or Borrower to file any registration statement with the Securities and Exchange Commission or to apply to qualify under the blue sky laws of any state;

(g)     Assignee Lender has no loans to, written or oral agreements with, or equity or other ownership interest in any Credit Party;

(h)     Assignee Lender will not enter into any written or oral agreement with, or acquire any equity or other ownership interest in, any Credit Party without the prior written consent of Agent; and

(i)     As of the Effective Date, Assignee Lender (i) is entitled to receive payments of principal and interest in respect of the Obligations without deduction for or on account of any taxes imposed by the United States of America or any political subdivision thereof, (ii) is not subject to capital adequacy or similar requirements under Section 1.16(a) of the Credit Agreement, (iii) does not require the payment of any increased costs under Section 1.16(b) of the Credit Agreement, and (iv) is not unable to fund LIBOR Loans under Section 1.16(c) of the Credit Agreement, and Assignee Lender will indemnify Agent from and against all

liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, or expenses that result from Assignee Lender's failure to fulfill its obligations under the terms of Section 1.15(c) of the Credit Agreement or from any other inaccuracy in the foregoing.

3.2     Assignor Lender's Representations, Warranties and Covenants.  Assignor Lender hereby represents, warrants and covenants the following to Assignee Lender:

(a)     Assignor Lender is the legal and beneficial owner of the Loans and Commitments assigned hereunder;

(b)     This Agreement is a legal, valid and binding agreement of Assignor Lender, enforceable according to its terms;

(c)     The execution and performance by Assignor Lender of its duties and obligations under this Agreement and the Loan Documents will not require any registration with, notice to or consent or approval by any Governmental Authority;

(d)     Assignor Lender has full power and authority, and has taken all action necessary to execute and deliver this Agreement and to fulfill the obligations hereunder and to consummate the transactions contemplated hereby;

(e)     Assignor Lender is the legal and beneficial owner of the interests being assigned hereby, free and clear of any adverse claim, lien, encumbrance, security interest, restriction on transfer, purchase option, call or similar right of a third party; and

(f)     This Assignment by Assignor Lender to Assignee Lender complies, in all material respects, with the terms of the Loan Documents.

4.  LIMITATIONS OF LIABILITY

Neither Assignor Lender (except as provided in Section 3.2) nor Agent makes any representations or warranties of any kind, nor assumes any responsibility or liability whatsoever, with regard to (a) the Loan Documents or any other document or instrument furnished pursuant thereto or the Loans, Letter of Credit Obligations or other Obligations, (b) the creation, validity, genuineness, enforceability, sufficiency, value or collectability of any of them, (c) the amount, value or existence of the Collateral,   (d) the perfection or priority of any Lien upon the Collateral, or (e) the financial condition of any Credit Party or other obligor or the performance or observance by any Credit Party of its obligations under any of the Loan Documents.  Neither Assignor Lender nor Agent has or will have any duty, either initially or on a continuing basis, to make any investigation, evaluation, appraisal of, or any responsibility or liability with respect to the accuracy or completeness of, any information provided to Assignee Lender which has been provided to Assignor Lender or Agent by any Credit Party.  Nothing in this Agreement or in the Loan Documents shall impose upon the Assignor Lender or Agent any fiduciary relationship in respect of the Assignee Lender.

5.  FAILURE TO ENFORCE

No failure or delay on the part of Agent or Assignor Lender in the exercise of any power, right, or privilege hereunder or under any Loan Document will impair such power, right, or privilege or be construed to be a waiver of any default or acquiescence therein. No single or partial exercise of any such power, right, or privilege will preclude further exercise thereof or of any other right, power, or privilege. All rights and remedies existing under this Agreement are cumulative with, and not exclusive of, any rights or remedies otherwise available.

## 6. NOTICES

Unless otherwise specifically provided herein, any notice or other communication required or permitted to be given will be in writing and addressed to the respective party as set forth below its signature hereunder, or to such other address as the party may designate in writing to the other.

## 7. AMENDMENTS AND WAIVERS

No amendment, modification, termination, or waiver of any provision of this Agreement will be effective without the written concurrence of Assignor Lender, Agent and Assignee Lender.

## 8. SEVERABILITY

Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. In the event any provision of this Agreement is or is held to be invalid, illegal, or unenforceable under applicable law, such provision will be ineffective only to the extent of such invalidity, illegality, or unenforceability, without invalidating the remainder of such provision or the remaining provisions of the Agreement. In addition, in the event any provision of or obligation under this Agreement is or is held to be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions or obligations in any other jurisdictions will not in any way be affected or impaired thereby.

## 9. SECTION TITLES

Section and Subsection titles in this Agreement are included for convenience of reference only, do not constitute a part of this Agreement for any other purpose, and have no substantive effect.

## 10. SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

## 11. APPLICABLE LAW

THIS AGREEMENT WILL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE.

## 12. COUNTERPARTS

This Agreement and any amendments, waivers, consents, or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which, when so executed and delivered, will be deemed an original and all of which shall together constitute one and the same instrument.

[remainder of this page intentionally left blank]

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**ASSIGNEE LENDER:**            **ASSIGNOR LENDER:**

YUCAIPA CORPORATE INITIATIVES FUND II, LP

By: _____

Title:   Vice President and Secretary

Notice Address:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069

ACKNOWLEDGED AND CONSENTED TO:

GENERAL ELECTRIC CAPITAL
CORPORATION

By: _____
    Authorized Signatory

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**ASSIGNEE LENDER:**                    **ASSIGNOR LENDER:**

YUCAIPA CORPORATE INITIATIVES FUND II, LP

By: _____
Title: _____

Notice Address:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069

ACKNOWLEDGED AND CONSENTED TO:

GENERAL ELECTRIC CAPITAL
CORPORATION

By: _____
        Authorized Signatory

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**ASSIGNEE LENDER:**                    **ASSIGNOR LENDER:**

YUCAIPA CORPORATE INITIATIVES FUND II,
LP


By: _____
Title: _____


Notice Address:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069



ACKNOWLEDGED AND CONSENTED TO:

GENERAL ELECTRIC CAPITAL
CORPORATION


By: _____
        Authorized Signatory



## PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the LSTA Standard Terms and Conditions for Purchase and Sale Agreement for Distressed Trades published by the LSTA as of August 6, 2010 (the "Standard Terms"). The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement for Distressed Trades governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
|---|---|
| Trade Date: | ███████████████████ |
| Agreement Date: | |
| Seller: | |
| Seller MEI[1]: | |
| Buyer: | Yucaipa Corporate Initiatives Fund II, LP |
| Buyer MEI[2]: | N/A |
| Credit Agreement: | Credit Agreement, dated as of August 13, 2004, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, as borrower, Goldman Sachs Specialty Lending Group, L.P., as syndication agent, General Electric Capital Corporation, as agent, and the other lenders signatory thereto from time to time. |
| Borrower: | ICBC Broadcast Holdings, Inc. |
| Purchase Amount(s): | (i) $8,305,546.90 of Term Loan |
| | (ii) $194,172.61 of Revolving Loan Commitment |
| Tranche(s): | (i) Term Loan |
| | (ii) Revolving Loan Commitment |
| REDACTED ███████████████████████████ | |

---

[1] Insert Markit Entity Identifier for Seller, if available.

[2] Insert Markit Entity Identifier for Buyer, if available.

LSTA EFFECTIVE AUGUST 6, 2010     Copyright © LSTA 2010. All rights reserved.



## A. DEFINITIONS

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means General Electric Capital Corporation, as Agent.

"Assignment" means the Assignment Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment.

"Bankruptcy Case" select one:
☒ not applicable.
☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, in re _____, No. _____].

"Bankruptcy Court" select one:

---

[3] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H. Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[4] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H. Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[5] Specify the Shift Date only if "Yes" is specified opposite "Step-Up Provisions" and if the second box is selected in the definition of Covered Prior Seller. The Shift Date is the date published by the LSTA and is that date determined by the LSTA to be the date on which market convention for transferring the Debt shifted from par documentation to distressed documentation (the "Shift Date"). The Parties shall include the Shift Date published by the LSTA, or, if the Shift Date has not been published by the LSTA, either party may request in writing (a "Shift Date Request") that the LSTA determine whether market convention for transferring the Debt has shifted from par documentation to distressed documentation and, if it so determines, to select and publish the Shift Date. To submit a Shift Date Request, send a request that includes the name of Borrower, the title and date of the Credit Agreement, the deal CUSIP (or facility CUSIP, if appropriate), and name of the administrative agent under the Credit Agreement to the LSTA at lstashiftdates@lsta.org. The Shift Date published by the LSTA shall be binding on the parties.

[6] "Yes" can be elected only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.

☒ not applicable.
☐ means [the United States Bankruptcy Court for the _____ District of _____ (and, if appropriate, the United States District Court for that District)].

"Bar Date" select one:
    ☒ not applicable.
    ☐ none has been set.
    ☐ means [specify applicable date, if any].

"Buyer Purchase Price" select one:
    ☒ not applicable.
    ☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
    ☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"Commitments" select one:
    ☐ none.
    ☒ means Revolving Loan Commitment in the principal amount of $194,172.61, all of which is fully funded in the form of Revolving Loans.

"Covered Prior Seller" select one:
    ☒ not applicable.
    ☐ means each Prior Seller that transferred the Loans and Commitments (if any)[7] on or after the Shift Date [but prior to the transfer pursuant to which _____[8] transferred such Loans and Commitments (if any) on a distressed documentation basis pursuant to the Purchase and Sale Agreement for Distressed Trades dated as of _____, as set forth in the Annex].[9]

"Filing Date" select one:
    ☒ not applicable.
    ☐ means [identify date on which Borrower filed Bankruptcy Case].

"Loans" means (i) Revolving Loans in the outstanding principal amount of $194,172.61 and (ii) Term Loans in the outstanding principal amount of $8,305,546.90.

"Netting Letter" select one:
    ☒ not applicable.
    ☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:
    ☒ not applicable.
    ☐ means [specify original buyer in the netting arrangement].

---

[7] If applicable to only a portion of the Loans and Commitments (if any), specify the portion that applies, _e.g.,_ "each Prior Seller that transferred the [Name of applicable Covered Prior Seller] Loans (as defined in Section 1 of the Annex)."

[8] Specify the first Entity that transferred the Loans and Commitments (if any) on a distressed documentation basis on or after the Shift Date.

[9] The bracketed language applies where the relevant Predecessor Transfer Documents include a distressed trade that settled after the par/near par trade which settled on or after the Shift Date.

"Penultimate Buyer" select one:
☒ not applicable.
☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
☐ means [_____].

"Required Consents" means the consent of the Agent.

"Seller Purchase Price" select one:
☒ not applicable.
☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" means the ▉▉▉ transfer or other similar fee payable to the Agent in connection with the Assignment.

"Unfunded Commitments" means that part of the Commitments that has not been funded in the form of loans, advances, letter of credit disbursements or otherwise under the Credit Agreement, which is in the principal amount of $0.

B.     **SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)**

The following specified terms shall apply to the sections referenced in this Section B:

| | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
| | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (Purchase Price); Netting Arrangements.
   If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

   "(k) [intentionally omitted]."[10]

Section 4.1(r) (Predecessor Transfer Agreements).
   ☒ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.
   ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.
   ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.
   ☐ Not applicable.

Section 4.1(u) (Other Documents).
   ☒ None.
   ☐ The following: _____.

Section 4.1(v) (Proof of Claim).
   ☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
         ☐ the Agent on behalf of the Lenders.
         ☐ Seller or a Prior Seller.
   ☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.
   ☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.
   ☒ Not applicable.

**C.     SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)**

**C.1**   Section 5.1(n) (Buyer Status).

   ☒ Buyer is not a Lender.
   ☐ Buyer is a Lender.
   ☐ Buyer is an Affiliate [substitute Credit Agreement defined term if different] (as defined in the Credit Agreement) of a Lender.
   ☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

**C.2**   If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

**D.     SECTION 6 (INDEMNIFICATION)**

Section 6.1 (Seller's Indemnities); Step-Up Indemnities.

   (i)     If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

---

[10] Seller should add, and Buyer should cause Original Buyer or Penultimate Buyer, as applicable, to add, a comparable representation to the Netting Letter in lieu of this representation.

(ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

**E.    SECTION 7 (COSTS AND EXPENSES)**

☐  The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to
    ☐  one-half thereof.
    ☐  other relevant fraction or percentage, _____, thereof.
☐  The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
    ☐  one-half thereof.
    ☐  other relevant fraction or percentage, _____, thereof.
☐  The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☒  The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☐  There is no Transfer Fee and,  accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

**F.    SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)**

**F.1**    Section 8.2 (Distributions); Step-Up Distributions Covenant.

(i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

(ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

**F.2**    Section 8.5 (Wire Instructions).

Buyer's Wire Instructions:

BANK:                Union Bank of California
                       Corporate Deposit Services
                       445 South Figueroa St
                       Los Angeles, CA  90071
ABA #               REDACT
ACCOUNT #:        REDACTE
ACCOUNT NAME:    YUCAIPA CORPORATE INITIATIVES FUND II, LP
REFERENCE:

Seller's Wire Instructions:

████████████████

**G.**     **SECTION 9 (NOTICES)**

<u>Buyer's Address for Notices and Delivery</u>:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069
Attention: Robert P. Bermingham
Telephone: (310) REDAC
Facsimile: (310) REDAC
Electronic Mail Address: REDACTED

<u>Seller's Address for Notices and Delivery</u>:



**H.**     **SECTION 27 (ADDITIONAL PROVISIONS)**

1. Seller and Buyer agree that the following representation shall be added to the Standard Terms as Section 4.1(x) thereof:

"As indicated by the Agent to the Seller, there is at least REDACTE of interest that has accrued, but not been paid, in respect of the Loans and Commitment as of REDACTED

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**



**BUYER**

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By:_____
    Name:
    Title:

**IN WITNESS WHEREOF,** Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**



**BUYER**

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By: _____

    Name:    Robert P. Bermingham
    Title:     Vice President and Secretary

**ANNEX TO PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES[1]**

1.    If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements[2] and principal amount, as of the Settlement Date, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.



2.    List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.[3]

Credit Agreement, dated as of August 13, 2004, among ICBC Broadcast Holdings, Inc., as Borrower, the other Credit Parties signatory thereto from time to time, as Credit Parties, the Lenders party thereto from time to time, as Lenders, and General Electric Capital Corporation, as Administrative Agent, Goldman Sachs Specialty Lending Group, L.P., as Syndication Agent, GECC Capital Markets Group, Inc. and Goldman Sachs Specialty Lending Group, L.P., as Lead Arrangers.

The First Amendment to the Credit Agreement, dated as of September 27, 2004, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

The Second Amendment to the Credit Agreement, dated as of November 11, 2004, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

The Third Amendment to the Credit Agreement, dated as of May 5, 2005, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

---

[1] For purposes of Sections 1 through 6 in this Annex, terms such as "none", "not applicable", "n/a", "irrelevant" and "zero" should be given the same meaning.

[2] List (i) any Predecessor Transfer Agreement to which Seller is a party, (ii) any Predecessor Transfer Agreement of Prior Sellers relating to distressed loans delivered to Seller by Immediate Prior Seller and (iii) any Predecessor Transfer Agreement of Prior Sellers relating to par loans listed in any Predecessor Transfer Agreement described in the preceding clause (ii).

[3] If not applicable, so state.

The Fourth Amendment to the Credit Agreement, dated as of October 20, 2006, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

The Fifth Amendment to the Credit Agreement, dated as of June 22, 2007, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

Waiver Letter Agreement, dated as of November 15, 2007, between the Borrower, the other Credit Parties signatory thereto, the Agent, and the lenders signatory thereto.

Waiver Letter Agreement, dated as of April 10, 2008, between the Borrower, the other Credit Parties signatory thereto, the Agent, and the lenders signatory thereto.

3. Description of Proof of Claim (if any).[4]

   N/A

4. Description of Adequate Protection Order (if any).[5]

   N/A

5. List any exceptions to Section 4.1(w) (Notice of Impairment).[6] None.

6. The amount of any PIK Interest that accreted to the principal amount of the Loans on or after the Trade Date but on or prior to the Settlement Date is $0.00[7]

---

[4] May apply only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary. If not applicable, so state. If applicable, note that according to the Standard Terms, failure to state is not failure to convey rights or obligations with respect thereto.

[5] May apply only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary. If not applicable, so state. If applicable, note that according to the Standard Terms, failure to state is not failure to convey rights or obligations with respect thereto.

[6] If none, so state.

[7] In addition to the terms listed in footnote 1 of this Annex, amounts listed as 0 or 0.00, with or without a currency sign, should be given the same meaning.

**Yucaipa Corporate Initiatives Fund II, LP**
The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069



*Re:*     *ICBC Broadcast Holdings, Inc.*

Ladies and Gentlemen:

Reference is made to the Purchase and Sale Agreement, dated as of the date hereof (the "Agreement"), between ▇▇▇▇▇▇▇▇ ("Seller") and Yucaipa Corporate Initiatives Fund II, LP ("Buyer"), pursuant to which Buyer is purchasing from Seller the Transferred Rights. Capitalized terms used herein, but not otherwise defined herein, shall have the meanings ascribed to such terms in the Agreement.

This letter is the Purchase Price Letter referred to in the Agreement. In accordance with the terms of the Agreement, Buyer shall pay to Seller the Purchase Price by wire transfer of immediately available funds to Seller's wire instructions set forth in the Agreement.

The Purchase Price for the Transferred Rights is set forth on Schedule A hereto.

Please evidence your agreement to the foregoing by executing and returning a copy of this letter.

Sincerely,

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By:_____

    Name:    Robert P. Bermingham

    Title:    Vice President and Secretary

Please evidence your agreement to the foregoing by executing and returning a copy of this letter.

Sincerely,

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By:_____
    Name:
    Title:



## **SCHEDULE A**

*See attached spreadsheet*

DISTRESSED FUNDING MEMORANDUM

Seller:
Buyer: Yucaipa Corporate Initiatives Fund II, LP
Funding Date:

Trade Date:
Price: T+20

Borrower: ICBC Broadcast

| Facility: | Term Loan | Revolving Commitment | Paydowns | Date | Global Amt | Trade Amt | Benefit |
|---|---|---|---|---|---|---|---|
| Original Global: | REDACT | | | | | $ - | $ - |
| Original Trade Amount: | $8,305,546.90 | $194,172.61 | | | | | |
| Pro-rata %: | REDACT | REDACT | | | | | |
| Current Global: | REDACT | | | | | | |
| Current Trade Amount: | $8,305,546.90 | $194,172.61 | | | | | |
| Pro-rata %: | REDACT | REDACT | | | | | |

| Cost of Carry: | Accrual Start Date | Accrual End Date | T+20 Purchase Price | Delay Days | LIBOR | Basis | Delay Comp |
|---|---|---|---|---|---|---|---|
| Term Loan | | | | | | | |
| Revolving Commitment | | | | | | | |

| Interest: | Accrual Start Date | Accrual End Date | Face | Days | All-in Rate | Basis | Delay Comp |
|---|---|---|---|---|---|---|---|
| Term Loan | | | | | | | |
| Revolver Commitment | | | | | | | |

| | |
|---|---|
| Price x Outstanding Loans | $ |
| Benefit of Paydowns | |
| Interest | |
| Cost of Carry | |
| Total Purchase Price | $ |

| Assignee Lender's Loans | Principal Amount of Loans/Commitments held by all Lenders | Principal Amount of Loans and Commitment assigned by Assignor Lender to Assignee Lender | Pro Rata Share |
|---|---|---|---|
| Term Loan | REDACTED | $10,866,018.65 | REDACTED |

1.2     Delegation.  Assignor Lender hereby irrevocably assigns and delegates to Assignee Lender a portion of its Commitments and its other duties and obligations as a Lender under the Loan Documents equivalent to REDACT of Assignor Lender's Term Loan (such percentage representing a loan amount of $10,866,018.65).

1.3     Acceptance by Assignee Lender.  By its execution of this Agreement, Assignee Lender irrevocably purchases, assumes and accepts such assignment and delegation and agrees to be a Lender with respect to the delegated interest under the Loan Documents and to be bound by the terms and conditions thereof.  By its execution of this Agreement, Assignor Lender agrees, to the extent provided herein, to relinquish its rights and be released from its obligations and duties under the Credit Agreement.

1.4     Effective Date.  Such assignment and delegation by Assignor Lender and acceptance by Assignee Lender will be effective and Assignee Lender will become a Lender under the Loan Documents as of the date of this Agreement ("Effective Date") and upon payment of the Payment Amount (as such term is defined below).  Interest and Fees accrued prior to, on and after the Effective Date are for the account of Assignee Lender.

## 2.   INITIAL PAYMENT AND DELIVERY OF NOTES

2.1     Payment of the Payment Amount.  Assignee Lender will pay to Assignor Lender, in immediately available funds, not later than 11:00 a.m. (New York time) on the Effective Date, an amount equal to the purchase price as set forth in the Purchase Price Letter dated as of ██████ between the Assignor Lender and the Assignee Lender (the "Payment Amount").

2.2     Reserved.

2.3     Execution and Delivery of Notes.  Following payment of the Payment Amount, and upon Assignee Lender's request, Agent will obtain from Borrower for delivery to Assignee Lender, new executed Notes evidencing Assignee Lender's Pro Rata Share in the Loans after giving effect to the assignment described in Section 1.  Each new Note will be issued in the aggregate maximum principal amount of the Commitment of the Assignee Lender.

## 3.   REPRESENTATIONS, WARRANTIES AND COVENANTS

3.1    Assignee Lender's Representations, Warranties and Covenants.  Assignee Lender hereby represents, warrants, and covenants the following to Assignor Lender and Agent:

(a)    This Agreement is a legal, valid, and binding agreement of Assignee Lender, enforceable according to its terms;

(b)    The execution and performance by Assignee Lender of its duties and obligations under this Agreement and the Loan Documents will not require any registration with, notice to, or consent or approval by any Governmental Authority;

(c)    Assignee Lender is familiar with transactions of the kind and scope reflected in the Loan Documents and in this Agreement;

(d)    Assignee Lender has made its own independent investigation and appraisal of the financial condition and affairs of each Credit Party, has conducted its own evaluation of the Loans and Letter of Credit Obligations, the Loan Documents and each Credit Party's creditworthiness, has made its decision to become a Lender to Borrower under the Credit Agreement independently and without reliance upon Assignor Lender or Agent, and will continue to do so;

(e)    Assignee Lender is entering into this Agreement in the ordinary course of its business, and is acquiring its interest in the Loans and Letter of Credit Obligations for its own account and not with a view to or for sale in connection with any subsequent distribution; provided, however, that at all times the distribution of Assignee Lender's property shall, subject to the terms of the Credit Agreement, be and remain within its control;

(f)    No future assignment or participation granted by Assignee Lender pursuant to Section 9.1 of the Credit Agreement will require Assignor Lender, Agent, or Borrower to file any registration statement with the Securities and Exchange Commission or to apply to qualify under the blue sky laws of any state;

(g)    Assignee Lender has no loans to, written or oral agreements with, or equity or other ownership interest in any Credit Party;

(h)    Assignee Lender will not enter into any written or oral agreement with, or acquire any equity or other ownership interest in, any Credit Party without the prior written consent of Agent; and

(i)    As of the Effective Date, Assignee Lender (i) is entitled to receive payments of principal and interest in respect of the Obligations without deduction for or on account of any taxes imposed by the United States of America or any political subdivision thereof, (ii) is not subject to capital adequacy or similar requirements under Section 1.16(a) of the Credit Agreement, (iii) does not require the payment of any increased costs under Section 1.16(b) of the Credit Agreement, and (iv) is not unable to fund LIBOR Loans under Section 1.16(c) of the Credit Agreement, and Assignee Lender will indemnify Agent from and against all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, or expenses

that result from Assignee Lender's failure to fulfill its obligations under the terms of Section 1.15(c) of the Credit Agreement or from any other inaccuracy in the foregoing.

3.2     <u>Assignor Lender's Representations, Warranties and Covenants</u>.  Assignor Lender hereby represents, warrants and covenants the following to Assignee Lender:

(a)     Assignor Lender is the legal and beneficial owner of the Loans and Commitments assigned hereunder;

(b)     This Agreement is a legal, valid and binding agreement of Assignor Lender, enforceable according to its terms;

(c)     The execution and performance by Assignor Lender of its duties and obligations under this Agreement and the Loan Documents will not require any registration with, notice to or consent or approval by any Governmental Authority;

(d)     Assignor Lender has full power and authority, and has taken all action necessary to execute and deliver this Agreement and to fulfill the obligations hereunder and to consummate the transactions contemplated hereby;

(e)     Assignor Lender is the legal and beneficial owner of the interests being assigned hereby, free and clear of any adverse claim, lien, encumbrance, security interest, restriction on transfer, purchase option, call or similar right of a third party; and

(f)     This Assignment by Assignor Lender to Assignee Lender complies, in all material respects, with the terms of the Loan Documents.

4.   LIMITATIONS OF LIABILITY

Neither Assignor Lender (except as provided in <u>Section 3.2</u>) nor Agent makes any representations or warranties of any kind, nor assumes any responsibility or liability whatsoever, with regard to (a) the Loan Documents or any other document or instrument furnished pursuant thereto or the Loans, Letter of Credit Obligations or other Obligations, (b) the creation, validity, genuineness, enforceability, sufficiency, value or collectability of any of them, (c) the amount, value or existence of the Collateral,  (d) the perfection or priority of any Lien upon the Collateral, or (e) the financial condition of any Credit Party or other obligor or the performance or observance by any Credit Party of its obligations under any of the Loan Documents.  Neither Assignor Lender nor Agent has or will have any duty, either initially or on a continuing basis, to make any investigation, evaluation, appraisal of, or any responsibility or liability with respect to the accuracy or completeness of, any information provided to Assignee Lender which has been provided to Assignor Lender or Agent by any Credit Party.  Nothing in this Agreement or in the Loan Documents shall impose upon the Assignor Lender or Agent any fiduciary relationship in respect of the Assignee Lender.

5.   FAILURE TO ENFORCE

No failure or delay on the part of Agent or Assignor Lender in the exercise of any power, right, or privilege hereunder or under any Loan Document will impair such power, right, or privilege or be construed to be a waiver of any default or acquiescence therein. No single or partial exercise of any such power, right, or privilege will preclude further exercise thereof or of any other right, power, or privilege. All rights and remedies existing under this Agreement are cumulative with, and not exclusive of, any rights or remedies otherwise available.

6. NOTICES

Unless otherwise specifically provided herein, any notice or other communication required or permitted to be given will be in writing and addressed to the respective party as set forth below its signature hereunder, or to such other address as the party may designate in writing to the other.

7. AMENDMENTS AND WAIVERS

No amendment, modification, termination, or waiver of any provision of this Agreement will be effective without the written concurrence of Assignor Lender, Agent and Assignee Lender.

8. SEVERABILITY

Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. In the event any provision of this Agreement is or is held to be invalid, illegal, or unenforceable under applicable law, such provision will be ineffective only to the extent of such invalidity, illegality, or unenforceability, without invalidating the remainder of such provision or the remaining provisions of the Agreement. In addition, in the event any provision of or obligation under this Agreement is or is held to be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions or obligations in any other jurisdictions will not in any way be affected or impaired thereby.

9. SECTION TITLES

Section and Subsection titles in this Agreement are included for convenience of reference only, do not constitute a part of this Agreement for any other purpose, and have no substantive effect.

10. SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

11. APPLICABLE LAW

THIS AGREEMENT WILL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE.

## 12. COUNTERPARTS

This Agreement and any amendments, waivers, consents, or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which, when so executed and delivered, will be deemed an original and all of which shall together constitute one and the same instrument.

[remainder of this page intentionally left blank]

NYC:228171.1

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**ASSIGNEE LENDER:**

YUCAIPA CORPORATE INITIATIVES FUND II, LP

By:
Title: Vice President and Secretary

Notice Address:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069

**ASSIGNOR LENDER:**

ACKNOWLEDGED AND CONSENTED TO:

GENERAL ELECTRIC CAPITAL
CORPORATION

By:
    Authorized Signatory

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date
first written above.

**ASSIGNEE LENDER:**

YUCAIPA CORPORATE INITIATIVES FUND II,
LP

By: _____
Title: _____

Notice Address:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069

ACKNOWLEDGED AND CONSENTED TO:

GENERAL ELECTRIC CAPITAL
CORPORATION

By: _____
        Authorized Signatory

NYC:225171.1

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**ASSIGNEE LENDER:**                    **ASSIGNOR LENDER:**

YUCAIPA CORPORATE INITIATIVES FUND II, LP



By: _____

Title: _____

Notice Address:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069

ACKNOWLEDGED AND CONSENTED TO:

GENERAL ELECTRIC CAPITAL
CORPORATION

By:  _____
     Authorized Signatory



# PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES

## TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the LSTA Standard Terms and Conditions for Purchase and Sale Agreement for Distressed Trades published by the LSTA as of August 6, 2010 (the "Standard Terms"). The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement for Distressed Trades governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
|---|---|
| Trade Date: | ██████ |
| Agreement Date: | ██████ |
| Seller: | ████████ |
| Seller MEI[1]: | ██ |
| Buyer: | Yucaipa Corporate Initiatives Fund II, LP |
| Buyer MEI[2]: | N/A |
| Credit Agreement: | Credit Agreement, dated as of August 13, 2004, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, as borrower, Goldman Sachs Specialty Lending Group, L.P., as syndication agent, General Electric Capital Corporation, as agent, and the other lenders signatory thereto from time to time. |
| Borrower: | ICBC Broadcast Holdings, Inc. |
| Purchase Amount(s): | $10,866,018.65 |
| Tranche(s): | ██████ |
| REDACTED | RE |
| ██████████ | ☐ REDACTED |
| | ☒ ████████ |
| Type of Assignment: | ██████████ |
| REDACTED | ██ ☐   ██ ☒ |
| ████████ | ██ ☒   ██ ☐ |
| ████████ | ██ ☐   ██ ☒ |

[1] Insert Markit Entity Identifier for Seller, if available.

[2] Insert Markit Entity Identifier for Buyer, if available.

   Copyright © LSTA 2010. All rights reserved.



## A.    <u>DEFINITIONS</u>

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"<u>Agent</u>" means General Electric Capital Corporation, as Agent.

"<u>Assignment</u>" means the Assignment Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment.

"<u>Bankruptcy Case</u>" select one:
- ☒ not applicable.
- ☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

"<u>Bankruptcy Court</u>" select one:
- ☒ not applicable.
- ☐ means [the United States Bankruptcy Court for the _____ District of _____ (and, if appropriate, the United States District Court for that District)].

---

[3] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H. Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[4] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H. Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[5] Specify the Shift Date only if "Yes" is specified opposite "Step-Up Provisions" and if the second box is selected in the definition of Covered Prior Seller. The Shift Date is the date published by the LSTA and is that date determined by the LSTA to be the date on which market convention for transferring the Debt shifted from par documentation to distressed documentation (the "<u>Shift Date</u>"). The Parties shall include the Shift Date published by the LSTA, or, if the Shift Date has not been published by the LSTA, either party may request in writing (a "<u>Shift Date Request</u>") that the LSTA determine whether market convention for transferring the Debt has shifted from par documentation to distressed documentation and, if it so determines, to select and publish the Shift Date. To submit a Shift Date Request, send a request that includes the name of Borrower, the title and date of the Credit Agreement, the deal CUSIP (or facility CUSIP, if appropriate), and name of the administrative agent under the Credit Agreement to the LSTA at lstashiftdates@lsta.org. The Shift Date published by the LSTA shall be binding on the parties.

[6] "Yes" can be elected only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.

"Bar Date" select one:
- ☒ not applicable.
- ☐ none has been set.
- ☐ means [specify applicable date, if any].

"Buyer Purchase Price" select one:
- ☒ not applicable.
- ☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
- ☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"Commitments" select one:
- ☒ none.
- ☐ means [identify applicable commitment tranche(s) using Credit Agreement definitions] in the principal amount of $/£/€_____ [in each case specify the aggregate amount of the Loans, the Unfunded Commitments and the portion, if any, of the Commitments that is irrevocably "frozen" (i.e., that is not subject to future drawing)].

"Covered Prior Seller" select one:
- ☒ not applicable.
- ☐ means each Prior Seller that transferred the Loans and Commitments (if any)[7] on or after the Shift Date [but prior to the transfer pursuant to which _____[8] transferred such Loans and Commitments (if any) on a distressed documentation basis pursuant to the Purchase and Sale Agreement for Distressed Trades dated as of _____, as set forth in the Annex].[9]

"Filing Date" select one:
- ☒ not applicable.
- ☐ means [identify date on which Borrower filed Bankruptcy Case].

"Loans" means Term Loans in the outstanding principal amount of $10,866,018.65.

"Netting Letter" select one:
- ☒ not applicable.
- ☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:
- ☒ not applicable.
- ☐ means [specify original buyer in the netting arrangement].

"Penultimate Buyer" select one:
- ☒ not applicable.
- ☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).

---

[7] If applicable to only a portion of the Loans and Commitments (if any), specify the portion that applies, e.g., "each Prior Seller that transferred the [Name of applicable Covered Prior Seller] Loans (as defined in Section 1 of the Annex)."

[8] Specify the first Entity that transferred the Loans and Commitments (if any) on a distressed documentation basis on or after the Shift Date.

[9] The bracketed language applies where the relevant Predecessor Transfer Documents include a distressed trade that settled after the par/near par trade which settled on or after the Shift Date.

☐ means [_____].

"Required Consents" means the consent of the Agent.

"Seller Purchase Price" select one:
☒ not applicable.
☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" means the ▓▓▓▓ transfer or other similar fee payable to the Agent in connection with the Assignment.

"Unfunded Commitments" means that part of the Commitments that has not been funded in the form of loans, advances, letter of credit disbursements or otherwise under the Credit Agreement, which is in the principal amount of $0.

## B.  SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)

The following specified terms shall apply to the sections referenced in this Section B:

| | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
| | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (Purchase Price); Netting Arrangements.

If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

"(k) [intentionally omitted]."[10]

Section 4.1(r) (Predecessor Transfer Agreements).

☒ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.

☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.

☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.

☐ Not applicable.

Section 4.1(u) (Other Documents).

☒ None.

☐ The following: _____.

Section 4.1(v) (Proof of Claim).

☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by

    ☐ the Agent on behalf of the Lenders.

    ☐ Seller or a Prior Seller.

☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.

☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.

☒ Not applicable.

## C.     SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)

**C.1**     Section 5.1(n) (Buyer Status).

☒ Buyer is not a Lender.

☐ Buyer is a Lender.

☐ Buyer is an Affiliate [substitute Credit Agreement defined term if different] (as defined in the Credit Agreement) of a Lender.

☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

**C.2**     If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

## D.     SECTION 6 (INDEMNIFICATION)

Section 6.1 (Seller's Indemnities); Step-Up Indemnities.

(i)     If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

---

[10] Seller should add, and Buyer should cause Original Buyer or Penultimate Buyer, as applicable, to add, a comparable representation to the Netting Letter in lieu of this representation.

(ii)     If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

**E.**    <u>**SECTION 7 (COSTS AND EXPENSES)**</u>

☐  The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to
       ☐  one-half thereof.
       ☐  other relevant fraction or percentage, _____, thereof.
☐  The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
       ☐  one-half thereof.
       ☐  other relevant fraction or percentage, _____, thereof.
☐  The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☒  The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☐  There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

**F.**    <u>**SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)**</u>

**F.1**    Section 8.2 (<u>Distributions</u>); <u>Step-Up Distributions Covenant</u>.

    (i)     If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

    (ii)     If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

**F.2**    Section 8.5 (<u>Wire Instructions</u>).

<u>Buyer's Wire Instructions:</u>

| | |
|---|---|
| BANK: | Union Bank of California |
| | Corporate Deposit Services |
| | 445 South Figueroa St |
| | Los Angeles, CA 90071 |
| ABA # | REDACT |
| ACCOUNT #: | REDACTE |
| ACCOUNT NAME: | YUCAIPA CORPORATE INITIATIVES FUND II, LP |
| REFERENCE: | ▮▮▮▮▮▮▮▮▮▮ |

<u>Seller's Wire Instructions:</u>

G.    **SECTION 9 (NOTICES)**

Buyer's Address for Notices and Delivery:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069
Attention: Robert P. Bermingham
Telephone: (310) REDAC
Facsimile: (310) REDAC
Electronic Mail Address:   REDACTED

Seller's Address for Notices and Delivery:



H.    **SECTION 27 (ADDITIONAL PROVISIONS)**

1. Seller and Buyer agree that the following representation shall be added to the Standard Terms as Section 4.1(x) thereof:

"As indicated by the Agent to the Seller, there is at least REDACTER of interest that has accrued, but not been paid, in respect of the Loans and Commitment as of REDACTED

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**



**BUYER**

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By:_____
    Name:
    Title:

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**



**BUYER**

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By: _____

Name:   Robert P. Bermingham

Title:   Vice President and Secretary

# ANNEX TO PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES[1]

1. If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements[2] and principal amount, as of the Settlement Date, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.

Assignment Agreement, dated as of ███REDACTED██████ by and among ██████████████ as assignor, ██████████████ as assignee, and the Agent, relating to par/near par loans.

2. List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.[3]

Credit Agreement, dated as of August 13, 2004, among ICBC Broadcast Holdings, Inc., as Borrower, the other Credit Parties signatory thereto from time to time, as Credit Parties, the Lenders party thereto from time to time, as Lenders, and General Electric Capital Corporation, as Administrative Agent, Goldman Sachs Specialty Lending Group, L.P., as Syndication Agent, GECC Capital Markets Group, Inc. and Goldman Sachs Specialty Lending Group, L.P., as Lead Arrangers.

The First Amendment to the Credit Agreement, dated as of September 27, 2004, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

The Second Amendment to the Credit Agreement, dated as of November 11, 2004, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

The Third Amendment to the Credit Agreement, dated as of May 5, 2005, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

The Fourth Amendment to the Credit Agreement, dated as of October 20, 2006, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

The Fifth Amendment to the Credit Agreement, dated as of June 22, 2007, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory

---

[1] For purposes of Sections 1 through 6 in this Annex, terms such as "none", "not applicable", "n/a", "irrelevant" and "zero" should be given the same meaning.

[2] List (i) any Predecessor Transfer Agreement to which Seller is a party, (ii) any Predecessor Transfer Agreement of Prior Sellers relating to distressed loans delivered to Seller by Immediate Prior Seller and (iii) any Predecessor Transfer Agreement of Prior Sellers relating to par loans listed in any Predecessor Transfer Agreement described in the preceding clause (ii).

[3] If not applicable, so state.

thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

Waiver Letter Agreement, dated as of November 15, 2007, between the Borrower, the other Credit Parties signatory thereto, the Agent, and the lenders signatory thereto.

Waiver Letter Agreement, dated as of April 10, 2008, between the Borrower, the other Credit Parties signatory thereto, the Agent, and the lenders signatory thereto.

3.     Description of Proof of Claim (if any).[4]

       N/A

4.     Description of Adequate Protection Order (if any).[5]

       N/A

5.     List any exceptions to Section 4.1(w) (<u>Notice of Impairment</u>).[6] None.

6.     The amount of any PIK Interest that accreted to the principal amount of the Loans on or after the Trade Date but on or prior to the Settlement Date is ████████

---

[4] May apply only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary. If not applicable, so state. If applicable, note that according to the Standard Terms, failure to state is not failure to convey rights or obligations with respect thereto.

[5] May apply only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary. If not applicable, so state. If applicable, note that according to the Standard Terms, failure to state is not failure to convey rights or obligations with respect thereto.

[6] If none, so state.

[7] In addition to the terms listed in footnote 1 of this Annex, amounts listed as 0 or 0.00, with or without a currency sign, should be given the same meaning.

# Yucaipa Corporate Initiatives Fund II, LP
The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069





*Re:    ICBC Broadcast Holdings, Inc.*

Ladies and Gentlemen:

Reference is made to the Purchase and Sale Agreement, dated as of the date hereof (the "Agreement"), between ████████ ("Seller") and Yucaipa Corporate Initiatives Fund II, LP ("Buyer"), pursuant to which Buyer is purchasing from Seller the Transferred Rights. Capitalized terms used herein, but not otherwise defined herein, shall have the meanings ascribed to such terms in the Agreement.

This letter is the Purchase Price Letter referred to in the Agreement. In accordance with the terms of the Agreement, Buyer shall pay to Seller the Purchase Price by wire transfer of immediately available funds to Seller's wire instructions set forth in the Agreement.

The Purchase Price for the Transferred Rights is set forth on Schedule A hereto.

Please evidence your agreement to the foregoing by executing and returning a copy of this letter.

Sincerely,

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**



By: _____

Name: Robert P. Bermingham
Title: Vice President and Secretary

Accepted and Agreed to:

Please evidence your agreement to the foregoing by executing and returning a copy of this letter.

Sincerely,

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By:_____
     Name:
     Title:

Accepted and Agreed to:



# SCHEDULE A

*See attached spreadsheet*

Seller: ▓▓▓
Buyer: Yucaipa Corporate Initiatives Fund II, LP
Funding Date: ▓▓▓

Trade Date: ▓▓▓
Price: T+20

Borrower: **ICBC Broadcast**

| | Paydowns | Date | Global Amt | Trade Amt | Benefit |
|---|---|---|---|---|---|
| Facility: | Term Loan | | | $ - | $ - |
| | Term Loan | | | | |
| Original Global: | REDACTED | | | | |
| Original Trade Amount: | $10,868,018.65 | | | | |
| Pro-rata %: | REDACTED | | | | |
| Current Global: | REDACTED | | | | |
| Current Trade Amount: | REDACTED | | | | |
| Pro-rata %: | REDACTED | | | | |

Cost of Carry:

| | Accrual Start Date | Accrual End Date | T-20 Purchase Price | Delay Days | LIBOR | Basis | Delay Comp |
|---|---|---|---|---|---|---|---|
| Term Loan | ▓▓ | | | | | ▓▓ | ▓▓ |

Interest Credit:

| | Accrual Start Date | Accrual End Date | Face | Delay Days | All-in Rate | Basis | Delay Comp |
|---|---|---|---|---|---|---|---|
| Term Loan | | | | | ▓▓ | ▓▓ | ▓▓ |

| | |
|---|---|
| Price x Outstanding Loans | $ ▓▓ |
| Benefit of Paydowns | $0.00 |
| Interest Credit | $0.00 |
| Cost of Carry | $0.00 |
| Assignment Fee Waived | ▓▓ |
| **Total Purchase Price** | $ ▓▓ |

# ASSIGNMENT AGREEMENT

This Assignment Agreement (this "Agreement") is made as of ▮▮▮▮▮▮▮▮ by and between ▮▮▮▮▮▮▮▮▮▮▮ ("Assignor Lender") and YUCAIPA CORPORATE INITIATIVES FUND II, LP ("Assignee Lender") and acknowledged and consented to by GENERAL ELECTRIC CAPITAL CORPORATION, as agent ("Agent"). All capitalized terms used in this Agreement and not otherwise defined herein will have the respective meanings set forth in the Credit Agreement as hereinafter defined.

## RECITALS:

WHEREAS, ICBC BROADCAST HOLDINGS, INC., a Delaware corporation ("Borrower"), Agent, Assignor Lender and other Persons signatory thereto as Lenders have entered into that certain Credit Agreement dated as of August 13, 2004 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") pursuant to which Assignor Lender has agreed to make certain Loans to, and incur certain Letter of Credit Obligations for, Borrower;

WHEREAS, Assignor Lender desires to assign to Assignee Lender a portion of its interest in the Loans (as described below), the Letter of Credit Obligations and the Collateral and to delegate to Assignee Lender a portion of its Commitments and other duties with respect to such Loans, Letter of Credit Obligations and Collateral;

WHEREAS, Assignee Lender desires to become a Lender under the Credit Agreement and to accept such assignment and delegation from Assignor Lender; and

WHEREAS, Assignee Lender desires to appoint Agent to serve as agent for Assignee Lender under the Credit Agreement;

NOW, THEREFORE, in consideration of the premises and the agreements, provisions, and covenants herein contained, Assignor Lender and Assignee Lender agree as follows:

## 1. ASSIGNMENT, DELEGATION, AND ACCEPTANCE

1.1     Assignment. Assignor Lender hereby transfers and assigns to Assignee Lender, without recourse and without representations or warranties of any kind (except as set forth in Section 3.2), such percentage of Assignor Lender's right, title, and interest in the Loans, Commitments, the Letter of Credit Obligations, Loan Documents and Collateral as will result in Assignee Lender having as of the Effective Date (as hereinafter defined) a Pro Rata Share thereof, as follows:

| Assignee Lender's Loans | Principal Amount of Loans/Commitments held by all Lenders | Principal Amount of Loans and Commitment assigned by Assignor Lender to Assignee Lender | Pro Rata Share |
|---|---|---|---|
| Term Loan | REDACTED | $16,299,027.96 | REDACTED |

1.2　　　　Delegation. Assignor Lender hereby irrevocably assigns and delegates to Assignee Lender a portion of its Commitments and its other duties and obligations as a Lender under the Loan Documents equivalent to REDACT of Assignor Lender's Term Loan (such percentage representing a loan amount of $16,299,027.96).

1.3　　　　Acceptance by Assignee Lender. By its execution of this Agreement, Assignee Lender irrevocably purchases, assumes and accepts such assignment and delegation and agrees to be a Lender with respect to the delegated interest under the Loan Documents and to be bound by the terms and conditions thereof. By its execution of this Agreement, Assignor Lender agrees, to the extent provided herein, to relinquish its rights and be released from its obligations and duties under the Credit Agreement.

1.4　　　　Effective Date. Such assignment and delegation by Assignor Lender and acceptance by Assignee Lender will be effective and Assignee Lender will become a Lender under the Loan Documents as of the date of this Agreement ("Effective Date") and upon payment of the Payment Amount (as such term is defined below). Interest and Fees accrued prior to, on and after the Effective Date are for the account of Assignee Lender.

2.　INITIAL PAYMENT AND DELIVERY OF NOTES

2.1　　　　Payment of the Payment Amount. Assignee Lender will pay to Assignor Lender, in immediately available funds, not later than ▉▉▉▉▉▉ (New York time) on the Effective Date, an amount equal to the purchase price as set forth in the Purchase Price Letter dated as of ▉▉▉▉▉▉ between the Assignor Lender and the Assignee Lender (the "Payment Amount").

2.2　　　　Reserved.

2.3　　　　Execution and Delivery of Notes. Following payment of the Payment Amount, and upon Assignee Lender's request, Agent will obtain from Borrower for delivery to Assignee Lender, new executed Notes evidencing Assignee Lender's Pro Rata Share in the Loans after giving effect to the assignment described in Section 1. Each new Note will be issued in the aggregate maximum principal amount of the Commitment of the Assignee Lender.

3.　REPRESENTATIONS, WARRANTIES AND COVENANTS

3.1          <u>Assignee Lender's Representations, Warranties and Covenants</u>. Assignee Lender hereby represents, warrants, and covenants the following to Assignor Lender and Agent:

(a)          This Agreement is a legal, valid, and binding agreement of Assignee Lender, enforceable according to its terms;

(b)          The execution and performance by Assignee Lender of its duties and obligations under this Agreement and the Loan Documents will not require any registration with, notice to, or consent or approval by any Governmental Authority;

(c)          Assignee Lender is familiar with transactions of the kind and scope reflected in the Loan Documents and in this Agreement;

(d)          Assignee Lender has made its own independent investigation and appraisal of the financial condition and affairs of each Credit Party, has conducted its own evaluation of the Loans and Letter of Credit Obligations, the Loan Documents and each Credit Party's creditworthiness, has made its decision to become a Lender to Borrower under the Credit Agreement independently and without reliance upon Assignor Lender or Agent, and will continue to do so;

(e)          Assignee Lender is entering into this Agreement in the ordinary course of its business, and is acquiring its interest in the Loans and Letter of Credit Obligations for its own account and not with a view to or for sale in connection with any subsequent distribution; provided, however, that at all times the distribution of Assignee Lender's property shall, subject to the terms of the Credit Agreement, be and remain within its control;

(f)          No future assignment or participation granted by Assignee Lender pursuant to Section 9.1 of the Credit Agreement will require Assignor Lender, Agent, or Borrower to file any registration statement with the Securities and Exchange Commission or to apply to qualify under the blue sky laws of any state;

(g)          Assignee Lender has no loans to, written or oral agreements with, or equity or other ownership interest in any Credit Party;

(h)          Assignee Lender will not enter into any written or oral agreement with, or acquire any equity or other ownership interest in, any Credit Party without the prior written consent of Agent; and

(i)          As of the Effective Date, Assignee Lender (i) is entitled to receive payments of principal and interest in respect of the Obligations without deduction for or on account of any taxes imposed by the United States of America or any political subdivision thereof, (ii) is not subject to capital adequacy or similar requirements under Section 1.16(a) of the Credit Agreement, (iii) does not require the payment of any increased costs under Section 1.16(b) of the Credit Agreement, and (iv) is not unable to fund LIBOR Loans under Section 1.16(c) of the Credit Agreement, and Assignee Lender will indemnify Agent from and against all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, or expenses

that result from Assignee Lender's failure to fulfill its obligations under the terms of Section 1.15(c) of the Credit Agreement or from any other inaccuracy in the foregoing.

      3.2              <u>Assignor Lender's Representations, Warranties and Covenants</u>. Assignor Lender hereby represents, warrants and covenants the following to Assignee Lender:

      (a)      Assignor Lender is the legal and beneficial owner of the Loans and Commitments assigned hereunder;

      (b)      This Agreement is a legal, valid and binding agreement of Assignor Lender, enforceable according to its terms;

      (c)      The execution and performance by Assignor Lender of its duties and obligations under this Agreement and the Loan Documents will not require any registration with, notice to or consent or approval by any Governmental Authority;

      (d)      Assignor Lender has full power and authority, and has taken all action necessary to execute and deliver this Agreement and to fulfill the obligations hereunder and to consummate the transactions contemplated hereby;

      (e)      Assignor Lender is the legal and beneficial owner of the interests being assigned hereby, free and clear of any adverse claim, lien, encumbrance, security interest, restriction on transfer, purchase option, call or similar right of a third party; and

      (f)      This Assignment by Assignor Lender to Assignee Lender complies, in all material respects, with the terms of the Loan Documents.

## 4. LIMITATIONS OF LIABILITY

      Neither Assignor Lender (except as provided in <u>Section 3.2</u>) nor Agent makes any representations or warranties of any kind, nor assumes any responsibility or liability whatsoever, with regard to (a) the Loan Documents or any other document or instrument furnished pursuant thereto or the Loans, Letter of Credit Obligations or other Obligations, (b) the creation, validity, genuineness, enforceability, sufficiency, value or collectability of any of them, (c) the amount, value or existence of the Collateral, (d) the perfection or priority of any Lien upon the Collateral, or (e) the financial condition of any Credit Party or other obligor or the performance or observance by any Credit Party of its obligations under any of the Loan Documents. Neither Assignor Lender nor Agent has or will have any duty, either initially or on a continuing basis, to make any investigation, evaluation, appraisal of, or any responsibility or liability with respect to the accuracy or completeness of, any information provided to Assignee Lender which has been provided to Assignor Lender or Agent by any Credit Party. Nothing in this Agreement or in the Loan Documents shall impose upon the Assignor Lender or Agent any fiduciary relationship in respect of the Assignee Lender.

## 5. FAILURE TO ENFORCE

No failure or delay on the part of Agent or Assignor Lender in the exercise of any power, right, or privilege hereunder or under any Loan Document will impair such power, right, or privilege or be construed to be a waiver of any default or acquiescence therein. No single or partial exercise of any such power, right, or privilege will preclude further exercise thereof or of any other right, power, or privilege. All rights and remedies existing under this Agreement are cumulative with, and not exclusive of, any rights or remedies otherwise available.

6. NOTICES

Unless otherwise specifically provided herein, any notice or other communication required or permitted to be given will be in writing and addressed to the respective party as set forth below its signature hereunder, or to such other address as the party may designate in writing to the other.

7. AMENDMENTS AND WAIVERS

No amendment, modification, termination, or waiver of any provision of this Agreement will be effective without the written concurrence of Assignor Lender, Agent and Assignee Lender.

8. SEVERABILITY

Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. In the event any provision of this Agreement is or is held to be invalid, illegal, or unenforceable under applicable law, such provision will be ineffective only to the extent of such invalidity, illegality, or unenforceability, without invalidating the remainder of such provision or the remaining provisions of the Agreement. In addition, in the event any provision of or obligation under this Agreement is or is held to be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions or obligations in any other jurisdictions will not in any way be affected or impaired thereby.

9. SECTION TITLES

Section and Subsection titles in this Agreement are included for convenience of reference only, do not constitute a part of this Agreement for any other purpose, and have no substantive effect.

10. SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

11. APPLICABLE LAW

THIS AGREEMENT WILL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE.

## 12. COUNTERPARTS

This Agreement and any amendments, waivers, consents, or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which, when so executed and delivered, will be deemed an original and all of which shall together constitute one and the same instrument.

[remainder of this page intentionally left blank]

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**ASSIGNEE LENDER:**

YUCAIPA CORPORATE INITIATIVES FUND II, LP

By: _____

Title: _____Vice President and Secretary_____

Notice Address:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069

ACKNOWLEDGED AND CONSENTED TO:

GENERAL ELECTRIC CAPITAL
CORPORATION

By: _____
        Authorized Signatory

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**ASSIGNEE LENDER:**

YUCAIPA CORPORATE INITIATIVES FUND II, LP

By: _____

Title: _____

Notice Address:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069

ACKNOWLEDGED AND CONSENTED TO:

GENERAL ELECTRIC CAPITAL
CORPORATION

By: _____

     Authorized Signatory

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**ASSIGNEE LENDER:**                    **ASSIGNOR LENDER:**

YUCAIPA CORPORATE INITIATIVES FUND II, LP

By: _____
Title: _____

Notice Address:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069

ACKNOWLEDGED AND CONSENTED TO:

GENERAL ELECTRIC CAPITAL CORPORATION

By: _____
       Authorized Signatory



## PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the LSTA Standard Terms and Conditions for Purchase and Sale Agreement for Distressed Trades published by the LSTA as of August 6, 2010 (the "Standard Terms"). The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement for Distressed Trades governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.



**TRANSACTION SUMMARY**

| | |
|---|---|
| Trade Date: | |
| Agreement Date: | |
| Seller: | |
| Seller MEI[1]: | |
| Buyer: | Yucaipa Corporate Initiatives Fund II, LP |
| Buyer MEI[2]: | N/A |
| Credit Agreement: | Credit Agreement, dated as of August 13, 2004, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, as borrower, Goldman Sachs Specialty Lending Group, L.P., as syndication agent, General Electric Capital Corporation, as agent, and the other lenders signatory thereto from time to time. |
| Borrower: | ICBC Broadcast Holdings, Inc. |
| Purchase Amount(s): | $16,299,027.96 |
| Tranche(s): | Term Loan |

REDACTED

---

[1] Insert Markit Entity Identifier for Seller, if available.

[2] Insert Markit Entity Identifier for Buyer, if available.

LSTA EFFECTIVE AUGUST 6, 2010     Copyright © LSTA 2010. All rights reserved.

NYC:228173.1



## A. DEFINITIONS

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means General Electric Capital Corporation, as Agent.

"Assignment" means the Assignment Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment.

"Bankruptcy Case" select one:
☒ not applicable.
☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

"Bankruptcy Court" select one:
☒ not applicable.
☐ means [the United States Bankruptcy Court for the _____ District of _____ (and, if appropriate, the United States District Court for that District)].

---

[3] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H. Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[4] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H. Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[5] Specify the Shift Date only if "Yes" is specified opposite "Step-Up Provisions" and if the second box is selected in the definition of Covered Prior Seller. The Shift Date is the date published by the LSTA and is that date determined by the LSTA to be the date on which market convention for transferring the Debt shifted from par documentation to distressed documentation (the "Shift Date"). The Parties shall include the Shift Date published by the LSTA, or, if the Shift Date has not been published by the LSTA, either party may request in writing (a "Shift Date Request") that the LSTA determine whether market convention for transferring the Debt has shifted from par documentation to distressed documentation and, if it so determines, to select and publish the Shift Date. To submit a Shift Date Request, send a request that includes the name of Borrower, the title and date of the Credit Agreement, the deal CUSIP (or facility CUSIP, if appropriate), and name of the administrative agent under the Credit Agreement to the LSTA at lstashiftdates@lsta.org. The Shift Date published by the LSTA shall be binding on the parties.

[6] "Yes" can be elected only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.

"Bar Date" select one:

☒ not applicable.
☐ none has been set.
☐ means [specify applicable date, if any].

"Buyer Purchase Price" select one:

☒ not applicable.
☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"Commitments" select one:

☒ none.
☐ means [identify applicable commitment tranche(s) using Credit Agreement definitions] in the principal amount of $/£/€_____ [in each case specify the aggregate amount of the Loans, the Unfunded Commitments and the portion, if any, of the Commitments that is irrevocably "frozen" (i.e., that is not subject to future drawing)].

"Covered Prior Seller" select one:

☒ not applicable.
☐ means each Prior Seller that transferred the Loans and Commitments (if any)[7] on or after the Shift Date [but prior to the transfer pursuant to which _____[8] transferred such Loans and Commitments (if any) on a distressed documentation basis pursuant to the Purchase and Sale Agreement for Distressed Trades dated as of _____, as set forth in the Annex].[9]

"Filing Date" select one:

☒ not applicable.
☐ means [identify date on which Borrower filed Bankruptcy Case].

"Loans" means Term Loans in the outstanding principal amount of $16,299,027.96.

"Netting Letter" select one:

☒ not applicable.
☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:

☒ not applicable.
☐ means [specify original buyer in the netting arrangement].

"Penultimate Buyer" select one:

☒ not applicable.
☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).

---

[7] If applicable to only a portion of the Loans and Commitments (if any), specify the portion that applies, e.g., "each Prior Seller that transferred the [Name of applicable Covered Prior Seller] Loans (as defined in Section 1 of the Annex)."

[8] Specify the first Entity that transferred the Loans and Commitments (if any) on a distressed documentation basis on or after the Shift Date.

[9] The bracketed language applies where the relevant Predecessor Transfer Documents include a distressed trade that settled after the par/near par trade which settled on or after the Shift Date.

☐ means [_____].

"Required Consents" means the consent of the Agent.

"Seller Purchase Price" select one:
☒ not applicable.
☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" means the ▓▓▓▓▓ transfer or other similar fee payable to the Agent in connection with the Assignment.

"Unfunded Commitments" means that part of the Commitments that has not been funded in the form of loans, advances, letter of credit disbursements or otherwise under the Credit Agreement, which is in the principal amount of $0.

## B.    SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)

The following specified terms shall apply to the sections referenced in this Section B:

| | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
| | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (Purchase Price); Netting Arrangements.
   If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

   "(k) [intentionally omitted]."[10]

Section 4.1(r) (Predecessor Transfer Agreements).
   ☒ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.
   ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.
   ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.
   ☐ Not applicable.

Section 4.1(u) (Other Documents).
   ☒ None.
   ☐ The following: _____.

Section 4.1(v) (Proof of Claim).
   ☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
        ☐ the Agent on behalf of the Lenders.
        ☐ Seller or a Prior Seller.
   ☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.
   ☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.
   ☒ Not applicable.

## C.    SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)

**C.1**    Section 5.1(n) (Buyer Status).

   ☒ Buyer is not a Lender.
   ☐ Buyer is a Lender.
   ☐ Buyer is an Affiliate [substitute Credit Agreement defined term if different] (as defined in the Credit Agreement) of a Lender.
   ☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

**C.2**    If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

## D.    SECTION 6 (INDEMNIFICATION)

Section 6.1 (Seller's Indemnities); Step-Up Indemnities.

   (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

---

[10] Seller should add, and Buyer should cause Original Buyer or Penultimate Buyer, as applicable, to add, a comparable representation to the Netting Letter in lieu of this representation.

(ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

E.    **SECTION 7 (COSTS AND EXPENSES)**

☐    The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to
      ☐    one-half thereof.
      ☐    other relevant fraction or percentage, _____, thereof.
☐    The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
      ☐    one-half thereof.
      ☐    other relevant fraction or percentage, _____, thereof.
☐    The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☒    The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☐    There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

F.    **SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)**

**F.1**    Section 8.2 (Distributions); Step-Up Distributions Covenant.

(i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

(ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

**F.2**    Section 8.5 (Wire Instructions).

Buyer's Wire Instructions:

BANK:               Union Bank of California
                            Corporate Deposit Services
                            445 South Figueroa St
                            Los Angeles, CA 90071
ABA #           REDACT
ACCOUNT #:     REDACTE
ACCOUNT NAME:  YUCAIPA CORPORATE INITIATIVES FUND II, LP
REFERENCE:

Seller's Wire Instructions:

G. **SECTION 9 (NOTICES)**

Buyer's Address for Notices and Delivery:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069
Attention: Robert P. Bermingham
Telephone: (310) REDAC
Facsimile: (310) REDAC
Electronic Mail Address: REDACTED

Seller's Address for Notices and Delivery:



H. **SECTION 27 (ADDITIONAL PROVISIONS)**

1. Seller and Buyer agree that the following representation shall be added to the Standard Terms as Section 4.1(x) thereof:

"As indicated by the Agent to the Seller, there is at least $ REDACTE of interest that has accrued, but not been paid, in respect of the Loans and Commitment as of REDACTED

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**



**BUYER**

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By:_____
     Name:
     Title:

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**



**BUYER**

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By: _____
Name:    Robert P. Bermingham
Title:     Vice President and Secretary

# ANNEX TO PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES[1]

1. If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements[2] and principal amount, as of the Settlement Date, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.

   Assignment Agreement, dated as of ███████████ by and among ███████████, as assignor, ███████████, as assignee, and the Agent, relating to par/near par loans.

2. List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.[3]

   Credit Agreement, dated as of August 13, 2004, among ICBC Broadcast Holdings, Inc., as Borrower, the other Credit Parties signatory thereto from time to time, as Credit Parties, the Lenders party thereto from time to time, as Lenders, and General Electric Capital Corporation, as Administrative Agent, Goldman Sachs Specialty Lending Group, L.P., as Syndication Agent, GECC Capital Markets Group, Inc. and Goldman Sachs Specialty Lending Group, L.P., as Lead Arrangers.

   The First Amendment to the Credit Agreement, dated as of September 27, 2004, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

   The Second Amendment to the Credit Agreement, dated as of November 11, 2004, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

   The Third Amendment to the Credit Agreement, dated as of May 5, 2005, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

   The Fourth Amendment to the Credit Agreement, dated as of October 20, 2006, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

   The Fifth Amendment to the Credit Agreement, dated as of June 22, 2007, by and among ICBC Broadcast Holdings, Inc., a Delaware corporation, the Borrower, the other Credit Parties signatory

---

[1] For purposes of Sections 1 through 6 in this Annex, terms such as "none", "not applicable", "n/a", "irrelevant" and "zero" should be given the same meaning.

[2] List (i) any Predecessor Transfer Agreement to which Seller is a party, (ii) any Predecessor Transfer Agreement of Prior Sellers relating to distressed loans delivered to Seller by Immediate Prior Seller and (iii) any Predecessor Transfer Agreement of Prior Sellers relating to par loans listed in any Predecessor Transfer Agreement described in the preceding clause (ii).

[3] If not applicable, so state.

thereto, the Lenders signatory thereto, and General Electric Capital Corporation, a Delaware corporation , as Agent for the Lenders.

Waiver Letter Agreement, dated as of November 15, 2007, between the Borrower, the other Credit Parties signatory thereto, the Agent, and the lenders signatory thereto.

Waiver Letter Agreement, dated as of April 10, 2008, between the Borrower, the other Credit Parties signatory thereto, the Agent, and the lenders signatory thereto.

3.  Description of Proof of Claim (if any).[4]

    N/A

4.  Description of Adequate Protection Order (if any).[5]

    N/A

5.  List any exceptions to Section 4.1(w) (Notice of Impairment).[6] None.

6.  The amount of any PIK Interest that accreted to the principal amount of the Loans on or after the Trade Date but on or prior to the Settlement Date is ███ .[7]

---

[4] May apply only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary. If not applicable, so state. If applicable, note that according to the Standard Terms, failure to state is not failure to convey rights or obligations with respect thereto.

[5] May apply only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary. If not applicable, so state. If applicable, note that according to the Standard Terms, failure to state is not failure to convey rights or obligations with respect thereto.

[6] If none, so state.

[7] In addition to the terms listed in footnote 1 of this Annex, amounts listed as 0 or 0.00, with or without a currency sign, should be given the same meaning.

# Yucaipa Corporate Initiatives Fund II, LP
The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069





Re:    *ICBC Broadcast Holdings, Inc.*

Ladies and Gentlemen:

Reference is made to the Purchase and Sale Agreement, dated as of the date hereof (the "Agreement"), between █████████ ("Seller") and Yucaipa Corporate Initiatives Fund II, LP ("Buyer"), pursuant to which Buyer is purchasing from Seller the Transferred Rights. Capitalized terms used herein, but not otherwise defined herein, shall have the meanings ascribed to such terms in the Agreement.

This letter is the Purchase Price Letter referred to in the Agreement. In accordance with the terms of the Agreement, Buyer shall pay to Seller the Purchase Price by wire transfer of immediately available funds to Seller's wire instructions set forth in the Agreement.

The Purchase Price for the Transferred Rights is set forth on Schedule A hereto.

Please evidence your agreement to the foregoing by executing and returning a copy of this letter.

Sincerely,

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By: _____

Name: Robert P. Bermingham

Title: Vice President and Secretary

Please evidence your agreement to the foregoing by executing and returning a copy of this letter.

Sincerely,

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By:_____
　　　　Name:
　　　　Title:



# **SCHEDULE A**

*See attached spreadsheet*

DISTRESSED FUNDING MEMORANDUM

Seller: ▮
Buyer: Yucaipa Corporate Initiatives Fund II. LP
Funding Date:

Trade Date:
Price:
T+20

Borrower: **ICBC Broadcast**
Facility: Term Loan
Original Global: REDACT
Original Trade Amount: $16,289,027.96
Pro-rata %: REDACT
Current Global: REDACT
Current Trade Amount: ▮

| | | Paydowns | Date | Global Amt | Trade Amt | Benefit |
|---|---|---|---|---|---|---|
| | | Term Loan | | | $ - | $ - |

| Cost of Carry: | Accrual Start Date | Accrual End Date | T-20 Purchase Price | Delay Days | LIBOR | Basis | Delay Comp |
|---|---|---|---|---|---|---|---|
| Term Loan | ▮ | | | | | ▮ | ▮ |

| Interest Credit: | Accrual Start Date | Accrual End Date | Face | Delay Days | All-in Rate | Basis | Delay Comp |
|---|---|---|---|---|---|---|---|
| Term Loan | ▮ | | | | ▮ | ▮ | ▮ |

| | |
|---|---|
| Price x Outstanding Loans | $ ▮ |
| Benefit of Paydowns | ▮ |
| Interest Credit | ▮ |
| Cost of Carry | ▮ |
| Assignment Fee Waived | ▮ |
| **Total Purchase Price** | $ ▮ |

## ASSIGNMENT AGREEMENT

This Assignment Agreement (this "Agreement") is made as of ████████ by and between ██████████████ ("Assignor Lender") and YUCAIPA CORPORATE INITIATIVES FUND II, LP ("Assignee Lender") and acknowledged and consented to by CORTLAND CAPITAL MARKET SERVICES LLC, as agent ("Agent"). All capitalized terms used in this Agreement and not otherwise defined herein will have the respective meanings set forth in the Credit Agreement as hereinafter defined.

### RECITALS:

WHEREAS, ICBC BROADCAST HOLDINGS, INC., a Delaware corporation ("Borrower"), Agent, Assignor Lender and other Persons signatory thereto as Lenders have entered into that certain Credit Agreement dated as of August 13, 2004 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") pursuant to which Assignor Lender has agreed to make certain Loans to, and incur certain Letter of Credit Obligations for, Borrower;

WHEREAS, Assignor Lender desires to assign to Assignee Lender a portion of its interest in the Loans (as described below), the Letter of Credit Obligations and the Collateral and to delegate to Assignee Lender a portion of its Commitments and other duties with respect to such Loans, Letter of Credit Obligations and Collateral;

WHEREAS, Assignee Lender desires to become a Lender under the Credit Agreement and to accept such assignment and delegation from Assignor Lender; and

WHEREAS, Assignee Lender desires to appoint Agent to serve as agent for Assignee Lender under the Credit Agreement;

NOW, THEREFORE, in consideration of the premises and the agreements, provisions, and covenants herein contained, Assignor Lender and Assignee Lender agree as follows:

1. ASSIGNMENT, DELEGATION, AND ACCEPTANCE

   1.1    Assignment.  Assignor Lender hereby transfers and assigns to Assignee Lender, without recourse and without representations or warranties of any kind (except as set forth in Section 3.2), such percentage of Assignor Lender's right, title, and interest in the Revolving Loan, Commitments, the Term Loan, Loan Documents and Collateral as will result in Assignee Lender having as of the Effective Date (as hereinafter defined) a Pro Rata Share thereof, as follows:

1.2

| Type of Loans | Principal Amount of Loans/Commitments by all Lenders | Principal Amount of Loans/Commitments assigned by Assignor Lender to Assignee Lender | Pro Rata Share |
|---|---|---|---|
| Term Loan | REDACTED | $4,026,377.57 | REDACTED |

1.3    Delegation.    Assignor Lender hereby irrevocably assigns and delegates to Assignee Lender a portion of its Commitments and its other duties and obligations as a Lender under the Loan Documents equivalent to REDACT of Assignor Lender's Term Loan (such percentage representing a commitment of $4,026,377.57.

1.4    Acceptance by Assignee Lender.    By its execution of this Agreement, Assignee Lender irrevocably purchases, assumes and accepts such assignment and delegation and agrees to be a Lender with respect to the delegated interest under the Loan Documents and to be bound by the terms and conditions thereof.  By its execution of this Agreement, Assignor Lender agrees, to the extent provided herein, to relinquish its rights and be released from its obligations and duties under the Credit Agreement.

1.5    Effective Date.    Such assignment and delegation by Assignor Lender and acceptance by Assignee Lender will be effective and Assignee Lender will become a Lender under the Loan Documents as of the date of this Agreement ("Effective Date") and upon payment of the Assigned Amount and the Assignment Fee (as each term is defined below).  Interest and Fees accrued prior to, on and after the Effective Date are for the account of Assignee Lender.

2.    INITIAL PAYMENT AND DELIVERY OF NOTES

2.1    Payment of the Assigned Amount.    Assignee Lender will pay to Assignor Lender, in immediately available funds, not later than 11:00 a.m. (New York time) on the Effective Date, an amount equal to the purchase price as set forth in the Purchase Price Letter, dated as of July ___, 2011, by and between the Assignor Lender and the Assignee Lender (the "Assigned Amount").

2.2    Payment of Assignment Fee.    Assignor Lender will pay to Agent, for its own account in immediately available funds, not later than 11:00 a.m. (New York time) on the Effective Date, the assignment fee in the amount of ▇▇▇▇ (the "Assignment Fee") as required pursuant to Section 9.1(a) of the Credit Agreement.

2.3    Execution and Delivery of Notes.    Prior to payment of the Assigned Amount and the Assignment Fee, Assignor Lender will deliver to Agent the Notes previously delivered to Assignor Lender for redelivery to Borrower and Agent will obtain from Borrower for delivery to Assignee Lender, new executed Notes evidencing Assignee Lender's Pro Rata Share in the Loans

DOC ID-16792232.4

after giving effect to the assignment described in <u>Section 1</u>. Each new Note will be issued in the aggregate maximum principal amount of the Commitment of the Assignee Lender.

3.     REPRESENTATIONS, WARRANTIES AND COVENANTS

3.1     <u>Assignee Lender's Representations, Warranties and Covenants</u>. Assignee Lender hereby represents, warrants, and covenants the following to Assignor Lender and Agent:

(a)     This Agreement is a legal, valid, and binding agreement of Assignee Lender, enforceable according to its terms;

(b)     The execution and performance by Assignee Lender of its duties and obligations under this Agreement and the Loan Documents will not require any registration with, notice to, or consent or approval by any Governmental Authority;

(c)     Assignee Lender is familiar with transactions of the kind and scope reflected in the Loan Documents and in this Agreement;

(d)     Assignee Lender has made its own independent investigation and appraisal of the financial condition and affairs of each Credit Party, has conducted its own evaluation of the Loans and Letter of Credit Obligations, the Loan Documents and each Credit Party's creditworthiness, has made its decision to become a Lender to Borrower under the Credit Agreement independently and without reliance upon Assignor Lender or Agent, and will continue to do so;

(e)     Assignee Lender is entering into this Agreement in the ordinary course of its business, and is acquiring its interest in the Loans and Letter of Credit Obligations for its own account and not with a view to or for sale in connection with any subsequent distribution; provided, however, that at all times the distribution of Assignee Lender's property shall, subject to the terms of the Credit Agreement, be and remain within its control;

(f)     No future assignment or participation granted by Assignee Lender pursuant to Section 9.1 of the Credit Agreement will require Assignor Lender, Agent, or Borrower to file any registration statement with the Securities and Exchange Commission or to apply to qualify under the blue sky laws of any state;

(g)     Assignee Lender has no loans to, written or oral agreements with, or equity or other ownership interest in any Credit Party;

(h)     Assignee Lender will not enter into any written or oral agreement with, or acquire any equity or other ownership interest in, any Credit Party without the prior written consent of Agent; and

(i)     As of the Effective Date, Assignee Lender (i) is entitled to receive payments of principal and interest in respect of the Obligations without deduction for or on account of any taxes imposed by the United States of America or any political subdivision thereof, (ii) is not subject to capital adequacy or similar requirements under Section 1.16(a) of the

Credit Agreement, (iii) does not require the payment of any increased costs under Section 1.16(b) of the Credit Agreement, and (iv) is not unable to fund LIBOR Loans under Section 1.16(c) of the Credit Agreement, and Assignee Lender will indemnify Agent from and against all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, or expenses that result from Assignee Lender's failure to fulfill its obligations under the terms of Section 1.15(c) of the Credit Agreement or from any other inaccuracy in the foregoing.

3.2    Assignor Lender's Representations, Warranties and Covenants. Assignor Lender hereby represents, warrants and covenants the following to Assignee Lender:

(a)    Assignor Lender is the legal and beneficial owner of the Loans and Commitment assigned hereunder;

(b)    This Agreement is a legal, valid and binding agreement of Assignor Lender, enforceable according to its terms;

(c)    The execution and performance by Assignor Lender of its duties and obligations under this Agreement and the Loan Documents will not require any registration with, notice to or consent or approval by any Governmental Authority;

(d)    Assignor Lender has full power and authority, and has taken all action necessary to execute and deliver this Agreement and to fulfill the obligations hereunder and to consummate the transactions contemplated hereby;

(e)    Assignor Lender is the legal and beneficial owner of the interests being assigned hereby, free and clear of any adverse claim, lien, encumbrance, security interest, restriction on transfer, purchase option, call or similar right of a third party; and

(f)    This Assignment by Assignor Lender to Assignee Lender complies, in all material respects, with the terms of the Loan Documents.

4.    LIMITATIONS OF LIABILITY

Neither Assignor Lender (except as provided in Section 3.2) nor Agent makes any representations or warranties of any kind, nor assumes any responsibility or liability whatsoever, with regard to (a) the Loan Documents or any other document or instrument furnished pursuant thereto or the Loans, Letter of Credit Obligations or other Obligations, (b) the creation, validity, genuineness, enforceability, sufficiency, value or collectability of any of them, (c) the amount, value or existence of the Collateral, (d) the perfection or priority of any Lien upon the Collateral, or (e) the financial condition of any Credit Party or other obligor or the performance or observance by any Credit Party of its obligations under any of the Loan Documents. Neither Assignor Lender nor Agent has or will have any duty, either initially or on a continuing basis, to make any investigation, evaluation, appraisal of, or any responsibility or liability with respect to the accuracy or completeness of, any information provided to Assignee Lender which has been provided to Assignor Lender or Agent by any Credit Party. Nothing in this Agreement or in the Loan Documents shall impose upon the Assignor Lender or Agent any fiduciary relationship in respect of the Assignee Lender.

5.    FAILURE TO ENFORCE

No failure or delay on the part of Agent or Assignor Lender in the exercise of any power, right, or privilege hereunder or under any Loan Document will impair such power, right, or privilege or be construed to be a waiver of any default or acquiescence therein. No single or partial exercise of any such power, right, or privilege will preclude further exercise thereof or of any other right, power, or privilege. All rights and remedies existing under this Agreement are cumulative with, and not exclusive of, any rights or remedies otherwise available.

6.    NOTICES

Unless otherwise specifically provided herein, any notice or other communication required or permitted to be given will be in writing and addressed to the respective party as set forth below its signature hereunder, or to such other address as the party may designate in writing to the other.

7.    AMENDMENTS AND WAIVERS

No amendment, modification, termination, or waiver of any provision of this Agreement will be effective without the written concurrence of Assignor Lender, Agent and Assignee Lender.

8.    SEVERABILITY

Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. In the event any provision of this Agreement is or is held to be invalid, illegal, or unenforceable under applicable law, such provision will be ineffective only to the extent of such invalidity, illegality, or unenforceability, without invalidating the remainder of such provision or the remaining provisions of the Agreement. In addition, in the event any provision of or obligation under this Agreement is or is held to be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions or obligations in any other jurisdictions will not in any way be affected or impaired thereby.

9.    SECTION TITLES

Section and Subsection titles in this Agreement are included for convenience of reference only, do not constitute a part of this Agreement for any other purpose, and have no substantive effect.

10.   SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

11.   APPLICABLE LAW

THIS AGREEMENT WILL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE.

12.  COUNTERPARTS

This Agreement and any amendments, waivers, consents, or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which, when so executed and delivered, will be deemed an original and all of which shall together constitute one and the same instrument.

[remainder of this page intentionally left blank]

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**ASSIGNEE LENDER:**         **ASSIGNOR LENDER:**

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**



By: _____
Title: _____

Notice Address:
The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069
Attention: Robert P. Bermingham

ACKNOWLEDGED AND CONSENTED TO:

CORTLAND CAPITAL MARKET SERVICES LLC

By: _____
     Authorized Signatory



## PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the LSTA Standard Terms and Conditions for Purchase and Sale Agreement for Distressed Trades published by the LSTA as of August 6, 2010 (the "Standard Terms"). The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement for Distressed Trades governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
| --- | --- |
| Trade Date: | |
| Agreement Date: | |
| Seller: | |
| Seller MEI: | |
| Buyer: | YUCAIPA CORPORATE INITIATIVES FUND II, LP |
| Buyer MEI: | N/A |
| Credit Agreement: | Credit Agreement, dated as of August 13, 2004 among ICBC Broadcast Holdings, Inc., as Borrower, General Electric Capital Corporation, as Administrative Agent, Goldman Sachs Specialty Lending Group, L.P., as Syndication Agent, GECC Capital Markets Group, Inc. and Goldman Sachs Specialty Lending Group, L.P., as Lead Arrangers, and the Lenders party thereto. |
| Borrower: | ICBC Broadcast Holdings, Inc. |
| Purchase Amount(s): | $4,026,377.57 |
| Tranche(s): | Term Loan |
| REDACTED | |

Copyright © LSTA 2010. All rights reserved.



## A.    <u>DEFINITIONS</u>

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"<u>Agent</u>" means Cortland Capital Market Services LLC (as successor to General Electric Capital Corporation), as Agent under the Credit Agreement.

"<u>Assignment</u>" means an Assignment Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment.

"<u>Bankruptcy Case</u>" select one:
    ☒ not applicable.
    ☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

"<u>Bankruptcy Court</u>" select one:
    ☒ not applicable.
    ☐ means [the United States Bankruptcy Court for the _____District of _____ (and, if appropriate, the United States District Court for that District)].

"<u>Bar Date</u>" select one:
    ☒ not applicable.
    ☐ none has been set.
    ☐ means [specify applicable date, if any].

"<u>Buyer Purchase Price</u>" select one:
    ☒ not applicable.
    ☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
    ☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"<u>Commitments</u>" select one:
    ☒ none.
    ☐ means [identify applicable commitment tranche(s) using Credit Agreement definitions] in the principal amount of $/£/€_____ [in each case specify the aggregate amount of the Loans, the

Unfunded Commitments and the portion, if any, of the Commitments that is irrevocably "frozen" (i.e., that is not subject to future drawing)].

"Covered Prior Seller" select one:
☒ not applicable.
☐ means each Prior Seller that transferred the Loans and Commitments (if any) on or after the Shift Date.

"Filing Date" select one:
☒ not applicable.
☐ means [identify date on which Borrower filed Bankruptcy Case].

"Loans" means Term Loans in the outstanding principal amount of $4,026,377.57.

"Netting Letter" select one:
☒ not applicable.
☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:
☒ not applicable.
☐ means [specify original buyer in the netting arrangement].

"Penultimate Buyer" select one:
☒ not applicable.
☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
☐ means [_____].

"Required Consents" means the consent of the Agent.

"Seller Purchase Price" select one:
☒ not applicable.
☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" means the ▓▓▓▓▓▓transfer or other similar fee payable to the Agent in connection with the Assignment.

"Unfunded Commitments" means that part of the Commitments that has not been funded in the form of loans, advances, letter of credit disbursements or otherwise under the Credit Agreement, which is in the principal amount of $0.00.

**B.    SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)**

The following specified terms shall apply to the sections referenced in this Section B:

|  | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
|  | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (Purchase Price); Netting Arrangements.
    If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

       "(k) [intentionally omitted]."

Section 4.1(r) (Predecessor Transfer Agreements).
    ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.
    ☒ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.
    ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.
    ☐ Not applicable.

Section 4.1(u) (Other Documents).

☒ None.
☐ The following: _____.

Section 4.1(v) (Proof of Claim).
    ☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
        ☐ the Agent on behalf of the Lenders.
        ☐ Seller or a Prior Seller.
    ☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.
    ☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.
    ☒ Not applicable.

**C.**     **SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)**

**C.1**     Section 5.1(n) (Buyer Status).

    ☐ Buyer is not a Lender.
    ☒ Buyer is a Lender.
    ☐ Buyer is an Affiliate of a Lender.
    ☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

**C.2**     If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

**D.**     **SECTION 6 (INDEMNIFICATION)**

Section 6.1 (Seller's Indemnities); Step-Up Indemnities.

    (i)     If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

    (ii)     If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

**E.**     **SECTION 7 (COSTS AND EXPENSES)**

☒ The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to ███████████████████████████████████████

☐ The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.
☐ The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☐ The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☐ There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

**F.**     **SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)**

**F.1**     Section 8.2 (Distributions); Step-Up Distributions Covenant.

      (i)     If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

      (ii)     If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

**F.2**     Section 8.5 (Wire Instructions).

Buyer's Wire Instructions:

| | |
|---|---|
| BANK: | Union Bank of California |
| | Corporate Deposit Services<br>445 South Figueroa St<br>Los Angeles, CA 90071 |
| ABA # | REDACT |
| ACCOUNT #: | REDACTED |
| ACCOUNT NAME: | YUCAIPA CORPORATE INITIATIVES FUND II, LP |



**G.**     **SECTION 9 (NOTICES)**

Buyer's Address for Notices and Delivery:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069
Attention: Robert P. Bermingham
Telephone: (310) REDAC
Facsimile: (310) REDAC
Electronic Mail Address: REDACTED

Seller's Address for Notices and Delivery:



| | CREDIT CONTACTS | |
|---|---|---|
| **Credit Contact:** | | |
| | OPERATIONS | |
| **Notice Contact:** | | |

## H.     SECTION 27 (ADDITIONAL PROVISIONS)

Section 4.1(u)(i) of the Standard Terms is hereby deleted in its entirety and replaced with the following provision:

"Seller is not a party to, or bound by, any document or agreement (other than (A) the Credit Documents to which all Lenders are party, or by which all Lenders are bound, which have been made reasonably available to all Lenders and (B) the Predecessor Transfer Agreements) that could materially and adversely affect the Transferred Rights, the Assumed Obligations or Buyer's rights and remedies under this Agreement."

Copyright © LSTA 2010. All rights reserved.

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**



**BUYER**

**YUCAIPA CORPORATE INITIATIVES FUND II, LP**

By: _____
Name: Robert Bermingham
Title: V.P.

662853v.1 2717/00016

**ANNEX TO PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES**

1.  If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements and principal amount, as of the Settlement Date, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.



REDACTED

2.  List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.

    None.

3.  Description of Proof of Claim (if any).

    None.

4.  Description of Adequate Protection Order (if any).

    None.

5.  List any exceptions to Section 4.1(w) (Notice of Impairment).

    None.

6.   The amount of any PIK Interest that accreted to the principal amount of the Loans on or after the Trade Date but on or prior to the Settlement Date is ████████



**VIA ELECTRONIC MAIL**

Yucaipa Corporate Initiatives Fund II, LP
The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069

      Re:   *ICBC Broadcast Holdings, Inc.*

Ladies and Gentlemen:

      Reference is made to the Purchase and Sale Agreement, dated as of the date hereof (the "Agreement") between ████████████████ (the "Seller") and YUCAIPA CORPORATE INITIATIVES FUND II, LP (the "Buyer"), pursuant to which Buyer is purchasing the Transferred Rights from Seller. This letter constitutes the Purchase Price Letter referred to in the Agreement. Capitalized terms used herein, but not otherwise defined herein, shall have the meanings ascribed to such terms in the Agreement.

      Upon satisfaction of the terms and conditions set forth in the Agreement, Buyer shall pay to Seller the purchase price (the "Purchase Price") by wire transfer of immediately available funds to Seller's account pursuant to the wire instructions set forth in the Agreement.

      The Purchase Price is the amount set forth on Schedule A hereto.

      [remainder of page is intentionally left blank.]

Please evidence your agreement to the foregoing by executing and returning a copy of this letter.

Sincerely,



Accepted and Agreed to:

YUCAIPA CORPORATE INITIATIVES FUND II, LP

By : _____

Name: Robert P. Bermingham
Title: V.P.

2

## SCHEDULE A

[Please see attached spreadsheet]

3

Credit: ICBC 804
Seller:
Buyer: Yucaipa Corporate Initiatives Fund II, LP

TD:
T+20:
SD:

Orig. Global:
Orig. Assigned:
Orig. Pro-Rata:

T+20 Global:
T+20 Assigned:

Curr. Global:
Curr. Assigned:

Purchase Rate:

Loan Facility
REDACTED

$3,996,074.01

**Accrued Interest from T + 20**

Delayed Comp

| Pricing Option | Facility | Global Paydown | Pro-Rata Paydown | Benefit | Assigned Share |
|---|---|---|---|---|---|
| Libor | Loan Facility | $0.00 | $0.00 | $0.00 | $3,996,074.01 |
| | | | TOTAL | $0.00 | |

| | Base Rate | Margin Rate | All-in-Rate | Basis | Accrued Interest |
|---|---|---|---|---|---|
| | | | | | TOTAL |

Cost of Carry

| Pricing Option | Facility | Global Paydown | Fee Rate | Fee Type | Benefit | Assigned Share |
|---|---|---|---|---|---|---|
| Libor | Loan Facility | $0.00 | 0.000000% | | $0.00 | $3,996,074.01 |
| | | | | TOTAL | $0.00 | |

| | Base Rate | Margin Rate | All-in-Rate | Basis | Accrued Interest |
|---|---|---|---|---|---|
| | | | | | TOTAL |

**Commitment Reductions**

| Facility | Contract Start | Contract End | From | To |
|---|---|---|---|---|

**Non-Recurring Fees**

| Facility | Fee Type | Payment Date | Contract Start | Contract End | From | To |
|---|---|---|---|---|---|---|

PURCHASE PRICE CALCULATION

Funded TL                                   $3,996,074.01
Purchase Rate
Subtotal
Benefit of Commitment Reduction
Credit for Accrued Interest
Cost of Carry
Non-Recurring Fees
Transfer Fee

Purchase price

Seller's Wire Instructions:
Bank:
ABA:
Account:
Acct. No.:

# ASSIGNMENT AGREEMENT

This Assignment Agreement (this "Agreement") is made as of ███████ by and between ████████████████████████████████████████████████ ("Assignor Lender") and YUCAIPA CORPORATE INITIATIVES FUND II, LP ("Assignee Lender") and acknowledged and consented to by GENERAL ELECTRIC CAPITAL CORPORATION, as agent ("Agent"). All capitalized terms used in this Agreement and not otherwise defined herein will have the respective meanings set forth in the Credit Agreement as hereinafter defined.

## RECITALS:

WHEREAS, ICBC BROADCAST HOLDINGS, INC., a Delaware corporation ("Borrower"), Agent, Assignor Lender and other Persons signatory thereto as Lenders have entered into that certain Credit Agreement dated as of August 13, 2004 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") pursuant to which Assignor Lender has agreed to make certain Loans to, and incur certain Letter of Credit Obligations for, Borrower;

WHEREAS, Assignor Lender desires to assign to Assignee Lender a portion of its interest in the Loans (as described below), the Letter of Credit Obligations and the Collateral and to delegate to Assignee Lender a portion of its Commitments and other duties with respect to such Loans, Letter of Credit Obligations and Collateral;

WHEREAS, Assignee Lender desires to become a Lender under the Credit Agreement and to accept such assignment and delegation from Assignor Lender; and

WHEREAS, Assignee Lender desires to appoint Agent to serve as agent for Assignee Lender under the Credit Agreement;

NOW, THEREFORE, in consideration of the premises and the agreements, provisions, and covenants herein contained, Assignor Lender and Assignee Lender agree as follows:

## 1. ASSIGNMENT, DELEGATION, AND ACCEPTANCE

1.1     Assignment. Assignor Lender hereby transfers and assigns to Assignee Lender, without recourse and without representations or warranties of any kind (except as set forth in Section 3.2), such percentage of Assignor Lender's right, title, and interest in the Loans, Commitments, the Letter of Credit Obligations, Loan Documents and Collateral as will result in Assignee Lender having as of the Effective Date (as hereinafter defined) a Pro Rata Share thereof, as follows:

| Assignee Lender's Loans | Principal Amount of Loans/Commitments held by all Lenders | Principal Amount of Loans and Commitment assigned by Assignor Lender to Assignee Lender | Pro Rata Share |
|---|---|---|---|
| Revolving Loan |  | $40,317.86 |  |
| Term Loan | R | $3,332,825.25 | |

1.2     Delegation.  Assignor Lender hereby irrevocably assigns and delegates to Assignee Lender a portion of its Commitments and its other duties and obligations as a Lender under the Loan Documents equivalent to **REDACT** of Assignor Lender's Revolving Loan Commitment (such percentage representing a commitment of $40,317.86), and **REDACT** of Assignor Lender's Term Loan (such percentage representing a loan amount of $3,332,825.25).

1.3     Acceptance by Assignee Lender.  By its execution of this Agreement, Assignee Lender irrevocably purchases, assumes and accepts such assignment and delegation and agrees to be a Lender with respect to the delegated interest under the Loan Documents and to be bound by the terms and conditions thereof.  By its execution of this Agreement, Assignor Lender agrees, to the extent provided herein, to relinquish its rights and be released from its obligations and duties under the Credit Agreement.

1.4     Effective Date.  Such assignment and delegation by Assignor Lender and acceptance by Assignee Lender will be effective and Assignee Lender will become a Lender under the Loan Documents as of the date of this Agreement ("Effective Date") and upon payment of the Payment Amount (as such term is defined below).  Interest and Fees accrued prior to, on and after the Effective Date are for the account of Assignee Lender.

2.  INITIAL PAYMENT AND DELIVERY OF NOTES

2.1     Payment of the Payment Amount.  Assignee Lender will pay to Assignor Lender, in immediately available funds, not later than 11:00 a.m. (New York time) on the Effective Date, an amount equal to the purchase price as set forth in the Purchase Price Letter dated as of ▮▮▮▮▮▮ between the Assignor Lender and the Assignee Lender (the "Payment Amount").

2.2     Reserved.

2.3     Execution and Delivery of Notes.  Following payment of the Payment Amount, and upon Assignee Lender's request, Agent will obtain from Borrower for delivery to Assignee Lender, new executed Notes evidencing Assignee Lender's Pro Rata Share in the Loans after giving effect to the assignment described in Section 1.  Each new Note will be issued in the aggregate maximum principal amount of the Commitment of the Assignee Lender.

## 3. REPRESENTATIONS, WARRANTIES AND COVENANTS

3.1 <u>Assignee Lender's Representations, Warranties and Covenants</u>. Assignee Lender hereby represents, warrants, and covenants the following to Assignor Lender and Agent:

(a) This Agreement is a legal, valid, and binding agreement of Assignee Lender, enforceable according to its terms;

(b) The execution and performance by Assignee Lender of its duties and obligations under this Agreement and the Loan Documents will not require any registration with, notice to, or consent or approval by any Governmental Authority;

(c) Assignee Lender is familiar with transactions of the kind and scope reflected in the Loan Documents and in this Agreement;

(d) Assignee Lender has made its own independent investigation and appraisal of the financial condition and affairs of each Credit Party, has conducted its own evaluation of the Loans and Letter of Credit Obligations, the Loan Documents and each Credit Party's creditworthiness, has made its decision to become a Lender to Borrower under the Credit Agreement independently and without reliance upon Assignor Lender or Agent, and will continue to do so;

(e) Assignee Lender is entering into this Agreement in the ordinary course of its business, and is acquiring its interest in the Loans and Letter of Credit Obligations for its own account and not with a view to or for sale in connection with any subsequent distribution; provided, however, that at all times the distribution of Assignee Lender's property shall, subject to the terms of the Credit Agreement, be and remain within its control;

(f) No future assignment or participation granted by Assignee Lender pursuant to Section 9.1 of the Credit Agreement will require Assignor Lender, Agent, or Borrower to file any registration statement with the Securities and Exchange Commission or to apply to qualify under the blue sky laws of any state;

(g) Assignee Lender has no loans to, written or oral agreements with, or equity or other ownership interest in any Credit Party;

(h) Assignee Lender will not enter into any written or oral agreement with, or acquire any equity or other ownership interest in, any Credit Party without the prior written consent of Agent; and

(i) As of the Effective Date, Assignee Lender (i) is entitled to receive payments of principal and interest in respect of the Obligations without deduction for or on account of any taxes imposed by the United States of America or any political subdivision thereof, (ii) is not subject to capital adequacy or similar requirements under Section 1.16(a) of the Credit Agreement, (iii) does not require the payment of any increased costs under Section 1.16(b) of the Credit Agreement, and (iv) is not unable to fund LIBOR Loans under Section 1.16(c) of the Credit Agreement, and Assignee Lender will indemnify Agent from and against all

liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, or expenses that result from Assignee Lender's failure to fulfill its obligations under the terms of Section 1.15(c) of the Credit Agreement or from any other inaccuracy in the foregoing.

3.2     Assignor Lender's Representations, Warranties and Covenants. Assignor Lender hereby represents, warrants and covenants the following to Assignee Lender:

(a)     Assignor Lender is the legal and beneficial owner of the Loans and Commitments assigned hereunder;

(b)     This Agreement is a legal, valid and binding agreement of Assignor Lender, enforceable according to its terms;

(c)     The execution and performance by Assignor Lender of its duties and obligations under this Agreement and the Loan Documents will not require any registration with, notice to or consent or approval by any Governmental Authority;

(d)     Assignor Lender has full power and authority, and has taken all action necessary to execute and deliver this Agreement and to fulfill the obligations hereunder and to consummate the transactions contemplated hereby;

(e)     Assignor Lender is the legal and beneficial owner of the interests being assigned hereby, free and clear of any adverse claim, lien, encumbrance, security interest, restriction on transfer, purchase option, call or similar right of a third party; and

(f)     This Assignment by Assignor Lender to Assignee Lender complies, in all material respects, with the terms of the Loan Documents.

4.  LIMITATIONS OF LIABILITY

Neither Assignor Lender (except as provided in Section 3.2) nor Agent makes any representations or warranties of any kind, nor assumes any responsibility or liability whatsoever, with regard to (a) the Loan Documents or any other document or instrument furnished pursuant thereto or the Loans, Letter of Credit Obligations or other Obligations, (b) the creation, validity, genuineness, enforceability, sufficiency, value or collectibility of any of them, (c) the amount, value or existence of the Collateral,  (d) the perfection or priority of any Lien upon the Collateral, or (e) the financial condition of any Credit Party or other obligor or the performance or observance by any Credit Party of its obligations under any of the Loan Documents. Neither Assignor Lender nor Agent has or will have any duty, either initially or on a continuing basis, to make any investigation, evaluation, appraisal of, or any responsibility or liability with respect to the accuracy or completeness of, any information provided to Assignee Lender which has been provided to Assignor Lender or Agent by any Credit Party. Nothing in this Agreement or in the Loan Documents shall impose upon the Assignor Lender or Agent any fiduciary relationship in respect of the Assignee Lender.

5.  FAILURE TO ENFORCE

No failure or delay on the part of Agent or Assignor Lender in the exercise of any power, right, or privilege hereunder or under any Loan Document will impair such power, right, or privilege or be construed to be a waiver of any default or acquiescence therein. No single or partial exercise of any such power, right, or privilege will preclude further exercise thereof or of any other right, power, or privilege. All rights and remedies existing under this Agreement are cumulative with, and not exclusive of, any rights or remedies otherwise available.

## 6. NOTICES

Unless otherwise specifically provided herein, any notice or other communication required or permitted to be given will be in writing and addressed to the respective party as set forth below its signature hereunder, or to such other address as the party may designate in writing to the other.

## 7. AMENDMENTS AND WAIVERS

No amendment, modification, termination, or waiver of any provision of this Agreement will be effective without the written concurrence of Assignor Lender, Agent and Assignee Lender.

## 8. SEVERABILITY

Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. In the event any provision of this Agreement is or is held to be invalid, illegal, or unenforceable under applicable law, such provision will be ineffective only to the extent of such invalidity, illegality, or unenforceability, without invalidating the remainder of such provision or the remaining provisions of the Agreement. In addition, in the event any provision of or obligation under this Agreement is or is held to be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions or obligations in any other jurisdictions will not in any way be affected or impaired thereby.

## 9. SECTION TITLES

Section and Subsection titles in this Agreement are included for convenience of reference only, do not constitute a part of this Agreement for any other purpose, and have no substantive effect.

## 10. SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

## 11. APPLICABLE LAW

THIS AGREEMENT WILL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE.

NYC:228194.1

## 12. COUNTERPARTS

This Agreement and any amendments, waivers, consents, or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which, when so executed and delivered, will be deemed an original and all of which shall together constitute one and the same instrument.

[remainder of this page intentionally left blank]

NYC:228194.1

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**ASSIGNEE LENDER:**

YUCAIPA CORPORATE INITIATIVES FUND II, LP

By: _____

Title: ___Vice President and Secretary___

Notice Address:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069

**ASSIGNOR LENDER:**

ACKNOWLEDGED AND CONSENTED TO:

GENERAL ELECTRIC CAPITAL
CORPORATION

By: _____

___Authorized Signatory___

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**ASSIGNEE LENDER:**                                    **ASSIGNOR LENDER:**

YUCAIPA CORPORATE INITIATIVES FUND II,
LP


By: _____
Title: _____


Notice Address:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069


ACKNOWLEDGED AND CONSENTED TO:

GENERAL ELECTRIC CAPITAL
CORPORATION


By: _____
Authorized Signatory

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**ASSIGNEE LENDER:**                    **ASSIGNOR LENDER:**

YUCAIPA CORPORATE INITIATIVES FUND II, LP

By: _____
Title: _____

Notice Address:

The Yucaipa Companies
9130 West Sunset Boulevard
Los Angeles, CA 90069


ACKNOWLEDGED AND CONSENTED TO:

GENERAL ELECTRIC CAPITAL
CORPORATION

By: _____
    Authorized Signatory