CADWALADER, WICKERSHAM & TAFT LLP
John J. Rapisardi, Esq.
Scott J. Greenberg, Esq.
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

Peter Friedman, Esq. (pro hac vice pending)
700 Sixth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

*Attorneys for Yucaipa Corporate Initiatives Fund II, L.P.
and Yucaipa Corporate Initiatives (Parallel) Fund II, L.P.*

SCHULTE ROTH & ZABEL LLP
Adam C. Harris, Esq.
Meghan Breen, Esq.
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

*Attorneys for CF ICBC LLC, Fortress Credit Funding I L.P.,
and Drawbridge Special Opportunities Fund Ltd.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

| | : | |
|---|---|---|
| **In re:** | : | |
| | : | **Chapter 11** |
| **INNER CITY MEDIA CORPORATION,** | : | |
| | : | **Case No. 11-13967 ([___])** |
| Alleged Debtor. | : | |
| | : | |

------------------------------------------------------------------------x

| | : | |
|---|---|---|
| **In re:** | : | |
| | : | **Chapter 11** |
| **ICBC BROADCAST HOLDINGS, INC.,** | : | |
| | : | **Case No. 11-13968 ([___])** |
| Alleged Debtor. | : | |
| | : | |

------------------------------------------------------------------------x

----------------------------------------------------------------x
                                                                                        :

**In re:**                                                                                                     :

**INNER-CITY BROADCASTING**               :             **Chapter 11**
**CORPORATION OF BERKELEY,**            :

                                                                                                     :             **Case No. 11-13972 ([___])**

                       **Alleged Debtor.**            :

----------------------------------------------------------------x

**In re:**     :

**ICBC BROADCAST HOLDINGS-CA, INC.,**   :   **Chapter 11**

          **Alleged Debtor.**     :   **Case No. 11-13969 ([___])**

----------------------------------------------------------------x

**In re:**   :

**ICBC-NY, L.L.C.,**   :   **Chapter 11**

    **Alleged Debtor.**   :   **Case No. 11-13971 ([___])**

----------------------------------------------------------------x

**In re:**   :

**ICBC BROADCAST HOLDINGS-NY, INC.,**   :   **Chapter 11**

    **Alleged Debtor.**   :   **Case No. 11-13970 ([___])**

----------------------------------------------------------------x

**In re:**   :

**URBAN RADIO, L.L.C.,**   :   **Chapter 11**

    **Alleged Debtor.**   :   **Case No. 11-13979 ([___])**

----------------------------------------------------------------x

------------------------------------------------------------------------x
:
**In re:** :
: **Chapter 11**
**URBAN RADIO I, L.L.C.,** :
: **Case No. 11-13973 ([___])**
        **Alleged Debtor.** :
------------------------------------------------------------------------x

**In re:** :
:
: **Chapter 11**
**URBAN RADIO II, L.L.C.,** :
: **Case No. 11-13974 ([___])**
        **Alleged Debtor.** :
:
------------------------------------------------------------------------x

**In re:** :
: **Chapter 11**
**URBAN RADIO III, L.L.C.,** :
: **Case No. 11-13975 ([___])**
        **Alleged Debtor.** :
:
------------------------------------------------------------------------x

**In re:** :
: **Chapter 11**
**URBAN RADIO IV, L.L.C.,** :
: **Case No. 11-13976 ([___])**
        **Alleged Debtor.** :
:
------------------------------------------------------------------------x

**In re:** :
: **Chapter 11**
**URBAN RADIO OF MISSISSIPPI, L.L.C.,** :
: **Case No. 11-13977 ([___])**
        **Alleged Debtor.** :
:
------------------------------------------------------------------------x

```
---------------------------------------------------------------x
                                                               :
In re:                                                         :
                                                               :
URBAN RADIO OF SOUTH                                           :    Chapter 11
CAROLINA, L.L.C.,                                              :
                                                               :    Case No. 11-13978 ([___])
            Alleged Debtor.                                    :
                                                               :
---------------------------------------------------------------x
```

### STATEMENT OF PETITIONING CREDITORS IN SUPPORT OF THE INVOLUNTARY CHAPTER 11 PETITIONS FILED AGAINST INNER CITY MEDIA CORPORATION AND CERTAIN OF ITS AFFILIATES

The Petitioning Creditors[1] constitute the lenders (in such capacity, the "Senior Lenders") under the Senior Secured Credit Facility (as defined below), and respectfully submit this statement (i) in support of the involuntary chapter 11 petitions filed against Inner City Media Corporation ("ICMC") and certain of its affiliates (collectively, the "Alleged Debtors"),[2] and (ii) to assist the Court and other parties in interest in understanding the circumstances that led to commencement of these cases.

### INTRODUCTION

1.  The Petitioning Creditors are party to the Senior Secured Credit Facility pursuant to which they (or their predecessors in interest) extended $197 million in loans to the Alleged Debtors to be used for general corporate purposes. More than two years ago, the Alleged Debtors defaulted under the Senior Secured Credit Facility, and in any event the entire

---

[1] The Petitioning Creditors are Yucaipa Corporate Initiatives Fund II, L.P., Yucaipa Corporate Initiatives (Parallel) Fund II, L.P., CF ICBC LLC, Fortress Credit Funding I L.P., and Drawbridge Special Opportunities Fund Ltd.

[2] The Alleged Debtors in these involuntary chapter 11 cases are Inner City Media Corporation, ICBC Broadcast Holdings, Inc., Inner-City Broadcasting Corporation of Berkeley, ICBC Broadcast Holdings–CA, Inc., ICBC-NY, L.L.C., ICBC Broadcast Holdings–NY, Inc., Urban Radio, L.L.C., Urban Radio I, L.L.C., Urban Radio II, L.L.C., Urban Radio III, L.L.C., Urban Radio IV, L.L.C., Urban Radio of Mississippi, L.L.C., and Urban Radio of South Carolina, L.L.C.

amount of principal and accrued and unpaid interest and fees became immediately due and payable on February 13, 2010. As a result, the Senior Lenders are owed approximately $250 million in principal and accrued and unpaid interest and fees as of the commencement of these cases. Moreover, as the Senior Lenders will demonstrate in these cases, the Alleged Debtors have been mismanaged and the value of the Senior Lenders' collateral has steadily decreased to the point where they are now substantially undersecured.

2. Despite having gone unpaid for years and being deeply undersecured, the Senior Lenders exercised extreme patience and refrained from exercising remedies under the Senior Secured Credit Facility – notwithstanding a clear right to do so – all in an effort to promote a spirit of genuine good faith, cooperation, and compromise and to give the parties ample opportunity to negotiate a consensual resolution.

3. These negotiations resulted in a proposal from the Senior Lenders that, had it been accepted and implemented by the Alleged Debtors, would have led to an orderly, prepackaged bankruptcy case resulting in prompt confirmation of a plan of reorganization and the restructuring of the Alleged Debtors as viable ongoing entities. Notwithstanding the fact that the Senior Lenders are at this point undersecured, the restructuring offer made by the Senior Lenders would have left unsecured creditors unimpaired and provided equityholders with a cash recovery and a continuing stake in the reorganized entities.

4. That proposal was initially accepted by the board of one of the Alleged Debtors (ICMC, the main operating company of the Alleged Debtors), and ICMC executed and delivered a signature page for a plan support agreement that would have implemented the proposed prepackaged bankruptcy. Upon information and belief, the Alleged Debtors' professionals at the time, Skadden Arps and Alvarez & Marsal, recommended to the board of

ICMC that it approve the restructuring proposal embedded in the plan support agreement. That restructuring proposal was clearly in the best interest of all constituencies, and would have provided a sound path forward for the Alleged Debtors, who are the owners of, among other things, culturally and historically significant urban radio stations in a variety of U.S. markets.

5. However, on the eve of moving forward with this orderly chapter 11 filing, the parent company of the Alleged Debtors, at the behest of the parent company's chairman, Mr. Pierre Sutton, forced the Alleged Debtors to back out of this deal, apparently to seek a greater recovery for himself and other existing shareholders. This decision was inexplicable, given that negotiation of the restructuring proposal had been ongoing for several months, all of the Alleged Debtors are insolvent and owe their fiduciary duties to creditors. Moreover, Mr. Sutton engineered removal of incumbent boards of directors at the Alleged Debtors and put in place new "professional" directors. And, after having gone through months of negotiations, existing restructuring advisors (including Skadden) either were dismissed or resigned and replaced with new "hired guns."

6. The most recent conduct of Mr. Sutton and the Alleged Debtors represent an ill-conceived strategy to exercise leverage over the Senior Lenders and allow incumbent shareholders and managers to entrench themselves and extract value to which they have no legal entitlement. Since the Alleged Debtors' withdrawal of their initial acceptance of the proposed restructuring, the Senior Lenders have been unnecessarily forced to incur significant legal fees and expenses in pursuing and protecting their legal rights and remedies. Moreover, rather than seeking the protections of a voluntary chapter 11 case, the Alleged Debtors have made disturbing written threats – *going so far as threatening to file chapter 7 petitions,* with the consequential devastating affects on the Debtors' employees and vendors, and seeking to destroy the Alleged

6

Debtors' Federal Communications Commission licenses, which are the bedrock of the Alleged Debtors' operations and value.[3]

7. Faced with these reckless threats, the Senior Lenders reluctantly concluded that they had no choice but to commence these involuntary chapter 11 cases. The Senior Lenders believe that the chapter 11 process will preserve the Alleged Debtors' value and assure its continued orderly operations and hopeful speedy emergence from bankruptcy. To facilitate an expedited exit, the Senior Lenders are prepared to seek relief from the Court in short order that would permit them to file a plan of reorganization predicated upon the concept of paying all allowed administrative expense, priority and general unsecured claims in full.

## STATEMENT IN SUPPORT

### Senior Secured Credit Facility and Related Documents

8. The Senior Lenders are lenders under the Credit Agreement among the Alleged Debtors, General Electric Capital Corporation, as administrative agent, and the lenders signatory to the Credit Agreement from time to time, dated as of August 13, 2004 (as amended as of each of September 27, 2004, November 11, 2004, May 5, 2005, October 6, 2006, and June 22, 2007, and as further amended, restated, modified, or supplemented from time to time, the "Senior Secured Credit Facility").[4] A copy of the Senior Secured Credit Facility is attached as Exhibit A.

---

[3] As these events unfolded, the Senior Lenders acted to protect their cash collateral by asserting control over certain deposit accounts in which they have valid, perfected security interests. Certain funds from these accounts were rightfully applied toward the obligations under the Senior Secured Credit Facility in accordance with the underlying credit documents, while leaving the Alleged Debtors with more than sufficient cash to operate their businesses and satisfy ordinary course obligations. The Senior Lenders have not declined a single request for payment made by the Company. Indeed, upon information and belief, the Alleged Debtors' operations are cash flow neutral or positive and do not require significant withdrawals from the accounts in which the Senior Lenders are secured.

[4] Except as otherwise noted, capitalized terms used but not defined in this statement shall have the meanings set forth in the Senior Secured Credit Facility.

9. On July 1, 2011, General Electric Capital Corporation resigned as administrative agent under the Senior Secured Credit Facility and was succeeded by Cortland Capital Market Services LLC (the "Agent"). As of the filing of the involuntary petitions against the Alleged Debtors, the aggregate amount of the principal and accrued and unpaid interest and fees outstanding under the Senior Secured Credit Facility is approximately $250,000,000. The Senior Lenders hold 100% of the outstanding amounts. Accordingly, the Senior Lenders constitute Requisite Lenders under the Senior Secured Credit Facility and, pursuant to Section 8.2(b) of the Senior Secured Credit Facility, are authorized to direct the Agent to exercise any rights and remedies provided to the Agent under the Loan Documents or at law or equity.

10. Pursuant to certain collateral documents executed in connection with the Senior Secured Credit Facility, including, without limitation, the Control Agreements (as defined below) and the Security Agreement, dated as of August 13, 2004, by and between the Alleged Debtors and the Agent (as amended, restated, modified, or supplemented from time to time, the "Security Agreement"), the Obligations under the Senior Secured Credit Facility are secured by first priority liens on substantially all of the Alleged Debtors' assets, including, but not limited to, real property, equipment, cash or cash equivalents on deposit in certain of the Alleged Debtors' deposit accounts, including, without limitation, an account (the "JPM Account") at JPMorgan Chase Bank ("JPM") and an account (the "Citibank Account") at Citibank, N.A. ("Citibank") (together with the JPM Account and the Citibank Account, collectively, the "Accounts"), intellectual property, and certain pledged equity interests (collectively, the "Collateral").

11. The Accounts are subject to seven control agreements between the Agent, on behalf of the Senior Lenders, and certain depository institutions, including, without limitation,

the Blocked Account Control Agreement, dated as of August 13, 2004, related to the JPM Account, by and among ICBC Broadcast Holdings, Inc. ("Holdings"), JPM, and the Agent (as amended, restated, modified, or supplemented from time to time, the "JPM Agreement"), and the Blocked Account Agreement, dated as of October 15, 2004, related to the Citibank Account, by and among Citibank, ICBC Broadcast Holdings-CA, Inc., and the Agent (as amended, restated, modified, or supplemented from time to time, the "Citibank Agreement") (together with the JPM Agreement and the Citibank Agreement, collectively, the "Control Agreements"). Pursuant to the Control Agreements, the Senior Lenders have valid, perfected, and enforceable security interests in the cash and cash equivalents on deposit in the Accounts and, accordingly, funds in any of the Accounts over which the Agent has not asserted control constitute cash collateral (the "Cash Collateral"). The Control Agreements are attached as Exhibit B.

12. The Obligations under the Senior Secured Credit Facility are guaranteed by several subsidiaries of Holdings (the borrower under the Senior Secured Credit Facility) and ICMC (Holding's parent). Copies of the guaranties are attached as Exhibit C.

**Prepetition Defaults**

13. The Alleged Debtors have been in default under the Senior Secured Credit Facility for more than two years. These defaults include:

> failure to comply with certain financial covenants;
>
> failure to pay interest; and
>
> failure to make principal payments.

14. Indeed, the Alleged Debtors have not voluntarily made an interest or principal payment under the Senior Secured Credit Facility since March 31, 2009.

15. The Agent sent reservation of rights letters, dated February 18, 2009, April 14, 2009, June 8, 2009, July 15, 2009, October 8, 2009, and February 19, 2010, to Holdings and

its counsel (collectively, the "Reservation of Rights Letters"), pursuant to which the Agent notified Holdings that, among other things, certain Events of Default had occurred and were continuing. On February 13, 2010, all of the Obligations under the Senior Secured Credit Facility became immediately due and payable in full in accordance with the terms of the Senior Secured Credit Facility. Pursuant to the Reservation of Rights Letter dated as of February 19, 2010, the Agent, on behalf of the Senior Lenders, declared that all of the outstanding Obligations were immediately due and payable, and demanded that Holdings immediately repay in full all of the outstanding Obligations. The Reservation of Rights Letters are attached as Exhibit D.

**Prepetition Negotiations**

16. In spite of the Alleged Debtors' prepetition defaults, the Senior Lenders hoped to craft a viable restructuring plan with the Alleged Debtors and avoid the costs, risks, and delay of a free fall chapter 11. The Senior Lenders' restructuring proposals all have been designed with the goal of keeping the Alleged Debtors as a going concern and de-leveraging their balance sheet. Except as noted below, the Senior Lenders refrained from exercising remedies under the Senior Secured Credit Facility during the prepetition default period, notwithstanding the absence of a formal forbearance agreement.

17. For the last three months leading up to these chapter 11 cases, the Senior Lenders negotiated intensively and in good faith with the Alleged Debtors regarding the terms of a consensual restructuring. Over the course of the past several months, the Senior Lenders and the Alleged Debtors exchanged numerous drafts of a restructuring term sheet and a plan support agreement that provided for a comprehensive restructuring of the Alleged Debtors' obligations.

18. The general structure of the consensual deal has remained the same since the parties began negotiating in earnest at the end of May 2011; expedited prearranged or

prepackaged chapter 11 cases, pursuant to which the Senior Lenders would receive a new note at a substantially reduced face amount and the majority of the equity in the reorganized entity, and existing equityholders would receive cash, a small equity stake and warrants for additional equity in the reorganized entity. Further, at the Alleged Debtors' request, the Senior Lenders agreed to render general unsecured claims unimpaired to ensure that the contemplated recovery to equityholders would be enforceable under a plan of reorganization. This framework was for the purpose of a consensual deal, as holders of general unsecured claims and equityholders are otherwise out of the money and not entitled to any recovery given the current valuation of the Alleged Debtors.

19. The economics of the proposal, however, evolved over the course of the parties' negotiations. Throughout negotiations, the Alleged Debtors' equityholders repeatedly pressed the Senior Lenders for greater recoveries. Ultimately, the Senior Lenders agreed to certain additional concessions in favor of the Alleged Debtors, resulting in a fully negotiated, consensual restructuring term sheet and plan support agreement, attached as Exhibit E (the "Restructuring Proposal")[5] that, among other things, granted the Alleged Debtors' equityholders (i) $1,200,000 in cash, (ii) 2% of the equity interests in the reorganized ICMC, and (iii) 5-year warrants for 6% of the common stock of the reorganized ICMC on the effective date of a chapter 11 plan, and provided for the adoption of a new management incentive plan, pursuant to which the management of the reorganized Alleged Debtors would be eligible to receive stock options for up to an additional 6% of the equity interests in reorganized ICMC.

---

[5] The Senior Lenders submit the Restructuring Proposal term sheet only as proof that the Alleged Debtors backed out of the their agreement and for no other purposes.

20. The Restructuring Proposal also incorporated the proposed terms of a 5-year employment agreement for Mr. Pierre Sutton, chief executive officer and chairman of the board of directors of Holdings, ICMC, and ICMC parent, Inner City Broadcasting Corporation ("ICBC"), pursuant to which Mr. Sutton would (i) receive base compensation of $600,000 per year, (ii) 2% of the common stock of the reorganized ICMC, issued pursuant to the new management incentive plan, (iii) be entitled to participate in all health and dental insurance plans of the reorganized Alleged Debtors on the same terms and conditions as other senior executives, (iv) be entitled to $20,000 per year as an expense budget for business related travel expenses, and (v) be given the title of Chairman Emeritus.

**Events Precipitating the Chapter 11 Cases**

21. The Senior Lenders were informed that the board of directors of ICMC was convening on August 10, 2010 to consider whether to approve the Restructuring Proposal. Despite numerous inquiries following that meeting, the Senior Lenders did not receive any information regarding the outcome of the ICMC board meeting until two days later on August 12, 2011.

22. In the interim, the Senior Lenders took steps to protect their Collateral. To that end, pursuant to Section 8.2(vi) of the Senior Secured Credit Facility and Section 7(a) the Security Agreement, the Senior Lenders directed the Agent to assert control over the JPM Account.[6]

23. Specifically, on August 11, 2011, the Senior Lenders sent the letter attached as Exhibit F to the Agent, directing the Agent to (i) deliver a shifting control notice to

---

[6] At the time, the JPM Account had more than $21 million on deposit, an amount which the Alleged Debtors had accumulated over several years while failing to make payments due and owing to the Senior Lenders.

JPM in accordance with Sections 2 and 10 of the JPM Agreement, (ii) retain all funds transferred by JPM into the Agent's account until further directed by the Senior Lenders, and (iii) following the Agent's receipt of $10 million from the JPM Account and until further directed by the Senior Lenders, authorize JPM to satisfy Holdings' requests to withdraw funds from the JPM Account. Pursuant to the terms of the JPM Agreement, control over the JPM Account was to shift to the Agent effective as of August 15, 2011.

24. On August 12, 2011, Alleged Debtors' counsel, then Skadden, advised CWT that (i) the August 10, 2011 ICMC board meeting was continued without the ICMC board of directors having voted on whether to proceed with the Restructuring Proposal and (ii) the ICMC board of directors was reconvening on August 13, 2011 to vote on the Restructuring Proposal.

25. To ensure that the ICMC board of directors did not misconstrue the Senior Lenders' decision to assert control over the JPM Account, the letter attached as Exhibit G was sent on August 12, 2011, to explain the Senior Lenders' rationale for their actions, and underscoring that the sweep of $10 million was consistent with the spirit and intent of the Restructuring Proposal (which had always contemplated prepetition payments to the Senior Lenders in the aggregate amount of $10 million). The letter was further intended to assure the ICMC board of directors that the Senior Lenders stood ready and willing to proceed with the Restructuring Proposal.

26. Soon after the letter was sent, Skadden acknowledged its receipt via the letter attached as Exhibit H, and later that same day, advised CWT of the Alleged Debtors' concern that, on and after August 15, 2011 (the date on which control over the JPM Account was scheduled to shift to the Agent), the Alleged Debtors' draw requests to the JPM Account would

13

not be satisfied and the Alleged Debtors' operations might be disrupted as a result. Accordingly, to allay these fears, the Senior Lenders sent the letter attached as Exhibit I, confirming that, so long as the Restructuring Proposal was approved, the Senior Lenders' intended to coordinate with the Agent and JPM to ensure that JPM returned control of the JPM Account to the Alleged Debtors immediately following the Agent's receipt of $10 million from the JPM Account.

27. Late in the afternoon on August 13, 2011, Skadden advised CWT that the ICMC board of directors, including all of the independent directors, had reconvened that day and voted to approve the Restructuring Proposal, as modified to remove the prepetition payments to the Senior Lenders aggregating $10 million in exchange for the Alleged Debtors' agreement that the Senior Lenders could retain the $10 million swept from the JPM Account and apply it to the Obligations. On August 14, 2011, Skadden sent CWT a revised restructuring term sheet and plan support agreement, reflecting those changes attached as Exhibit J.[7]

28. Following the affirmative vote of the ICMC board of directors, all that remained was for the board of directors of ICBC (i.e., the parent company) to also approve the Restructuring Proposal. On August 15, 2011, the Senior Lenders received ICMC's signature page to the execution version of the plan support agreement, a copy of which is attached as Exhibit K, and Skadden advised CWT that the ICBC board of directors was convening on August 16, 2011 to consider the Restructuring Proposal. On August 16, 2011, the Senior Lenders directed the Agent to apply the $10 million swept from the JPM Account to the Obligations, in accordance with Section 1.11(a) of the Senior Secured Credit Facility.

---

[7] The Senior Lenders submit the revised Restructuring Proposal term sheet only as proof that the Alleged Debtors backed out of the their agreement and for no other purposes.

29. Upon information and belief, shortly after the ICMC board meeting on August 13, 2011 – and entirely unbeknownst to the Senior Lenders – Mr. Sutton commandeered the ICBC board of directors in order to block any further progress toward a restructuring agreement. While the precise details of all that occurred in the 48 hours after ICMC's board meeting on August 13, 2011 are unclear, given the lack of communication from the Alleged Debtors, on information and belief, Mr. Sutton, as a member of the board of directors of ICBC, terminated the ICBC directorships of Charles M. Warfield (ICMC President and Chief Operations Officer), Lois Wright (ICMC Executive Vice President and General Counsel), and Edwin Shirley (a long-standing director of ICBC and ICMC), each of whom supported and voted in favor of the Restructuring Proposal in his or her capacity as director of ICMC, and installed new "professional" directors in their place. With Messrs. Warfield and Shirley and Ms. Wright removed from the ICBC (and possibly the ICMC) boards of directors, Mr. Sutton apparently proceeded to disavow the Restructuring Proposal, engage new restructuring counsel, Akin Gump Strauss Hauer & Feld LLP ("Akin"), and an investment bank, Rothschild, Inc., after having received counsel from Skadden and financial advisory services from Alvarez & Marsal for over three months.

30. The Senior Lenders first heard reports of Mr. Sutton's actions on August 16, 2011. Upon learning that the Restructuring Proposal was no longer supported by the Alleged Debtors, the Senior Lenders took reasonable measures to protect their rights to the Cash Collateral by sending the Agent the letter attached as Exhibit L that directed the Agent to (i) cease all actions to shift control of the JPM Account back to the Alleged Debtors and (ii) deliver an activation notice to Citibank, which initiated an automatic, daily sweep of all available funds on deposit in the Citibank Account. Further, the Senior Lenders directed the

15

Agent via the email attached as Exhibit M to sweep an additional $6 million from the JPM Account.

31. The Senior Lenders did not receive official confirmation from the Alleged Debtors regarding the outcome of the ICBC board of directors meeting until the following day on August 17, 2011, when Akin sent the letter attached as Exhibit N (the "Akin Letter") to CWT. Pursuant to the Akin Letter, the Alleged Debtors asserted that the Senior Lenders' sweep of $10 million from the JPM Account impaired the Alleged Debtors' ability to conduct day-to-day operations, demanded that the Senior Lenders immediately return $10 million to the Alleged Debtors. Incredibly, the Alleged Debtors went so far as to threaten to file chapter 7 petitions and seek a declaratory judgment with the Federal Communications Commission that the Senior Lenders' actions resulted in a *de facto* change of control of the Alleged Debtors (thus threatening the Alleged Debtors' FCC licenses) in the event that the Senior Lenders declined to comply with the Alleged Debtors' demands. Prior to the Akin Letter, there had been no communication whatsoever from the Alleged Debtors to the Senior Lenders regarding the Alleged Debtors' plans or intentions with respect to the Restructuring Proposal.

32. Later the same day, after CWT's attempts to reach Akin to discuss the Akin Letter were unsuccessful, the Senior Lenders sent the letter attached as Exhibit O to Akin, advising Akin that (i) the $10 million sweep from the JPM Account was effectuated after full disclosure to the Alleged Debtors' predecessor counsel, Skadden, (ii) the Senior Lenders were not aware of any of the Alleged Debtors' payment requests being denied by JPM as a result of the cash sweeps, and (iii) the Senior Lenders did not intend to return any swept cash. Furthermore, counsel for the Senior Lenders reached out to Akin only to receive no response. Indeed, the letter to Akin has been met with silence. Since the Senior Lenders first directed the

Agent to exercise control over the JPM Account on August 11, 2011, to the best of our knowledge, all payment requests by the Alleged Debtors have been honored and the Senior Lenders have never been advised by the Alleged Debtors or their counsel that the Alleged Debtors require additional cash in order to operate without interruption.

33. In addition, to further protect their rights in the Cash Collateral and to prevent the Alleged Debtors from acting rashly after the filing of the involuntary chapter 11 petitions, the Senior Lenders directed the Agent to sweep an additional $4.5 million from the JPM Account and $400,000 from the Citibank Account on August 19, 2011. These additional sweeps by the Senior Lenders are reasonable under the circumstances because the Alleged Debtors' recent financial performance data indicates that the Alleged Debtors' operations are cash neutral and, therefore, the Alleged Debtors will have sufficient funds to finance ongoing, ordinary course obligations.

34. In light of all that has transpired over the past few months – and, in particular over just the last few days (including the Alleged Debtors' threats to shut their businesses and file chapter 7 cases) – the Senior Lenders arrived at the rational conclusion that involuntary chapter 11 cases were the only way to avoid the costly, value-destructive chapter 7 cases threatened by the Alleged Debtors, and the only means to break the apparent impasse caused by entrenched equityholders who have disregarded their fiduciary duties as directors and officers of the Alleged Debtors. Thus, after over two years without any debt service payments, over one year of maturity, and several months of protracted, good faith negotiations with the Debtors, the Senior Lenders have commenced these chapter 11 cases reluctantly, as a method of last resort to preserve the value of the Collateral for all stakeholders and to drive an otherwise stagnate default situation forward to a successful resolution.

Dated: August 20, 2011
      New York, New York

CADWALADER, WICKERSHAM & TAFT LLP

 /s/ John J. Rapisardi
John J. Rapisardi, Esq.
Scott J. Greenberg, Esq.
One World Financial Center
New York, New York  10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
Email: john.rapisardi@cwt.com
          scott.greenberg@cwt.com

Peter Friedman, Esq. (pro hac vice pending)
700 Sixth Street, N.W.
Washington, D.C.  20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400
Email: peter.friedman@cwt.com

*Attorneys for Yucaipa Corporate Initiatives Fund II, LP and Yucaipa Corporate Initiatives (Parallel) Fund II, LP*

SCHULTE ROTH & ZABEL LLP
Adam C. Harris, Esq.
Meghan Breen, Esq.
919 Third Avenue
New York, New York  10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955
Email: adam.harris@srz.com

*Attorneys for CF ICBC LLC, Fortress Credit Funding I LP, and Drawbridge Special Opportunities Fund Ltd.*