**Exhibit A**

CREDIT AGREEMENT

Dated as of August 13, 2004

among

ICBC BROADCAST HOLDINGS, INC.,

as Borrower,

THE OTHER CREDIT PARTIES SIGNATORY HERETO

FROM TIME TO TIME,

as Credit Parties,

THE LENDERS PARTY HERETO

FROM TIME TO TIME,

as Lenders,

and

GENERAL ELECTRIC CAPITAL CORPORATION,

as Administrative Agent,

GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.,

as Syndication Agent,

GECC CAPITAL MARKETS GROUP, INC. and

GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.,

as Lead Arrangers

# TABLE OF CONTENTS

1. AMOUNT AND TERMS OF CREDIT ................................................................1
   1.1 Credit Facilities........................................................................2
   1.2 Letters of Credit .......................................................................4
   1.3 Prepayments.............................................................................4
   1.4 Use of Proceeds.........................................................................7
   1.5 Interest and Applicable Margins........................................................7
   1.6 Reserved................................................................................12
   1.7 Reserved................................................................................12
   1.8 Cash Management Systems ................................................................12
   1.9 Fees ...................................................................................12
   1.10 Receipt of Payments ..................................................................14
   1.11 Application and Allocation of Payments ...............................................14
   1.12 Loan Account and Accounting ..........................................................15
   1.13 Indemnity. ...........................................................................15
   1.14 Access ...............................................................................16
   1.15 Taxes ................................................................................17
   1.16 Capital Adequacy; Increased Costs; Illegality........................................18
   1.17 Single Loan ..........................................................................20
   1.18 Incremental Term Loan Commitments....................................................20

2. CONDITIONS PRECEDENT ........................................................................21
   2.1 Conditions to the Initial Loans.......................................................21
   2.2 Further Conditions to Each Loan.......................................................23
   2.3 Further Conditions to Each Incremental Term Loan .....................................24

3. REPRESENTATIONS AND WARRANTIES ..............................................................25
   3.1 Existence; Compliance with Law .......................................................25
   3.2 Executive Offices, Collateral Locations, FEIN; Organizational Number .................26
   3.3 Corporate Power, Authorization, Enforceable Obligations ..............................26
   3.4 Financial Statements and Projections .................................................26
   3.5 Material Adverse Effect...............................................................27
   3.6 Ownership of Property; Liens .........................................................28
   3.7 Labor Matters.........................................................................28
   3.8 Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness ............29
   3.9 Government Regulation.................................................................29
   3.10 Margin Regulations...................................................................29
   3.11 Taxes ...............................................................................29
   3.12 ERISA. ..............................................................................30
   3.13 No Litigation........................................................................31
   3.14 Brokers..............................................................................31

| | 3.15 | Intellectual Property | 31 |
| | 3.16 | Full Disclosure | 31 |
| | 3.17 | Environmental Matters | 32 |
| | 3.18 | Insurance | 33 |
| | 3.19 | Deposit and Disbursement Accounts | 33 |
| | 3.20 | Government Contracts | 33 |
| | 3.21 | Customer and Trade Relations | 33 |
| | 3.22 | Bonding; Licenses | 33 |
| | 3.23 | Solvency | 33 |
| | 3.24 | Status of ICMC | 33 |
| | 3.25 | Status of FCC Subsidiaries | 33 |
| | 3.26 | FCC Licenses and Station Matters | 34 |
| | 3.27 | OFAC | 36 |
| | 3.28 | Patriot Act | 36 |
| | 3.29 | Material Agreements and Other Documents | 36 |
| 4. | | FINANCIAL STATEMENTS AND INFORMATION | 37 |
| | 4.1 | Reports and Notices | 37 |
| | 4.2 | Communication with Accountants | 37 |
| 5. | | AFFIRMATIVE COVENANTS | 37 |
| | 5.1 | Maintenance of Existence and Conduct of Business | 37 |
| | 5.2 | Payment of Charges | 38 |
| | 5.3 | Books and Records | 38 |
| | 5.4 | Insurance; Damage to or Destruction of Collateral | 38 |
| | 5.5 | Compliance with Laws | 40 |
| | 5.6 | Supplemental Disclosure | 40 |
| | 5.7 | Intellectual Property | 41 |
| | 5.8 | Environmental Matters | 41 |
| | 5.9 | Landlords' Agreements, Mortgagee Agreements, Bailee Letters and Real Estate Purchases | 41 |
| | 5.10 | FCC Matters | 42 |
| | 5.11 | Reserved | 43 |
| | 5.12 | Reserved | 43 |
| | 5.13 | Interest Rate/Currency Fluctuations Protection | 43 |
| | 5.14 | Further Assurances | 43 |
| | 5.15 | Future Credit Parties | 43 |
| | 5.16 | License Subsidiaries | 43 |
| 6. | | NEGATIVE COVENANTS | 44 |
| | 6.1 | Mergers, Subsidiaries, Etc. | 44 |
| | 6.2 | Investments; Loans and Advances | 45 |
| | 6.3 | Indebtedness | 45 |
| | 6.4 | Affiliate Transactions; Employee Loans | 46 |
| | 6.5 | Capital Structure and Business | 47 |
| | 6.6 | Guaranteed Indebtedness | 47 |
| | 6.7 | Liens | 47 |

| | 6.8 | Sale of Stock and Assets | 47 |
|---|---|---|---|
| | 6.9 | ERISA | 48 |
| | 6.10 | Financial Covenants | 48 |
| | 6.11 | Hazardous Materials | 48 |
| | 6.12 | Sale-Leasebacks | 48 |
| | 6.13 | Restricted Payments | 48 |
| | 6.14 | Change of Corporate Name or Location; Change of Fiscal Year | 49 |
| | 6.15 | No Impairment of Intercompany Transfers | 49 |
| | 6.16 | Material Contracts | 49 |
| | 6.17 | ICMC; License Subsidiaries | 49 |
| | 6.18 | FCC Licenses | 50 |
| | 6.19 | Marketing Agreements | 50 |
| 7. | TERM | | 50 |
| | 7.1 | Termination | 50 |
| | 7.2 | Survival of Obligations Upon Termination of Financing Arrangements | 50 |
| 8. | EVENTS OF DEFAULT; RIGHTS AND REMEDIES | | 51 |
| | 8.1 | Events of Default | 51 |
| | 8.2 | Remedies. | 54 |
| | 8.3 | Co-operation of Credit Parties. | 55 |
| | 8.4 | Waivers by Credit Parties | 57 |
| | 8.5 | Consent to Receiver | 57 |
| | 8.6 | FCC Matters | 58 |
| 9. | ASSIGNMENT AND PARTICIPATIONS; APPOINTMENT OF AGENT | | 58 |
| | 9.1 | Assignment and Participations. | 58 |
| | 9.2 | Appointment of Agent | 61 |
| | 9.3 | Agent's Reliance, Etc. | 62 |
| | 9.4 | GE Capital and Affiliates | 63 |
| | 9.5 | Lender Credit Decision | 63 |
| | 9.6 | Indemnification | 64 |
| | 9.7 | Successor Agent | 64 |
| | 9.8 | Setoff and Sharing of Payments | 65 |
| | 9.9 | Advances; Payments; Non-Funding Lenders; Information; Actions in Concert. | 65 |
| 10. | SUCCESSORS AND ASSIGNS | | 68 |
| | 10.1 | Successors and Assigns | 68 |
| 11. | MISCELLANEOUS | | 68 |
| | 11.1 | Complete Agreement; Modification of Agreement. | 68 |
| | 11.2 | Amendments and Waivers | 68 |
| | 11.3 | Fees and Expenses | 71 |
| | 11.4 | No Waiver | 72 |
| | 11.5 | Remedies. | 72 |
| | 11.6 | Severability | 72 |
| | 11.7 | Conflict of Terms | 73 |

11.8    Confidentiality ............................................................................................................73
11.9    GOVERNING LAW...............................................................................................73
11.10   Notices ......................................................................................................................74
11.11   Section Titles ...........................................................................................................74
11.12   Counterparts.............................................................................................................74
11.13   WAIVER OF JURY TRIAL......................................................................................75
11.14   Press Releases and Related Matters ......................................................................75
11.15   Reinstatement...........................................................................................................75
11.16   Advice of Counsel.....................................................................................................75
11.17   No Strict Construction ............................................................................................76

## INDEX OF APPENDICES

| | | |
|---|---|---|
| Annex A (Recitals) | - | Definitions |
| Annex B (Section 1.2) | - | Letters of Credit |
| Annex C (Section 1.8) | - | Cash Management System |
| Annex D (Section 2.1(a)) | - | Closing Checklist |
| Annex E (Section 4.1(a)) | - | Financial Statements and Projections -- Reporting |
| Annex F (Section 4.1(b)) | - | Collateral Reports |
| Annex G (Section 6.10) | - | Financial Covenants |
| Annex H (Section 9.9(a)) | - | Lenders' Wire Transfer Information |
| Annex I (Section 11.10) | - | Notice Addresses |
| Annex J (from Annex A- Commitments definition) | - | Commitments as of Closing Date |
| | | |
| Exhibit 1.1(a)(i) | - | Form of Notice of Revolving Credit Advance |
| Exhibit 1.1(a)(ii) | - | Form of Revolving Note |
| Exhibit 1.1(b) | - | Form of Term Note |
| Exhibit 1.1(c)(i) | - | Form of Notice of Incremental Term Loan |
| Exhibit 1.5(d)(iii) | - | Form of Revolving Loan PIK Note |
| Exhibit 1.5(d)(iv) | - | Form of Term Loan PIK Note |
| Exhibit 1.5(f) | - | Form of Notice of Conversion/Continuation |
| Exhibit 9.1(a) | - | Form of Assignment Agreement |
| Exhibit A-1 | - | Form of Alta Make-Well Agreement |
| Exhibit B-1 | - | Application for Standby Letter of Credit |
| | | |
| Schedule 1.1 | - | Agent's Representatives |
| Disclosure Schedule 1.4 | - | Sources and Uses; Funds Flow Memorandum |
| Disclosure Schedule 3.1 | - | Type of Entity; State of Organization |
| Disclosure Schedule 3.2 | - | Executive Offices, Collateral Locations, FEIN |
| Disclosure Schedule 3.4(a) | - | Financial Statements |
| Disclosure Schedule 3.4(b) | - | Pro Forma |
| Disclosure Schedule 3.4(c) | - | Projections |
| Disclosure Schedule 3.4(d) | - | Fair Salable Balance Sheet |
| Disclosure Schedule 3.6 | - | Real Estate and Leases |
| Disclosure Schedule 3.7 | - | Labor Matters |
| Disclosure Schedule 3.8 | - | Ventures, Subsidiaries and Affiliates; Outstanding Stock |
| Disclosure Schedule 3.11 | - | Tax Matters |
| Disclosure Schedule 3.12 | - | ERISA Plans |
| Disclosure Schedule 3.13 | - | Litigation |
| Disclosure Schedule 3.14 | - | Brokers |
| Disclosure Schedule 3.15 | - | Intellectual Property |
| Disclosure Schedule 3.17 | - | Hazardous Materials |
| Disclosure Schedule 3.18 | - | Insurance |
| Disclosure Schedule 3.19 | - | Deposit and Disbursement Accounts |

| | | |
|---|---|---|
| Disclosure Schedule 3.20 | - | Government Contracts |
| Disclosure Schedule 3.22 | - | Bonds; Patent, Trademark Licenses |
| Disclosure Schedule 3.26(a) | - | Stations |
| Disclosure Schedule 3.26(b) | - | FCC Licenses |
| Disclosure Schedule 3.26(k) | - | Closing Date Marketing Agreements |
| Disclosure Schedule 3.29 | - | Material Agreements |
| Disclosure Schedule 5.1 | - | Trade Names |
| Disclosure Schedule 5.9 | - | Landlord Agreements |
| Disclosure Schedule 5.17(c) | - | Post Closing Real Estate Mortgages |
| Disclosure Schedule 5.17(d) | - | Post Closing Landlord Agreements |
| Disclosure Schedule 5.17(e) | - | Post Closing Blocked Account Agreements |
| Disclosure Schedule 6.3 | - | Indebtedness |
| Disclosure Schedule 6.4(a) | - | Transactions with Affiliates |
| Disclosure Schedule 6.4(c) | - | Compensation Levels |
| Disclosure Schedule 6.7 | - | Existing Liens |

This CREDIT AGREEMENT (this "Agreement"), dated as of August 13, 2004, among ICBC BROADCAST HOLDINGS, INC., a Delaware corporation ("Borrower"); the other Credit Parties signatory hereto; GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P., as Syndication Agent (the "Syndication Agent"), GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation (in its individual capacity, "GE Capital"), for itself, as Lender, and as Administrative Agent for Lenders (the "Agent"), and the other Lenders signatory hereto from time to time.

RECITALS

WHEREAS, Borrower has requested that Lenders extend revolving and term credit facilities to Borrower of One Hundred Ninety Seven Million Dollars ($197,000,000) in the aggregate for the purpose of refinancing certain indebtedness of Borrower, redeeming the preferred stock and related warrants of Inner City Media Corporation, a Delaware corporation ("ICMC"), to fund certain fees and expenses associated with this Agreement, the refinancing, the redemption and the other transactions contemplated hereby, and providing working capital financing for Borrower, funds for other general corporate purposes of Borrower and funds for other purposes permitted hereunder; and for these purposes, Lenders are willing to make certain loans and other extensions of credit to Borrower of such amount upon the terms and conditions set forth herein; and

WHEREAS, Borrower has agreed to secure all of its obligations under the Loan Documents (as defined herein) by granting to Agent, for the benefit of Agent and Lenders, a security interest in and lien upon substantially all of its existing and after-acquired personal and real property; and

WHEREAS, ICMC is willing to guarantee all of the obligations of Borrower to Agent and Lenders under the Loan Documents and to pledge to Agent, for the benefit of Agent and Lenders, all of the Stock of Borrower to secure such guaranty; and

WHEREAS, the Subsidiaries of Borrower are willing to guarantee all of the obligations of Borrower to Agent and Lenders under the Loan Documents and to pledge to Agent, for the benefit of Agent and Lenders, a security interest in and lien upon all of their existing and after acquired personal and real property, to the extent permitted by law, to secure such guaranty; and

WHEREAS, capitalized terms used in this Agreement shall have the meanings ascribed to them in Annex A and, for purposes of this Agreement and the other Loan Documents, the rules of construction set forth in Annex A shall govern. All Annexes, Disclosure Schedules, Exhibits and other attachments (collectively, "Appendices") hereto, or expressly identified to this Agreement, are incorporated herein by reference, and taken together with this Agreement, shall constitute but a single agreement. These Recitals shall be construed as part of the Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the parties hereto agree as follows:

## 1. AMOUNT AND TERMS OF CREDIT

**1.1 Credit Facilities.**

(a)     Revolving Credit Facility.

(i)     Subject to the terms and conditions hereof, each Revolving Lender agrees to make available to Borrower from time to time until the Commitment Termination Date its Pro Rata Share of revolving credit advances (each, a "Revolving Credit Advance"). The Pro Rata Share of the Revolving Loan of any Revolving Lender shall not at any time exceed its separate Revolving Loan Commitment. The obligations of each Revolving Lender to make Revolving Credit Advances hereunder shall be several and not joint. Until the Commitment Termination Date, and subject to the terms and conditions hereof, Borrower may from time to time borrow, repay and reborrow under this Section 1.1(a); provided, that the amount of any Revolving Credit Advance to be made at any time shall not exceed Borrowing Availability at such time. Each Revolving Credit Advance shall be made on notice by Borrower to one of the representatives of Agent identified in Schedule 1.1 at the address specified therein. Any such notice must be given no later than (1) noon (New York time) on the Business Day prior to the date of the proposed Revolving Credit Advance, in the case of an Index Rate Loan, or (2) noon (New York time) on the date which is three (3) Business Days prior to the proposed Revolving Credit Advance, in the case of a LIBOR Loan. Each such notice (a "Notice of Revolving Credit Advance") must be given in writing (by telefacsimile, telecopy or overnight courier) substantially in the form of Exhibit 1.1(a)(i), and shall include the information required in such Exhibit and such other information as may be reasonably required by Agent. If Borrower desires to have the Revolving Credit Advances bear interest by reference to a LIBOR Rate, it must comply with Section 1.5(h).

(ii)     Except as provided in Section 1.12, Borrower shall execute and deliver to each Revolving Lender a note to evidence the Revolving Loan Commitment of that Revolving Lender. Each note shall be in the principal amount of the Revolving Loan Commitment of the applicable Revolving Lender, dated the Closing Date and substantially in the form of Exhibit 1.1(a)(ii) (each a "Revolving Note" and, collectively, the "Revolving Notes"). Each Revolving Note shall represent the obligation of Borrower to pay the amount of Revolving Lender's Revolving Loan Commitment or, if less, such Revolving Lender's aggregate unpaid principal amount of all Revolving Credit Advances to Borrower together with interest thereon as prescribed in Section 1.5. The entire unpaid balance of the Revolving Loan and all other Obligations (other than contingent indemnification Obligations not yet due and payable) shall be immediately due and payable in full in immediately available funds on the Commitment Termination Date. Each payment of principal with respect to the Revolving Loan shall be paid to Agent for the ratable benefit of each Revolving Loan Lender, ratably in proportion to each such Revolving Loan Lender's respective Revolving Loan Commitment.

(b)     Term Loan B.

(i)     Subject to the terms and conditions hereof, each Term Lender agrees to make a term loan on the Closing Date to Borrower in the original principal amount of its Term Loan Commitment. The obligations of each Term Lender hereunder to make its Pro Rata Share of the Term Loan shall be several and not joint. The Term Loan shall be evidenced by promissory notes substantially in the form of Exhibit 1.1(b) (each a "Term Note" and

collectively the "Term Notes"), and, except as provided in Section 1.12, Borrower shall execute and deliver each Term Note to the applicable Term Lender. Each Term Note shall represent the obligation of Borrower to pay the amount of the applicable Term Lender's Term Loan Commitment, together with interest thereon as prescribed in Section 1.5. If Borrower desires to have the Closing Date Term Loan bear interest by reference to a LIBOR Rate, it must comply with Section 1.5(h).

(ii)     Borrower shall repay the principal amount of the Closing Date Term Loan in (A) sixteen (16) consecutive quarterly installments each in the amount of $233,750 on the last day of September, December, March and June, commencing September 30, 2005 through and including June 30, 2009, (B) one installment in the amount of $91,630,000 on September 30, 2009 and (C) a final installment equal to the remaining principal balance of the Term Loan on December 31, 2009. Borrower shall repay the principal amount of all Incremental Term Loans in quarterly installments equal to (A) 0.125% of the aggregate initial amount of all Incremental Term Loans funded hereunder, payable on the last day of September, December, March and June, commencing on the later of (i) June 30, 2005 and (ii) the first such date after the applicable Incremental Term Loan is funded, through and including June 30, 2009, (B) one installment in an amount equal to 48% of the aggregate initial amount of all Incremental Term Loans funded hereunder payable on September 30, 2009 and (C) a final installment equal to the remaining principal balance of the Term Loan payable on December 31, 2009.

(iii)     Notwithstanding Section 1.1(b)(ii), the aggregate outstanding principal balance of the Term Loan shall be due and payable in full in immediately available funds on the Commitment Termination Date, if not sooner paid in full. No payment with respect to the Term Loan may be reborrowed.

(iv)     Each payment of principal with respect to the Term Loan shall be paid to Agent for the ratable benefit of each Term Lender, ratably in proportion to each such Term Lender's respective Term Loan Commitment.

(c)     Incremental Term Loans.  To the extent that Incremental Term Loan Commitments are established pursuant to Section 1.18, each such Incremental Term Lender will make available to Borrower from time to time after the date such Incremental Term Loan Commitments are established and until the Incremental Term Loan Commitment Termination Date its Pro Rata Share of any incremental term loans (each, an "Incremental Term Loan"). The Pro Rata Share of the Incremental Term Loan of any Lender shall not at any time exceed its separate Incremental Term Loan Commitment.  The obligations of each Incremental Term Lender to make its Incremental Term Loans hereunder shall be several and not joint. Until the Incremental Term Loan Commitment Termination Date, and subject to the terms and conditions hereof, Borrower may from time to time borrow and repay, but not reborrow, under this Section 1.1(c); provided, that the aggregate amount of any Incremental Term Loans to be made at any time shall not exceed (i) $50,000,000 less (ii) the aggregate Incremental Term Loans previously funded (without giving effect to any payments of principal thereon). Each Incremental Term Loan shall be made on notice by Borrower to one of the representatives of Agent identified in Schedule 1.1 at the address specified therein.  Any such notice must be given no later than noon (New York time) at least 10 Business Days prior to the proposed Incremental Term Loans. Each such notice (a "Notice of Incremental Term Loan") must be given in writing (by telecopy or

overnight courier) substantially in the form of Exhibit 1.1(c)(i), and shall include the information required in such Exhibit and such other information as may be reasonably required by Agent. If Borrower desires to have any Incremental Term Loan bear interest by reference to a LIBOR Rate, it must comply with Section 1.5(h).

(d)     Reliance on Notices. Agent shall be entitled to rely upon, and shall be fully protected in relying upon, any Notice of Revolving Credit Advance, Notice of Incremental Term Loan, Notice of Conversion/Continuation or similar notice believed by Agent to be genuine. Agent may assume that each Person executing and delivering any notice in accordance herewith was duly authorized, unless the responsible individual acting thereon for Agent has actual knowledge to the contrary.

1.2     **Letters of Credit**. Subject to and in accordance with the terms and conditions contained herein and in Annex B, Borrower shall have the right to request, and Revolving Lenders agree to incur, or purchase participations in, Letter of Credit Obligations in respect of Borrower.

1.3     **Prepayments**.

(a)     Voluntary Prepayments; Reductions in Revolving Loan Commitments. Borrower may at any time on at least three (3) days' prior written notice to Agent (i) voluntarily prepay all or part of the Term Loan and/or (ii) permanently reduce (but not terminate) the Revolving Loan Commitment or permanently reduce or terminate the Incremental Term Loan Commitment; provided that (A) any such prepayments or reductions shall be in a minimum amount of $500,000 and integral multiples thereof, (B) the Revolving Loan Commitment shall not be reduced to an amount less than the amount of the Revolving Loan outstanding, (C) until the Incremental Term Loan Commitment Termination Date, the Incremental Term Loan Commitment shall not be reduced to an amount less than the amount of the Incremental Term Loan outstanding, and (D) after giving effect to such reductions, Borrower shall comply with Section 1.3(b)(i). Borrower may at any time on at least five (5) days' prior written notice to Agent terminate the Revolving Loan Commitment, provided that upon such termination all Loans and other Obligations shall be immediately due and payable in full and all Letter of Credit Obligations shall be cash collateralized or otherwise satisfied in accordance with Annex B hereto. Any voluntary prepayment must be accompanied by the payment of any LIBOR funding breakage costs in accordance with Section 1.13(b). Upon any such reduction or termination of the Revolving Loan Commitment, Borrower's right to request Revolving Credit Advances, or request that Letter of Credit Obligations be incurred on its behalf, shall simultaneously be permanently reduced or terminated, as the case may be; provided that a permanent reduction of the Revolving Loan Commitment shall not require a corresponding pro rata reduction in the L/C Sublimit, except to the extent that the Revolving Loan Commitment is reduced below the L/C Sublimit. Upon any such reduction or termination of the Incremental Term Loan Commitment, Borrower's right to request Incremental Term Loans shall simultaneously be permanently reduced or terminated, as the case may be. Each notice of partial prepayment shall designate the Loan or other Obligations to which such prepayment is to be applied; provided that any partial prepayments of the Term Loan shall be applied to prepay the scheduled installments of the Term Loan in inverse order of maturity.

(b)    Mandatory Prepayments.

(i)    If at any time the outstanding balances of the Revolving Loan exceeds the Maximum Amount, Borrower shall immediately repay the aggregate outstanding Revolving Credit Advances to the extent required to eliminate such excess. If any such excess remains after repayment in full of the aggregate outstanding Revolving Credit Advances, Borrower shall provide cash collateral for the Letter of Credit Obligations in the manner set forth in Annex B to the extent required to eliminate such excess. If at any time the outstanding balances of the Incremental Term Loans exceed the aggregate amount of the Incremental Term Loan Commitments, Borrower shall immediately repay the aggregate outstanding Incremental Term Loans to the extent required to eliminate such excess.

(ii)    Within 1 Business Day of receipt by any Credit Party of any cash proceeds of any asset disposition (other than proceeds from the disposition of assets permitted in Section 6.8(a), (b), (c), (d) and (e)), Borrower shall prepay the Loans (and cash collateralize Letter of Credit Obligations) in an amount equal to all such proceeds, net of (A) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by such Credit Party in connection therewith (in each case, paid to non-Affiliates), (B) sales, use and transfer taxes, (C) amounts payable to holders of senior Liens on such asset (to the extent such Liens constitute Permitted Encumbrances hereunder), if any, and (D) an appropriate reserve for income taxes paid in cash or estimated to be payable within the next tax year in cash in accordance with GAAP in connection therewith, provided that the reversal of such reserve shall be applied to prepay the Obligations as aforesaid. Any such prepayment shall be applied in accordance with Section 1.3(c). Notwithstanding the foregoing, if no Default or Event of Default has occurred and is continuing, Agent shall permit the applicable Credit Party to replace the assets disposed except with respect to the sale of WHAT(AM) in Philadelphia, Pennsylvania; provided that if such Credit Party has not completed such replacement within 180 days of such asset disposition, Agent shall apply such proceeds to the Obligations in accordance with Section 1.3(c), provided that in the case of proceeds pertaining to any Credit Party other than Borrower, such proceeds shall be applied to the Loans owing by Borrower. All proceeds that are to be made available to Borrower to replace the assets disposed shall be applied by Agent to reduce the outstanding principal balance of the Revolving Loan (which application shall not result in a permanent reduction of the Revolving Loan Commitment). All proceeds made available to any Credit Party that is not a Borrower to replace the assets disposed shall be deposited in a cash collateral account. Thereafter, such funds shall be made available to such Credit Party to provide funds to replace the assets disposed as follows: (i) Borrower shall request a Revolving Credit Advance or a release from the cash collateral account be made to such Credit Party in the amount requested to be released; (ii) so long as the conditions set forth in Section 2.2 have been met, Revolving Lenders shall make such Revolving Credit Advance or Agent shall release funds from the cash collateral account; and (iii) in the case of proceeds applied against the Revolving Loan, the Reserve established with respect to such proceeds shall be reduced by the amount of such Revolving Credit Advance.

(iii)    If ICMC or Borrower issues Stock (other than (a) any issuances of Stock on the Closing Date to shareholders of ICMC pursuant to the terms of the Preferred Equity Documents, (b) capital contribution made pursuant to the Alta Make-Well Agreement or (c) issuances of Stock to fund acquisitions approved by Agent and the Requisite Lenders, Capital

Expenditures and working capital in an aggregate amount not to exceed $3,000,000 per Fiscal Year and not to exceed $10,000,000 in the aggregate during the term of this Agreement) or incurs Indebtedness (other than proceeds of Indebtedness permitted under Section 6.3), no later than the Business Day following the date of receipt of the proceeds thereof, Borrower shall prepay the Loans (and cash collateralize Letter of Credit Obligations) in an amount equal to all cash proceeds, net of underwriting discounts and commissions and other reasonable costs paid to non-Affiliates in connection therewith. Any such prepayment shall be applied in accordance with Section 1.3(c).

(iv)     Commencing with respect to the Excess Cash Flow generated during the Fiscal Year ending December 31, 2005 and until the Termination Date, Borrower shall prepay the Obligations (and cash collateralize Letter of Credit Obligations) on the earlier of (1) the date on which Borrower's annual audited Financial Statements for the immediately preceding Fiscal Year are delivered pursuant to Annex E or (2) the date on which such annual audited Financial Statements were required to be delivered pursuant to Annex E, in an amount equal to (A) seventy-five percent (75%) of Excess Cash Flow for the immediately preceding Fiscal Year if the Leverage Ratio as of the last day of such Fiscal Year is greater than or equal to 6.0:1.0 and (B) fifty percent (50%) of Excess Cash Flow for the immediately preceding Fiscal Year otherwise. Any prepayments from Excess Cash Flow paid pursuant to this clause (iv) shall be applied in accordance with Section 1.3(c). Each such prepayment shall be accompanied by a certificate signed by Borrower's chief financial officer certifying the manner in which Excess Cash Flow and the resulting prepayment were calculated, which certificate shall be in form and substance reasonably satisfactory to Agent.

(c)     Application of Certain Mandatory Prepayments. Any prepayments made by Borrower pursuant to Sections 1.3(b)(ii), (iii) or (iv) above, and any prepayments made from insurance or condemnation proceeds in accordance with Section 5.4(b) or (c) and the Mortgage(s), respectively, shall be applied as follows: first, to pay Fees and reimbursable expenses of the Agent then due and payable pursuant to any of the Loan Documents; second to any expenses of Lenders then due and payable pursuant to any of the Loan Documents to the extent reimbursable under Section 11.3; third to pay Fees and interest to the extent accrued and unpaid in cash on the Loans, ratably in proportion to such Fees and interest payable in cash accrued as to each Loan; fourth to prepay the outstanding principal balance of the PIK Loans; fifth to prepay the outstanding principal balance of the Loans other than PIK Loans (which prepayment shall be applied (i) with respect to the Term Loan, to the remaining scheduled principal installments in inverse order of maturity and (ii) with respect to any Letter of Credit Obligations, to provide cash collateral therefor in the manner set forth in Annex B); and sixth to pay any other Obligations that may then be due and owing. If on the date of such mandatory prepayment a Default or Event of Default shall have occurred and be continuing, then the Revolving Loan Commitment shall be permanently reduced by the amount of any prepayment allocated to the Revolving Loan.

(d)     No Implied Consent. Nothing in this Section 1.3 shall be construed to constitute Agent's or any Lender's consent to any transaction that is not  permitted by other provisions of this Agreement or the other Loan Documents.

**1.4** <u>Use of Proceeds</u>. Borrower shall utilize the proceeds of the Loans on the Closing Date solely for the Refinancing (and to pay any related transaction expenses), and shall utilize the proceeds of Revolving Credit Advances and Letter of Credit Obligations made after the Closing Date for the financing of Borrower's ordinary working capital purposes, permitted capital expenditures, acquisitions to the extent approved by the Requisite Lenders in writing and general corporate needs. <u>Disclosure Schedule 1.4</u> contains a description of Borrower's sources and uses of funds as of the Closing Date, including Loans and Letter of Credit Obligations to be made or incurred on that date, and a funds flow memorandum detailing how funds from each source are to be transferred to particular uses. The Borrower shall utilize the proceeds of Incremental Term Loans solely to finance Acquisitions (and to pay fees and expenses related thereto) approved in writing by the Requisite Lenders.

**1.5** <u>Interest and Applicable Margins</u>.

(a) Borrower shall pay interest to Agent, for the ratable benefit of Lenders in accordance with the various Loans being made by each Lender, in arrears on each applicable Interest Payment Date, at the following rates: (i) with respect to the Revolving Credit Advances, the Index Rate plus the Applicable Revolver Index Margin per annum or, at the election of Borrower so long as no Default or Event of Default has occurred and is continuing, the applicable LIBOR Rate plus the Applicable Revolver LIBOR Margin per annum; and (ii) with respect to the Term Loan, the Index Rate plus the Applicable Term Loan Index Margin per annum or, at the election of Borrower so long as no Default or Event of Default has occurred and is continuing, the applicable LIBOR Rate plus the Applicable Term Loan LIBOR Margin per annum.

(b) The Applicable Term Loan Index Margin per annum shall not be subject to adjustment (except as provided in <u>Section 1.5(c)</u>) and shall at all times on and after the Closing Date be 2.50%. The Applicable Term Loan LIBOR Margin per annum shall not be subject to adjustment (except as provided in <u>Section 1.5(c)</u>) and shall at all times on and after the Closing Date be 4.00%.

(c) The Applicable Revolver Index Margin initially shall be 2.50%, and the Applicable Revolver LIBOR Margin initially shall be 4.00%. The Applicable Revolver Index Margin and the Applicable Revolver LIBOR Margin shall be subject to adjustment as set forth below, adjusted by reference to the following grids:

| If the Leverage Ratio is: | Level of Applicable Margins: |
|---|---|
| $\geq 8.0{:}1.0$ | Level I |
| $\geq 7.0{:}1.0$, but $< 8.0{:}1.0$ | Level II |
| $\geq 6.0{:}1.0$, but $< 7.0{:}1.0$ | Level III |
| $\geq 5.50{:}1.0$, but $< 6.0{:}1.0$ | Level IV |

| | Level V |
|---|---|
| ≥ 5.0:1.0, but < 5.50:1.0 | Level V |
| < 5.0:1.0 | Level VI |

| | Applicable Revolver Margins | | | | | |
|---|---|---|---|---|---|---|
| | Level I | Level II | Level III | Level IV | Level V | Level VI |
| Applicable Revolver Index Margin | 2.50% | 2.25% | 2.00% | 1.75% | 1.50% | 1.25% |
| Applicable Revolver LIBOR Margin | 4.00% | 3.75% | 3.50% | 3.25% | 3.00% | 2.75% |

Adjustments in the Applicable Revolver Index Margin and the Applicable Revolver LIBOR Margin commencing with the Fiscal Quarter ending September 30, 2004 shall be implemented quarterly on a prospective basis, for each calendar month commencing at least five (5) days after the date of delivery to Lenders of the quarterly unaudited or annual audited (as applicable) Financial Statements evidencing the need for an adjustment. Concurrently with the delivery of those Financial Statements, Borrower shall deliver to Agent and Lenders a certificate, signed by its chief financial officer, setting forth in reasonable detail the basis for the continuance of, or any change in, the Applicable Revolver Index Margin and the Applicable Revolver LIBOR Margin. Failure to timely deliver such Financial Statements shall, in addition to any other remedy provided for in this Agreement, result in an increase in the Applicable Revolver Index Margin and the Applicable Revolver LIBOR Margin to the highest level set forth in the foregoing grid, until the first day of the first calendar month that begins after the delivery of those Financial Statements demonstrating that such an increase is not required. If a Default or an Event of Default has occurred and is continuing at the time any reduction in the Applicable Revolver Index Margin and the Applicable Revolver LIBOR Margin is to be implemented, that reduction shall be deferred until the first day of the first calendar month that begins after the date on which such Default or Event of Default is waived or cured.

(d)    (i) In addition to the interest payable pursuant to Section 1.5(a) hereof on the Revolving Loan, Borrower shall pay to Agent, for the ratable benefit of the Revolving Lenders, in arrears on each applicable PIK Interest Payment Date occurring after the Closing Date through but not including the Termination Date, additional interest at the rate of three percent (3.00%) per annum based on the daily aggregate principal balance of the Revolving Loan outstanding from time to time (such additional interest is referred to herein as "Revolving Loan PIK Interest").

(ii)    In addition to the interest payable pursuant to Section 1.5(a) hereof on the Term Loan, Borrower shall pay to Agent, for the ratable benefit of the Term Lenders, in arrears on each applicable PIK Interest Payment Date occurring after the Closing Date through but not including the Termination Date, additional interest at the rate of three percent (3.00%) per annum

based on the daily aggregate principal balance of the Term Loan outstanding from time to time (such additional interest is referred to herein as "Term Loan PIK Interest"; together with Revolving Loan PIK Interest is referred to herein collectively as "PIK Interest").

(iii)     Subject to Section 1.12, all Revolving Loan PIK Interest accruing hereunder that becomes due and payable on a PIK Interest Payment Date shall be evidenced by a promissory note, substantially in the form of Exhibit 1.5(d)(iii) (each a "Revolving Loan PIK Note"), duly executed and delivered by Borrower to each Revolving Lender on the Closing Date or, in the case of any such Lender that becomes a Lender after the Closing Date, on the date that such Lender becomes a Revolving Lender. The Borrower hereby irrevocably authorizes each Revolving Lender to make (or cause to be made) appropriate notations as to the amount of such Revolving Lender's Pro Rata Share of Revolving Loan PIK Interest and the amount of each payment or prepayment of Revolving Loan PIK Interest and interest thereon on the reverse of, or on an attachment to, such Revolving Lender's Revolving Loan PIK Note. Such notations shall be presumed correct and binding on the Borrower absent manifest error; provided, however, that the failure of any Revolving Lender to make any such notations shall not limit or otherwise affect any Obligations of the Borrower or any other Credit Party.

(iv)     All Term Loan PIK Interest accruing hereunder that becomes due and payable on a PIK Interest Payment Date shall be evidenced by a promissory note, substantially in the form of Exhibit 1.5(d)(iv) (each a "Term Loan PIK Note"; together with the Revolving Loan PIK Notes referred to herein collectively as the "PIK Notes"), duly executed and delivered by Borrower to each Term Lender on the Closing Date or, in the case of any such Lender that becomes a Lender after the Closing Date, on the date that such Lender becomes a Term Lender. The Borrower hereby irrevocably authorizes each Term Lender to make (or cause to be made) appropriate notations as to the amount of such Term Lender's Pro Rata Share of Term Loan PIK Interest and the amount of each payment or prepayment of Term Loan PIK Interest and interest thereon on the reverse of, or on an attachment to, such Term Lender's Term Loan PIK Note. Such notations shall be presumed correct and binding on the Borrower absent manifest error; provided, however, that the failure of any Term Lender to make any such notations shall not limit or otherwise affect any Obligations of the Borrower or any other Credit Party.

(v)     All accrued Revolving Loan PIK Interest that becomes due and payable on a PIK Interest Payment Date shall be deemed the extension of an additional loan pursuant to the terms of, and subject to, all Loan Documents (such accrued Revolving Loan PIK Interest is referred to herein as a "Revolving PIK Loan"). The failure of the Borrower to issue to any Lender a Revolving Loan PIK Note as provided in Section 1.5(d)(iii) shall not alter or affect the payment obligations of the Borrower as to all accrued Revolving Loan PIK Interest or the obligation of the Borrower to pay the amount due on such PIK Interest Payment Date under the terms applicable to a Revolving PIK Loan, and such accrued and unpaid amount shall in all events be deemed to be a Revolving PIK Loan hereunder notwithstanding any action or non-action of the Borrower. The entire unpaid balance of all Revolving PIK Loans shall be immediately due and payable in full in immediately available funds on the earlier of (A) the first Interest Payment Date following the fifth anniversary of the Closing Date (the "PIK Payment Date") or (B) the Commitment Termination Date. In the event that such payment occurs on the PIK Payment Date, all subsequently accrued Revolving Loan PIK Interest that becomes due and

payable on a subsequent PIK Interest Date shall be immediately due and payable in full in immediately available funds on such date. The amount of any Revolving PIK Loan shall not be included in the calculation of the amount of the Revolving Loan or the Revolving Loan Commitments.

(vi)     All accrued Term Loan PIK Interest that becomes due and payable on a PIK Interest Payment Date shall be deemed the extension of an additional loan pursuant to the terms of, and subject to, all Loan Documents (such accrued Term Loan PIK Interest is referred to herein as a "Term PIK Loan"). The failure of the Borrower to issue to any Term Lender a Term Loan PIK Note as provided in Section 1.5(d)(iv) shall not alter or affect the payment obligations of the Borrower as to all accrued Term Loan PIK Interest or the obligation of the Borrower to pay the amount due on such PIK Interest Payment Date under the terms applicable to a Term PIK Loan, and such accrued and unpaid amount shall in all events be deemed to be a Term PIK Loan hereunder notwithstanding any action or non-action of the Borrower. The entire unpaid balance of all Term PIK Loans shall be immediately due and payable in full in immediately available funds on the earlier of (A) the PIK Payment Date or (B) the Commitment Termination Date. In the event that such payment occurs on the PIK Payment Date, all subsequently accrued Term Loan PIK Interest that becomes due and payable on a subsequent PIK Interest Date shall be immediately due and payable in full in immediately available funds on such date. The amount of any Term PIK Loan shall not be included in the calculation of the amount of the Term Loan or the Term Loan Commitments.

(vii) Interest on each Revolving PIK Loan shall accrue at the Index Rate plus the Applicable Revolver Index Margin per annum or, at the election of Borrower and so long as no Default or Event of Default shall have occurred and be continuing, the applicable LIBOR Rate plus the Applicable Revolver LIBOR Margin per annum based on the daily aggregate Revolving PIK Loan outstanding from time to time; provided that if a Default or an Event of Default shall have occurred and be continuing, interest on each Revolving PIK Loan shall accrue at the Index Rate plus the Applicable Revolver Index Margin per annum from and after the date of occurrence of such Default or Event of Default. Interest on each Revolving PIK Loan shall be due and payable in cash in arrears on each applicable Interest Payment Date. In addition to the cash pay interest provided for in the immediately preceding sentence, each Revolving PIK Loan shall accrue additional interest (such additional interest is referred to herein as "Additional Revolving PIK Interest") at the rate of three percent (3.00%) per annum based on the daily aggregate principal balance of such Revolving PIK Loan outstanding from time to time, which Additional Revolving PIK Interest shall be calculated as of each PIK Interest Payment Date and payable in arrears by adding such accrued interest to the outstanding principal of each Revolving Loan PIK Note and subject to the payment requirements set forth in Section 1.5(d)(v).

(viii)   Interest on each Term PIK Loan shall accrue at the Index Rate plus the Applicable Term Loan Index Margin per annum or, at the election of Borrower and so long as no Default or Event of Default shall have occurred and be continuing, the applicable LIBOR Rate plus the Applicable Term Loan LIBOR Margin per annum based on the aggregate Term PIK Loan outstanding from time to time; provided that if a Default or an Event of Default shall have occurred and be continuing, interest on each Term PIK Loan shall accrue at the Index Rate plus the Applicable Term Loan Index Margin per annum from and after the date of occurrence of

such Default or Event of Default. Interest on each Term PIK Loan shall be due and payable in cash in arrears on each applicable Interest Payment Date. In addition to the cash pay interest provided for in the immediately preceding sentence, each Term PIK Loan shall accrue additional interest (such additional interest is referred to herein as "Additional Term PIK Interest") at the rate of three percent (3.00%) per annum based on the daily aggregate principal balance of such Term PIK Loan outstanding from time to time, which Additional Term PIK Interest shall be calculated as of each PIK Interest Payment Date and payable in arrears by adding such accrued interest to the outstanding principal of each Term Loan PIK Note and subject to the payment requirements set forth in Section 1.5(d)(vi).

(e) If any payment on any Loan or Commitment becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day (except as set forth in the definition of LIBOR Period) and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(f) All computations of Fees calculated on a per annum basis and interest shall be made by Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such interest and Fees are payable. The Index Rate is a floating rate determined for each day. Each determination by Agent of interest rates and Fees hereunder shall be final, binding and conclusive evidence of the correctness of such rates and Fees, absent manifest error.

(g) So long as an Event of Default has occurred and is continuing, the interest rates applicable to the Loans (including without limitation the PIK Loans) and the Letter of Credit Fees shall be increased by two percentage points (2%) per annum above the rates of interest or the rate of such Fees otherwise applicable hereunder unless Requisite Lenders elect to impose a smaller increase (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations; provided, however, the Requisite Lenders shall have the right to waive the Default Rate upon written notice to Agent. Interest and Letter of Credit Fees at the Default Rate shall accrue from the initial date of such Event of Default until that Event of Default is cured or waived and shall be payable upon demand.

(h) Subject to the conditions precedent set forth in Section 2.2, Borrower shall have the option to (i) request that any Revolving Credit Advance or Incremental Term Loan be made as a LIBOR Loan, (ii) convert at any time all or any part of outstanding Loans from Index Rate Loans to LIBOR Loans or (iii) continue all or any portion of any Loan as a LIBOR Loan upon the expiration of the applicable LIBOR Period and the succeeding LIBOR Period of that continued Loan shall commence on the first day after the last day of the LIBOR Period of the Loan to be continued. Borrower shall have the option to convert any LIBOR Loan to an Index Rate Loan, subject to payment of LIBOR breakage costs in accordance with Section 1.13(b) if such conversion is made prior to the expiration of the LIBOR Period applicable thereto. Any Loan or group of Loans having the same proposed LIBOR Period to be made or continued as, or converted into, a LIBOR Loan must be in a minimum amount of $1,000,000 and integral multiples of $500,000 in excess of such amount. Any such election must be made by noon (New York time) on the third Business Day prior to (1) the date of any proposed Revolving Credit Advance or the making of any Incremental Term Loan which is to bear interest at the LIBOR

Rate, (2) the end of each LIBOR Period with respect to any LIBOR Loans to be continued as such, or (3) the date on which Borrower wishes to convert any Index Rate Loan to a LIBOR Loan for a LIBOR Period designated by Borrower in such election. If no election is received with respect to a LIBOR Loan by noon (New York time) on the third Business Day prior to the end of the LIBOR Period with respect thereto (or if a Default or an Event of Default has occurred and is continuing or the additional conditions precedent set forth in Section 2.2 shall not have been satisfied), that LIBOR Loan shall be converted to an Index Rate Loan at the end of its LIBOR Period. Borrower must make such election by notice to Agent in writing, by telecopy or overnight courier. In the case of any conversion or continuation, such election must be made pursuant to a written notice (a "Notice of Conversion/Continuation") in the form of Exhibit 1.5(f). No Loan may be made as or converted into a LIBOR Loan until the earlier of (i) ninety (90) days after the Joint Syndication Commencement Date (as defined in the Commitment Letter) or (ii) completion of the Primary Syndication as determined by Agent and Syndication Agent.

(i)      Notwithstanding anything to the contrary set forth in this Section 1.5, if a court of competent jurisdiction determines in a final order after the exhaustion or expiration of available appeals that the rate of interest or any Fee payable hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest or any Fee payable hereunder shall be equal to the Maximum Lawful Rate; provided, however, that if at any time thereafter the rate of interest or such Fee payable hereunder is less than the Maximum Lawful Rate, Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest or such Fee received by Agent, on behalf of Lenders, is equal to the total interest or Fees that would have been received had the interest rate or such Fee payable hereunder been (but for the operation of this paragraph) the interest rate or Fee payable since the Closing Date as otherwise provided in this Agreement. In no event shall the total interest or Fee received by any Lender pursuant to the terms hereof exceed the amount that such Lender could lawfully have received had the interest or Fee due hereunder been calculated for the full term hereof at the Maximum Lawful Rate.

**1.6      Reserved.**

**1.7      Reserved.**

**1.8      Cash Management Systems.** On or prior to the Closing Date, Borrower will establish and will maintain until the Termination Date, the cash management systems described in Annex C (the "Cash Management Systems").

**1.9      Fees.**

(a)      Borrower shall pay to GE Capital and GSSLG, individually, the Fees specified in the Fee Letter.

(b)      As additional compensation for the Revolving Lenders, Borrower shall pay to Agent, for the ratable benefit of (and distribution to) such Lenders, in arrears, on the first Business Day of each quarter prior to the Commitment Termination Date and on the

Commitment Termination Date, a Fee for Borrower's non-use of available funds in an amount equal to three-quarters of one percent (0.75%) per annum (calculated on the basis of a 360 day year for actual days elapsed) multiplied by the average of the daily excess of (x) the Maximum Amount (as it may be reduced from time to time) over (y) the daily closing balance of the Revolving Loan outstanding during the period for which such Fee is due.

(c)     To the extent that the Incremental Term Loan Commitments have been established hereunder, as additional compensation for the Incremental Term Lenders, Borrower shall pay to Agent, for the ratable benefit of (and distribution to) such Lenders, in arrears, on the first Business Day of each quarter prior to the Incremental Term Loan Commitment Termination Date and on the Incremental Term Loan Commitment Termination Date, a Fee for Borrower's non-use of available funds in an amount equal to three-quarters of one percent (0.75%) per annum (calculated on the basis of a 360 day year for actual days elapsed) multiplied by the average of the daily excess of (x) the aggregate amount of the Incremental Term Loan Commitments (as reduced from time to time) over (y) the daily total amount of the Incremental Term Loans funded (without giving effect to any principal reductions thereof).

(d)     If Borrower pays after acceleration or prepays all or any portion of the Term Loan, Term PIK Loan, Revolving PIK Loan or prepays the Revolving Loan and reduces or terminates the Revolving Loan Commitment, whether voluntarily or involuntarily and whether before or after acceleration of the Obligations or if the Commitments are otherwise terminated, Borrower shall pay to Agent, for the benefit of the applicable Lenders as liquidated damages and compensation for the costs of being prepared to make funds available hereunder an amount equal to the Applicable Percentage (as defined below) multiplied by the sum of (i) the principal amount of the Term Loan, Term PIK Loan and/or Revolving PIK Loan, as the case may be, paid after acceleration or prepaid, and (ii) the amount of the reduction of the Revolving Loan Commitment. As used herein, the term "Applicable Percentage" shall mean (x) three percent (3.00%), in  the case of such payment, prepayment or reduction on or prior to the first anniversary of the Closing Date, (y) two percent (2.00%), in the case of such payment, prepayment or reduction after the first anniversary of the Closing Date but on or prior to the second anniversary thereof, and (z) one percent (1.00%), in the case of such payment, prepayment or reduction after the second anniversary of the Closing Date but on or prior to the third anniversary thereof.  The Credit Parties agree that the Applicable Percentages are a reasonable calculation of Lenders' lost profits in view of the difficulties and impracticality of determining actual damages resulting from an early termination of the Commitments or repayments of the Loans.  Notwithstanding the foregoing, no prepayment fee shall be payable by Borrower upon a mandatory prepayment made pursuant to Section 1.3(b)(i), Section 1.3(b)(ii) solely with respect to Permitted Station Sales (provided that any prepayment from the proceeds of the sale of WHAT(AM) in excess of $10,000,000 shall be subject to the prepayment fee required under this Section 1.9(d)), Section 1.3(b)(iii) or Section 1.3(b)(iv) (up to the required amount of such mandatory Excess Cash Flow payment); so long as Borrower does not permanently reduce or terminate the Revolving Loan Commitment upon any such prepayment and, in the case of prepayments made pursuant to Sections 1.3(b)(ii) or (b)(iii), the transaction giving rise to the applicable prepayment is expressly permitted under Section 6.

(e)     Borrower shall pay to Agent, for the ratable benefit of (and distribution to) Revolving Lenders, the Letter of Credit Fee as provided in Annex B.

**1.10    Receipt of Payments**.  Borrower shall make each payment under this Agreement not later than 2:00 p.m. (New York time) on the day when due in immediately available funds in Dollars to the Collection Account.  For purposes of computing interest and Fees and determining Borrowing Availability as of any date, all payments shall be deemed received on the Business Day on which immediately available funds therefor are received in the Collection Account prior to 2:00 p.m. New York time.  Payments received after 2:00 p.m. New York time on any Business Day or on a day that is not a Business Day shall be deemed to have been received on the following Business Day.

## 1.11    Application and Allocation of Payments.

(a)    So long as no Event of Default has occurred and is continuing, (i) payments matching specific scheduled payments then due shall be applied to those scheduled payments; (ii) voluntary prepayments shall be applied in accordance with the provisions of Section 1.3(a); and (iii) mandatory prepayments shall be applied as set forth in Section 1.3(c). All payments and prepayments applied to a particular Loan shall be applied ratably to the portion thereof held by each Lender as determined by its Pro Rata Share.  As to any other payment, and as to all payments made when an Event of Default has occurred and is continuing or following the Commitment Termination Date, Borrower hereby irrevocably waives the right to direct the application of any and all payments received from or on behalf of Borrower, and Borrower hereby irrevocably agrees that payments shall be applied to amounts then due and payable in the following order: first to pay Fees and reimbursable expenses of the Agent then due and payable pursuant to any of the Loan Documents; second to expenses of Lenders then due and payable pursuant to any of the Loan Documents to the extent reimbursable under Section 11.3; third to pay Fees and interest then to the extent accrued and unpaid in cash on the Loans, ratably in proportion to such Fees and interest payable in cash accrued as to each Loan; fourth to prepay the outstanding principal balance of the PIK Loans; fifth to prepay the outstanding principal balance of the Loans other than PIK Loans (which prepayment shall be applied (i) with respect to the Term Loan, to the remaining scheduled principal installments in inverse order of maturity and (ii) with respect to any Letter of Credit Obligations, to provide cash collateral therefor in the manner set forth in Annex B); and sixth to pay any other Obligations that may then be due and owing; provided, however, Agent may in its sole and absolute discretion allocate payments for its Fees and expenses reimbursable hereunder to any other Obligation as it may deem advisable. If on the date of any such prepayment a Default or Event of Default shall have occurred and be continuing, then the Revolving Loan Commitment shall be permanently reduced by the amount of any prepayment allocated to the Revolving Loan.

(b)    Agent is authorized to, and at its sole election may, charge to the Revolving Loan balance on behalf of Borrower and cause to be paid all Fees, expenses, Charges, costs (including insurance premiums in accordance with Section 5.4(a)) and interest and principal, other than principal of the Revolving Loan, owing by Borrower under this Agreement or any of the other Loan Documents if and to the extent Borrower fails to pay promptly any such amounts as and when due, even if the amount of such charges would exceed Borrowing Availability at such time.  At Agent's option and to the extent permitted by law, any charges so made shall constitute part of the Revolving Loan hereunder.

**1.12    Loan Account and Accounting**.  Agent shall maintain a loan account (the "Loan Account") on its books to record: all Revolving Credit Advances and the Term Loan, all payments made by Borrower, and all other debits and credits as provided in this Agreement with respect to the Loans or any other Obligations.  All entries in the Loan Account shall be made in accordance with Agent's customary accounting practices as in effect from time to time.  The balance in the Loan Account, as recorded on Agent's most recent printout or other written statement, shall, absent manifest error, be final, binding and conclusive evidence of the amounts due and owing to Agent and Lenders by Borrower; provided that any failure to so record or any error in so recording shall not limit or otherwise affect Borrower's duty to pay the Obligations.  Agent shall render to Borrower a monthly accounting of transactions with respect to the Loans setting forth the balance of the Loan Account for the immediately preceding month.  Unless Borrower notifies Agent in writing of any objection to any such accounting (specifically describing the basis for such objection), within thirty (30) days after the date thereof, each and every such accounting shall, absent manifest error, be final, binding and conclusive evidence of all matters reflected therein.  Only those items expressly objected to in such notice shall be deemed to be disputed by Borrower.  Notwithstanding any provision herein contained to the contrary, any Lender may elect (which election may be revoked) to dispense with the issuance of Notes to that Lender and may rely on the Loan Account as evidence of the amount of Obligations from time to time owing to it.

**1.13    Indemnity.**

(a)    Each Credit Party that is a signatory hereto shall jointly and severally indemnify and hold harmless each of Agent, Syndication Agent, Lenders and their respective Affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted by any third party or by any Credit Party against, or incurred by, any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, including any and all Environmental Liabilities and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents (collectively, "Indemnified Liabilities"); provided, that no such Credit Party shall be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results from that  Indemnified Person's gross negligence or willful misconduct or the gross negligence or willful misconduct of such Indemnified Person's Affiliates, officers, directors, employees, attorneys, agents or representatives, in each case as finally determined by a court of competent jurisdiction after the exhaustion or expiration of available appeals.  NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY LOAN DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR

TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER. The indemnities and payment obligations in this Section 1.13(a) shall survive the termination of this Agreement.

(b) To induce Lenders to provide the LIBOR Rate option on the terms provided herein, if (i) any LIBOR Loans are repaid in whole or in part prior to the last day of any applicable LIBOR Period (whether that repayment is made pursuant to any provision of this Agreement or any other Loan Document or occurs as a result of acceleration, by operation of law or otherwise); (ii) Borrower shall default in payment when due of the principal amount of or interest on any LIBOR Loan; (iii) Borrower shall refuse to accept any borrowing of, or shall request a termination of any borrowing of, conversion into or continuation of LIBOR Loans after Borrower has given notice requesting the same in accordance herewith; or (iv) Borrower shall fail to make any prepayment of a LIBOR Loan after Borrower has given a notice thereof in accordance herewith, then Borrower shall indemnify and hold harmless each Lender from and against all losses, costs and expenses resulting from or arising from any of the foregoing. Such indemnification shall include any loss (including loss of margin) or expense arising from the reemployment of funds obtained by it or from fees payable to terminate deposits from which such funds were obtained. For the purpose of calculating amounts payable to a Lender under this subsection, each Lender shall be deemed to have actually funded its relevant LIBOR Loan through the purchase of a deposit bearing interest at the LIBOR Rate in an amount equal to the amount of that LIBOR Loan and having a maturity comparable to the relevant LIBOR Period; provided, that each Lender may fund each of its LIBOR Loans in any manner it sees fit, and the foregoing assumption shall be utilized only for the calculation of amounts payable under this subsection. This covenant shall survive the termination of this Agreement and the payment of the Notes and all other amounts payable hereunder. As promptly as practicable under the circumstances, each Lender shall provide Borrower with its written calculation of all amounts payable pursuant to this Section 1.13(b), and such calculation shall be binding on the parties hereto unless Borrower shall object in writing within ten (10) Business Days of receipt thereof, specifying the basis for such objection in detail.

**1.14 Access.** Each Credit Party that is a party hereto shall, during normal business hours, from time to time upon two (2) Business Days' prior notice as frequently as Agent reasonably determines to be appropriate: (a) provide Agent and any of its officers, employees and agents access to its properties, facilities, advisors, officers and employees of each Credit Party and to the Collateral provided that so long as no Event of Default has occurred and is continuing, communications with employees and advisors shall be coordinated through a corporate executive officer of Borrower unless such officer shall fail to arrange for such communications within a reasonable time after any request by Agent, (b) permit Agent, and any of its officers, employees and agents, to inspect, audit and make extracts from any Credit Party's books and records, and (c) permit Agent, and its officers, employees and agents, to inspect, review, evaluate and make test verifications and counts of the Accounts, Inventory and other Collateral of any Credit Party. If an Event of Default has occurred and is continuing, each such Credit Party shall provide such access to Agent and to each Lender at all times and without advance notice. Furthermore, so long as any Event of Default has occurred and is continuing, upon prior notice from Agent, Borrower shall provide Agent and each Lender with access to its suppliers and customers. Each Credit Party shall make available to Agent reasonably promptly originals or copies of all books and records that Agent may reasonably request. Each Credit

Party shall deliver any document or instrument necessary for Agent, as it may from time to time request, to obtain records from any service bureau or other Person that maintains records for such Credit Party, and shall maintain duplicate records or supporting documentation on media, including computer tapes and discs owned by such Credit Party. Agent will give Lenders at least five (5) days' prior written notice of regularly scheduled audits. Representatives of other Lenders may accompany Agent's representatives on regularly scheduled audits at no charge to Borrower. In addition, at a date to be mutually agreed upon between the Agent and Borrower occurring on or prior to the 120th day after the close of each Fiscal Year of Borrower, Borrower will, at the request of Agent, hold a meeting with all of the Lenders at which meeting Borrower shall review the financial results of Borrower and its Subsidiaries for the previous Fiscal Year and the budgets presented for the current Fiscal Year of Borrower.

### 1.15  Taxes.

(a)     Except as otherwise required by this Agreement, any and all payments by Borrower hereunder or under the Notes shall be made, in accordance with this Section 1.15, free and clear of and without deduction for any and all present or future Taxes; provided, however, that neither the Borrower nor any other Credit Party shall be required to increase any such payments payable to any Agent or any Lender with respect to any Non-Excluded Taxes (i) that are attributable to such Agent's or Lender's failure to comply with the requirements of paragraph (c) of this Section or (ii) that are United States withholding taxes imposed on amounts payable to such Agent or Lender at the time such Agent or Lender becomes a party to this Agreement, except to the extent that such Agent's or Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from the Borrower with respect to such Non-Excluded Taxes pursuant to this paragraph (a). If Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under the Notes, (i) in the case of Non-Excluded Taxes, the sum payable shall be increased as much as shall be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 1.15) Agent or Lenders, as applicable, receive an amount equal to the sum they would have received had no such deductions been made, (ii) Borrower shall make such deductions, and (iii) Borrower shall pay the full amount deducted to the relevant taxing or other authority in accordance with applicable law. Within thirty (30) days after the date of any payment of Non-Excluded Taxes, Borrower shall furnish to Agent the original or a certified copy of a receipt evidencing payment thereof. Agents and Lenders shall not be obligated to return or refund any amounts received pursuant to this Section 1.15.

(b)     Each Credit Party that is a signatory hereto shall jointly and severally indemnify and, within ten (10) days of a detailed written demand therefor, pay Agent and each Lender for the full amount of Non-Excluded Taxes (including any Non-Excluded Taxes imposed by any jurisdiction on amounts payable under this Section 1.15) paid by Agent or such Lender, as appropriate, and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Non-Excluded Taxes were correctly or legally asserted.

(c)     Each Lender (and any assignee of a Lender) that is not a United States person as defined in Section 7701(a)(30) of the Code (a "Foreign Lender") shall deliver to Borrower and Agent whichever of the following is applicable: (i) two accurate and complete original signed copies of U.S. Internal Revenue Service Form W-8BEN claiming eligibility for

benefits of an income tax treaty to which the United States is a party; (ii) two accurate and complete original signed copies of U.S. Internal Revenue Service Form W-8ECI; or, (iii) in the case of a Foreign Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest," (x) a duly executed certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) two accurate and complete original signed copies of U.S. Internal Revenue Service Form W-8BEN. Such forms shall be delivered by each Foreign Lender on or before the date it becomes a party to this Agreement. In addition, within thirty (30) days after receipt of a reasonable written request by Borrower in the event such forms or certifications become inapplicable or obsolete, each Foreign Lender agrees that it will deliver to Borrower and Agent updated versions of the foregoing documentation and such other forms as may be required to confirm or establish the entitlement of the Foreign Lender to a continued exemption from or reduction in withholding tax with respect to payments under this Agreement or under any Loan Document. Each Foreign Lender shall promptly notify Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose).

(d)     The obligations of Borrower and each Credit Party under this Section 1.15 shall survive the termination of this Agreement.

### 1.16     Capital Adequacy; Increased Costs; Illegality.

(a)     If any law, treaty, governmental (or quasi-governmental) rule, regulation, guideline or order regarding capital adequacy, reserve requirements or similar requirements or compliance by any Lender with any request or directive regarding capital adequacy, reserve requirements or similar requirements (whether or not having the force of law), in each case, adopted after the Closing Date, from any central bank or other Governmental Authority increases or would have the effect of increasing the amount of capital, reserves or other funds required to be maintained by such Lender and thereby reducing the rate of return on such Lender's capital as a consequence of its obligations hereunder, then Borrower shall from time to time upon demand by such Lender (with a copy of such demand to Agent) pay to Agent, for the account of such Lender, additional amounts sufficient to compensate such Lender for such reduction. A certificate as to the amount of that reduction and showing the basis of the computation thereof submitted by such Lender to Borrower and to Agent shall be final, binding and conclusive evidence of the matters set forth therein, absent manifest error.

(b)     If, due to either (i) the introduction of or any change in any law or regulation (or any change in the interpretation thereof) except for changes in the rate of any Tax that is not a Non-Excluded Tax or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in each case adopted after the Closing Date, there shall be any increase in the cost to any Lender of agreeing to make or making, funding or maintaining any Loan, then Borrower shall from time to time, upon demand by such Lender (with a copy of such demand to Agent), pay to Agent for the account of such Lender additional amounts sufficient to compensate such Lender for such

increased cost. A certificate as to the amount of such increased cost, submitted to Borrower and to Agent by such Lender, shall be final, binding and conclusive evidence of the matters set forth therein, absent manifest error. Each Lender agrees that, as promptly as practicable after it becomes aware of any circumstances referred to above which would result in any such increased cost, the affected Lender shall, to the extent not inconsistent with such Lender's internal policies of general application, use reasonable commercial efforts to minimize costs and expenses incurred by it and payable to it by Borrower pursuant to this Section 1.16(b).

(c)     Notwithstanding anything to the contrary contained herein, if the introduction of or any change in any law or regulation (or any change in the interpretation thereof) shall make it unlawful, or any central bank or other Governmental Authority shall assert after the Closing Date that it is unlawful, for any Lender to agree to make or to make or to continue to fund or maintain any LIBOR Loan, then, unless that Lender is able to make or to continue to fund or to maintain such LIBOR Loan at another branch or office of that Lender without, in that Lender's reasonable opinion, materially adversely affecting it or its Loans or the income obtained therefrom, on notice thereof and demand therefor by such Lender to Borrower through Agent, (i) the obligation of such Lender to agree to make or to make or to continue to fund or maintain LIBOR Loans shall terminate and (ii) all such LIBOR Loans shall automatically be converted into Index Rate Loans.

(d)     Within thirty (30) days after receipt by Borrower of written notice and demand from any Lender (an "Affected Lender") for payment of additional amounts or increased costs as provided in Sections 1.15(a), 1.16(a) or 1.16(b), Borrower may, at its option, notify Agent and such Affected Lender of its intention to replace the Affected Lender. So long as no Default or Event of Default has occurred and is continuing, Borrower, with the consent of Agent, may obtain, at Borrower's expense, a replacement Lender ("Replacement Lender") for the Affected Lender, which Replacement Lender must be reasonably satisfactory to Agent. If Borrower obtains a Replacement Lender within ninety (90) days following notice of its intention to do so, the Affected Lender must sell and assign its Loans and Commitments to such Replacement Lender for an amount equal to the principal balance of all Loans held by the Affected Lender and all accrued interest and Fees with respect thereto through the date of such sale and such assignment shall not require the payment of an assignment fee to Agent; provided, that Borrower shall have reimbursed such Affected Lender for the additional amounts or increased costs that it is entitled to receive under this Agreement through the date of such sale and assignment. Notwithstanding the foregoing, Borrower shall not have the right to obtain a Replacement Lender if the Affected Lender rescinds its demand for increased costs or additional amounts within 15 days following its receipt of Borrower's notice of intention to replace such Affected Lender. Furthermore, if Borrower gives a notice of intention to replace and does not so replace such Affected Lender within ninety (90) days thereafter, Borrower's rights under this Section 1.16(d) shall terminate with respect to the increased costs or additional amounts of such Affected Lender that are the subject of the applicable notice and Borrower shall promptly pay all increased costs or additional amounts demanded by such Affected Lender pursuant to Sections 1.15(a), 1.16(a) and 1.16(b).

(e)     The obligations of Borrower and each Credit Party under this Section 1.16 shall survive the termination of this Agreement.

1.17     **Single Loan.**  All Loans to Borrower and all of the other Obligations of Borrower arising under this Agreement and the other Loan Documents shall constitute one general obligation of Borrower secured, until the Termination Date, by all of the Collateral.

1.18     **Incremental Term Loan Commitments.**

(a)     So long as no Default or Event of Default has occurred and is continuing, from time to time after the Closing Date but prior to the Incremental Term Loan Commitment Termination Date, the Borrower may request Incremental Term Loan Commitments not to exceed $50,000,000 in the aggregate upon written notice to the Agent (who shall promptly provide a copy of such notice to each Lender) delivered at least 60 days, and no more than 120 days, prior to the requested effective date of the Incremental Term Loan Commitments.  Such notice shall set forth (i) the amount of the Incremental Term Loan Commitments being requested (which shall be in a minimum amount of the lesser of $10,000,000 or the remaining Incremental Term Loan Amount and in minimum increments of $5,000,000), and (ii) the date on which such Incremental Term Loan Commitments are requested to become effective.

(b)     Each Term Lender shall have the right, for a period of 30 days following receipt of such notice, to elect by written notice to the Borrower and the Agent to provide up to its Pro Rata Share (based on the amount of all Term Loans and Revolving Commitments) of the requested Incremental Term Loan Commitment.  No Lender (or any successor thereto) shall have any obligation to provide an Incremental Term Loan Commitment, and any decision by a Lender to provide an Incremental Term Loan Commitment shall be made in its sole discretion independently from any other Lender.  If a Lender does not respond in writing during such 30-day period, it will be deemed to have rejected the request to provide any portion of the Incremental Term Loan Commitment.

(c)     If any Lender shall not elect to provide an Incremental Term Loan Commitment pursuant to clause (b) above (a "Declining Lender"), the Agent shall then offer the portion of the requested Incremental Term Loan Commitment that all Declining Lenders declined to provide to all Lenders that have elected to participate in the requested Incremental Term Loan Commitment (the "Participating Lenders") which portion shall be offered to the Participating Lenders based on their relative interests held in all Loans and unfunded Commitments held by all such Participating Lenders.  Each such Participating Lender shall have the right, but not the obligation, for a period of 10 Business Days immediately following notice from Agent to such Participating Lender with respect thereto to provide the portion of requested Incremental Term Loan Commitment that all Declining Lenders declined to provide that was allocated to such Participating Lender in accordance with the preceding sentence.  To the extent that the Participating Lenders decline to commit to provide the entire amount of the requested Incremental Term Loan Commitment, the portion of the requested Incremental Term Loan Commitment may be offered by the Borrower to one or more new lenders not then party to this Agreement approved by the Agent ("Additional Lenders"); provided that final allocations of the Incremental Term Loan Commitment to any Additional Lenders shall be made at the discretion of the Agent.

(d)     The Borrower and each Incremental Term Lender shall execute and deliver to the Agent an Incremental Term Loan Assumption Agreement and such other

documentation as the Administrative Agent shall reasonably specify to evidence the Incremental Term Loan Commitment of such Incremental Term Lender, no later than 60 days after notification by the Borrower to the Agent that it requests that the Incremental Term Loan Commitments be provided. The Agent shall promptly notify each Lender as to the effectiveness of each Incremental Term Loan Assumption Agreement. Each of the parties hereto hereby agrees that, upon the effectiveness of any Incremental Term Loan Assumption Agreement, this Agreement shall be deemed amended to the extent (but only to the extent) necessary to reflect the existence and terms of the Incremental Term Loan Commitment evidenced thereby, including without limitation that (i) the Term Loan Commitments shall automatically be increased by the amount of the Incremental Term Loan Commitments so added and (ii) Annex J shall automatically be deemed amended to reflect the Incremental Term Loan Commitments of all Lenders after giving effect to the addition thereto.

(e)     The Incremental Term Loans shall have the same terms and conditions as the Term Loans made on the Closing Date. If provided, the Incremental Term Loan Commitments shall terminate on the Incremental Term Loan Commitment Termination Date, at which time any unused portion of the Incremental Term Loan Commitment shall be cancelled.

(f)     Notwithstanding the foregoing, no Incremental Term Loan Commitment shall become effective under this Section 1.18 unless (i) on the date of such effectiveness, the conditions set forth in Sections 2.2 and 2.3 shall be satisfied and the Agent shall have received a certificate to that effect dated such date and executed by the Chief Financial Officer of Borrower, and (ii) the Agent shall have received (with sufficient copies for each of the Incremental Term Lenders) the duly executed Incremental Term Loan Assumption Agreements, additional Term Notes, reaffirmations of the Guaranty Agreements and other Collateral Documents by the Credit Parties (all in form and substance acceptable to the Agent), and such legal opinions, corporate documents and board resolutions as the Agent shall request, consistent with those delivered on the Closing Date under Section 2.1 and Annex D.

## 2. CONDITIONS PRECEDENT

**2.1     Conditions to the Initial Loans.**  No Lender shall be obligated to make any Loan or incur any Letter of Credit Obligations on the Closing Date, or to take, fulfill, or perform any other action hereunder, until the following conditions have been satisfied or provided for in a manner reasonably satisfactory to Agents, or waived in writing by Agents and Requisite Lenders:

(a)     Credit Agreement; Loan Documents.  This Agreement or counterparts hereof shall have been duly executed by, and delivered to, Borrower, each other Credit Party, Agent and Lenders; and Agents shall have received such documents, instruments, agreements and legal opinions as Agents shall reasonably request in connection with the transactions contemplated by this Agreement and the other Loan Documents, including all those listed in the Closing Checklist attached hereto as Annex D, each in form and substance reasonably satisfactory to Agent.

(b)     Repayment of Prior Lender Obligations; Satisfaction of Outstanding L/Cs. (i) Agents shall have received a fully executed original of a pay-off letter reasonably satisfactory to Agent confirming that all of the Prior Lender Obligations will be repaid in full from the proceeds of the Term Loan and the initial Revolving Credit Advance and all Liens upon any of the property of Borrower or any of its Subsidiaries in favor of Prior Lender shall be terminated by Prior Lenders immediately upon such payment; and (ii) all letters of credit issued or guaranteed by Prior Lenders shall have been cash collateralized or supported by a Letter of Credit issued pursuant to Annex B, as mutually agreed upon by Agents, Borrower and Prior Lender.

(c)     Redemption of Existing Preferred Stock.   Agents shall have received certified copies of the Redemption Agreement and all related documents, all conditions precedent thereto shall have been satisfied and ICMC shall redeem, simultaneously with the making of the Term Loan and initial Revolving Credit Advance, all of its preferred stock and related warrants held by Quetzal/JP Morgan Partners, Wachovia Capital Markets, BMO Nesbitt Burns Capital, and Bank of Montreal and/or their affiliates in an aggregate amount not to exceed $140,000,000.

(d)     Approvals.   Agents shall have received (i) satisfactory evidence that the Credit Parties have obtained all required consents and approvals of all Persons including all requisite Governmental Authorities, including without limitation, the FCC, to the execution, delivery and performance of this Agreement and the other Loan Documents and the consummation of the Related Transactions or (ii) an officer's certificate in form and substance reasonably satisfactory to Agents affirming that no such consents or approvals are required.

(e)     Opening Loan-to-Value.   After giving effect to the Loans to be made and Letter of Credit Obligations to be incurred on the Closing Date and the consummation of the Related Transactions (on a pro forma basis, with trade payables being paid currently and expenses and liabilities being paid in the ordinary course of business and without acceleration of sales) on the Closing Date, the Loan-to-Value Ratio as of the Closing Date is equal to or less than 0.51:1.0.

(f)     Payment of Fees.   Borrower shall have paid the Fees required to be paid on the Closing Date in the respective amounts specified in Section 1.9 (including the Fees specified in the Fee Letter), and shall have reimbursed Agents for all fees, costs and expenses of closing presented as of the Closing Date.

(g)     Capital Structure: Other Indebtedness.   The capital structure of each Credit Party and the terms and conditions of all Indebtedness of each Credit Party shall be acceptable to Agents in their sole discretion.

(h)     Due Diligence.     Agents    shall    have    completed    their    business, environmental, and legal due diligence, including without limitation as to corporate structure, capital structure, other debt instruments, equity or stockholder agreements, FCC licenses and related matters, tax agreements and other tax matters, incentive and employment agreements, material contracts and governing documents of the Borrower and its Affiliates, with results satisfactory to Agents.

(i)    Consummation of Related Transactions. Agents shall have received fully executed copies of each of the other Related Transactions Documents, each of which shall be in full force and effect in form and substance satisfactory to Agents. The Related Transactions shall have been consummated in accordance with the terms of the Related Transactions Documents.

(j)    FCC Compliance. Each Agent shall have received evidence satisfactory to it that on the Closing Date, each Credit Party shall be in compliance in all material respects with all Communications Laws both prior to and immediately after giving effect to the consummation of all of the Related Transactions.

(k)    Reserved.

(l)    Closing Date Marketing Agreements. Each Agent shall have received evidence satisfactory to it that (i) all Closing Date Marketing Agreements are in full force and effect on the Closing Date and have not been terminated for any reason and (ii) there has been no change in applicable laws, statutes, regulations, ordinances or published policies of any Governmental Authority (in each case, excluding notices of proposed rulemaking) which has had or could reasonably be expected to have the effect of limiting any right of any Credit Party under any of the Closing Date Marketing Agreements.

(m)    No Material Changes. As of the Closing Date, there will have been (i) since December 31, 2003, no material adverse change, individually or in the aggregate, in the business, financial or other condition of Borrower or the Credit Parties taken as a whole, the industry in which any Credit Party operates, or the collateral which will be subject to the security interest granted to the Agent or in the prospects or projections of Borrower or the Credit Parties taken as a whole, other than the loss of anticipated revenue from Progress Media programming projected by the Borrower in the Projections, (ii) no litigation commenced which (A) has a reasonable possibility of success and, if successful, would have a Material Adverse Effect on the Borrower or the Credit Parties taken as a whole, its or their business, or its or their ability to repay the Obligations except such litigation determined to be immaterial by the Agents in their sole discretion, or (B) would challenge the transactions contemplated hereunder, and (iii) since December 31, 2003, no material increase in the liabilities, liquidated or contingent, of the Borrower or the Credit Parties taken as a whole, or material decrease in the assets of the Borrower or the Credit Parties taken as a whole.

2.2    **Further Conditions to Each Loan**. Except as otherwise expressly provided herein, no Lender shall be obligated to fund any Revolving Credit Advance, convert or continue any Loan as a LIBOR Loan or incur any Letter of Credit Obligation (including, but not limited to, incurrence of such obligation through the extension of the expiration date of a Letter of Credit), if, as of the date thereof:

(a)    any representation or warranty by any Credit Party contained herein or in any other Loan Document is untrue or incorrect as of such date as determined by Agent or Requisite Lenders, except to the extent that such representation or warranty expressly relates to an earlier date and except for changes therein expressly permitted or expressly contemplated by this Agreement unless the Requisite Revolving Lenders have determined to make such

Revolving Credit Advance, convert or continue any Loan as LIBOR Loan or incur such Letter of Credit Obligation despite the fact that such warranty or representation is untrue or incorrect;

(b)    (i) any Default or Event of Default has occurred and is continuing or would result after giving effect to any Revolving Credit Advance (or the incurrence of any Letter of Credit Obligation) unless the Requisite Revolving Lenders have determined to make any Revolving Credit Advance, convert or continue any Loan as a LIBOR Loan or incur any Letter of Credit Obligation despite any such Default or Event of Default;

(c)    after giving effect to any Revolving Credit Advance (or the incurrence of any Letter of Credit Obligations), the outstanding principal amount of the Revolving Loan would exceed the Maximum Amount; or

(d)    after giving effect to any Revolving Credit Advance (or the incurrence of any Letter of Credit Obligations), (i) at all times on or prior to December 31, 2005, the Loan-to-Value Ratio as of such date would exceed 0.51:1.00, and (ii) at all times on or after January 1, 2006, the Leverage Ratio as of such date would exceed the threshold required under Section (e) of Annex G for the last day of the Fiscal Quarter in which such Revolving Credit Advance or Letter of Credit Obligation is being incurred unless the Requisite Revolving Lenders have determined to make any Revolving Credit Advance, convert or continue any Loan as a LIBOR Loan or incur any Letter of Credit Obligation despite such Loan-to-Value Ratio or Leverage Ratio.

The request and acceptance by Borrower of the proceeds of any Revolving Credit Advance or any Incremental Term Loan, the incurrence of any Letter of Credit Obligations or the conversion or continuation of any Loan into, or as, a LIBOR Loan shall be deemed to constitute, as of the date thereof, (i) a representation and warranty by Borrower that the applicable conditions in this Section 2.2 have been satisfied and (ii) a reaffirmation by Borrower of the granting and continuance of Agent's Liens, on behalf of itself and Lenders, pursuant to the Collateral Documents.

2.3    **Further Conditions to Each Incremental Term Loan.** Except as otherwise expressly provided herein, no Lender shall be obligated to fund any Incremental Term Loan and Borrower shall not be permitted to borrow any Incremental Term Loans if, as of the date thereof, in addition to the conditions set forth in Section 2.2 above, any of the following statements is true:

(a)    The Requisite Lenders have not given their prior written approval of the Acquisition to be financed with such Incremental Term Loan.

(b)    The Agent has not received evidence satisfactory to it demonstrating that after giving pro forma effect to the incurrence of such Incremental Term Loan, as if such Incremental Term Loan had been incurred on the first day of the twelve month period for which EBITDA, Interest Expense and Fixed Charges are calculated and assuming that the interest rates that were applicable to the Term Loan were ratably applicable to the Incremental Term Loan, (i) for any Incremental Term Loan incurred on or prior to December 31, 2005, the Loan-to-Value

Ratio would be less than 0.50:1.0, and (ii) for any Incremental Term Loan incurred on or after to January 1, 2006, the Leverage Ratio would be less than 6.0:1.0.

(c) The radio stations to be acquired in the Acquisition to be financed with such Incremental Term Loan are not located in a radio market rated 1-100 by BIA Financial Network, Inc., or the Incremental Term Loan to finance such Acquisition exceeds 50% of the arm's length purchase price being paid by the applicable Credit Party for such Acquisition.

(d) After giving effect to such Incremental Term Loan, the outstanding principal amount of all Incremental Term Loans would exceed the aggregate amount of all Incremental Term Loan Commitments.

(e) The purchase price for the Acquisition to be financed with such Incremental Term Loan exceeds $25,000,000 and the Agent has not received an appraisal of the property to be acquired in the Acquisition in form and substance, and conducted by a third party appraiser, reasonably acceptable to Agent.

(f) Immediately after the making of such Incremental Term Loan, Agent shall not have a valid and enforceable, perfected, first priority Lien on the assets acquired in such Acquisition, free and clear of all Liens, other than Liens permitted under this Agreement.

## 3. REPRESENTATIONS AND WARRANTIES

To induce Lenders to make the Loans and to incur Letter of Credit Obligations, the Credit Parties executing this Agreement, jointly and severally, make the following representations and warranties to Agent and each Lender with respect to all Credit Parties, each and all of which shall survive the execution and delivery of this Agreement.

**3.1** **Existence; Compliance with Law**. Each Credit Party (a) is a corporation, limited liability company, general partnership or limited partnership duly organized, validly existing and in good standing (except to the extent that the concept does not apply with regard to general partnerships) under the laws of its respective jurisdiction of incorporation or organization set forth in Disclosure Schedule 3.1; (b) is duly qualified to conduct business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect; (c) has the requisite power and authority and the legal right to own, pledge, mortgage (to the extent that any required landlord consent thereto has been obtained with respect to any leasehold interest) or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now conducted or proposed to be conducted; (d) subject to specific representations regarding Environmental Laws, has all licenses, permits, consents or approvals from or by, and has made all material filings with, and has given all notices to, all Governmental Authorities having jurisdiction, to the extent required for such ownership, operation and conduct; (e) is in compliance with its charter and bylaws or partnership or operating agreement, as applicable; and (f) subject to specific representations set forth herein regarding ERISA, Environmental Laws, the Communications Laws, tax and other laws, is in compliance with all applicable provisions of law

25

and regulation, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**3.2   Executive Offices, Collateral Locations, FEIN; Organizational Number**.  As of the Closing Date, for each Credit Party that is not a general partnership, the name of such Credit Party as it appears in official filings in its state of incorporation or organization, the state of incorporation or organization, organization type, organization number, if any, issued by its state incorporation or organization, and the current location of each Credit Party's chief executive office and the warehouses and premises at which any Collateral (except for Equipment or Inventory in transit and other collateral with a fair market value not to exceed $250,000 in the aggregate at any time) are set forth in Disclosure Schedule 3.2, and none of such locations has changed within four (4) months preceding the Closing Date except as set forth on Disclosure Schedule 3.2.   In addition, Disclosure Schedule 3.2 lists the federal employer identification number of each Credit Party as of the Closing Date.

**3.3   Corporate Power, Authorization, Enforceable Obligations**.   The execution, delivery and performance by each Credit Party of the Loan Documents to which it is a party and the creation of all Liens provided for therein: (a) are within such Person's power; (b) have been duly authorized by all necessary corporate, limited liability company or limited partnership action; (c) do not contravene any provision of such Person's charter, bylaws or partnership or operating agreement as applicable; (d) do not violate any law or regulation, or any order or decree of any court or Governmental Authority; (e) except as could not reasonably be expected to have a Material Adverse Effect, do not conflict with or result in the breach or termination of, constitute a default under or accelerate or permit the acceleration of any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which such Person is a party or by which such Person or any of its property is bound; (f) do not result in the creation or imposition of any Lien upon any of the property of such Person other than those in favor of Agent, on behalf of itself and Lenders, pursuant to the Loan Documents; and (g) do not require the consent or approval of any Governmental Authority or any other Person, except those referred to in Section 2.1(d), all of which will have been duly obtained, made or complied with prior to the Closing Date. Each of the Loan Documents shall be duly executed and delivered by each Credit Party that is a party thereto and each such Loan Document shall constitute a legal, valid and binding obligation of such Credit Party enforceable against it in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

**3.4   Financial Statements and Projections**.  Except for the Projections and the Fair Salable Balance Sheet, all Financial Statements concerning ICMC and its Subsidiaries that are referred to below have been prepared in accordance with GAAP consistently applied throughout the periods covered (except as disclosed therein and except, with respect to unaudited Financial Statements, for the absence of footnotes and normal year-end audit adjustments) and present fairly in all material respects the financial position of the Persons covered thereby as at the dates thereof and the results of their operations and cash flows for the periods then ended.

(a)   Financial Statements.  The following Financial Statements attached hereto as Disclosure Schedule 3.4(a) have been delivered on the date hereof:

(i)     The audited consolidated balance sheets at December 31, 2002 and 2003 and the related statements of income and cash flows of ICMC and its Subsidiaries for the Fiscal Years then ended, certified by Deloitte & Touche LLP, and the unaudited consolidating income statements of ICMC and its Subsidiaries for such periods.

(ii)     The unaudited consolidated balance sheet(s) at June 30, 2004 and the related consolidated statement(s) of income and cash flows of Borrower and its Subsidiaries for the six Fiscal Month period then ended and, with respect to the consolidated statement of income only, for the twelve Fiscal Month period then ended which such financial statements exclude the results of the Stations referred to in the definition of Permitted Station Sales.

(b)     Pro Forma. The Pro Forma delivered on the date hereof and attached hereto as Disclosure Schedule 3.4(b) was prepared by Borrower giving pro forma effect to the Related Transactions, was based on the unaudited consolidated balance sheet of Borrower and its Subsidiaries dated June 30, 2004 and was prepared in accordance with GAAP, with only such adjustments thereto as would be required in accordance with GAAP.

(c)     Projections. The Projections delivered on the date hereof and attached hereto as Disclosure Schedule 3.4(c) have been prepared by Borrower in light of the past operations of its businesses, but including future payments of known contingent liabilities reflected on the Fair Salable Balance Sheet, and reflect projections for the five year period beginning on January 1, 2004 on a quarter-by-quarter basis for the first year and on a year-by-year basis thereafter. The Projections are based upon the same accounting principles as those used in the preparation of the financial statements described above and the estimates and assumptions stated therein, all of which Borrower believes to be reasonable and fair in light of current conditions and current facts known to Borrower and, as of the Closing Date, reflect Borrower's good faith estimate based upon assumptions believed to be reasonable at the time made. The Projections are not a guaranty of future performance, and actual results may differ from those set forth in the Projections.

(d)     Fair Salable Balance Sheet. The Fair Salable Balance Sheet delivered on the date hereof and attached hereto as Disclosure Schedule 3.4(d) was prepared by Borrower on the same basis as the Pro Forma, except that Borrower's assets are set forth therein at their fair salable values on a going concern basis and the liabilities set forth therein include all contingent liabilities of Borrower stated at the reasonably estimated present values thereof.

3.5     **Material Adverse Effect**. Between December 31, 2003 and the Closing Date, (a) no Credit Party has incurred any obligations, contingent or noncontingent liabilities, liabilities for Charges, long-term leases or unusual forward or long-term commitments that are not reflected in the Pro Forma and that, alone or in the aggregate, could reasonably be expected to have a Material Adverse Effect, (b) no contract, lease or other agreement or instrument has been entered into by any Credit Party or has become binding upon any Credit Party's assets and no law or regulation applicable to any Credit Party has been adopted that has had or could reasonably be expected to have a Material Adverse Effect, and (c) no Credit Party is in default and to the best of Borrower's knowledge no third party is in default under any material contract, lease or other agreement or instrument, that alone or in the aggregate could reasonably be expected to have a Material Adverse Effect. Since December 31, 2003, no event has occurred

that, alone or together with other events, could reasonably be expected to have a Material Adverse Effect other than the loss of anticipated revenue from Progress Media programming projected by the Borrower in the Projections.

      **3.6**    **Ownership of Property; Liens**. As of the Closing Date, the real estate ("Real Estate") listed in Disclosure Schedule 3.6 constitutes all of the real property owned, leased, subleased, or used by any Credit Party. Each Credit Party owns good and marketable fee simple title to all of its owned Real Estate, and valid leasehold interests in all of its leased Real Estate, all as described on Disclosure Schedule 3.6, and copies of all such leases or a summary of terms thereof reasonably satisfactory to Agents have been delivered to Agents. Disclosure Schedule 3.6 further describes any Real Estate with respect to which any Credit Party is a lessor, sublessor or assignor as of the Closing Date. Each Credit Party also has good and marketable title to, or valid leasehold interests in, all of its personal property and assets. As of the Closing Date, none of the properties and assets of any Credit Party are subject to any Liens other than Permitted Encumbrances, and there are no facts, circumstances or conditions known to any Credit Party that may result in any Liens (including Liens arising under Environmental Laws) other than Liens permitted by this Agreement. Each Credit Party has received all deeds, assignments, waivers, consents, nondisturbance and attornment or similar agreements, bills of sale and other documents, and has duly effected all recordings, filings and other actions necessary to establish, protect and perfect such Credit Party's right, title and interest in and to all such Real Estate and other properties and assets. Disclosure Schedule 3.6 also describes any purchase options, rights of first refusal or other similar contractual rights pertaining to any Real Estate. As of the Closing Date, no portion of any Credit Party's Real Estate has suffered any material damage by fire or other casualty loss that has not heretofore been repaired and restored in all material respects to its original condition or otherwise remedied. As of the Closing Date, all material permits required to have been issued or appropriate to enable the Real Estate to be lawfully occupied and used for all of the purposes for which it is currently occupied and used have been lawfully issued and are in full force and effect.

      **3.7**    **Labor Matters**. Except as set forth on Disclosure Schedule 3.7, as of the Closing Date: (a) no strikes or other material labor disputes against any Credit Party are pending or, to any Credit Party's knowledge, threatened; (b) hours worked by and payment made to employees of each Credit Party comply with the Fair Labor Standards Act and each other federal, state, local or foreign law applicable to such matters in all material respects; (c) all payments due from any Credit Party for employee health and welfare insurance have been paid or accrued as a liability on the books of such Credit Party except as would not reasonably be expected to result in a material liability to any Credit Party; (d) no Credit Party is a party to or bound by any collective bargaining agreement, management agreement, consulting agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement (and true and complete copies of any agreements described on Disclosure Schedule 3.7 have been delivered to Agent); (e) there is no organizing activity involving any Credit Party pending or, to any Credit Party's knowledge, threatened by any labor union or group of employees; (f) there are no representation proceedings pending or, to any Credit Party's knowledge, threatened with the National Labor Relations Board, and no labor organization or group of employees of any Credit Party has made a pending demand for recognition; and (g) there are no material complaints or charges against any Credit Party pending or, to the knowledge of any Credit Party, threatened to be filed with any

Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment by any Credit Party of any individual.

      **3.8    Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness**. Except as set forth in Disclosure Schedule 3.8, as of the Closing Date, no Credit Party has any Subsidiaries, is engaged in any joint venture or partnership with any other Person, or is an Affiliate of any other Person. All of the issued and outstanding Stock of each Credit Party is owned by each of the Stockholders and in the amounts set forth in Disclosure Schedule 3.8. Except as set forth in Disclosure Schedule 3.8, there are no outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Credit Party may be required to issue, sell, repurchase or redeem any of its Stock or other equity securities or any Stock or other equity securities of its Subsidiaries. All outstanding Indebtedness and Guaranteed Indebtedness of each Credit Party as of the Closing Date (except for the Obligations) is described in Section 6.3 (including Disclosure Schedule 6.3).

      **3.9    Government Regulation**. No Credit Party is an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940. No Credit Party is subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, or any other federal or state statute that restricts or limits its ability to incur Indebtedness or to perform its obligations hereunder. The making of the Loans by Lenders to Borrower, the incurrence of the Letter of Credit Obligations on behalf of Borrower, the application of the proceeds thereof and repayment thereof and the consummation of the Related Transactions will not violate any provision of any such statute or any rule, regulation or order issued by the Securities and Exchange Commission.

      **3.10    Margin Regulations**. No Credit Party is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" as such terms are defined in Regulation U of the Federal Reserve Board as now and from time to time hereafter in effect (such securities being referred to herein as "Margin Stock"). No Credit Party owns any Margin Stock, and none of the proceeds of the Loans or other extensions of credit under this Agreement will be used, directly or indirectly, for the purpose of purchasing or carrying any Margin Stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any Margin Stock or for any other purpose that might cause any of the Loans or other extensions of credit under this Agreement to be considered a "purpose credit" within the meaning of Regulations T, U or X of the Federal Reserve Board. No Credit Party will take or permit to be taken any action that might cause any Loan Document to violate any regulation of the Federal Reserve Board.

      **3.11    Taxes**. All Federal and other material tax returns, reports and statements, including information returns, required by any Governmental Authority to be filed by any Credit Party have been filed with the appropriate Governmental Authority, and all Charges due and payable have been paid prior to the date on which any fine, penalty, interest or late charge may be added thereto for nonpayment thereof, excluding Charges or other amounts being contested in accordance with Section 5.2(b) and unless the failure to so file or pay would not reasonably be expected to result in fines, penalties or interest in excess of $250,000 in the aggregate. Proper

and accurate amounts have been withheld by each Credit Party from its respective employees for all periods in compliance with all applicable federal, state, local and foreign laws and such withholdings have been timely paid to the respective Governmental Authorities. Disclosure Schedule 3.11 sets forth as of the Closing Date those taxable years for which any Credit Party's tax returns are currently being audited by the IRS or any other applicable Governmental Authority and any assessments or threatened assessments in connection with such audit, or otherwise currently outstanding. Except as described in Disclosure Schedule 3.11, as of the Closing Date, no Credit Party has executed or filed with the IRS or any other Governmental Authority any agreement or other document extending, or having the effect of extending, the period for assessment or collection of any Charges. None of the Credit Parties and their respective predecessors are liable for any Charges: (a) under any agreement (including any tax sharing agreements) or (b) to each Credit Party's knowledge, as a transferee. As of the Closing Date, no Credit Party has agreed or been requested to make any adjustment under IRC Section 481(a), by reason of a change in accounting method or otherwise, which would reasonably be expected to have a Material Adverse Effect. Except for Charges that have been fully discharged or are accurately reflected on the financial statements of the applicable Credit Party in accordance with GAAP delivered on the Closing Date, no Credit Party is liable for any Charge relating to or arising out of (x) the formation of the Borrower as a Subsidiary of ICMC and Parent and the related transactions, including the restructuring of the business of the Parent and its Subsidiaries, or (y) any sale or other disposition of property not in the ordinary course of business prior to the Closing Date.

### 3.12  ERISA.

(a)  Disclosure Schedule 3.12 lists as of the Closing Date, (i) all ERISA Affiliates and (ii) all Plans and separately identifies all Pension Plans, including Title IV Plans, Multiemployer Plans, ESOPs and Welfare Plans, including all Retiree Welfare Plans. Copies of all such listed Plans, together with a copy of the latest IRS/DOL 5500-series form for each such Plan have been delivered to Agent. Except with respect to Multiemployer Plans, each Qualified Plan has been determined by the IRS to qualify under Section 401 of the IRC, the trusts created thereunder have been determined to be exempt from tax under the provisions of Section 501 of the IRC, and, nothing has occurred that would reasonably be expected to cause the loss of such qualification or tax-exempt status. Each Plan is in compliance in all material respects with the applicable provisions of ERISA and the IRC, including the timely filing of all reports required under the IRC or ERISA, including the statement required by 29 CFR Section 2520.104-23. Neither any Credit Party nor ERISA Affiliate has failed to make any contribution or pay any amount due as required by either Section 412 of the IRC or Section 302 of ERISA or the terms of any such Plan. Neither any Credit Party nor ERISA Affiliate has engaged in a "prohibited transaction," as defined in Section 406 of ERISA and Section 4975 of the IRC, in connection with any Plan, that would subject any Credit Party to a material tax on prohibited transactions imposed by Section 502(i) of ERISA or Section 4975 of the IRC.

(b)  Except as set forth in Disclosure Schedule 3.12: (i) there is no Unfunded Pension Liability; (ii) no ERISA Event or event described in Section 4062(e) of ERISA with respect to any Title IV Plan has occurred or is reasonably expected to occur; (iii) there are no pending, or to the knowledge of any Credit Party, threatened claims (other than claims for benefits in the normal course), sanctions, actions or lawsuits, asserted or instituted against any

Plan or any Person as fiduciary or sponsor of any Plan; (iv) no Credit Party or to the knowledge of any Credit Party, any ERISA Affiliate has incurred or reasonably expects to incur any liability as a result of a complete or partial withdrawal from a Multiemployer Plan; (v) within the last five years no Title IV Plan of any Credit Party or ERISA Affiliate has been terminated, whether or not in a "standard termination" as that term is used in Section 4041 of ERISA, nor has any Title IV Plan of any Credit Party or ERISA Affiliate (determined at any time within the past five years) with Unfunded Pension Liabilities been transferred outside of the "controlled group" (within the meaning of Section 4001(a)(14) of ERISA) of any Credit Party or ERISA Affiliate; (vi) except in the case of any ESOP, Stock of all Credit Parties and their ERISA Affiliates constitutes, in the aggregate, no more than 10% of fair market value of the assets of any Plan measured on the basis of fair market value as of the latest valuation date of any Plan; (vii) no liability under any Title IV Plan has been satisfied with the purchase of a contract from an insurance company that is not rated AAA by the Standard & Poor's Corporation or an equivalent rating by another nationally recognized rating agency and (viii) no Credit Party or ERISA Affiliate has entered into a transaction that might reasonably be expected to be covered by Section 4069 of ERISA.

3.13 **No Litigation**. No action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of any Credit Party, threatened in writing against any Credit Party, before any Governmental Authority or before any arbitrator or panel of arbitrators (collectively, "Litigation"), (a) that challenges any Credit Party's right or power to enter into or perform to the extent permitted by law any of its obligations under the Loan Documents to which it is a party, or the validity or enforceability of any Loan Document or any action taken thereunder, or (b) that has a reasonable risk of being determined adversely to any Credit Party and that, if so determined, could reasonably be expected to have a Material Adverse Effect. Except as set forth on Disclosure Schedule 3.13, as of the Closing Date there is no Litigation pending or threatened that seeks damages in excess of $250,000 or injunctive relief against, or alleges criminal misconduct of, any Credit Party.

3.14 **Brokers**. Except as set forth on Disclosure Schedule 3.14, no broker or finder acting on behalf of any Credit Party or Affiliate thereof brought about the obtaining, making or closing of the Loans or the Related Transactions, and no Credit Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

3.15 **Intellectual Property**. As of the Closing Date, each Credit Party owns or has rights to use all Intellectual Property necessary to continue to conduct its business as now conducted by it or presently proposed to be conducted by it, and each Patent, Trademark, registered Copyright and License is listed, together with application or registration numbers, as applicable, in Disclosure Schedule 3.15. Each Credit Party conducts its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any material respect. Except as set forth in Disclosure Schedule 3.15 on the Closing Date, no Credit Party is aware of any material infringement claim by any other Person with respect to any Intellectual Property.

3.16 **Full Disclosure**. No information contained in this Agreement, any of the other Loan Documents, any Projections, Financial Statements or Collateral Reports or other

written reports from time to time delivered by or on behalf of any Credit Party hereunder or any written statement furnished by or on behalf of any Credit Party to any Agent or any Lender pursuant to the terms of this Agreement contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. Projections from time to time delivered hereunder by or on behalf of the Credit Parties are or will be prepared in good faith based upon assumptions believed to be reasonable in light of the circumstances when made. Such Projections are not a guaranty of future performance and actual results may differ from those set forth in such Projections. The Liens granted to Agent, on behalf of itself and Lenders, pursuant to the Collateral Documents will at all times be fully perfected first priority Liens in and to the Collateral described therein, subject, as to priority, only to Liens permitted by this Agreement.

### 3.17 Environmental Matters.

(a) Except as set forth in Disclosure Schedule 3.17, as of the Closing Date: (i) the Real Estate is free of contamination from any Hazardous Material except for such contamination that would not adversely impact the value or marketability of such Real Estate and that would not result in Environmental Liabilities that could reasonably be expected to exceed $250,000; (ii) no Credit Party has caused or suffered to occur any material Release of Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate except for any such Release that would not result in Environmental Liabilities that could not reasonably be expected to exceed $250,000; (iii) the Credit Parties are and have been in compliance with all Environmental Laws, except for such noncompliance that would not result in Environmental Liabilities which could reasonably be expected to exceed $250,000; (iv) the Credit Parties have obtained, and are in compliance with, all Environmental Permits required by Environmental Laws for the operations of their respective businesses as presently conducted or as proposed to be conducted, except where the failure to so obtain or comply with such Environmental Permits would not result in Environmental Liabilities that could reasonably be expected to exceed $250,000, and all such Environmental Permits are valid, uncontested and in good standing; (v) no Credit Party is involved in operations or knows of any facts, circumstances or conditions, including any Releases of Hazardous Materials, that are likely to result in any Environmental Liabilities of such Credit Party which could reasonably be expected to exceed $250,000; (vi) there is no Litigation arising under or related to any Environmental Laws, Environmental Permits or Hazardous Material that seeks damages, penalties, fines, costs or expenses in excess of $250,000 or injunctive relief against, or that alleges criminal misconduct by, any Credit Party; (vii) no notice has been received by any Credit Party identifying it as a "potentially responsible party" or requesting information under CERCLA or analogous state statutes, and to the knowledge of the Credit Parties, there are no facts, circumstances or conditions that may result in any Credit Party being identified as a "potentially responsible party" under CERCLA or analogous state statutes; and (viii) the Credit Parties have provided to Agent copies of all existing environmental reports, reviews and audits and all written information pertaining to actual or potential Environmental Liabilities, in each case relating to any Credit Party.

(b) Each Credit Party hereby acknowledges and agrees that no Agent (i) is now, nor has ever been, in control of any of the Real Estate or any Credit Party's affairs, and (ii) has the capacity through the provisions of the Loan Documents or otherwise to influence any

Credit Party's conduct with respect to the ownership, operation or management of any of its Real Estate or compliance with Environmental Laws or Environmental Permits.

**3.18   Insurance**.  Disclosure Schedule 3.18 lists all insurance policies of any nature maintained, as of the Closing Date, for current occurrences by each Credit Party, as well as a summary of the terms of each such policy.

**3.19   Deposit and Disbursement Accounts**.  Disclosure Schedule 3.19 lists all banks and other financial institutions at which any Credit Party maintains deposit or other accounts as of the Closing Date, including any Disbursement Accounts, and on the Closing Date such Schedule correctly identifies the name, address and telephone number of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

**3.20   Government Contracts**.  Except as set forth in Disclosure Schedule 3.20, as of the Closing Date, no Credit Party is a party to any contract or agreement with any Governmental Authority and no Credit Party's Accounts are subject to the Federal Assignment of Claims Act (31 U.S.C. Section 3727) or any similar state or local law.

**3.21   Customer and Trade Relations**.  As of the Closing Date, there exists no actual or, to the knowledge of any Credit Party, threatened (in writing) termination or cancellation of, or any material adverse modification or change in:  the business relationship of any Credit Party with any customer or group of customers whose purchases during the preceding 12 months caused them to be ranked among the ten largest customers of such Credit Party; or the business relationship of any Credit Party with any supplier essential to its operations.

**3.22   Bonding; Licenses**.  Except as set forth on Disclosure Schedule 3.22, as of the Closing Date, no Credit Party is a party to or bound by any surety bond agreement or bonding requirement with respect to products or services sold by it or any trademark or patent license agreement with respect to products sold by it.

**3.23   Solvency**.  Both before and after giving effect to (a) the Loans and Letter of Credit Obligations to be made or incurred on the Closing Date or such other date as Loans and Letter of Credit Obligations requested hereunder are made or incurred, (b) the disbursement of the proceeds of such Loans pursuant to the instructions of Borrower, (c) the Refinancing and the consummation of the other Related Transactions and (d) the payment and accrual of all transaction costs in connection with the foregoing, each Credit Party is and will be Solvent.

**3.24   Status of ICMC**.  Prior to the Closing Date, ICMC has not engaged in any business or incurred any Indebtedness or any other liabilities (except in connection with its corporate formation, guaranties of the Prior Lender Obligations, the Related Transactions Documents, this Agreement and the existing equity investment in ICMC that is the subject of the Redemption Agreement).

**3.25   Status of FCC Subsidiaries**.  Within 90 days of the Closing Date and at all times thereafter, all FCC Licenses held by the Credit Parties shall be owned by License Subsidiaries.

### 3.26    FCC Licenses and Station Matters.

(a)    Disclosure Schedule 3.26(a) correctly describes each of the Stations owned by any Credit Party as of the Closing Date.  Each Credit Party has all Main Station Licenses necessary to conduct the operations of the Stations in conformity with the Communications Laws and other applicable law.  The Main Station Licenses, together with those FCC Licenses material to the operation of the Stations, are all of the licenses, permits and other authorizations used or necessary to operate the Stations as currently operated by the respective Credit Parties.  Other than those conditions contained in the Communications Act and FCC Regulations that are applicable to broadcast stations in the same service and of the same class, the Main Station Licenses are not subject to any material restriction or condition not appearing on the face of such Main Station License that might limit or restrict the operation of the Stations and have been so unimpaired for the full current license term.

(b)    Set forth in Disclosure Schedule 3.26(b) is a true and correct description of all FCC Licenses and other Licenses constituting a License under clause (b) of the definition of such term in Annex A, issued in the name of or assigned to any Credit Party as of the Closing Date (including the call sign, community of license and expiration date of each such License), all of which are in full force and effect and have been duly and validly issued in the name of, or validly assigned to, the respective Credit Party and, in the case of each FCC License is held by a License Subsidiary which is a direct or indirect wholly-owned Subsidiary of the Borrower operating the Station with respect to which such FCC License was issued.  True, complete and correct copies of each FCC License and other Licenses described in Disclosure Schedule 3.26(b) have been delivered to Agent.

(c)    Except as set forth in Disclosure Schedule 3.26(b), each Credit Party has taken all actions and performed all of its obligations necessary to maintain each Main Station License without adverse modification or impairment.

(d)    Except as set forth in Disclosure Schedule 3.26(b), no event has occurred which (A) results in, or after notice or lapse of time or both would result in, revocation, suspension, adverse modification, non-renewal, short-term renewal, impairment or termination of or any notice of apparent liability or order of forfeiture with respect to, any Main Station License, or (B) adversely affects or in the future may (so far as any Credit Party can now reasonably foresee) materially adversely affect any of the rights of any Credit Party with respect to any Main Station License.

(e)    None of the Main Station Licenses requires that any present Stockholder, director, officer or employee of any Credit Party remain a stockholder, director, officer or employee of such Credit Party, or that any transfer of control of such Person must be approved by any Governmental Authority other than the FCC.

(f)    Except as set forth in Disclosure Schedule 3.26(b), no Credit Party has any reason to believe that any Main Station License listed and described in Disclosure Schedule 3.26(b) will not be renewed for a full term in the ordinary course.  Each Credit Party (a) has duly filed all material reports and other filings which are required to be filed under the Communications Laws, and (b) is in compliance in all material respects with the

Communications Laws. All information provided by or on behalf of any Credit Party in any filing with the FCC was, at the time of filing, true, correct and complete in all material respects when made, and the FCC has been notified of any material changes in such information as may be required by the Communications Laws.

(g)    Except as set forth in Disclosure Schedule 3.26(b), no Credit Party is a party to or has knowledge of any investigation, notice of apparent liability, violation, forfeiture or other order or complaint issued or threatened by or before any Governmental Authority, including the FCC, or of any other proceedings (other than proceedings relating to the radio broadcasting industry generally) which would reasonably be likely to threaten or otherwise materially adversely affect the validity or continued effectiveness of any Main Station License of any Credit Party. In addition, no such investigation, notice of apparent liability, violation, forfeiture or other order or complaint issued by or before any Governmental Authority, including the FCC, or any other proceedings have occurred or been issued with respect to any Credit Party or any Main Station License since the last renewal of each such Main Station License.

(h)    All information contained in any pending applications for modification, extension or renewal of any Main Station License or any construction permit associated with any of the Stations filed with the FCC by any Credit Party is true, complete and accurate in all material respects. Each Ownership Report filed by any Credit Party with the FCC was true, correct and complete in all material respects as of the date of such filing, and there has been no change in control of the ownership of any Credit Party or the FCC Licenses of any Credit Party since the most recently filed Ownership Report for any Credit Party other than any change of control of ownership to Alta Communications that may occur following receipt of any necessary FCC consent therefore in connection with the Related Transactions. All FCC regulatory fees assessed with respect to each Main Station License have been timely and accurately paid.

(i)    Set forth in Disclosure Schedule 3.26 is an accurate and complete list as of the Closing Date of the locations of all tower installations, transmitters and offices used in connection with the operation of the Stations (identified with reference to the Station to which each such location serves). Each of the Stations' towers required to be registered with the FCC pursuant to the FCC's antenna structure registration requirements has been duly and accurately registered by such Credit Party or, to the best knowledge of such Credit Party, by the owner of such towers as the case may be.

(j)    Except as set forth in Disclosure Schedule 3.26(b), the Stations' physical facilities, including their transmitting and studio equipment, are operated in accordance with, in all material respects, their respective FCC Licenses and the Communications Laws. The location and staffing of each Station's main studio complies with the Communications Laws. The equipment of each Station's main studio complies in all material respects with the Communications Laws. The Stations are in compliance with the limitations on exposure of workers and the public to radio frequency radiation established by the Communications Laws.

(k)    As of the Closing Date, no Credit Party is a party to any Marketing Agreement other than the Closing Date Marketing Agreements. Set forth in Disclosure Schedule 3.26(k) is a complete and accurate list, as of the Closing Date, of all of the Closing Date Marketing Agreements. With respect to each Closing Date Marketing Agreement, (i) such

Marketing Agreement is in full force and effect as of the Closing Date, has not been terminated, and is in compliance with the Communications Laws, (ii) each Credit Party is in compliance with its obligations thereunder, (iii) no Credit Party is in default thereunder and no notice of a claim of default thereunder by any Credit Party has been delivered to any Credit Party or is now pending, (iv) such Marketing Agreement is fully assignable to the Agent for collateral security for the payment of the Obligations under the Loan Documents and, following the occurrence and during the continuance of an Event of Default, may be freely assigned by the Agent upon the exercise of any rights and remedies by the Agent, and (v) to each Credit Party's knowledge, there does not exist any event that with notice or the passing of time, or both, would constitute a default thereunder, in either case (w) permitting the termination of such Marketing Agreement, (x) permitting the imposition of any material penalty thereunder, (y) permitting specific performance or a similar equitable remedy, or (z) otherwise excusing performance by any other party thereto.

(l)     None of the Credit Parties operates television stations or cable franchises.

**3.27     OFAC.** No Credit Party (i) is a person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such person in any manner violative of Section 2, or (iii) is a person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order.

**3.28     Patriot Act.** Each Credit Party is in compliance, in all material respects, with the (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) the Uniting And Strengthening America By Providing Appropriate Tools Required To Intercept And Obstruct Terrorism (USA Patriot Act of 2001). No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**3.29     Material Agreements and Other Documents.** As of the Closing Date, each Credit Party has provided to Agent, on behalf of Lenders, accurate and complete copies (or summaries) of all Material Agreements in existence as of the Closing Date as well as all of the following other agreements or documents to which it is subject and each of which is listed in Disclosure Schedule 3.29:    all management agreements, all other agreements involving transactions in excess of $250,000 per annum; leases of Equipment having a remaining term of one year or longer and requiring aggregate rental and other payments in excess of $250,000 per annum; licenses and permits held by the Credit Parties (other than FCC Licenses) the absence of which, individually or in the aggregate, could be reasonably likely to have a Material Adverse Effect; instruments and documents evidencing any Indebtedness or Guaranteed Indebtedness of such Credit Party and any Lien granted by such Credit Party with respect thereto in existence

after the consummation of the transactions contemplated hereby; and instruments and agreements in existence after the consummation of the transactions contemplated hereby on the Closing Date evidencing the issuance of any equity securities, warrants, rights or options to purchase equity securities of such Credit Party.

## 4. FINANCIAL STATEMENTS AND INFORMATION

### 4.1 Reports and Notices.

(a) Each Credit Party executing this Agreement hereby agrees that from and after the Closing Date and until the Termination Date, the Borrower shall deliver to Agent or to Agent and Lenders, as required, the Financial Statements, notices, Projections and other information at the times, to the Persons and in the manner set forth in Annex E.

(b) Each Credit Party executing this Agreement hereby agrees that from and after the Closing Date and until the Termination Date, it shall deliver to Agent or to Agent and Lenders, as required, the various Collateral Reports at the times, to the Persons and in the manner set forth in Annex F.

### 4.2 Communication with Accountants. Each Credit Party executing this Agreement authorizes (a) Agent and (b) so long as an Event of Default has occurred and is continuing, each Lender, to communicate directly with its independent certified public accountants, including Deloitte & Touche LLP, and financial representatives, including BNY Capital Markets, Inc., provided that so long as no Event of Default has occurred and is continuing, communications with independent certified public accountants and financial representatives shall be coordinated through Borrower unless Borrower shall fail to arrange for such communications within a reasonable time after any request by Agent, and authorizes and shall instruct those accountants and advisors to disclose and make available to Agent and each Lender any and all Financial Statements and other supporting financial documents, schedules and information relating to any Credit Party with respect to the business, results of operations and financial condition of any Credit Party.

## 5. AFFIRMATIVE COVENANTS

Each Credit Party executing this Agreement jointly and severally agrees as to all Credit Parties that from and after the date hereof and until the Termination Date:

### 5.1 Maintenance of Existence and Conduct of Business. Each Credit Party shall: do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and its material rights and franchises; continue to conduct its business substantially as now conducted or as otherwise permitted hereunder; at all times maintain, preserve and protect all of its assets and properties necessary in the conduct of its business, and keep the same in good repair, working order and condition in all material respects (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with

industry practices; and transact business only in such corporate and trade names as are set forth in Disclosure Schedule 5.1.

## 5.2 Payment of Charges.

(a) Subject to Section 5.2(b), each Credit Party shall pay and discharge or cause to be paid and discharged promptly all Charges payable by it, including (i) Charges imposed upon it, its income and profits, or any of its property (real, personal or mixed) and all Charges with respect to tax, social security and unemployment withholding with respect to its employees, (ii) lawful claims for labor, materials, supplies and services or otherwise, and (iii) all storage or rental charges payable to warehousemen and bailees, in each case, before any thereof shall become past due, except in the case of clauses (ii) and (iii) where the failure to pay or discharge such Charges would not result in aggregate liabilities in excess of $250,000.

(b) Each Credit Party may in good faith contest, by appropriate proceedings, the validity or amount of any Charges, Taxes or claims described in Section 5.2(a); provided, that (i) adequate reserves with respect to such contest are maintained on the books of such Credit Party, in accordance with GAAP; (ii) no Lien shall be imposed to secure payment of such Charges (other than payments to warehousemen and/or bailees) that is superior to any of the Liens securing payment of the Obligations and such contest is maintained and prosecuted continuously and with diligence and operates to suspend collection or enforcement of such Charges, (iii) none of the Collateral becomes subject to forfeiture or loss as a result of such contest, and (iv) such Credit Party shall promptly pay or discharge such contested Charges, Taxes or claims and all additional charges, interest, penalties and expenses, if any, and shall deliver to Agent evidence reasonably acceptable to Agent of such compliance, payment or discharge, if such contest is terminated or discontinued adversely to such Credit Party or the conditions set forth in this Section 5.2(b) are no longer met.

## 5.3 Books and Records.
Each Credit Party shall keep adequate books and records with respect to its business activities in which proper entries, reflecting all financial transactions, are made in accordance with GAAP and on a basis consistent with the Financial Statements attached as Disclosure Schedule 3.4(a).

## 5.4 Insurance; Damage to or Destruction of Collateral.

(a) The Credit Parties shall, at their sole cost and expense, maintain the policies of insurance described on Disclosure Schedule 3.18 as in effect on the date hereof or otherwise in form and amounts and with insurers reasonably acceptable to Agent. Such policies of insurance (or the loss payable and additional insured endorsements delivered to Agent) shall contain provisions pursuant to which the insurer agrees to provide thirty (30) days prior written notice to Agent in the event of any non-renewal, cancellation or amendment of any such insurance policy. If any Credit Party at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required above or to pay all premiums relating thereto, Agent may at any time or times thereafter obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto that Agent deems advisable. Agent shall have no obligation to obtain insurance for any Credit Party or pay any premiums therefor. By doing so, Agent shall not be deemed to have waived any Default or Event of Default arising

from any Credit Party's failure to maintain such insurance or pay any premiums therefor. All sums so disbursed, including reasonable attorneys' fees, court costs and other charges related thereto, shall be payable on demand by Borrower to Agent and shall be additional Obligations hereunder secured by the Collateral.

(b)     Agent reserves the right at any time upon any change in any Credit Party's risk profile (including any change in the product mix maintained by any Credit Party or any laws affecting the potential liability of such Credit Party) to require additional forms and limits of insurance to, in Agent's opinion, adequately protect both Agent's and Lenders' interests in all or any portion of the Collateral and to ensure that each Credit Party is protected by insurance in amounts and with coverage customary for its industry. If reasonably requested by Agent, each Credit Party shall deliver to Agent from time to time a report of a reputable insurance broker reasonably satisfactory to Agent, with respect to its insurance policies.

(c)     Each Credit Party shall deliver to Agent, in form and substance reasonably satisfactory to Agent, endorsements to (i) all "All Risk" and business interruption insurance naming Agent, on behalf of itself and Lenders, as loss payee, and (ii) all general liability and other liability policies naming Agent, on behalf of itself and Lenders, as additional insured. Each Credit Party irrevocably makes, constitutes and appoints Agent (and all officers, employees or agents designated by Agent), so long as any Default or Event of Default has occurred and is continuing or the anticipated insurance proceeds exceed $250,000, as each Credit Party's true and lawful agent and attorney-in-fact for the purpose of making, settling and adjusting claims under such "All Risk" policies of insurance, endorsing the name of each Credit Party on any check or other item of payment for the proceeds of such "All Risk" policies of insurance and for making all determinations and decisions with respect to such "All Risk" policies of insurance. Agent shall have no duty to exercise any rights or powers granted to it pursuant to the foregoing power-of-attorney. Borrower shall promptly notify Agent of any loss, damage, or destruction to the Collateral in the amount of $250,000 or more, whether or not covered by insurance. After deducting from such proceeds (i) the expenses incurred by Agent in the collection or handling thereof, and (ii) amounts required to be paid to creditors (other than Lenders) having Permitted Encumbrances, such proceeds at the option of Agent shall be applied to the reduction of the Obligations in accordance with Section 1.3(c), provided that in the case of insurance proceeds pertaining to any Credit Party other than Borrower, such insurance proceeds shall be applied to the Loans owing by Borrower, or permit or require such Credit Party to use such money, or any part thereof, to replace, repair, restore or rebuild the Collateral in a diligent and expeditious manner with materials and workmanship of substantially the same quality as existed before the loss, damage or destruction. Notwithstanding the foregoing, if the casualty giving rise to such insurance proceeds could not reasonably be expected to have a Material Adverse Effect, no Default or Event of Default has occurred and is continuing and such insurance proceeds do not exceed $100,000 in the aggregate for all insurance proceeds from a single claim (or series of related claims), Agent shall permit the applicable Credit Party to replace, restore, repair or rebuild the property; provided that if such Credit Party has not completed such replacement, restoration, repair or rebuilding within 180 days of such casualty, such reinvestment period may be extended an additional 180 days if (i) the applicable Credit Party has executed a binding agreement for such replacement, restoration, repair or rebuilding replacement property and (ii) such proceeds are deposited in a cash collateral account controlled by Agent. If such Credit Party fails to replace, restore, repair or rebuild the property in accordance with the immediately

preceding sentence, Agent may apply such insurance proceeds to the Obligations in accordance with Section 1.3(c), provided that in the case of insurance proceeds pertaining to any Credit Party other than Borrower, such insurance proceeds shall be applied to the Loans owing by Borrower. All insurance proceeds that are to be made available to Borrower to replace, repair, restore or rebuild the Collateral shall be applied by Agent to reduce the outstanding principal balance of the Revolving Loan (which application shall not result in a permanent reduction of the Revolving Loan Commitment). All insurance proceeds made available to any Credit Party that is not a Borrower to replace, repair, restore or rebuild Collateral shall be deposited in a cash collateral account. Thereafter, such funds shall be made available to such Credit Party to provide funds to replace, repair, restore or rebuild the Collateral as follows: (i) Borrower shall request a Revolving Credit Advance or a release from the cash collateral account be made to such Credit Party in the amount requested to be released; (ii) so long as the conditions set forth in Section 2.2 have been met, Revolving Lenders shall make such Revolving Credit Advance or Agent shall release funds from the cash collateral account; and (iii) in the case of insurance proceeds applied against the Revolving Loan, the Reserve established with respect to such insurance proceeds shall be reduced by the amount of such Revolving Credit Advance. To the extent not used to replace, repair, restore or rebuild the Collateral, such insurance proceeds shall be applied in accordance with Section 1.3(c); provided that in the case of insurance proceeds pertaining to any Credit Party other than Borrower, such insurance proceeds shall be applied to the Loans owing by Borrower.

(d)     The Borrower shall maintain key-man life insurance on Charles Warfield, Jr. (or other key employees designated by the Agent as a substitute for such individual in the event Charles Warfield, Jr. no longer serves as an officer of the Borrower) in an amount equal to at least $10,000,000 with such life insurance policy collaterally assigned to the Agent and on terms reasonably satisfactory to the Agent and, on the Closing Date, the Syndication Agent. The proceeds of such life insurance shall be paid to the Agent to be applied to prepayment of the Obligations, with any remaining proceeds to be paid to the Borrower.

**5.5     Compliance with Laws**. Each Credit Party shall comply with (i) all federal, state, local and foreign laws and regulations applicable to it, including ERISA, labor laws, and Environmental Laws and Environmental Permits and (ii) the obligations, covenants and conditions contained in all Material Agreements of such Credit Party or any of its Subsidiaries, except to the extent that the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**5.6     Supplemental Disclosure**. From time to time as may be reasonably requested by Agent (which request will not be made more frequently than once each year absent the occurrence and continuance of an Event of Default) or at Credit Parties' election, the Credit Parties shall supplement each Disclosure Schedule hereto, or any representation herein or in any other Loan Document, with respect to any matter hereafter arising that, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in such Disclosure Schedule or as an exception to such representation or that is necessary to correct any information in such Disclosure Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Disclosure Schedule, such Disclosure Schedule shall be appropriately marked to show the changes made therein); provided that (a) no such supplement to any such Disclosure Schedule or representation shall amend, supplement or

otherwise modify any Disclosure Schedule or representation, or be or be deemed a waiver of any Default or Event of Default resulting from the matters disclosed therein, except as consented to by Agent and Requisite Lenders in writing, and (b) no supplement shall be required or permitted as to representations and warranties that relate solely to the Closing Date.

5.7 **Intellectual Property**. Each Credit Party will conduct its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any material respect and shall comply in all material respects with the terms of its Licenses.

5.8 **Environmental Matters**. Each Credit Party shall and shall cause each Person within its control to: (a) conduct its operations and keep and maintain its Real Estate in compliance with all Environmental Laws and Environmental Permits other than noncompliance that could not reasonably be expected to have a Material Adverse Effect; (b) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws and Environmental Permits pertaining to the presence, generation, treatment, storage, use, disposal, transportation or Release of any Hazardous Material on, at, in, under, above, to, from or about any of its Real Estate in all material respects; (c) notify Agent promptly after such Credit Party becomes aware of any violation of Environmental Laws or Environmental Permits or any Release on, at, in, under, above, to, from or about any Real Estate that is reasonably likely to result in Environmental Liabilities in excess of $250,000; and (d) promptly forward to Agent a copy of any order, notice, request for information or any communication or report received by such Credit Party in connection with any such violation or Release or any other matter relating to any Environmental Laws or Environmental Permits that could reasonably be expected to result in Environmental Liabilities in excess of $250,000 in each case whether or not the Environmental Protection Agency or any Governmental Authority has taken or threatened any action in connection with any such violation, Release or other matter. If Agent at any time has a reasonable basis to believe that there may be a violation of any Environmental Laws or Environmental Permits by any Credit Party or any Environmental Liability arising thereunder, or a Release of Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, that, in each case, could reasonably be expected to have a Material Adverse Effect, then each Credit Party shall, upon Agent's written request (i) cause the performance of such environmental audits including subsurface sampling of soil and groundwater, and preparation of such environmental reports, at Borrower's expense, as Agent may from time to time reasonably request, which shall be conducted by reputable environmental consulting firms reasonably acceptable to Agent and shall be in form and substance reasonably acceptable to Agent, and (ii) permit Agent or its representatives to have access to all Real Estate for the purpose of conducting such environmental audits and testing as Agent deems appropriate, including subsurface sampling of soil and groundwater. Borrower shall reimburse Agent for the costs of such audits and tests and the same will constitute a part of the Obligations secured hereunder.

5.9 **Landlords' Agreements, Mortgagee Agreements, Bailee Letters and Real Estate Purchases**. Each Credit Party shall obtain a landlord's agreement, mortgagee agreement or bailee letter, as applicable, required pursuant to Disclosure Schedule 5.9 from the lessor of each leased property, mortgagee of owned property or bailee with respect to any facility or location not owned by any Credit Party where Collateral is stored or located, which agreement

or letter shall contain a waiver or subordination of all Liens or claims that the landlord, mortgagee or bailee may assert against the Collateral at that facility or location, and shall otherwise be reasonably satisfactory in form and substance to Agent. After the Closing Date, no real property or warehouse space shall be leased by any Credit Party and no Inventory shall be shipped to a facility or location under arrangements established after the Closing Date without the prior written consent of Agent or, unless and until a satisfactory landlord agreement or bailee letter, as appropriate, shall first have been obtained with respect to such location; in each case except locations (i) where Collateral located thereon has an aggregate fair market value of $250,000 or less at any time or (ii) that generate revenue of less than $250,000 on an annual basis <u>provided</u> any such exception in clause (i) or (ii) above shall not apply to any Tower Lease. Each Credit Party shall timely and fully pay and perform its obligations under all leases and other agreements with respect to each leased location or public warehouse where any Collateral is or may be located. To the extent permitted hereunder, if any Credit Party proposes to acquire a fee ownership or leased interest in Real Estate after the Closing Date, it shall first provide to Agent a mortgage or deed of trust granting Agent a first priority Lien on in its interest in such Real Estate, together with environmental audits, mortgage title insurance commitment, real property survey, local counsel opinion(s), and, if required by Agent, supplemental casualty insurance and flood insurance, and such other documents, instruments or agreements reasonably requested by Agent, in each case, in form and substance reasonably satisfactory to Agent.

### 5.10 FCC Matters.

(a)     Each Credit Party shall at all times maintain in full force and effect each Main Station License and each other License material to the operation of its business or the ownership of its assets, including each FCC License material to the operation of the Stations.

(b)     Each Credit Party shall comply in all material respects with the terms of each FCC License; notify the Agents promptly (but in no case later than five Business Days) of (i) the termination, cancellation, adverse modification, suspension, impairment, lapse, non-renewal or other loss of any Main Station License or any FCC License material to the operation of the Stations, (ii) any default under or with respect to any Main Station License or any FCC License material to the operation of the Stations and (iii) any proceeding to which any Credit Party is a party which involves a material risk of the termination, cancellation, modification, suspension, impairment, non-renewal or other loss of any Main Station License or any FCC License material to the operation of the Stations; and furnish to the Agents copies of any new FCC License acquired by any Credit Party.

(c)     In addition to and not in lieu of the requirements set forth in <u>Annex E</u>, the Credit Parties shall provide Agents, promptly (but in no case later than five Business Days) after the same becomes available, with copies of all (i) letters of inquiry, notices of apparent liability, hearing designation orders or any other orders, rulings or decisions of the FCC naming any of the Stations and (ii) any material correspondence, pleading or other response from any Credit Party to the FCC with respect to the foregoing. Each Credit Party shall comply in all material respects with all FCC filing requirements described in 47 C.F.R. §§73.3613 and 73.3615 and shall provide copies to Agents of all filings made pursuant to such requirements; and shall timely pay all FCC regulatory fees assessed against any of the Stations. Without limiting the generality of the foregoing, each Credit Party shall file at the FCC the Loan Documents required to be filed