CADWALADER, WICKERSHAM & TAFT LLP
John J. Rapisardi, Esq.
Scott J. Greenberg, Esq.
Zachary H. Smith, Esq.
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

Peter Friedman, Esq.
700 Sixth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

*Attorneys for Yucaipa Corporate Initiatives Fund II, L.P.*
*and Yucaipa Corporate Initiatives (Parallel) Fund II, L.P.*

SCHULTE ROTH & ZABEL LLP
Adam C. Harris, Esq.
Meghan Breen, Esq.
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

*Attorneys for CF ICBC LLC, Fortress Credit Funding I L.P.,*
*and Drawbridge Special Opportunities Fund Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| INNER CITY MEDIA CORPORATION, *et al.*, | : Case No. 11-13967 (SCC) |
| | : |
| Debtors. | : Jointly Administered |
| | : |

---------------------------------------------------------------- x

**STATEMENT AND RESERVATION OF RIGHTS OF SENIOR LENDERS**
**WITH RESPECT TO ENTRY OF SECOND INTERIM ORDER**
**AUTHORIZING DEBTORS' USE OF CASH COLLATERAL**

The lenders (collectively, the "Senior Lenders")[1] under the Senior Secured Credit Facility (as defined below) respectfully submit this statement and reservation of rights (the "Statement and Reservation") in connection with the motion of Inner City Media Corporation ("ICMC") and certain of its affiliates (the "Debtors"),[2] as debtors and debtors in possession in the above-referenced cases (collectively, the "Cases"), seeking entry of a further interim order authorizing the Debtors' use of the Senior Lenders' Cash Collateral.[3] Specifically, the Senior Lenders submit this Statement and Reservation for the purpose of (i) apprising the Court of certain developments in the Cases since the Relief Date, which cause the Senior Lenders concern with respect to the Debtors' commitment to administer these Cases in a consensual, transparent, and expedited manner, as required under the First Interim Order; (ii) informing the Court of the terms upon which the Senior Lenders are willing to consent to the Debtors' further use of Cash Collateral on an interim basis for the period from October 10, 2011 through and including November 7, 2011 (the "Second Interim Period"), as set forth in the proposed order attached as Exhibit A (together with a budget to be agreed between the Debtors and the Senior Lenders, the "Lender Proposed Order"); and (iii) reserving the rights of the Senior Lenders to object to the

---

[1]  The Senior Lenders are Yucaipa Corporate Initiatives Fund II, L.P., Yucaipa Corporate Initiatives (Parallel) Fund II, L.P., CF ICBC LLC, Fortress Credit Funding I L.P., and Drawbridge Special Opportunities Fund Ltd.

[2]  The Debtors are Inner City Media Corporation, ICBC Broadcast Holdings, Inc., Inner City Broadcasting Corporation of Berkeley, ICBC Broadcast Holdings – CA, Inc., ICBC-NY, L.L.C., Urban Radio, L.L.C., Urban Radio I, L.L.C., Urban Radio II, L.L.C., Urban Radio III, L.L.C., Urban Radio IV, L.L.C., Urban Radio of Mississippi, L.L.C., and Urban Radio of South Carolina, L.L.C.

[3]  Capitalized terms used but not defined in the Statement and Reservation have the meanings ascribed to such terms in the First Interim Order (as defined below).

Debtors' use of Cash Collateral, in the event the Debtors refuse to consent to entry of the Lender Proposed Order.[4]  In support hereof, the Senior Lenders respectfully represent:

## BACKGROUND

A.      General Background

1.      The Senior Lenders are lenders under the Credit Agreement among the Debtors, Cortland Capital Market Services LLC, as administrative agent, and the lenders signatory to the Credit Agreement from time to time, dated as of August 13, 2004 (as amended as of each of September 27, 2004, November 11, 2004, May 5, 2005, October 6, 2006, and June 22, 2007, and as further amended, restated, modified, or supplemented from time to time) (the "Senior Secured Credit Facility").

2.      On August 19, 2011, the Senior Lenders filed involuntary chapter 11 petitions against the Debtors (the "Involuntary Petitions").  Upon the consent of the Debtors, on September 8, 2011, the Court entered orders for relief, commencing the Cases (the "Relief Date").  As of the date hereof, the Debtors continue to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      On September 22, 2011, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") filed the Statement of the U.S. Trustee of Inability to Appoint Committee of Unsecured Creditors.  See Docket No. 84.  Accordingly, as of the date hereof, no statutory committee of unsecured creditors has been appointed in the Cases. In addition, as of the date hereof, no trustee or examiner has been appointed in the Cases.

---

[4]     Prior to the September 28, 2011 deadline to submit a responsive pleading to entry of a Successive Interim Order, the Debtors extended the Senior Lenders' deadline to October 3, 2011 at 12:00 p.m. (EST).

B.    Negotiation and Entry of First Interim Order

4.    On August 31, 2011, the Court held a status conference in connection with the filing of the Involuntary Petitions.  Following the August 31 conference, as agreed among the parties and directed by the Court, the Debtors, the Senior Lenders, and the Agent engaged in negotiations regarding (i) an interim order authorizing the Debtors' use of Cash Collateral on an interim basis, and granting of Adequate Protection to the Senior Lenders and the Agent (the "First Interim Order"), and (ii) an accompanying budget (the "First Interim Budget").

5.    On September 9, 2011, the Court held the first-day hearing in the Cases. On the record of the hearing, Debtors' counsel advised the Court of certain high-level terms of an agreement in principle reached on September 6 among principals of the Debtors, the Senior Lenders, non-Debtor parent Inner City Broadcast Corporation ("ICBC"), and Mr. Pierre Sutton (Chairman and Chief Executive Officer of the Debtors, and Chairman of ICBC), with respect to a global consensual restructuring of the Debtors' estates.[5]

6.    Also on September 9, the Court heard the Debtors' motion seeking entry of the First Interim Order and approval of the First Interim Budget.  On the record of the hearing, counsel for the Senior Lenders advised the Court of certain concerns that had arisen in connection with the negotiation of the First Interim Order, which caused the Senior Lenders to question whether ICBC and Mr. Sutton truly intend to cooperate with the Senior Lenders (and the Debtors) in implementing the principals' agreement, and moving forward expeditiously with a consensual plan of reorganization.[6]  As explained by counsel for the Senior Lenders, on

---

[5]    The Senior Lenders reserved their rights on the record of the first-day hearing, with respect to Debtors' counsel's representations concerning the various deal terms.  See Hr'g Tr. 9/9/11, 15 (hereinafter, the "September 9 Transcript").  A copy of the September 9 Transcript is attached as Exhibit B.

[6]    See September 9 Transcript, 35 – 36.

September 8, counsel for ICBC, Meyer, Suozzi, English & Klein ("Meyer Suozzi"), contacted counsel for the Senior Lenders and requested the insertion of certain language into the First Interim Order, in effect reserving the right of ICBC to seek to challenge certain liens of the Senior Lenders. While the comment was resolved by the insertion of the reservation of rights language in paragraph G.9. of the First Interim Order, the Senior Lenders advised all parties in interest on the record of the hearing that these issues would need to be resolved prior to any extension of the Debtors' authorization to use Cash Collateral, or, at the very latest, the October 9 milestone for filing of the Plan.[7]

7. Later that day, the Court entered the First Interim Order.[8] Pursuant to the First Interim Order, the Debtors are authorized to use Cash Collateral from the Relief Date through and including October 9, 2011 (the "First Interim Period"), "solely in accordance with [the First Interim Order], the Approved Budget, and the other Cash Collateral Documents." First Interim Order, 2. Further, with respect to any proposed use of Cash Collateral by the Debtors beyond the First Interim Period, the First Interim Order provides:

> for the avoidance of doubt, notwithstanding anything herein to the contrary, the Debtors' authorization to use Cash Collateral pursuant to this Interim Order, and the consent of the Senior Lenders with respect thereto, extends solely through the date that is thirty (30) days from entry of this Interim Order . . . and the Debtors and the Senior Lenders reserve all rights with respect to any proposed use of Cash Collateral beyond such [First Interim Period]."

Id. In addition, pursuant to the First Interim Order, as one of the forms of Adequate Protection granted to the Senior Lenders, the Debtors are required to adhere to certain case milestones (the "Milestone Schedule") related to the Plan confirmation process:

---

[7] See September 9 Transcript, 36.

[8] A copy of the First Interim Order [Docket No. 68] is attached as Exhibit C.

> Milestones. The Debtors shall take the actions identified below by the following dates: (i) within thirty (30) days of the date of entry of the [First Interim Order] (the "Process Start Date"), the Debtors shall have filed with the Court a proposed chapter 11 plan (the "Plan") and a corresponding disclosure statement (the "Disclosure Statement"), in each case, in form and substance acceptable to the Senior Lenders, (ii) within sixty (60) days of the Process Start Date, the Court shall have entered an order approving the Disclosure Statement, (iii) within ninety (90) days of the Process Start Date, the Court shall have entered an order confirming the Plan; and (iv) by December 31, 2011, the Plan shall have been consummated if necessary FCC or other governmental approvals have been obtained.

Id., 3(i). Accordingly, pursuant to the First Interim Order, the Debtors are required to file the Plan by October 9.

C.       Events Since Entry of the First Interim Order

         (i)        Debtors' Unauthorized Payment of Previously Undisclosed Director Fees

8.       In connection with the negotiation of the First Interim Order, on September 2, 2011, the Debtors provided the Senior Lenders with a proposed thirteen-week operating budget (the "September 2 Draft Budget"). The September 2 Draft Budget contained, among other things, a line item of projected expenses during the First Interim Period and beyond, denoted "Other Operating." Subsequently, on September 5, 2011, in response to the request of the Senior Lenders, the Debtors delivered to the Senior Lenders certain detail regarding the "Other Operating" line item (the "Other Operating Detail").[9]

9.       Neither the September 2 Draft Budget, nor the Other Operating Detail, included any proposed payments to the Debtors' three (3) newly appointed "professional directors" (i.e., Eugene Davis, Tim Bernlohr, and Steve Scheiwe), who comprise the Debtors' Restructuring Committee (such directors, the "Professional Directors").

---

[9]    Copies of the September 2 Draft Budget, and the Other Operating Detail, are attached as Exhibit D.

10.     As negotiations regarding the First Interim Order and the First Interim Budget continued, on September 7, 2011, the Debtors delivered to the Senior Lenders a revised thirteen-week operating budget (the "September 7 Draft Budget").  The September 7 Draft Budget included, in pertinent part, a $40,000 increase in the line item denoted "Other Operating" for each of the weeks ending October 7, 2011, November 4, 2011, and December 2, 2011. However, the Debtors did not provide the Senior Lenders with a revised Other Operating Detail, or in any way alert the Senior Lenders to the nature of the proposed expenditures comprising the periodic $40,000 increases in the "Other Operating" line item.  The September 7 Draft Budget was ultimately attached to the First Interim Order, and, on September 9, approved by the Court as the First Interim Budget with respect to the period from the Relief Date through and including October 9, 2011.

11.     After entry of the First Interim Order, on September 13, the Debtors informed the Senior Lenders for the first time of the nature of the $40,000 increases in the "Other Operating" line item.  Specifically, the Debtors advised the Senior Lenders that (i) the Debtors agreed prepetition to compensate the Professional Directors at the rate of $40,000 (in the aggregate) per month, payable in advance during the previous month (such monthly fees, the "Director Fees"); and (ii) the Debtors had inadvertently omitted from the First Interim Budget $40,000 of fees payable to the Professional Directors during the week ending September 16, 2011.[10]

12.     As September 16 falls within the period covered by the First Interim Budget, the Debtors requested the Senior Lenders' consent to pay $40,000 to the Professional

---

[10]   The Debtors also advised the Senior Lenders that the 13-week operating budget attached to the First Interim Order incorrectly reflected Director Fees payable during the weeks ending October 7, 2011, November 4, 2011, and December 2, 2011 (instead of October 14, 2011, November 11, 2011 and December 11, 2011).

Directors by September 16.  At the same time, Debtors' counsel expressly assured the Senior Lenders that the Debtors would not pay any Director Fees without the Senior Lenders' consent.[11]

13.     Subsequently, the Senior Lenders requested further detail from the Debtors regarding the Director Fees, including (i) information as to how ICMC directors are compensated in the ordinary course of business; (ii) information as to which directors were contemplated to receive the Directors Fees, and what amounts were proposed to be paid for each such director; and (iii) information as to what time periods / number of meetings were covered for each payment of the Director Fees.  In the interim, the Senior Lenders repeatedly advised the Debtors that the Senior Lenders had not consented to payment of any of the Director Fees.

14.     In response, the Debtors informed the Senior Lenders on September 16 that (i) during the year prior to the Cases, outside directors of ICMC had received compensation of $2,500 per board meeting, and inside directors of ICMC had received no compensation in such capacity; (ii) each of the Professional Directors is to receive the Director Fees on a monthly basis, with $20,000 to Eugene Davis, $10,000 to Tim Bernlohr, and $10,000 to Steve Scheiwe; and (iii) the Director Fees are payable in advance of each month and bear no relation to the number of board meetings in which the Professional Directors participate.[12]  Additionally, the Debtors provided the Senior Lenders with a copy of the Unanimous Written Consent of the

---

[11]   See Email from Shaya Rochester of Akin, Gump, Strauss, Hauer & Feld LLP ("Akin") to Zachary Smith of Cadwalader, Wickersham & Taft, LLP ("CWT"), dated September 15, 2011, attached as Exhibit E.

[12]   See Email from Shaya Rochester of Akin to Zachary Smith of CWT, dated September 16, 2011, attached as Exhibit F.

ICMC board of directors appointing the Professional Directors, and purporting to fix the Director Fees at $40,000 per month.[13]

15. On September 27, 2011, the Debtors advised the Senior Lenders that, four days earlier on September 23, 2011, the Debtors had paid $20,000 of the Director Fees due for September 2011 to Tim Bernlohr and Steve Scheiwe. As the Senior Lenders never consented to this payment, the payment triggered an Event of Default under the First Interim Order. See First Interim Order, 9(g).

16. On September 27, the Senior Lenders reiterated to the Debtors that the Senior Lenders reserved all rights with respect to any past or future payments of Director Fees to the Professional Directors.[14] The next day, September 28, the Senior Lenders advised the Debtors of their willingness to consent to payment of $40,000 to the Professional Directors for services rendered and to be rendered during each of September and October (i.e., $80,000 in the aggregate), provided that the Debtors and the Professional Directors agree that subsequent payments to the Professional Directors would be in the amount of $2,500 per director meeting, not to exceed $20,000 per month in the aggregate.[15] To date, the Debtors have not indicated their acceptance of the Senior Lenders' proposal.

---

[13] A copy of the Unanimous Written Consent is attached as Exhibit G. The Debtors' first-day motion seeking authorization to pay certain prepetition and postpetition employee wage and benefit obligations also fails to include any information concerning the Debtors' fee arrangement with the Professional Directors, or a copy of the Unanimous Written Consent. See Docket No. 40.

[14] See Email from Zachary Smith of CWT to Shaya Rochester of Akin, dated September 27, 2011, attached as Exhibit H.

[15] See Email from Zachary Smith of CWT to Scott Alberino of Akin, dated September 28, 2011, attached as Exhibit I.

17.     Notwithstanding, on September 30, the Debtors proceeded to pay $20,000 to Gene Davis on account of Director Fees, triggering an additional violation of the First Interim Order.

(ii)     Debtors' Unauthorized Payment to Counsel for Non-Debtor Parent ICBC

18.     As stated, on September 9, the Court entered the First Interim Order.  On the next day, September 10, the Debtors advised the Senior Lenders that subsequent to entry of the First Interim Order, the Debtors "inadvertently" paid $75,000 to Meyer Suozzi.[16]  This unauthorized payment constituted an Event of Default under the First Interim Order.  See First Interim Order, 9(g).  At the same time, the Debtors also advised the Senior Lenders that, in order to remedy the unauthorized payment, ICBC subsequently transferred $75,000 to the Debtors.  To the knowledge of the Senior Lenders, the Debtors did not seek a refund of the $75,000 payment from Meyer Suozzi, nor did Meyer Suozzi offer to simply return the unauthorized payment.

(iii)     Lack of Progress Towards Appointment of Chief Restructuring Officer

19.     Pursuant to the First Interim Order, the Debtors are required to appoint a Chief Restructuring Officer from a list(s) of candidates provided by the Senior Lenders, having a scope of authority acceptable to the Senior Lenders in their reasonable discretion, on or before October 8.  Specifically, paragraph 3(p) of the First Interim Order provides:

> Within 30 days after the entry of orders for relief, the Debtors shall appoint a Chief Restructuring Officer ("CRO").  The Senior Lenders shall provide the Debtors with a list of not less than three (3) qualified candidates for the CRO position within five (5) days after entry of this [First] Interim Order, and the Debtors shall select the CRO from such list.  The Debtors reserve the right to request that the Senior Lenders propose additional candidates in the event

---

[16]   Meyer Suozzi is included on the Debtors' list of creditors holding the top thirty (30) unsecured claims in the Cases, with a claim of $37,786.  As the amount of the payment to Meyer Suozzi exceeds the amount of its asserted claim according to the Debtors' list of creditors, the alleged debt satisfied by the Debtors' payment of $75,000 to Meyer Suozzi is unclear.

the persons on the Senior Lenders' initial list are not available or conflicted. The scope, terms and conditions of the CRO's corporate authority and retention shall be acceptable to the Senior Lenders in the exercise of their reasonable discretion. Upon the occurrence of an Event of Default with respect to this provision, the Remedies Notice Period will be reduced from five (5) days to the earlier to occur of (i) three (3) days or (ii) the date upon which the Court enters an order determining whether an Event of Default has or has not occurred under this section.

First Interim Order, 3(p). Accordingly, the above-referenced provision of the First Interim Order makes clear that (i) the CRO must be appointed within thirty (30) days of the Relief Date, i.e., October 8, 2011;[17] (ii) the CRO must be appointed from the candidates proposed by the Senior Lenders, either from the Senior Lenders' initial list or a subsequent list, if the initial candidates are conflicted or unavailable; and (iii) timely appointment of the CRO is of critical importance of the Senior Lenders, as reflected by the expedited Remedies Notice Period applicable under the First Interim Order in the event the CRO is not appointed by the required deadline.

20. Pursuant to the First Interim Order, on September 13, the Senior Lenders provided the Debtors with a list of three qualified candidates for the CRO position. Subsequently, the Senior Lenders made repeated inquiry to Debtors' counsel for information regarding the status of CRO interviews, selection, and appointment. In response, Debtors' counsel represented to the Senior Lenders that the Debtors were in the process of scheduling interviews with the Senior Lenders' proposed CRO candidates. On September 28, 2011, however, the Senior Lenders learned from the CRO candidates that the Debtors have not contacted any of them.

---

[17] As a mechanical matter, and as the Senior Lenders have discussed with the U.S. Trustee and Debtors' counsel, the Senior Lenders contemplate that the CRO would be selected and vested with appropriate authority such that the CRO is "in place" by October 8, with a motion for nunc pro tunc approval of such appointment to be filed with the Court shortly thereafter.

21.     Accordingly, on September 30, the Senior Lenders delivered to the Debtors the letter attached as Exhibit J (the "Status Letter"), for the purpose of (i) advising the Debtors of the Senior Lenders' disappointment and frustration with the Debtors' lack of progress in the Cases, in particular with respect to the CRO selection and Plan processes; (ii) reminding the Debtors that time is of the essence with respect to both, and rejecting the Debtors' request for an extension of the Milestone Schedule; (iii) requesting a detailed status update regarding the appointment of the CRO; (iv) requesting copies of all minutes of the Debtors' board of directors (including minutes of the Restructuring Committee) since the Relief Date, in order to assess whether any board discussions regarding CRO selection and appointment had, in fact, occurred; and (v) urging the Debtors to address the CRO selection, and finalize the Plan, without delay.

22.     In response, on September 30, counsel for the Debtors informed the Senior Lenders during a telephonic conference that (i) no interviews with any of the Senior Lenders' CRO candidates had been scheduled; (ii) counsel was not aware of any prior representations by Akin to the Senior Lenders' counsel, to the effect that the Debtors were in the process of scheduling interviews with the Senior Lenders' CRO candidates; (iii) the delay in the CRO interview process is due to the dispute between the Senior Lenders and the Debtors concerning the payment of the Director Fees (although, as stated, the Debtors proceeded to pay the disputed fees without the Senior Lenders' consent); (iv) notwithstanding that the Director Fee issue remains unresolved, Akin has now advised the Professional Directors to move forward with the CRO interview and selection process, in light of the impending October 8 deadline under the First Interim Order;[18] (v) the Debtors have determined not to interview one of the three

---

[18]     Akin asserts that, notwithstanding the express language of paragraph 3(p) of the First Interim Order, which requires the Debtors to appoint the CRO "within 30 days after the entry of orders for relief" (i.e., by October 8) – that the Debtors nonetheless have until October 11 to satisfy this milestone because

candidates proposed by the Senior Lenders (although the Debtors have not indicated whether they believe this individual is conflicted or unavailable, the only two grounds for rejection of one of the Senior Lenders' candidates as stated in the First Interim Order), and have purported to add to the list of potential candidates two individuals proposed by the Debtors and/or Rothschild (which the Senior Lenders have advised the Debtors is unacceptable and not permitted under the First Interim Order); and (vi) Akin would attempt to locate the minutes of the Debtors' board meetings since the Relief Date, but would not be able to provide the minutes by the close of business on September 30.[19]

23.     The Senior Lenders understand from the CRO candidates that, as of the date hereof, the Debtors still have not contacted any of them, including the candidate whom the Debtors have purported to reject for reasons unbeknownst to the Senior Lenders.

(iv)     <u>Lack of Progress Towards Resolution of Plan Issues</u>

24.     Following entry of the First Interim Order, in an effort to expedite the process of documenting the agreement in principle that would serve as the foundation of the Plan, and in light of the imminent October 9 milestone for filing the Plan, on September 14 the Senior Lenders provided the Debtors with a Plan term sheet (the "<u>Term Sheet</u>").   Upon information and belief, the Debtors then shared the Term Sheet with Meyer Suozzi.

---

October 8 – 9 is a weekend, and October 10 is Columbus Day.  Not only are the Debtors wrong based upon the plain language of the First Interim Order, but the notion that the parties contemplated the addition of even a single day to this covenant – when time is of the essence with respect to the CRO appointment, as reflected by the expedited Remedies Notice Period applicable upon breach – is absurd, and reflects an obvious attempt by the Debtors to delay appointment of the CRO for as long as possible.

[19]     To date, the Senior Lenders have not received any board minutes.

25.     Unfortunately, however, as of the date hereof the Debtors and ICBC have failed to finalize the Term Sheet with the Senior Lenders.[20]  Rather, over the past several weeks since entry of the First Interim Order – while the Debtors have failed to make any progress towards selection and appointment of the CRO – the Debtors and ICBC have consistently avoided or delayed finalization of the Term Sheet.  Among other things, (i) despite repeated requests by the Senior Lenders, ICBC continues to refuse to provide disclosure to the Senior Lenders regarding its cash position, as a result leaving the Senior Lenders no alternative but to seek to compel production of this information by ICBC pursuant to Bankruptcy Rule 2004;[21] (ii) ICBC continues to resist, and the Debtors continue to question, fundamental Plan terms which provide for the validation of the Senior Lenders' security interest in ICBC trademarks; (iii) despite repeated inquiry by the Senior Lenders, Rothschild has not attempted to resolve the duplicative transaction fees asserted by Rothschild Inc. ("Rothschild") and Alvarez & Marsal

---

[20]    In an effort to move the process forward notwithstanding the Debtors' and ICBC's lack of cooperation with respect to finalization of the Term Sheet, on September 28, the Senior Lenders provided the Debtors with drafts of the Plan and Disclosure Statement consistent with the Term Sheet.  While the Senior Lenders recognize that counsel must be afforded an opportunity to review and comment on these documents, the documents are straightforward and consistent with the Term Sheet.  Although time is of the essence, to date the Senior Lenders are yet to receive any comments to the Plan or Disclosure Statement, even on a rolling basis.  Nor have the Senior Lenders received drafts of any of the exhibits to the Disclosure Statement – such as draft historical financials and projections – which were requested by the Senior Lenders weeks ago.

[21]    The Senior Lenders have been requesting this information from ICBC since before the Relief Date, and has consistently continued to request this information over the past several weeks.  Most recently, on September 26, 2011, the Senior Lenders advised ICBC that, in the event information regarding ICBC's cash position is not voluntary produced by October 3, 2011, the Senior Lenders will be forced to seek disclosure of this information under Bankruptcy Rule 2004.  See Letter from Scott J. Greenberg of CWT to Thomas M. Slome of Mayer Suozzi, dated September 26, 2011, attached as Exhibit K.  Five days after this letter was delivered to Meyer Suozzi, Meyer Suozzi responded with a less than firm commitment to produce the requested information to the Senior Lenders early in the week of October 3.  As of the filing of this Statement and Reservation, none of the requested information has been produced.

("A&M"), and, furthermore, has now advised the Senior Lenders that it does not intend to attempt to resolve the competing fees.[22]

## STATEMENT AND RESERVATION OF RIGHTS

26.     As the Senior Lenders made clear to the Debtors at the outset of these Cases, the Senior Lenders are amenable to the Debtors' use of Cash Collateral in accordance with an acceptable budget, provided that the Debtors and ICBC are responsibly and promptly pursuing confirmation of the fully consensual Plan in accordance with the Milestone Schedule and the other provisions of the First Interim Order – in particular, the timely appointment of a CRO from the Senior Lenders' proposed candidate list(s) by October 8.  As the Senior Lenders made equally clear, the Senior Lenders will not consent to the Debtors' further use of Cash Collateral, if the Debtors or ICBC exhibit behavior that is inconsistent with the orderly, expeditious, cost-effective, and consensual resolution of these Cases.

27.     The totality of events since entry of the First Interim Order has exacerbated the Senior Lenders' concern regarding the Debtors' intentions in these Cases.  It is difficult for the Senior Lenders to comprehend the Debtors' failure, since entry of the First Interim Order, to (i) take any action to select or appoint a CRO; (ii) finalize the Term Sheet; (iii) reach resolution of Plan terms with ICBC; (iv) provide even preliminary comments on the Plan or Disclosure Statement; (v) deliver drafts of the exhibits to the Disclosure Statement; (vi) ensure

---

[22]   The Senior Lenders understood Rothschild to have represented during business discussions concerning the global settlement and Plan that Rothschild would be responsible for the resolution of its and A&M's competing transaction fees – such that the total amount of any and all transaction fees payable to Rothschild and A&M in connection with the Cases would be capped at $1.25 million.  Based upon this understanding, the Senior Lenders did not anticipate the need to object to the Debtors' application to retain Rothschild (the "Rothschild Application"), which also seeks approval of Rothschild's transaction fee.  However, late in the afternoon on September 30, Rothschild advised the Senior Lenders that it does not intend to resolve A&M's claim for a transaction fee (A&M has already filed a proof of claim in the Cases, in the amount of $1.57 million).  Accordingly, as this issue appears to be unresolved, the Senior Lenders submitted a limited objection to the Rothschild Application insofar as it seeks approval of a transaction fee payable to Rothschild.  See Docket No. 91.

the Debtors would not "inadvertently" remit $75,000 to Meyer Suozzi shortly after the first-day hearing and the Court's entry of the First Interim Order; (vii) otherwise adhere to the First Interim Order and First Interim Budget, as opposed to making unauthorized payments to the Professional Directors totaling $40,000 without the Senior Lenders' consent, after representing to the Senior Lenders in writing that no such payments would be made without consent; (viii) take necessary action in order to ensure the timely production of information by ICBC; and (ix) ensure that Rothschild attempts to resolve the A&M transaction fee, and not seek payment of a transaction fee that could expose the Debtors' estates to aggregate transaction fees in excess of $1.25 million.

28.     In sum, the Senior Lenders do not have confidence that the Debtors intend to proceed on the path that is set forth in the First Interim Order – but that is the only path upon which the Senior Lenders are willing to consent to the Debtors' use of Cash Collateral in these Cases.[23]

29.     In the event the Debtors are unable or unwilling to comply with the Milestone Schedule and the October 8 deadline for appointment of the CRO, the Senior Lenders are prepared to move forward and file a confirmable plan of reorganization that provides for meaningful recoveries on account of allowed general unsecured claims, and is otherwise in the best interests of the Debtors' estates and creditors.  To be clear, the Senior Lenders believe it is incumbent upon the Debtors to move forward expeditiously with selection and appointment of the CRO, finalization of the Term Sheet, and filing of the Plan – and the Senior Lenders intend to

---

[23]    The Debtors have not made any showing of an ability to provide adequate protection to the Senior Lenders, absent the Senior Lenders' consent.  The Senior Lenders reserve all rights to object to any proposed use of Cash Collateral by the Debtors on a non-consensual basis.

continue to seek in good faith over the coming week to finalize the Term Sheet and Plan with the Debtors and ICBC in accordance with the agreed timeframe.

30.     However, in the event progress is not forthcoming, the Senior Lenders reserve all rights to object to any further use of Cash Collateral by the Debtors, and to seek to move forward with the filing of a plan under which the Senior Lenders are the sole proponents. Accordingly, to protect the interests of the Senior Lenders should the Debtors and ICBC continue to act in manner inconsistent with the Adequate Protection package granted to the Senior Lenders under the First Interim Order, the Senior Lenders intend to file with the Court in short order a motion seeking to terminate the Debtors' exclusive periods in which to file and solicit acceptances of a chapter 11 plan, and to schedule a hearing on that motion for the earliest possible date following October 9.

## CONCLUSION

WHEREFORE, for the reasons set forth above, the Senior Lenders respectfully request that the Court (i) condition the Debtors' use of Cash Collateral during the Second Interim Period upon entry of the Lender Proposed Order attached as Exhibit A, and the Senior Lenders' approval of an accompanying interim budget; and (ii) grant the Senior Lenders such other and further relief as is just.

Dated: October 3, 2011
       New York, New York

CADWALADER, WICKERSHAM & TAFT LLP


*/s/ John J. Rapisardi* _____

John J. Rapisardi, Esq.
Scott J. Greenberg, Esq.
Zachary H. Smith, Esq.
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
Email: john.rapisardi@cwt.com
        scott.greenberg@cwt.com
        zachary.smith@cwt.com

Peter Friedman, Esq. (*pro hac vice*)
700 Sixth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400
Email: peter.friedman@cwt.com

*Attorneys for Yucaipa Corporate Initiatives Fund II,
L.P. and Yucaipa Corporate Initiatives (Parallel)
Fund II, L.P.*


SCHULTE ROTH & ZABEL LLP
Adam C. Harris, Esq.
Meghan Breen, Esq.
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955
Email: adam.harris@srz.com

*Attorneys for CF ICBC LLC, Fortress Credit
Funding I L.P., and Drawbridge Special
Opportunities Fund Ltd.*

## Exhibit A

## Lender Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- x

In re:                                                    :   Chapter 11

                                                   :

INNER CITY MEDIA CORPORATION, *et al.*,     :   Case No. 11-13967 (SCC)

                                                   :

                     Debtors.     :   Jointly Administered

-------------------------------------------------------------------- x

## SECOND INTERIM ORDER (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO AGENT AND SENIOR LENDERS, AND (III) GRANTING RELATED RELIEF

Upon the motion, dated September 8, 2011 (the "<u>Motion</u>"),[1] of Inner City Media

Corporation and certain of its affiliates, each as a debtor and debtor in possession (the "<u>Debtors</u>")

in the above-captioned cases (the "<u>Cases</u>"), pursuant to sections 105, 361, 362, 363(c)(2), 363(e),

and 507 of the Bankruptcy Code, Bankruptcy Rules 4001 and 9014, and Local Rule 4001-2, for

entry of interim and final orders (i) authorizing the Debtors to use cash collateral, (ii) granting

adequate protection to the Agent and the Senior Lenders, and (iii) granting certain related relief,

all as more fully set forth in the Motion; and the Interim Hearing having been held by this Court

on September 9, 2011; and the Court having entered on September 9, 2011 an interim order

authorizing the Debtors to use Cash Collateral through and including October 9, 2011 (the "<u>First

Interim Order</u>") [Docket No. 68], subject to and in accordance with the terms and provisions of

the First Interim Order and the Approved Budget attached thereto; and pursuant to the First

Interim Order, the Debtors' authorization to use Cash Collateral expires on October 9, 2011; and

pursuant to the First Interim Order, the Debtors' authorization to use Cash Collateral may be

further extended pursuant to a Successive Interim Order or Final Order, as applicable; and the

---

[1]    Except as otherwise noted, capitalized terms used but not defined herein shall have the meanings
ascribed to such terms in the First Interim Order (defined below).

Senior Lenders and the Debtors have reached agreement upon the terms of this Successive Interim Order (the "Second Interim Order") and the accompanying Approved Budget attached as Exhibit A (superseding and replacing the Approved Budget attached to the First Interim Order, as may be amended from time to time, the "Second Interim Approved Budget"), with respect to the Debtors' use of Cash Collateral through and including November 7, 2011 (such period from the expiration of the First Interim Order on October 9, 2011 through and including November 7, 2011, the "Second Interim Period"), pending a subsequent hearing to be held no later than November 7, 2011 to consider either the entry of a further Successive Interim Order or a Final Order, as applicable; and the Court having found and determined that the relief requested in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the Debtors having given timely and proper notice of the October 4, 2011 hearing to consider entry of a further order authorizing the Debtors to use Cash Collateral, to (a) the United States Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the Senior Lenders; (d) counsel to the Agent; (e) counsel to Inner City Broadcasting Corporation; and (f) all other parties that had filed notices of appearance in the Cases, and such notice represents sufficient and adequate notice pursuant to Bankruptcy Rule 4001 and no further notice of, or hearing on, the relief sought in the Motion and the entry of the Second Interim Order is necessary or required except as set forth hereinafter; and after due deliberation, and sufficient cause appearing therefor, and upon the record of the First Interim Hearing, and all of the proceedings had before the Court;

USActive 24244341.2

**IT IS HEREBY ORDERED, ADJUDGED,
AND DECREED THAT:**[2]

A.  The First Interim Order shall be and hereby is amended solely as follows:

1.  **<u>Use of Cash Collateral.</u>**  The Debtors are authorized, pursuant to section 363(c)(2)(B) of the Bankruptcy Code, to use Cash Collateral during the Second Interim Period, <u>provided</u>, that the grant of Adequate Protection to the Agent and the Senior Lenders shall and hereby does remain in full force and effect, and <u>provided</u>, <u>further</u>, that for the avoidance of doubt, notwithstanding anything herein to the contrary, the Debtors' authorization to use Cash Collateral pursuant to this Second Interim Order, and the consent of the Senior Lenders and the Agent with respect thereto, extends solely for the Second Interim Period, and the Debtors, the Senior Lenders, and the Agent reserve all rights with respect to any proposed used of Cash Collateral beyond such Second Interim Period.  The Debtors shall use the Cash Collateral solely in accordance with this Second Interim Order and the Second Interim Approved Budget, and the other Cash Collateral Documents, and the Cash Collateral shall be used exclusively to fund working capital and general corporate purposes of the Debtors during the Second Interim Period, and the costs, fees, and expenses incurred in connection with the administration and prosecution of the Cases.  The Debtors' right to use Cash Collateral under this Second Interim Order shall terminate upon the occurrence of an Event of Default, subject only to the Remedies Notice Period.  The Agent and the Senior Lenders have consented to the Debtors' use of the Cash

---

[2]  The findings and conclusions set forth in this Second Interim Order constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Collateral during the Second Interim Period, subject to the terms of this Second Interim Order, the Approved Budget, and the other Cash Collateral Documents.

2. **Bar Date.** Within three (3) business day following entry of this Second Interim Order, the Debtors shall file a motion and proposed order, each in form and substance acceptable to the Senior Lenders, seeking entry of on order establishing November 17, 2011 as the deadline for filing proofs of claim in the Cases, and the Debtors shall request that the Court hear such motion on October 18, 2011 or the next available hearing date after such date.

3. **Events of Default.** For purposes of this Second Interim Order, the Event of Default set forth in section 9(a) of the Interim Order shall be amended to read as follows: "A further Successive Interim Order or the Final Order shall not have been entered by the Court by no later than November 7, 2011."

4. **Waiver of Certain Events of Default.** The Agent and the Debtors confirm and acknowledge as of the date hereof that, (i) the Event of Default under the First Interim Order attributable to the Debtors' payment, following entry of the First Interim Order, of $75,000 in cash to Meyer, Suozzi, English & Klein, P.C., without the consent of the Agent or the Senior Lenders, is hereby waived, in reliance upon the Debtors' representation to the Agent and the Senior Lenders that, subsequent to the Debtors' remittance of such payment, Inner City Broadcasting Corporation transferred $75,000 in cash to the Debtors, and the Debtors' use of such cash is subject to the First Interim Order (as it may be amended); and (ii) the Event of Default attributable to the Debtors' payment of certain fees to the Chairman and the two other members of the Debtors' Restructuring Committee (collectively, the "Professional Directors"), without the consent of the Agent or the Senior Lenders, is hereby waived, and the Agent and the Senior Lenders consent to payment of $40,000 in cash to the Professional Directors for each of

4

September and October 2011, conditioned upon the Debtors' agreement that for the month of November 2011 and for each subsequent month of the Cases, the Professional Directors shall be entitled to compensation in the amount of $2,500 per meeting of the Professional Directors, not to exceed $20,000 in the aggregate per month, as reflected in the Second Interim Approved Budget. The Debtors confirm and acknowledge that, as of the date hereof, except as otherwise referenced in (i) and (ii) immediately above, no other Events of Default have occurred or are continuing under the First Interim Order.

B. **Terms of First Interim Order Remain In Effect.** All of the terms and provisions of the First Interim Order not expressly amended or modified by the terms and provisions hereof shall and hereby do remain in full force and effect during the Second Interim Period.

C. **Notice of Successive Interim or Final Hearing.** The Debtors shall promptly serve copies of this Second Interim Order and a notice of the hearing to consider entry of a Successive Interim Order or Final Order, as applicable (the "Subsequent Hearing Notice"), to be held on **November 7, 2011 at 10:00 a.m. (EST)**, on (a) the United States Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the Senior Lenders; (d) counsel to the Agent; (e) counsel to Inner City Broadcasting Corporation; and (f) all other parties that have filed notices of appearance in the Cases. The Subsequent Hearing Notice shall state that any party in interest objecting to entry of the Successive Interim Order or Final Order, as applicable, shall file written objections with the Court no later than **__:__ _.m. (EST) on _____, 2011**, which objections shall be served so that the same are received on or before such date and time by _____.

D.    **Effectiveness.**    This Second Interim Order shall be effective and enforceable immediately upon entry.

E.    **Jurisdiction.**    The Court has and will retain jurisdiction to enforce this Second Interim Order according to its terms.

Dated: _____, 2011
          New York, New York

_____
    UNITED STATES BANKRUPTCY JUDGE

USActive 24244341.2

**Exhibit B**


**September 9 Transcript**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:                              . Chapter 11
                                    .
INNER CITY MEDIA                    . Case No. 11-13967-SCC
CORPORATION, et al,                 .
                                    . New York, New York
                    Debtors.        . Friday, September 9, 2011
. . . . . . . . . . . . . . . . .     9:22 a.m.

TRANSCRIPT OF DEBTORS' MOTION FOR AN ORDER DIRECTING JOINT
ADMINISTRATION OF RELATED CHAPTER 11 CASES
DEBTORS' APPLICATION PURSUANT TO 28 U.S.C. SECTION 156(c) FOR
ENTRY OF AN ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF
GCG, INC. AS NOTICE AND CLAIMS AGENT NUNC PRO TUNC TO TH
PETITION DATE
DEBTORS' MOTION FOR ENTRY OF AN ORDER EXTENDING THE TIME TO
FILE SCHEDULES OF ASSETS AND LIABILITIES, SCHEDULES OF
CURRENT INCOME AND EXPENDITURES, SCHEDULES OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES AND STATEMENTS OF FINANCIAL
AFFAIRS
DEBTORS' MOTION FOR ENTRY OF AN ORDER ESTABLISHING CERTAIN
NOTICE, CASE MANAGEMENT AND ADMINISTRATIVE PROCEDURES
DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS
TO (A) PREPARE A LIST OF CREDITORS IN LIEU OF SUBMITTING A
FORMATTED MAILING MATRIX; (B) FILE A CONSOLIDATED LIST OF THE
DEBTORS' 30 LARGEST UNSECURED CREDITORS; AND (C) MAIL INITIAL
NOTICES
(Continued)
**BEFORE THE HONORABLE SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

Audio Operator:          Electronically Recorded
                         by Kathy S, ECRO

Transcription Company:   Rand Reporting & Transcription, LLC
                         80 Broad Street, Fifth Floor
                         New York, New York 10004
                         (212) 504-2919
                         www.randreporting.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
1                    TRANSCRIPT OF (Continued)
             DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
2    AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THE CASH
     MANAGEMENT SYSTEM; (B) HONOR CERTAIN PREPETITION OBLIGATIONS
3    RELATED TO THE CASH MANAGEMENT SYSTEM; (C) MAINTAIN EXISTING
      BUSINESS FORMS; AND (D) GRANT ADMINISTRATIVE PRIORITY FOR
4               INTERCOMPANY ARRANGEMENTS AND HISTORICAL PRACTICES
             DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
5    AUTHORIZING, BUT NOT DIRECTING THE DEBTORS TO (A) MAINTAIN
     PREPETITION INSURANCE POLICIES; (B) ENTER INTO NEW INSURANCE
6     POLICIES; AND (C) MAINTAIN A PREPETITION PREMIUM FINANCING
                            AGREEMENT
7      DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT
                DIRECTING, THE DEBTORS TO PAY TAXES AND FEES
8    DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING, BUT
              NOT DIRECTING, DEBTORS TO HONOR CERTAIN PREPETITION
9        OBLIGATIONS TO CUSTOMERS AND OTHERWISE CONTINUE CERTAIN
      CUSTOMER PROGRAMS AND PRACTICES IN THE ORDINARY COURSE OF
10                          BUSINESS
             DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
11       AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO (A) PAY
     CERTAIN PREPETITION WAGES AND REIMBURSIBLE EMPLOYEE EXPENSES;
12    (B) PAY AND HONOR EMPLOYEE MEDICAL AND OTHER BENEFITS; AND
                 (C) CONTINUE EMPLOYEE BENEFITS PROGRAMS
13           DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
     AUTHORIZING PAYMENT OF CLAIMS ARISING AFTER THE INVOLUNTARY
14   DATE BUT BEFORE THE RELIEF DATE AND AUTHORIZING PAYMENT OF
               ALL CHECKS ISSUED BEFORE THE RELIEF DATE
15   DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING
             DEBTORS TO USE CASH COLLATERAL; (II) GRANTING ADEQUATE
16        PROTECTION TO AGENT AND SENIOR LENDERS; (III) GRANTING
             RELATED RELIEF; AND (IV) SCHEDULING A FINAL HEARING

17
     APPEARANCES:
18
     For the Debtors:          Ira S. Dizengoff, Esq.
19                             Scott L. Alberino, Esq.
                               Shaya Rochester, Esq.
20                             AKIN, GUMP, STRAUSS, HAUER & FELD,
                               LLP
21                             One Bryant Park
                               New York, New York  10036
22
     For Inner City
23   Broadcasting Corp:        Edward J. LoBello, Esq.
                               MEYER, SUOZZI, ENGLISH & KLEIN, PC
24                             1350 Broadway, Suite 501
                               New York, New York 10018
25   (Appearances Continued)
```

1    APPEARANCES:  (Continued)

2    For Fortress Investment
     Group:                      Adam C. Harris, Esq.
3                                SCHULTE, ROTH & ZABEL, LLP
                                 919 Third Avenue
4                                New York, New York  10022

5    For Yucaipa:                Zachary H. Smith, Esq.
                                 Scott J. Greenberg, Esq.
6                                CADWALADER, WICKERSHAM & TAFT, LLP
                                 One World Financial Center
7                                New York, New York  10281

8    For the U.S. Trustee:       Serene K. Nakano, Esq.
                                 OFFICE OF THE U.S. TRUSTEE
9                                33 Whitehall Street, 21st Floor
                                 New York, New York 10004

10
     Also Appearing:            Daniel A. Bloom, Esq.
11                               KAYE SCHOLER, LLP
                                 425 Park Avenue
12                               New York, New York 10022

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                              INDEX

2

3                                                    Page

4    MOTION FOR JOINT ADMINISTRATION                  18

5    CASH COLLATERAL MOTION                           22

6    GCG RETENTION MOTION                             41

7    SCHEDULES EXTENSION MOTION                       42

8    CASE MANAGEMENT PROCEDURES MOTION                43

9    CREDITOR MATRIX MOTION                           44

10   CASH MANAGEMENT MOTION                           45

11   INSURANCE MOTION                                 46

12   TAXES AND FEES MOTION                            47

13   CUSTOMER PROGRAMS MOTION                         47

14   EMPLOYEE WAGES MOTION                            48

15   GAP PERIOD CLAIMS MOTION                         49

16

17

18   Exhibit                           Ident.   Evid.

19   Cooper Declaration                          17

20

21

22

23

24

25

1    (Proceedings commence at 9:22 a.m.)

2         THE COURT:  Good morning.  Please have a seat.

3         Good morning.  How are you?

4         PARTICIPANTS:  Good morning.  Doing well.  Good

5    morning, Your Honor.

6         THE COURT:  Who am I talking to this morning?

7         MR. ALBERINO:  Your Honor, Scott Alberino from Akin

8    Gump, for the record.

9         THE COURT:  Right.

10         MR. ALBERINO:  Here with Ira Dizengoff and Shaya

11    Rochester.

12         THE COURT:  Okay.  Good morning.

13         PARTICIPANTS:  Good morning.

14         THE COURT:  Do you want to come up to the podium?

15         All right.

16         MR. ALBERINO:  Good morning, Your Honor.

17         THE COURT:  Good morning.

18         MR. ALBERINO:  As I said, for the record, Scott

19    Alberino from Akin Gump on behalf of Inner City Media

20    Corporation and its affiliated debtors.

21         THE COURT:  Okay.

22         MR. ALBERINO:  Your Honor, as I mentioned, I'm joined

23    here with some of my colleagues from Akin Gump, along with some

24    representatives for the company.

25         THE COURT:  Okay.

1          MR. ALBERINO:  Our declarant, Mr. William Cooper.

2    Would you please stand for a second?

3          THE COURT:  All right.  Good morning, sir.

4          MR. ALBERINO:  The company's vice president and chief

5    financial officer, who submitted the first-day declaration in

6    support of the first days.

7          We're also joined by Sal LoBiondo from Marotta Gund,

8    who's the company's special bankruptcy consultant, and has been

9    assisting the company with respect to cash flows and cash

10   reporting.

11         Your Honor, as you're aware, the company consented to

12   entry of orders for relief under Chapter 11 on the evening of

13   September 7th, and I believe the orders for relief were signed

14   yesterday --

15         THE COURT:  Yes.

16         MR. ALBERINO:  -- by the Court.  So I just want to

17   thank you for hearing us this morning.

18         THE COURT:  Okay.

19         MR. ALBERINO:  I understand you have a ten o'clock, so

20   we're going to try to hopefully move quickly through today's --

21         THE COURT:  Okay.

22         MR. ALBERINO:  -- first-day agenda.

23         THE COURT:  Well, you can have as much time as you

24   need.

25         MR. ALBERINO:  Sure.

1          Your Honor, before we -- before we hit the first-day

2    agenda, I just want to spend a few minutes talking about --

3          THE COURT:  Great.

4          MR. ALBERINO:  -- just a little bit of background.

5          THE COURT:  Okay.

6          MR. ALBERINO:  I know you're well aware of what's

7    happened so far.  And kind of bring you up to speed from the

8    last status conference.  And then, after that, we're going to

9    turn to cash collateral; and after cash collateral, I think

10   we'll turn to the procedural and operational --

11         THE COURT:  All right.

12         MR. ALBERINO:  -- first-days.

13         THE COURT:  We should do joint administration first.

14         MR. ALBERINO:  We will, as Mr. Harris told me to, on

15   the agenda here today.

16         THE COURT:  Okay.

17         MR. ALBERINO:  Thank you, Mr. Harris.

18         All right.  May I approach?  I have an org. chart I'd

19   like to submit.

20         THE COURT:  Okay.

21         MR. ALBERINO:  Your Honor, Inner City, as we discussed

22   at the last status conference, is the largest privately owned

23   African-American radio company in the U.S., and I believe it's

24   the twenty-second largest broadcast -- radio broadcasting

25   company in the U.S., based upon 2010 revenues.

1          The debtors operate seventeen radio stations in four

2     different markets around the country, catering primarily to the

3     African-American community.

4          As you can see from the org. chart, the parent company

5     of Inner City Media Corporation is a company called "Inner City

6     Broadcasting," which was founded back in 1971 by Percy Sutton

7     and a group of more than fifty influential African-American

8     leaders, including former Mayor of New York David Dinkins.

9          The debtors, like their competitors in the radio

10    broadcast market, derive most of their -- most of their revenue

11    from the sale of advertising in local and national markets.

12    And as we'll discuss in a minute, the events leading to the

13    bankruptcy were -- relate primarily to a slow-down in those

14    markets and a slow-down in advertising revenues for the

15    company.

16         If I can refer to the org. chart for a second, Your

17    Honor, I just want to kind of briefly walk you through this, so

18    you can understand the cap. structure, which I think will kind

19    of shed some light on some of the issues that, you know,

20    transpired prior to today.

21         Inner City Broadcasting is the parent company, owning

22    eighty-two percent of Inner City Media Corporation.  There are

23    preferred stockholders that own seventeen percent of the --

24    seventeen percent of the interest, which are convertible into

25    approximately eighty-two percent of the common interest of

1    Inner City Media Corporation.  The remaining debtor entities,

2    which are highlighted in green on this org. chart are subs of

3    Inner City Media Corporation, and they're all debtors, as well

4    as borrowers and guarantors under the bank credit facility in

5    this case.

6          There was approximately 220 million of secured debt,

7    plus accrued and unpaid interest and fees, owing as of the

8    relief date in this case.  That secured debt is secured by

9    first liens on substantially all of the assets of the debtor

10   entities.  And as we indicated earlier, the company on the

11   equity side has preferred stock issuance, convertible into

12   approximately eighty-three percent of the common, as well as,

13   you know, common stockholders.

14         I should say the Inner City -- Inner City Broadcasting

15   is -- has a separate board of directors, a different board of

16   directors from Inner City Media Corporation.  It's represented

17   by separate counsel from the firm of Meyer Suozzi, who's

18   represented by Mr. Edward LoBello, who's in the courtroom with

19   us today.

20         And, Your Honor, do you have any questions about the

21   ownership structure?  Happy to keep moving.

22         THE COURT:  You can keep moving.

23         MR. ALBERINO:  All right.  All right.  So why are we

24   here?  As I said a moment ago, the company's decline started in

25   2008, with the decline -- with the decline in the economy,

given that most of their advertising stream derives from kind
of consumer segments.  You know, a slow-down of that market led
to a slow-down in advertising, which resulted in 2009 in the
company ceasing payment of interest on its first-lien bank
facility.

At the time, the bank facility was owned by Goldman
Sachs and GE.  And for whatever reason, the -- you know, the
company went -- went forward for about a two-year period
without paying interest on the facility, and without GE and
Goldman pursuing remedies against the company.

Ultimately, in the spring of this year, that facility
was sold primarily to Yucaipa -- funds associated with Yucaipa
and Fortress, who acquired control over a hundred percent of
the bank facility.  And in May of this year, restructuring
negotiations began.

As Your Honor is aware from the filings which predate
today, the restructuring negotiations did not come to
completion.  The parties reached an advanced stage of the -- an
advanced stage in the negotiation, but they didn't get across
the finish line.  And you know, since then, you know, there's
been a little bit of litigation through the involuntary
filings.  But I think, as Your Honor encouraged, and as we
hope, we pushed to get people back to, you know, the
negotiating table.  And I think it's fair to say that, you
know, since our last status conference, you know, the

1   temperature has come down significantly among the parties.

2           Your Honor, at that status conference, you encouraged

3   both sides to attend a principals meeting.  That principal's

4   meeting was held on Tuesday of this week.  Representatives from

5   Yucaipa were there, along with principals from the company, you

6   know, and the company's financial advisor.  And those meetings,

7   which you know, lasted kind of well into the day on Tuesday,

8   and I'm pleased to report resulted in -- resulted in an

9   agreement in principle between the company and the senior

10  lenders, which we think will pave the way for a -- you know, a

11  consensual and expedited plan process in this case.

12          I'd like to just briefly just walk you through what we

13  think the key terms are.

14          THE COURT:  Sure.

15          MR. ALBERINO:  And you know, representatives from the

16  lenders are here --

17          THE COURT:  All right.

18          MR. ALBERINO:  -- who may want to comment on that, as

19  well.

20          THE COURT:  Okay.  Is someone here from the Office of

21  the United States Trustee?

22          MS. NAKANO:  Yes, Serene Nakano for the U.S. Trustee's

23  Office.

24          THE COURT:  Good morning.  Do we anticipate that

25  you're going to form a committee in this case?

1    MS. NAKANO:  Your Honor, we plan to solicit by mail,

2  and we'll be requiring ballots to be returned within two weeks.

3    THE COURT:  Okay.  All right.  Thank you.

4    MR. ALBERINO:  Okay.

5    THE COURT:  Go ahead.

6    MR. ALBERINO:  Your Honor, so the key things -- the

7  key terms of the agreement are as follows:

8    Number one, you know, the senior lenders, you know,

9  will convert, you know, their debt position into a hundred

10  percent of the equity of the company, you know, as well as

11  take-back debt, you know, on the company, in an amount I think

12  to be determined, you know, by the lenders.

13    It's anticipated that the plan will provide for

14  payment in full of all allowed general unsecured claims, as

15  well as all allowed administrative expenses in the bankruptcy

16  case.

17    The lenders are also agreeing to contribute

18  approximately $2.5 million to fund a cash recovery to the

19  company's, you know, equity interest-holders, with potential

20  additional -- with potential for that fund to grow to 3 million

21  through contributions from certain of the company's legal and

22  financial advisors.

23    You know, as part of the agreement, the lenders also,

24  you know, agreed to terms with, you know, the company's

25  existing chairman and CEO, Mr. Pierre Sutton, under which Mr.

1   Sutton will continue with his role at the company as chairman

2   emeritus of the company upon emergence.

3          In addition, there was discussions about the company

4   Rothschild's completion fee.  As part of this deal -- as part

5   of this deal, an agreement has been reached by Rothschild, and

6   which the lenders we believe will consent to, to reduce that

7   completion fee from 2.5 million to 1.5 million, of which we

8   understand Rothschild intends to contribute approximately a

9   quarter-million to the -- to the shareholder recovery pot.  And

10  obviously, we'll be filing separate retention papers for Mr.

11  Rothschild -- for Rothschild and Mr. Augustine, which will

12  outline -- will outline this.  And obviously, his retention

13  remains subject to court approval.

14         And finally, Your Honor, as is, you know, customary,

15  you know, we expect, you know, full -- you know, full and

16  customary estate and third-party releases to be, you know,

17  exchanged between the parties as part of -- as part of this

18  agreement.

19         THE COURT:  Is this a candidate for a combined plan

20  and disclosure statement hearing?

21         MR. ALBERINO:  Your Honor, it's not something we've

22  given --

23         THE COURT:  All right.

24         MR. ALBERINO:  -- a lot of thought to, but it's

25  something we should talk about.

1      THE COURT:  It's an unusual animal, rarely seen

2      MR. ALBERINO:  Uh-huh.

3      THE COURT:  But in essence, it's a -- kind of a

4  prepack once you're here.  And it might be a cost-saving and a

5  time-saving way of going about this.  So without expressing a

6  view as to whether or not you think it's a good idea, you may

7  just want to take a look at that.

8      MR. ALBERINO:  We will.  I think under the

9  circumstances, I think we can do it to, you know, make this

10  occur more efficiently and save money.  We'll explore all those

11  options.

12      THE COURT:  All right.

13      MR. ALBERINO:  And we thank you for the suggestion.

14      MR. SMITH:  Good morning, Your Honor.

15      THE COURT:  Good morning.

16      MR. SMITH:  Zachary Smith, Cadwalader, for Yucaipa.

17  I'm here with Scott Greenberg, also with Cadwalader.

18      I just wanted to make two quick points, not to

19  interrupt.  But the Court's note regarding a potential combined

20  plan and disclosure statement hearing, that's certainly

21  something that we will consider --

22      THE COURT:  Okay.

23      MR. SMITH:  -- in order to potentially save costs --

24      THE COURT:  Okay.

25      MR. SMITH:  -- and expedite.

1            And second, I just wanted to make two sort of

2  confirmatory remarks regarding the agreement in principle.

3            The anticipated payment of allowed general unsecured

4  and administrative claims, that is certainly something that has

5  been discussed; it's subject to our confirmatory due diligence

6  --

7            THE COURT:  Sure.

8            MR. SMITH:  -- regarding the claims pool.

9            THE COURT:  Right.

10            MR. SMITH:  In addition, Your Honor, the contribution

11  of -- that counsel stated of 2.5 million, that number is a bit

12  different than what we had heard earlier in the week.  We're

13  just going to have to confirm with our client.

14            THE COURT:  Okay.

15            MR. SMITH:  But it's also subject to --

16            THE COURT:  All right.  Well, no, but --

17            MR. SMITH:  -- confirmatory due diligence.

18            THE COURT:  -- everything is subject to being

19  confirmed and having a committee come in and -- so no one is

20  bound.

21            MR. ALBERINO:  Yes, Your Honor.

22            THE COURT:  Okay.

23            MR. ALBERINO:  I was actually going to make that point

24  -- make that point to the Court; that, you know, the agreement

25  is still subject to confirmatory diligence.  There was some

1  claims work done, you know, in advance.  But as is normally the

2  case in these situations, you know, you can't really get down

3  and fill down into the claims until the company files.

4       So hopefully, at the end of the day, you know --

5  hopefully, at the end of the day, the diligence will -- you

6  know, will kind of confirm their understanding, and we'll be

7  able to confirm a plan here that pays all unsecured and admin.

8  claims, you know, in full in this case.

9       Your Honor, it's our intention to explore your option.

10  But, you know, in addition to that, you know, we hope to work

11  very quickly with the lenders.  And as I'll discuss in a moment

12  when we talk to cash -- when we talk about cash collateral,

13  we've agreed, you know, along with the lenders to attempt to

14  put a plan on file and disclosure statement on file within

15  thirty days of the relief date in this case.  The restructuring

16  milestone that we've agreed to as part of an adequate

17  protection package, you know, reached with the senior lenders

18  in this case, and you know, we intend to hopefully move heaven

19  and earth over the next thirty days to get there with the --

20  with the help and, you know, cooperation of the senior lenders.

21       THE COURT:  All right.

22       MR. ALBERINO:  So, Your Honor, that concludes kind of

23  the background presentation.  Do you have any questions?

24       THE COURT:  I don't.  That sounds very positive.

25  Thank you.

1    MR. ALBERINO:  Okay.  Well, let's move on to the -- I

2  guess the hearing agenda for today.

3        THE COURT:  Okay.

4        MR. ALBERINO:  Your Honor, as I said earlier, Mr.

5  William Cooper, the company's CFO, you know, and first-day

6  declarant is in the courtroom today.  He is available, prepared

7  to testify, and available for cross-examination.  However, I'm

8  unaware if anybody wishes to examine Mr. Cooper.

9        THE COURT:  Okay.

10        MR. ALBERINO:  And I would -- and I would propose

11  that, with Your Honor's permission, that we move the

12  declaration into evidence.

13        THE COURT:  All right.  Any objections to the

14  admission into evidence of the declaration of William Cooper?

15     (No verbal response.)

16        THE COURT:  All right.  There being none, it's in.

17        MR. ALBERINO:  Okay.  Thank you, Your Honor.

18     (Cooper Declaration received in evidence.)

19        MR. ALBERINO:  Your Honor, I think we'll --

20        THE COURT:  Just to confirm for the record, does

21  anyone wish to cross-examine Mr. Cooper on his declaration?

22        MR. SMITH:  No, Your Honor.

23        THE COURT:  All right.  Very well.  Thank you.

24        MR. ALBERINO:  Thank you, Your Honor.

25        Your Honor, let's start with the -- I think we'd like

1  to start with the joint administration motion, move to cash

2  collateral.  And then I can turn the podium over to my

3  colleague Mr. Rochester --

4              THE COURT:  Okay.  Excellent.

5              MR. ALBERINO:  -- who will walk you through all the

6  operational and procedural first-day matters.

7              THE COURT:  All right.

8              MR. ALBERINO:  It would be helpful if I had the joint

9  administration motion in front of me.

10             THE COURT:  All right.  And I take it that the Office

11 of the United States Trustee has had an opportunity to review

12 all of the first-day motions?

13             MS. NAKANO:  That's correct, Your Honor.

14             THE COURT:  All right.  And any of your comments are

15 reflected in the documents?

16             MS. NAKANO:  Yes.  That's correct, Your Honor.

17             THE COURT:  All right.  Thank you.

18      (Pause in proceedings.)

19             MR. ROCHESTER:  Your Honor, Shaya Rochester --

20             THE COURT:  Good morning.

21             MR. ROCHESTER:  -- Akin, Gump, Strauss, Hauer & Feld -

22 - good morning -- on behalf of the debtors.

23             As set forth in the motion, the debtor seeks to

24 consolidate the cases of twelve of the debtor entities, and

25 requests that Inner City Media Corporation be the lead debtor -

1  -

2         THE COURT:  Okay.

3         MR. ROCHESTER:  -- under which all of the other cases

4  will be jointly administered.

5         The only point worth noting here is that there was an

6  involuntary petition filed by the petitioning creditors against

7  a thirteenth entity called "ICBC Broadcast Holdings-NY."  As we

8  note in our papers, that entity no longer exists because it

9  merged into one of the debtor entities in 2005.

10         Subsequent to the filings of the involuntary

11  petitions, we provided the lenders with documentation

12  evidencing the merger and asked whether they would be willing

13  to withdraw the involuntary petition against that thirteenth

14  entity.

15         It's my understanding that, subject to final

16  confirmatory diligence, that the petitioning creditors do in

17  fact intend to withdraw the involuntary petition against that

18  thirteenth entity.  But they haven't done that diligence yet,

19  and they're not exactly sure how long it's going to take them

20  to complete that diligence.  And so a request is to extend the

21  time that we would be statutorily required to answer that

22  petition by one week.

23         THE COURT:  Well, we have an interesting procedural

24  situation because perhaps in our concern to do this right, I

25  believe I'd have to check that we entered the order for relief

1   in each of the involuntary cases.  In other words, yesterday

2   you gave me one order.

3           MR. ALBERINO:  Correct.

4           THE COURT:  And via a footnote, it applied to all of

5   the involuntary cases.

6           MR. ALBERINO:  To the twelve, I think, and --

7           THE COURT:  And that might have been -- I'm going to

8   have to check to see what we did.

9           MR. ALBERINO:  Okay.

10          THE COURT:  Because I directed the Clerk's Office to

11  enter the order in each of the cases, and I'm frankly not sure

12  whether they entered it in each of the involuntaries or limited

13  to those in the footnote.  If it was -- if it shouldn't have

14  been entered in the ICBC-NY case, we'll vacate that --

15          MR. ALBERINO:  Okay.

16          THE COURT:  -- and unring the bell --

17          MR. ALBERINO:  Okay.

18          THE COURT:  -- so that I will -- and you want a week's

19  time, a week's extension?

20          MR. ALBERINO:  Yeah.  That way, we can essentially --

21          THE COURT:  That's fine.

22          MR. ALBERINO:  -- extend the statutory -- I don't

23  think there's any objection to the one-week extension the

24  lenders --

25          THE COURT:  All right.  So for the purposes of -- go

1   ahead.

2         MR. SMITH:  Only, Your Honor, no, we did just receive

3   the documents this week --

4         THE COURT:  Okay.

5         MR. SMITH:  -- and we are reviewing them --

6         THE COURT:  All right.

7         MR. SMITH:  -- and we'll do it as quickly as possible.

8         THE COURT:  So for the purposes of the joint admin.

9   then and everything else we're doing here today, it's not going

10   to apply to ICBC-NY.

11         MR. ROCHESTER:  Correct.

12         THE COURT:  Okay.

13         MR. ROCHESTER:  Correct.

14         THE COURT:  All right.  We'll make sure it's done

15   right --

16         MR. ROCHESTER:  Thank you, Your Honor.

17         THE COURT:  -- for the purposes of the docket.

18         MR. ROCHESTER:  Thank you.

19         THE COURT:  Okay.  So the joint admin. motion is

20   otherwise granted.

21         MR. ROCHESTER:  Okay.  Thank you, Your Honor.  I think

22   I'll turn back the podium to Mr. Alberino.

23         THE COURT:  Okay.

24         MR. HARRIS:  Good morning, Your Honor.  Adam Harris

25   from Schulte Roth & Zabel --

1          THE COURT:  Yes, Mr. Harris.

2          MR. HARRIS:  -- on behalf of Fortress Investment Group

3    and certain of its affiliates.

4          With respect to the declaration of Mr. Cooper, Your

5    Honor, we have no problem with it coming in, in support of

6    direct testimony in support of the first-day motions.

7          THE COURT:  Okay.

8          MR. HARRIS:  I just want to make, you know, one

9    reservation of rights.  There's a lot of factual statements in

10   there about the history of the discussions --

11         THE COURT:  Understood.

12         MR. HARRIS:  And we're not agreeing to all of that.

13   But I don't think it's relevant for purposes of today's

14   hearing.

15         THE COURT:  Understood.  Thank you.  Okay.

16         MR. ALBERINO:  All right, Your Honor.  So if I can

17   take the agenda out of order, I'd like to turn to the company's

18   cash collateral motion first.

19         Your Honor, first of all, I just want to apologize.  I

20   don't believe -- the cash collateral motion wasn't filed until

21   late in the day.  As you might suspect, negotiations were

22   occurring kind of around the clock, you know, with the senior

23   lenders, you know, as well as with other constituencies.

24         Fortunately, I'd like Your Honor to know that, you

25   know, we negotiated it, you know, with the -- you know, with

1  the senior lenders, as well as with counsel to the parent.  And

2  we had provided a copy of the cash collateral order to the U.S.

3  Trustee, and had an opportunity yesterday afternoon before we

4  filed to run through certain comments.  And there's one little

5  change we're going to make to the order --

6            THE COURT:  Okay.

7            MR. ALBERINO:  -- today that, you know, I'll mention,

8  you know, as we get there.

9            But, Your Honor, we filed a motion seeking

10 authorization to use cash collateral and to provide adequate

11 protection.  Use of the cash is obviously necessary to operate

12 this estate.

13           When the company went in on the relief date, according

14 to Mr. Cooper's affidavit, the company had approximately 1.1

15 million of cash, you know, in its accounts.  All that cash was

16 subject to the liens of the company's senior lenders, and use

17 of that cash was necessary, you know, to fund -- continue to

18 fund operations, and to pay administrative expenses in

19 connection with the bankruptcy case.

20           We had -- we've been working with them since the

21 August 31st status conference on, not only the terms of the

22 order, but a budget.  There have been several iterations of the

23 budget.  And as Your Honor may see from the order, there is a

24 thirteen-week budget we'll talk about in a minute; and there is

25 also an Exhibit 2, which is the professional fee accrual

1  budget, you know, which is linked to the professional fee, you

2  know, pipeline carve-out that we'll talk about in a second, as

3  well.

4           I think I would like to just note for the record of

5  course that, you know, in negotiating this order, we negotiated

6  it under the premise that this is a -- you know, going to be a

7  consensual deal; that the parties intend to kind of move

8  forward and to put in place, you know, a plan of reorganization

9  on an expedited basis.  And you know, obviously, to the extent

10 that for some reason, you know, issues come up in the future,

11 you know, we would like to kind of reserve rights to revisit,

12 you know, some of the elements of this order.

13          But you know, given the fact that, you know, we're

14 sitting here today, you know, on a consensual posture, the

15 company was willing to agree to an extensive adequate

16 protection package for the benefit of the senior lenders.

17          I just want to walk you through some of the --

18          THE COURT:  Is the -- am I reading --

19          MR. ALBERINO:  Sure.

20          THE COURT:  Am I reading this correctly, that there's

21 no budget line for unsecured creditors' committee

22 professionals?

23          MR. ALBERINO:  Right.  There's no budget line for the

24 unsecured creditors' committee, which is a -- which is a

25 departure -- which is a departure from local rules.  We've had

1   discussions with that with the senior lenders.

2         I think the way we'd like to address it, Your Honor,

3   is, given the fact that this is essentially a thirty-day order,

4   that we will be back in front of Your Honor a month from now,

5   when -- if and when a committee is appointed, I assume with the

6   lenders we'll reach, you know, some kind of accommodation, you

7   know, to put a line item in the budget, you know, for a

8   committee, if and when appointed.

9         THE COURT:  Okay.

10        MR. ALBERINO:  If that's okay with Your Honor.

11        THE COURT:  It's not a reflection of a final

12   determination that those professional fees are not going to be

13   funded.

14        MR. ALBERINO:  No.  It's an issue that obviously was

15   raised in discussions.  I think we've kind of fully vetted it.

16   And given the senior lenders' at least willingness, subject to

17   diligence, to fund a plan that provides for payment in full of

18   unsecured claims, you know, we elected to take the unsecured --

19   unsecured advisors out of the budget.  You know, but if a

20   committee is appointed, I would think we'd be remiss if we

21   showed up with another budget that didn't provide for payment

22   of their professionals.

23        THE COURT:  Okay.  And the "public affairs" line?  I'm

24   probably getting ahead of you.  The public affairs line is --

25        MR. ALBERINO:  The company's --

1      THE COURT:  -- the company that we spoke about a

2  couple --

3      MR. ALBERINO:  Correct.  Rubenstein & Company.

4      THE COURT:  All right.

5      MR. ALBERINO:  The company's public relations

6  consultant.

7      THE COURT:  Okay.  Go ahead.  I interrupted you.

8      MR. ALBERINO:  Sure.  I think what's probably best,

9  unless you have a preference, Your Honor, is I'm just going to

10 kind of look through some of the highlights --

11     THE COURT:  Walk through the highlights, great.

12     MR. ALBERINO:  -- so you get a flavor for kind of what

13 we agreed to and -- and what's substantive in this -- in this

14 document.

15     First, Your Honor, I think you should understand this

16 is essentially a thirty-day order.  You know, given the

17 background here, I think the way this process is going to work

18 is, you know, we have a thirty-day cash collateral -- a thirty-

19 day -- thirty-day use -- thirty-day authorization to use cash

20 collateral, pursuant to the thirteen-week budget, which is

21 attached.  We will be back in front of Your Honor for either a

22 successive interim order, or perhaps a final order, you know,

23 depending upon, you know, what we're willing to -- what the

24 lenders are willing to do with that company at that point in

25 time.  But you know, it's clear that we've got a thirty-day

1   kind of budget that we can operate off of.

2          Number two, there's an extensive adequate protection

3   package.  We've agreed to a number of things:

4          First, a set of restructuring milestones.

5          Number one, we've agreed, as a -- as a covenant and

6   within the document to have a claim disclosure statement on

7   file within thirty days of the relief date.

8          We have agreed to -- we have agreed to have --

9   hopefully have the disclosure statement approved within sixty

10  days, a filing of that plan.

11         And we hope to have a -- you know, we hope to have the

12  plan confirmed within ninety days of, you know, filing that

13  plan and disclosure statement, with the hope to be out by year-

14  end, assuming the company can -- and the lenders can secure all

15  necessary FCC approvals to transfer the radio licenses.

16         In terms of supervision, you know, there's --

17         THE COURT:  We can confirm -- we can confirm a plan

18  subject to FCC approval, right?

19         MR. ALBERINO:  Correct.

20         THE COURT:  Right.  Okay.

21         MR. ALBERINO:  And that would be the intention, Your

22  Honor.

23         THE COURT:  Okay.

24         MR. ALBERINO:  There are two what I call "supervisory

25  provisions" here:

1    Number one, there's a monitor concept.  You know,

2  we've agreed to allow -- to allow the lenders to, you know,

3  bring in an industry professional, you know, to remain on site

4  at the company, to become familiar with, you know, the

5  company's business and operations.  The monitor was not an

6  officer; it's merely kind of an observer, kind of put in -- put

7  in place by the lenders, who can -- who is -- has the ability

8  to remain on site, interact with the company's professionals,

9  and will have access, you know, to non-privileged information

10  at the company.

11    THE COURT:  Is the monitor going to be retained in

12  this case?

13    MR. ALBERINO:  The monitor would be an -- would be a

14  professional, I think employed by the senior lenders.  So it

15  would not --

16    THE COURT:  Okay.  Not paid --

17    MR. ALBERINO:  -- be an estate officer.

18    THE COURT:  -- from the estate.

19    MR. HARRIS:  Your Honor, it's in the nature of a

20  financial advisor with radio experience, who's going to simply

21  --

22    THE COURT:  Okay.  But not --

23    MR. HARRIS:  -- be on site.

24    THE COURT:  But not paid --

25    MR. HARRIS:  But not an estate professional.

1      THE COURT:  Got it.

2      MR. HARRIS:  And paid by us.

3      MR. ALBERINO:  And it's not reflected in the budget,

4  Your Honor.

5      THE COURT:  Okay.  All right.

6      MR. ALBERINO:  So the company is not paying for it.

7  It's a professional, you know, selected by the lenders to kind

8  of remain on site at the company.

9      THE COURT:  Okay.

10      MR. ALBERINO:  But you know, staying with that

11  concept, you know, we have agreed to bring a CRO into the

12  company, you know, within thirty days.  This was -- this was

13  probably the reason why you didn't get the motion filed until

14  late yesterday.

15      But what we did agree to do is to -- as part of the

16  covenant under the cash collateral order, is to appoint the CRO

17  within thirty days.  We've asked the lenders to provide us with

18  a list of at least three candidates, so that the -- so that the

19  board of directors at the company can review and vet and

20  negotiate terms of potential CRO candidates.  We intend to do

21  that on an expedited basis once we get that list.

22      And you know, what was very -- what was very important

23  for the company -- and it's reflected in the order -- is that,

24  you know, the scope, terms, and conditions of the CRO retention

25  -- and I know the U.S. Trustee will have issues, as well,

1  because we'll have to ultimately, you know, file this and get

2  court approval of the CRO.  But you know, it was important to

3  us that, you know, the lenders didn't retain absolute

4  discretion on the scope of that retention.  We have -- we have

5  provided and we have agreed to make those -- make the terms of

6  the retention subject to their reasonable discretion.  And I

7  think we're fairly confident that we'll be able to, you know,

8  advance this process and kind of all reach agreement on the

9  scope, you know, terms, and parameters for the CRO retention in

10 this case.

11        And I think once the, you know, board has fully

12 negotiated an agreement, you know, with sign-off to the

13 lenders, it would be our intention, you know, to file papers,

14 you know, perhaps on an expedited basis, you know, to get that

15 CRO in there and approved by the Court.

16        THE COURT:  Okay.

17        MR. ALBERINO:  And I assume it will be reflected in a

18 -- in a future budget in this case, as well.

19        THE COURT:  Okay.

20        MR. ALBERINO:  Your Honor, there are certain covenants

21 dealing with, you know, the plan and sale process, which I

22 think are customary for these types of situations, where we've,

23 you know, agreed to certain covenants to not file plans -- to

24 not file a plan or a disclosure statement that's not acceptable

25 to the lenders, you know, during the terms of this -- during

1    the term of this cash collateral order.

2            There is a carve-out that I'll talk about very

3    briefly.  I think we've addressed the U.S. Trustee fees through

4    the carve-out.  I believe there is a hundred-thousand-dollar

5    carve-out for a Chapter 7 Trustee, you know, if ultimately this

6    case were to be -- were to be converted.

7            And as far as, you know, professionals go in this

8    bankruptcy case, there is, you know, what I would call kind of

9    a pipeline and termination carve-out, albeit the pipeline

10   carved out in this case will be subject to what we call the

11   "professional fee accrual budget," which is attached to the

12   order, given, you know, the timing differences, you know --

13           THE COURT:  Right.

14           MR. ALBERINO:  -- in terms of when we get paid.  You

15   know, we just wanted to make sure that the carve-out, you know,

16   was accruing throughout the case.

17           THE COURT:  Okay.

18           MR. ALBERINO:  There are some -- there are a number of

19   other provisions that are customary.  The lenders -- the

20   lenders required replacement liens on avoidance actions, credit

21   bid rights and acknowledgements from the company, surcharge

22   waivers under 506 and 552.  We've agreed to that, subject to

23   entry of either a successive interim order, you know, or final

24   order in this case.  So if the committee has an issue, or

25   another party-in-interest has an issue --

1           THE COURT:  Right.

2           MR. ALBERINO:  -- they can come back and address that.

3           With respect to stipulations with respect to the debt

4    and the liens, that's in there, as well, subject to a sixty-day

5    challenge period.  And I'll discuss that in a second because is

6    deals with one of the U.S. Trustee's comments.

7           There also is an estate release of the lenders

8    relating to kind of pre-petition conduct, which will be -- you

9    know, that release will be subject to entry of the successive

10   interim order or final order, and will also be subject to a

11   challenge -- the challenge period by a committee or another

12   party-in-interest.

13          In terms of timing, Your Honor, the one change the

14   U.S. Trustee has requested that we make that we've agreed to

15   is, you know, we initially said that the order would provide a

16   sixty-day challenge period from committee appointment --

17          THE COURT:  Right.

18          MR. ALBERINO:  -- or from entry of a successive

19   interim order or final order.  You know, we're striking the

20   committee appointment.  So the challenge -- the cutoff for

21   challenges will be sixty days from entry of the successive

22   interim order or a final order in this case.

23          THE COURT:  Okay.

24          MR. ALBERINO:  So there also are a number of

25   disclosure deliverables that we owe to the company.  Again,

1  this is all in the nature of trying to move this case forward

2  quickly and to have the lenders check boxes on a number of the

3  diligence items that they've requested.  And like I said, we

4  will -- you know, we'll move heaven and earth, you know, to get

5  them what they need.

6          THE COURT:  Okay.

7          MR. ALBERINO:  But you know, our -- what we're

8  thinking, Your Honor, is, you know, hopefully with the entry of

9  this order, you know, we've got now a thirty-day window.  You

10 know, I think, you know, the ship has been righted, so to

11 speak.  You know, we're going to turn to, you know, diligence;

12 we're going to turn to plan documentation.  And you know, we're

13 happy that the senior lenders were able to work with us and be

14 cooperative and, you know, provide us kind of with a runway,

15 you know, to hopefully, you know, paper the deal up, negotiate

16 the final points, you know, and get the company in and out of

17 Chapter very quickly.

18         So, in light of the foregoing, we would request, you

19 know, that Your Honor enter the interim cash collateral order.

20         THE COURT:  Okay.  I did have a chance to review it

21 very early this morning.  I'd like to have another opportunity

22 to go through it again.  But I really -- I don't see anything

23 in here that troubles me.  It is, as you said, a thirty-day

24 order.  I think you've hit all the high points.  In light of

25 the fact that it's fully negotiated and incident to what

1   appears to be a very positive path, I'm highly confident I'm

2   going to enter your order later today.

3        When you give us -- as a matter of housekeeping, are

4   you going to give us a folder of disks, or are you going to

5   send them by email?

6        MR. ROCHESTER:  Your Honor, I mean we can do whatever

7   is better for your chambers.  I thought that we could send you

8   an email of --

9        THE COURT:  We'd prefer email, if you can do that; so

10  that the order on this one should reflect the change requested

11  by the U.S. Trustee.

12       MR. ALBERINO:  Yes, Your Honor.  We'll make that

13  change.

14       THE COURT:  Okay.  All right.  Does anyone wish to be

15  heard with respect to the debtors' motion for interim approval

16  of its cash collateral order?

17       MR. SMITH:  Yes, Your Honor, just briefly, if I may

18  use the podium.

19       THE COURT:  Sure.

20       MR. SMITH:  Your Honor, again, Zachary Smith,

21  Cadwalader, for Yucaipa.

22       I just wanted to make two points today in connection

23  with the order, the first of which was already emphasized by

24  Mr. Alberino.

25       Just to make it very clear for the record, it is a

1  thirty-day order.  We have approved the budget for the next

2  thirty days.  The debtors and the lenders have reserved rights

3  with respect to subsequently, which will be discussed over the

4  next few weeks.

5         And the second point, Your Honor, is really just a

6  larger point, to give the Court a little bit of context for

7  some additional developments from yesterday, which I think were

8  part of the reason for the delay in submission of the order.

9         Since the conference on August 31st, we have had very

10  positive developments in the case.  We are very pleased about

11  what appears to be an agreement in principle.

12         Just yesterday morning, after having negotiated the

13  order with Akin Gump for many days and many drafts, we were

14  first contacted by Meyer Suozzi, who the Court is aware

15  represents ICBC, the parent, letting us know, or stating that

16  they had just received the order for the first time and had

17  some comments.

18         We were able to negotiate, Your Honor, the language

19  that's reflected in Paragraph G(9), which is a recital

20  paragraph, which really, Your Honor, as we intended it, is

21  simply just a reservation of rights by ICBC to challenge at a

22  later time the debtors' various stipulations contained in the

23  order.

24         But the reason why we felt it was important to note,

25  Your Honor, was because from our perspective, just hearing this

1  type of message on behalf of ICBC yesterday gave us concern

2  again about whether, in fact, we are on the path to getting

3  this done quickly and fully consensually, or whether we're

4  going to be -- again, from our perspective -- in a situation

5  where we're dealing with the debtor on one hand and certain

6  individuals wearing one hat, and a non-debtor parent on the

7  other giving us surprises along the way.

8         So we will certainly be looking for these issues to be

9  buttoned up by the final cash collateral hearing or successive

10 interim, and absolutely by the very latest when we file a plan

11 and disclosure statement.  We don't want to go through a

12 process, only to learn at the very end that the parent is not

13 supportive, and it's turned into a consensual case at the

14 eleventh hour -- a non-consensual case at the eleventh hour.

15        THE COURT:  Okay.

16        MR. SMITH:  That's all, Your Honor.  Thank you.

17        THE COURT:  All right.  Thank you.

18        MR. ALBERINO:  Your Honor, may I respond briefly?

19        THE COURT:  Sure.  I think --

20        MR. ALBERINO:  I think Mr. LoBello will respond after

21 me.

22        THE COURT:  Okay.

23        MR. ALBERINO:  Just a very quick note on that point.

24        I had an opportunity to speak with, you know,

25 Cadwalader and Schulte about this yesterday.

1    First of all, just to be clear, I think the order was

2  distributed to Meyer Suozzi well before yesterday.  We didn't

3  really fully engage with them on comments until, you know --

4  until probably the last twenty-four hours, but they've had it.

5    Number two, the kind of issue that they're concerned

6  about -- and this wasn't reflected in the presentation.  I'm

7  sure Mr. LoBello will educate the court on this.  But there is

8  a -- the parent company had entered into a trademark security

9  agreement with the lenders, as well as certain of the debtor

10 entities, because the parent purportedly owned certain

11 trademarks that are outside the bankruptcy estate.  The lenders

12 required that -- required the debtors to make certain

13 stipulations regarding the debtor entities' views about the --

14 about the trademark owned by the parent.

15    And I think Mr. LoBello, on the parent's side, was

16 understandably concerned about, you know, the parent

17 potentially being estopped from raising any challenges or

18 defenses to what the debtor estate was stipulating with respect

19 to, you know, their piece of -- their collateral, their asset,

20 which was part of their collateral, which is outside the

21 bankruptcy estate.  So I think the language that was drafted --

22    THE COURT:  Okay.

23    MR. ALBERINO:  -- you know, was meant to make clear

24 and provide comfort to the parent that, you know, all rights

25 were preserved there, and that, you know, the estate was not

1  attempting to prejudice the rights of the parent with respect

2  to their assets outside -- their assets and their collateral

3  outside the bankruptcy estate.

4          THE COURT:  All right.  Well, that's a sensible

5  explanation.  But now that you've focused me on this paragraph

6  --

7          MR. ALBERINO:  Yep.

8          THE COURT:  -- I have a question.  It says,

9  notwithstanding anything in this Paragraph G to the contrary:

10          "-- none of the debtors' acknowledgements, admissions,

11          stipulations, confirmations, and agreements shall be

12          binding on ICBC."

13          And then it says:

14          "And nothing in this interim order" -- there's an

15          extra comma -- "shall limit or affect ICBC's position

16          it has not pledged."

17          I understand that nothing in the order shouldn't

18  affect their position.  But I'm just a little troubled by --

19  ICBC is bound by this -- by the decretal aspects of this order,

20  the cash collateral order.  I mean, this is the cash collateral

21  order that is going to be entered for the next thirty days.

22          MR. ALBERINO:  Yes.

23          THE COURT:  It's without prejudice to ICBC's positions

24  with respect to the trademarks, et cetera, and none of the

25  admissions are binding.  I'm just pausing -- I'm just paused on

1  the word "agreements," and I just want to be clear that the

2  decretal aspects of the order are going to be binding on

3  everybody.

4  Mr. LoBello, do you disagree with that?

5  MR. LOBELLO:  Your Honor, I don't disagree.  May I be

6  heard?

7  THE COURT:  Yes.  I mean, I think -- I think we're

8  probably making a mountain out of a molehill.

9  MR. LOBELLO:  I'd like to think so, Your Honor.

10  Your Honor, we received the cash collateral draft, my

11  recollection is Tuesday afternoon.  I heard statements that

12  this is --

13  THE COURT:  In other words, years ago --

14  MR. LOBELLO:  Well -- well --

15  THE COURT:  -- in the world of this type of case.

16  MR. LOBELLO:  Well, they started talking about it --

17  about it on August 31st, which is --

18  THE COURT:  Okay.

19  MR. LOBELLO:  Okay.  So I think it's unfair to

20  characterize the parent --

21  THE COURT:  Okay.

22  MR. LOBELLO:  -- as a fly in the ointment.  We're

23  here.  We raised an issue.  It took us many hours to negotiate

24  a simple reservation of rights.  All right?

25  THE COURT:  Okay.

1    MR. LOBELLO:  And I hardly think that it's fair for

2  anyone to characterize that, you know, we threw a curve ball

3  into the --

4    THE COURT:  Okay.  I'm not taking it that way.  I'm

5  taking it as there's a separate entity that's entitled to take

6  an independent look with its own counsel, and that you're

7  entitled to a reservation of rights with respect to the rights

8  that you've identified.

9    But I do want to be clear that when the cash

10  collateral order is entered, it's a binding order, and it binds

11  your client.

12    MR. LOBELLO:  I understand, Your Honor.  And we have

13  the reservation of rights, as well --

14    THE COURT:  Yes.

15    MR. LOBELLO:  -- with respect to the trademark and the

16  effect of the liens.

17    THE COURT:  Right.

18    MR. LOBELLO:  And we're happy to work with the parties

19  here in the courtroom to -- you know, to move this case

20  forward.

21    THE COURT:  Okay.

22    MR. LOBELLO:  Maybe -- maybe --

23    THE COURT:  Then I --

24    MR. LOBELLO:  Maybe it would be appropriate that we

25  get documents sooner than later, you know.  But we ultimately

1   got to where we need to go. And based on -- based on the

2   reservation of rights, we have no objection to the entry of the

3   cash collateral order.

4           THE COURT: Okay. Well, I'll assume that the parties

5   are going to continue to work together in a constructive way to

6   resolve --

7           MR. LOBELLO: Thank you, Your Honor.

8           THE COURT: -- any issue that's there. Thank you, Mr.

9   LoBello. Okay.

10           All right. So once again, does anyone else wish to be

11   heard with respect to the interim cash collateral order?

12     (No verbal response.)

13           THE COURT: Okay. Subject to my final review, I'll

14   anticipate that I'll enter the order later today, and if I have

15   any questions, we'll reach out to you. All right?

16           MR. ALBERINO: Thank you, Your Honor.

17           THE COURT: Okay. What's next?

18           MR. ROCHESTER: Shaya Rochester, on behalf of the

19   debtors, from Akin, Gump, Strauss, Hauer & Feld.

20           So I think we're just going to go through the balance

21   of the agenda now. I know that Your Honor has a tight time

22   line, so we'll try and go through the remaining matters

23   quickly.

24           THE COURT: Okay.

25           MR. ROCHESTER: Item B(2) on the agenda, we'll go

1  through the procedural motions first; this is the Garden City

2  retention.

3       Debtors expect, you know, as in most cases this size,

4  that there will be numerous, probably hundreds of creditors and

5  other parties-in-interest, will need to be required to service

6  notice in -- of various pleadings on those creditors.

7       In compliance with the local procedures, the debtors

8  received and reviewed proposals from different claims agents

9  and selected Garden City based on their qualifications, the

10  pricing terms that they submitted, and their experience.  We

11  previewed this motion with the Office of the U.S. Trustee, as

12  well as the lenders.

13       And just as a general matter, we have -- in fact, all

14  of these motions have been previewed with the U.S. Trustee and

15  the lenders, and my understanding is that there are no

16  objections to any of these motions at this point.  So unless

17  Your Honor has any questions, we respectfully request that Your

18  Honor grant the relief requested.

19       THE COURT:  All right.  Does anyone wish to be heard

20  with respect to the Garden City retention?

21     (No verbal response.)

22       THE COURT:  All right.  The motion is approved.

23       MR. ROCHESTER:  Thank you, Your Honor.

24       Next on the agenda is the schedules extension motion.

25  By the motion, the debtors are seeking a twenty-five-day

1    extension of the deadline to file schedules with -- the

2    schedules of assets and statements of financial affairs.  So

3    this would take us out to October 17th, 2011.  That date is

4    consistent with the date that's in the milestones in the cash

5    collateral order.  Unless Your Honor has any questions, we'd

6    ask that the motion be granted.

7            THE COURT:  All right.  Does anyone wish to be heard

8    with respect to the schedules extension motion?

9        (No verbal response.)

10           THE COURT:  All right.  The motion is granted.

11           MR. ROCHESTER:  Thank you, Your Honor.

12           Next on the agenda is the case management procedures

13   motion.  The case management procedures that we used here are

14   very similar to the procedures that have been used in other

15   cases; most notably, they are virtually the same that were

16   adopted by this Court in the ArchBrook Laguna cases.  We did

17   have --

18           THE COURT:  What a coincidence.

19       (Laughter.)

20           THE COURT:  Sorry.

21       (Laughter.)

22           MR. ROCHESTER:  That we --

23           THE COURT:  I like to make Mr. Dizengoff smile every

24   once in a while.

25           MR. ROCHESTER:  We all do.  We all do.

1  (Laughter.)

2  MR. ROCHESTER:  We, again, previewed this with your

3  chambers --

4  THE COURT:  Okay.

5  MR. ROCHESTER:  -- and we were told that, as long as

6  it's consistent with ArchBrook, they should be fine.  Unless

7  there are any questions, we'd ask that the motion be granted.

8  THE COURT:  All right.  Does anyone wish to be heard

9  with respect to the case management procedures motion?

10  (No verbal response.)

11  THE COURT:  Okay.  That's granted.

12  MR. ROCHESTER:  Thank you, Your Honor.

13  Next on the agenda is the creditor matrix motion.

14  We're seeking authority to prepare an electronic format list of

15  creditors in lieu of submitting the -- submitting a formatted

16  mailing matrix.

17  We're doing the top thirty largest unsecured creditors

18  on a consolidated basis.  The U.S. Trustee has that and has

19  been reviewing it.  And as discussed, we'll fill out -- send

20  out the list soliciting the committee to those thirty

21  creditors.

22  With the assistance of Garden City Group, we'll mail

23  notices -- or actually have mailed notices of the commencement

24  of these cases.

25  So unless Your Honor has any questions, we'd ask that

1   that be granted.

2          THE COURT:  All right.  The creditor matrix motion is

3   approved.

4          MR. ROCHESTER:  Thank you, Your Honor.

5          Okay.  Now we'll turn to Item C, which are the --

6          THE COURT:  Okay.

7          MR. ROCHESTER:  -- operations-related motions; the

8   first of which is the cash management motion.

9          By this motion, the debtors are seeking authority to

10  continue their existing cash management system and bank

11  accounts; specifically, the ability to continue using their

12  existing bank accounts for all purposes, as debtors -- debtors

13  -- as -- excuse me -- as accounts for debtors, as debtors-in-

14  possession; to be able to continue to disperse funds from these

15  accounts by all usual methods; perform obligations under the

16  documents governing the cash management system and bank

17  accounts.

18         We had some comments from the U.S. Trustee, which

19  we've incorporated; as well as from the lenders, which we've

20  incorporated, both in the orders that we submitted and filed

21  with the Court.  So there are no objections to the cash

22  management motion.

23         Unless Your Honor has any questions about the cash

24  management system, we respectfully request that the motion be

25  granted.

1          THE COURT:  All right.  Everyone satisfied with the

2  cash management system?

3      (No verbal response.)

4          THE COURT:  All right.  The motion is granted.

5          MR. ROCHESTER:  Thank you, Your Honor.

6          Next on the agenda is the insurance motion.

7          THE COURT:  Okay.

8          MR. ROCHESTER:  In the ordinary course of business,

9  the debtors maintain a comprehensive insurance program.

10          For certain of the insurance policies -- commercial,

11  property, earthquake, and general liability -- the debtors

12  finance the payment of the premiums pursuant to a premium

13  finance agreement.  So by this motion, the debtors are seeking

14  authority to continue to honor the terms of the policies, as

15  well as the terms of the premium finance agreement, to pay

16  premiums, deductibles, or any other costs related to the

17  policies or the premium finance agreement.

18          Unless -- again, this is all on an interim basis --

19          THE COURT:  Premiums -- the premium finance agreements

20  are market?

21          MR. ROCHESTER:  Excuse me?

22          THE COURT:  They're market?

23          MR. ROCHESTER:  Yes.  Yes.  They're market.  The

24  current balance right now is 186,000.

25          THE COURT:  Okay.  All right.  Does anyone wish to be

1  heard with respect to the insurance motion?

2      (No verbal response.)

3          THE COURT:  All right.  I'll grant that motion.

4          MR. ROCHESTER:  Thank you, Your Honor.

5          The next motion is the taxes and fees motion.  We're

6  requesting entry of an order authorizing the debtors, but not

7  directing them, to pay any taxes and business licensing fees.

8  The motion sets out in detail the specific categories of taxes

9  that are covered.  My assumption is that Your Honor does not

10  want me to go through the individual categories.

11          The fees primarily relate to FCC licensing fees, which

12  are crucial to the operations of this business.  In order to

13  operate, you have to pay these fees.  So we're seeking

14  authority to continue making those payments to the FCC.

15          And unless Your Honor has any questions, we'd request

16  that it be granted.

17          THE COURT:  Does anyone wish to be heard with respect

18  to the taxes and fees motion?

19      (No verbal response.)

20          THE COURT:  All right.  The motion is granted.

21          MR. ROCHESTER:  Okay.  Thank you, Your Honor.

22          The next item on the agenda is the customer programs

23  motion.  By this motion, the debtors are seeking authority to

24  maintain and administer their existing customer programs.

25          It's important to note that approximately two-thirds

1    of the debtors' revenues are generated by advertising.  So

2    essentially, the customers to whom this -- to whom the relief

3    requested in this motion is directed -- the motion sets out the

4    four basic categories of the customer programs:  Barter

5    obligations, cash and advance sales, prepaid events, and

6    customer obligations.

7         It's worth noting that only a very small chunk of the

8    obligations that we're seeking authority to honor are actually

9    cash obligations.  The great majority of the obligations here

10   are non-cash, like basically providing advertising time.  So

11   they are non-cash obligations.

12        Unless Your Honor had any questions, we'd request that

13   the relief requested be granted.

14        THE COURT:  All right.  Does anyone wish to be heard

15   with respect to the customer programs motion?

16      (No verbal response.)

17        THE COURT:  All right.  That's granted.

18        MR. ROCHESTER:  Thank you, Your Honor.

19        The next item on the agenda is the employee wages and

20   benefits motion.  By this motion, the debtors seek

21   authorization to pay prepetition employees, employee

22   obligations, and to continue honoring the prepetition employee

23   programs.  As set forth in the motion, this includes wages,

24   sales, commissions, health, other welfare benefits, expense

25   reimbursements, severance plan obligations -- although there

1    are no severance plan obligations that are owing as of the

2    relief date.

3         One thing that's very clear, and we've discussed this

4    with the U.S. Trustee, is that we are not seeking authority to

5    make any payments in excess of the statutory cap.  And that's

6    set forth clearly in the order.

7         THE COURT:  Okay.

8         MR. ROCHESTER:  If Your Honor likes, I can go through

9    the specific --

10        THE COURT:  No, I was interested in your making that

11   confirmation on the record.

12        MR. ROCHESTER:  Sure.

13        THE COURT:  So with that, does anyone else wish to be

14   heard with respect to the employee wages motion?

15      (No verbal response.)

16        THE COURT:  Okay.  The motion is granted.

17        MR. ROCHESTER:  Okay.  And I think the last motion on

18   the agenda for today is the gap period claims motion.

19        THE COURT:  Right.

20        MR. ROCHESTER:  I --

21        THE COURT:  Which more accurately should be called the

22   "gap and non-gap claims motion."

23        MR. ROCHESTER:  Fair point, fair point.

24        So by this motion, Your Honor, we're requesting

25   authority -- an order authorizing, but again not directing the

1  debtors to pay claims that incur -- that the debtors incur in

2  the ordinary course during the gap period --

3          THE COURT:  Right.

4          MR. ROCHESTER:  -- twenty-one days between the

5  involuntary date and the relief date.

6          The other important aspect of this motion is that the

7  checks that were cut before the involuntary date --

8          THE COURT:  Right.

9          MR. ROCHESTER:  -- and some banks have had confusion

10  about what they're supposed to do with those checks.

11          THE COURT:  Right.

12          MR. ROCHESTER:  We're requesting authority for those

13  banks to continue to honor and to pay those checks.

14          THE COURT:  But you're requesting that -- you're --

15  and if everybody is on board with this, it's just an interim

16  order.

17          MR. ROCHESTER:  Right.

18          THE COURT:  But what you're basically asking for is

19  critical vendor relief without a critical vendor showing.  Just

20  let me state it differently.  What you said in the papers is

21  it's too hard to sort it out between the non-gap -- or pre-gap.

22          MR. ROCHESTER:  Pre-gap.

23          THE COURT:  I think they're pre-gap, right?

24          MR. ROCHESTER:  Correct.

25          THE COURT:  And then there's gap.

1           MR. ROCHESTER:  Right.

2           THE COURT:  So gap would be entitled to priority --

3           MR. ROCHESTER:  Correct.

4           THE COURT:  But pre-gap, hypothetically, would just be

5   claims.

6           MR. ROCHESTER:  Correct.

7           THE COURT:  Right?  But you're -- the basis of what

8   your saying is that it would cost more to sort it out than it's

9   worth.

10          MR. ROCHESTER:  Correct.  Basically, the way we look

11  at it is that there are -- each week, there are a hundred -- I

12  think it's over 120 checks that are issued.  So over that --

13  you know, there are a lot of checks out there.  The amount of

14  the sort of pre-gap claims that are at issue, though, is de

15  minimis.  But nonetheless, you'd have to go through --

16          THE COURT:  Okay.  But it is -- it's not a -- it's not

17  a huge number --

18          MR. ROCHESTER:  It's not a huge number.

19          THE COURT:  -- of pre-gap.

20          MR. ROCHESTER:  That's correct.  That's correct.

21          And moreover, we would make it very clear in the

22  motion, and also in the order, is that we reserve the right to

23  later seek to avoid payments that arose before the involuntary

24  period.  So --

25          THE COURT:  And that are paid.

1        MR. ROCHESTER:  That were paid.

2        THE COURT:  And that are paid.

3        MR. ROCHESTER:  Exactly.  Exactly.

4        THE COURT:  Either that have been paid, or that will

5   be paid --

6        MR. ROCHESTER:  Pursuant to this order.

7        THE COURT:  -- pursuant to this order.

8        MR. ROCHESTER:  That's exactly right, Your Honor.

9        THE COURT:  All right.

10        MR. ROCHESTER:  And the lenders and the United States

11   Trustee --

12        THE COURT:  And the lenders are on board.

13        MR. ROCHESTER:  Yes.

14        THE COURT:  All right.  Does anyone else wish to be

15   heard with respect to the gap period claims motion?

16      (No verbal response.)

17        THE COURT:  All right.  I'll enter it as an interim

18   order.

19        MR. ROCHESTER:  Thank you, Your Honor.  Thank you.

20        That concludes the agenda.  I think it probably makes

21   sense to just go through some housekeeping matters.

22        THE COURT:  Yes.

23        MR. ROCHESTER:  As we already discussed, we will send

24   electronic versions of the order by email --

25        THE COURT:  Okay.

1          MR. ROCHESTER:  -- this afternoon to your chambers.

2          THE COURT:  All right.  Ms. Edelboim is going to be

3    your point person on this case.

4          MR. ROCHESTER:  I'm sorry.  Which -- which --

5          THE COURT:  Ms. Edelboim.

6          MR. ROCHESTER:  Oh, right.  Okay.

7          THE COURT:  Okay?

8          MR. ROCHESTER:  Yes, we've spoken before.

9          And then the other thing is --

10          THE COURT:  And do you need dates?

11          MR. ROCHESTER:  Yes, that would -- you read my mind,

12    Your Honor.

13          THE COURT:  Okay.

14          MR. ROCHESTER:  We need dates.  A couple of things.

15    They're not -- one would be -- there are certain matters that

16    we've second for a second day's hearing.  And we think it

17    probably also makes sense to coincide that hearing with the

18    final hearing on all these motions that were granted just on an

19    interim basis.  So that's one thing, we need to set an

20    objection deadline.

21          And then also, pursuant to the case management

22    procedures, we've put in some times for four omnibus hearing

23    dates.  We can maybe just do one or two if that's your

24    preference.

25          THE COURT:  Okay.

1          MR. ROCHESTER:  But that's what we're looking at.

2          THE COURT:  All right.  Tell me what you're looking --

3   what you'd like for your first omnibus date.

4          MR. ROCHESTER:  Maybe it makes sense to --

5          THE COURT:  Or for the second -- for the second day's.

6          MR. ROCHESTER:  Yeah, the second --

7          THE COURT:  Okay.

8          MR. ROCHESTER:  We were thinking -- let me pull up my

9   calendar -- probably sometime maybe in that second week of

10  October, or the first week of -- the week of October 3rd,

11  October 10th.  There are a couple of blackout dates due to the

12  Jewish holidays, but there are certainly -- you know, the

13  Monday -- the 3rd, the 4th, the 5th, the 6th would be fine; the

14  10th, 11th, 12th, those would all be fine, as well, subject to

15  your availability, Your Honor.

16         THE COURT:  That's the hard part.

17      (Court and court personnel confer.)

18      (Counsel confer.)

19         MR. ROCHESTER:  Mr. Alberino is bringing up a good

20  point --

21         THE COURT:  Okay.  We need --

22         MR. ROCHESTER:  -- that -- actually, we just have to

23  confer with the lenders here.

24      (Counsel confer.)

25         THE COURT:  Okay.

1          MR. ROCHESTER:  It probably would make sense, if Your

2     Honor has availability, to do it before the 8th, which is

3     thirty days from today, so --

4          THE COURT:  Yeah.

5          MR. ROCHESTER:  -- the 3rd, the 4th, I think --

6          THE COURT:  How about at eleven o'clock on Tuesday,

7     the 4th.

8          MR. ROCHESTER:  That should be fine, Your Honor.

9          THE COURT: Okay.  All right.

10          MR. ROCHESTER:  Okay.  So we'll set that for the

11     second-day hearing and the final hearing.

12          In terms of an objection deadline?

13          THE COURT:  Why don't we have that be -- we run into

14     the holidays.  So close of business on the 28th, is that too

15     short?  I'm just hesitant to make an objection deadline be on

16     the holidays.

17          MR. ROCHESTER:  Right.  Right.

18          THE COURT:  And then the 3rd is the day before.

19     There's not enough time?

20       (Counsel confer.)

21          MR. ROCHESTER:  Right.  Twenty-one days, I guess, on

22     the retention apps.  Does that take us -- that's a little --

23     today is the 7th.

24       (Counsel confer.)

25          MR. ROCHESTER:  I think that's fine from our

1  perspective, Your Honor.

2           THE COURT:  Does that work?  All right.

3           MR. ROCHESTER:  And then does it make sense to

4  schedule, maybe some of the omnibus --

5           THE COURT:  Give you two omnibus dates?  So you -- one

6  in November, one in December?

7           MR. ROCHESTER:  Correct, Your Honor.

8           THE COURT:  Okay.  November.  Monday, November 7th?

9      (Court and court personnel confer.)

10          THE COURT:  How about Monday, November 7th?

11          MR. ROCHESTER:  Okay.

12          THE COURT:  All right?  Ten o'clock?

13          MR. ROCHESTER:  Good.

14          THE COURT:  All right.  And Monday December 5th?

15  Monday December 5th?

16          MR. ROCHESTER:  At 10 a.m.?

17          THE COURT:  Ten o'clock.

18          MR. ROCHESTER:  Okay.  Great.  Thank you very much,

19  Your Honor.

20          THE COURT:  Okay.  And we are, as some of you know --

21  if matters come up in the interim, we can fit you in at times

22  other than the omnibus dates.

23          MR. ROCHESTER:  Okay.

24          THE COURT:  All right?

25          MR. ROCHESTER:  I think the last -- thank you, Your

1  Honor.

2          The last thing in terms of housekeeping, and I think

3  for the day, is the trustee motion that the lenders had filed.

4  My understanding is that they have agreed to adjourn --

5          THE COURT:  It's adjourned without date, right?

6  Right?

7          MR. ROCHESTER:  To carry it over and --

8          THE COURT:  It's just carried.

9          MR. ROCHESTER:  Just carry it over?

10          UNIDENTIFIED:  Right.

11          MR. ROCHESTER:  Just so that's on the record.

12          THE COURT:  Okay.  Yes.

13          All right.  Mr. Harris, did you want to say something

14  else?

15          MR. HARRIS:  That was it, Your Honor.

16          THE COURT:  Okay.  All right.  Anything else?

17          MR. ROCHESTER:  I think that's all we have, Your

18  Honor.

19          THE COURT:  Okay.  I'm very encouraged to hear about

20  the positive developments.  I expect you'll continue on that

21  path.  Have a good weekend.

22          MR. ROCHESTER:  Thank you very much, Your Honor.

23          THE COURT:  Thank you.

24      (Proceedings concluded at 10:19 a.m.)

25                          *****

1

2                           <u>CERTIFICATION</u>

3          I certify that the foregoing is a correct transcript

4     from the electronic sound recording of the proceedings in the

5     above-entitled matter.

6

7

8

9

10                                              September 13, 2011

11    Coleen Rand, AAERT Cert. No. 341

12    Certified Court Transcriptionist

13    For Rand Reporting & Transcription, LLC

14

15

16

17

18

19

20

21

22

23

24

25

## Exhibit C

## First Interim Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| INNER CITY MEDIA CORPORATION, *et al.*, | ) Case No. 11-13967 (SCC) |
|  | ) |
| Debtors.[1] | ) Jointly Administered |
|  | ) |

### INTERIM ORDER (I) AUTHORIZING DEBTORS TO USE
### CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION
### TO AGENT AND SENIOR LENDERS, AND (III) GRANTING RELATED RELIEF

Upon the motion, dated September 8, 2011 (the "Motion"),[2] of Inner City Media

Corporation and certain of its affiliates, each as a debtor and debtor in possession (the "Debtors")

in the above-captioned cases (the "Cases"), pursuant to sections 105, 361, 362, 363(c)(2), 363(e),

and 507 of the Bankruptcy Code, Bankruptcy Rules 4001 and 9014, and Local Rule 4001-2 for

entry of interim and final orders (i) authorizing the Debtors to use cash collateral, (ii) granting

adequate protection to the Agent and the Senior Lenders (as defined below), and (iii) granting

certain related relief, all as more fully set forth in the Motion; and the Interim Hearing having

been held by this Court on September 9, 2011; and upon the record of the Hearing and all of the

proceedings had before the Court; and the Court having found and determined that the relief

requested in the Motion is in the best interests of the Debtors, their estates and creditors, and all

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer identification number, are: Inner City Media Corporation (5309), ICBC Broadcast Holdings, Inc. (2429), Inner City Broadcasting Corporation of Berkeley (5990), ICBC Broadcast Holdings – CA, Inc. (5311), ICBC-NY, L.L.C. (8879), Urban Radio, L.L.C. (6747), Urban Radio I, L.L.C. (2649), Urban Radio II, L.L.C. (2701), Urban Radio III, L.L.C. (2747), Urban Radio IV, L.L.C. (3662), Urban Radio of Mississippi, L.L.C. (1154), and Urban Radio of South Carolina, L.L.C. (5231). The principal corporate location of the Debtors is 3 Park Avenue, 40th Floor, New York, NY 10016. The service address for all of the Debtors is 3 Park Avenue, 40th Floor, New York, NY 10016.

[2] Except as otherwise noted, capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

parties in interest, and that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby:

**FOUND AND DETERMINED THAT:**[3]

A.      On August 19, 2011, Yucaipa Corporate Initiatives Fund II, L.P., Yucaipa Corporate Initiatives (Parallel) Fund II, L.P., CF ICBC LLC, Fortress Credit Funding I L.P., and Drawbridge Special Opportunities Fund Ltd., which constitute the lenders (collectively, in such capacity, the "Senior Lenders") under the Senior Secured Credit Facility (as defined below), filed involuntary chapter 11 petitions against the Debtors.

B.      Upon the consent of the Debtors, on September 8, 2011, the Court entered orders for relief, commencing the Cases (the "Relief Date").

C.      The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On the Relief Date, the Debtors filed a motion requesting the joint administration of the Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).  No statutory committee of unsecured creditors has yet been appointed in these Cases.

D.      This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] The findings and conclusions set forth in this Interim Order constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

E.     Pursuant to Bankruptcy Rule 4001(b)(2), the Interim Hearing was held by this Court on September 9, 2011.

F.     Notice of the Motion, the relief requested by the Motion, and the Interim Hearing was served by the Debtors on (a) the United States Trustee for the Southern District of New York (the "U.S. Trustee"); (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d) (the "Top 30 Creditors"); (c) counsel to the Senior Lenders; (d) counsel to the Agent; (e) counsel to Inner City Broadcasting Corporation; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; and (h) the Federal Communications Commission. A copy of the Motion is also available on the website of the Debtors' notice and claims agent, GCG, Inc., at www.gcginc.com/cases/ICBC. The foregoing notice was, in the Debtors' belief, the best available under the circumstances.

G.     Subject to paragraph 14 of this Interim Order, the Debtors acknowledge, admit, stipulate, confirm, and agree that:

1.     Pursuant to the Credit Agreement among the Debtors, General Electric Capital Corporation,[4] as administrative agent, and the lenders signatory to the Credit Agreement from time to time, dated as of August 13, 2004 (as amended as of each of September 27, 2004, November 11, 2004, May 5, 2005, October 6, 2006, and June 22, 2007, and as further amended, restated, modified, or supplemented from time to time, the "Senior Secured Credit Facility"),[5] and certain related documents executed in connection

---

[4] On July 1, 2011, General Electric Capital Corporation resigned as administrative agent under the Senior Secured Credit Facility and was succeeded by Cortland Capital Market Services LLC (the "Agent").

[5] Except as otherwise noted, capitalized terms used but not defined in this statement shall have the meanings set forth in the Senior Secured Credit Facility.

with the Senior Secured Credit Facility, including, without limitation, the Collateral Documents (as defined in the Senior Secured Credit Facility, the "<u>Collateral Documents</u>"), control agreements, guaranties, mortgages, Uniform Commercial Code financing statements, and all other related agreements, documents, and instruments (as the same may have been amended, restated, modified, or supplemented from time to time, the "<u>Prepetition Loan Documents</u>"), the Senior Lenders (or their predecessors in interest) made certain loans, advances, and other financial accommodations for the account of the Debtors.

2.     As of the Relief Date, the Debtors were indebted to the Senior Lenders for the loans, advances, and other financial accommodations made by the Senior Lenders pursuant to, and in accordance with, the Prepetition Loan Documents in the aggregate principal amount of approximately $228 million, plus accrued and unpaid interest and fees.

3.     For purposes of this Interim Order, the term "<u>Prepetition Indebtedness</u>" shall mean, without duplication, any and all amounts owing or outstanding under the Prepetition Loan Documents, including, without limitation, all Obligations (as defined in the Senior Secured Credit Facility), interest, fees, and other costs, expenses, and charges owing in respect of such amounts, including, without limitation, any attorney or other professional fees and expenses, and other fees and expenses that are chargeable or reimbursable pursuant to the Prepetition Loan Documents, and any and all obligations and liabilities, contingent or otherwise, owed in respect of the Obligations.

4.     To secure the Prepetition Indebtedness, pursuant to the Collateral Documents executed in connection with the Senior Secured Credit Facility, including,

without limitation, the Security Agreement, dated as of August 13, 2004, by and between the Debtors and the Agent (as amended, restated, modified, or supplemented from time to time, the "Security Agreement"), the Trademark Security Agreement, dated as of August 13, 2004, by and between Inner City Broadcasting Corporation ("ICBC"), Inner-City Broadcasting Corporation of Berkeley, and ICBC Broadcast Holdings, Inc. (collectively, the "IP Grantors") and the Agent (as amended, restated, modified, or supplemented from time to time, the "Trademark Security Agreement"), control agreements, guaranties, mortgages, Uniform Commercial Code financing statements, and all other related agreements, documents, and instruments, the Debtors and the IP Grantors, as applicable, granted to the Agent for the benefit of the Senior Lenders valid, enforceable, and perfected security interests in, and continuing first priority liens on (collectively, the "Prepetition Liens"), substantially all of the assets identified in or that are the subject of such Collateral Documents, including, but not limited to, real property, equipment, cash or cash equivalents on deposit in certain deposit accounts, patents, copyrights, trademarks, or other intellectual property (including, without limitation, all of the trademarks identified on Schedule IV attached to the Security Agreement and on Schedule I attached to the Trademark Security Agreement), and certain pledged equity interests (collectively, the "Collateral"). For the avoidance of doubt, the term "Collateral" shall include (a) collateral in or upon which a Prepetition Lien or other security interest has been granted in favor or for the benefit of the Agent, for the benefit of the Senior Lenders in connection with, pursuant to, or under the Senior Secured Credit Facility and the Collateral Documents and (b) any Collateral provided under any Prepetition Loan Document, including that described in this subparagraph 4, that existed

as of the Relief Date and at any time prior to the Relief Date, and, subject to section 552 of the Bankruptcy Code, postpetition proceeds, products, offspring, rents, and profits.

5.        The Prepetition Loan Documents are legal, valid, and binding agreements and obligations of the Debtors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and the Debtors represent that they have been and are using the Collateral in connection with their control and operation of the Stations and the provision of radio broadcasting services related thereto, which control and operation of the Stations, provision of such services, and use of all such Collateral have been free of interference and control by ICBC and any other non-Debtor affiliate.

6.        The Prepetition Liens are (a) valid, binding, enforceable (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code), and perfected first priority security interests and liens, subject only to the Permitted Encumbrances (as defined in the Senior Secured Credit Facility), but only to the extent such Permitted Encumbrances existed as of the Relief Date and are valid, enforceable, non-avoidable liens and security interests that are perfected prior to the Relief Date (or perfected after the Relief Date to the extent permitted by section 546(b) of the Bankruptcy Code) (the "Permitted Encumbrances") and (b) not subject to avoidance, reduction, disallowance, impairment, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law.  The Agent (on behalf, and for the benefit, of the Senior Lenders) holds valid, binding, enforceable (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code), and perfected first priority security interests and Prepetition Liens in and on the Collateral by taking

possession of, or obtaining control over, certain assets and by the filing of Uniform Commercial Code financing statements, mortgages, and other required documents against the Debtors and the IP Grantors and such Collateral with the proper federal, state, and county offices for the perfection of such security interests and liens.

7.      (a) The Prepetition Indebtedness constitutes a legal, valid, and binding obligation of the Debtors, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code), (b) no objection, offset, defense, or counterclaim of any kind or nature to the Prepetition Indebtedness or the Prepetition Liens exists, and none of the Debtors or any IP Grantor, either collectively or individually, shall assert any claim, counterclaim, setoff, or defense of any kind, nature or description that would in any way affect the validity, enforceability, and non-avoidability of any of the Prepetition Indebtedness, the Prepetition Liens or any of the Collateral, and (c) the Prepetition Indebtedness and any amounts previously paid to the Agent or any Senior Lender on account of, or with respect to, the Prepetition Indebtedness are not subject to avoidance, reduction, disallowance, impairment, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law.

8.      Neither the Agent nor the Senior Lenders shall be required to file proofs of claims in the Cases with respect the Prepetition Indebtedness, and the Debtors' acknowledgments set forth in this paragraph G shall be deemed a timely filed proof of claim on behalf of the Agent and the Senior Lenders on account of the Prepetition Indebtedness and any order entered by the Court in relation to the establishment of a bar date in any of the Cases shall so provide.

9. Notwithstanding anything in this paragraph G to the contrary, none of the Debtors' acknowledgements, admissions, stipulations, confirmations and agreements shall be binding on ICBC and, nothing in this Interim Order shall limit or affect ICBC's position that it has not pledged any trademarks to the Senior Lenders or ICBC's right to challenge the Senior Lenders' position that they have a lien on such trademarks; provided, that the Senior Lenders reserve all rights under this Interim Order and otherwise in the event of any such challenge by ICBC.

H. Good cause has been shown for the immediate entry and effectiveness of this Interim Order pursuant to Bankruptcy Rule 4001(b).

I. An immediate and critical need exists for the Debtors to use "cash collateral" (as defined by section 363(a) of the Bankruptcy Code) and including any and all prepetition and, subject to section 552 of the Bankruptcy Code, postpetition proceeds of the Collateral (the "Cash Collateral"). The Debtors' immediate use of the Cash Collateral is necessary in order to ensure that the Debtors have sufficient working capital and liquidity to preserve and maintain the value of their assets and to conduct the orderly administration of the Cases for the benefit of the Debtors' estates and all parties in interest.

J. The Debtors have requested that, pursuant to the terms of this Interim Order, any successive interim order regarding the Debtors' use of the Cash Collateral entered by the Court with the consent of the Agent and the Senior Lenders (each, a "Successive Interim Order"), the Final Order, and all other agreements, documents, and instruments delivered in connection with the Interim Order, any Successive Interim Order, and the Final Order, including, without limitation, the Approved Budget (as defined below, and together with the Interim Order, any Successive Interim Order, the Final Order, and all of the foregoing agreements, documents,

and instruments, collectively, the "Cash Collateral Documents"), the Agent and the Senior Lenders consent to the Debtors' use of the Cash Collateral, solely in accordance with the terms of the Cash Collateral Documents.

K.      The Agent and the Senior Lenders are prepared to consent to the Debtors' use of the Cash Collateral only if the Debtors agree, and the Court orders in this Interim Order, that the Debtors shall provide the Adequate Protection (as defined below).

L.      The Adequate Protection is (i) reasonable and sufficient to protect the interests of the Agent and the Senior Lenders, (ii) consistent with and authorized by the Bankruptcy Code, and (iii) necessary to obtain the consent of the Agent and the Senior Lenders. The Cash Collateral Documents have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors and the Senior Lenders. The terms of the Cash Collateral Documents, including, without limitation, the Adequate Protection, are fair and reasonable, and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

M.      The Debtors have prepared and delivered to the Agent and the Senior Lenders a 13-week budget, which is attached to this Interim Order as Exhibit 1 (in each case, subject to the Permitted Variance (as defined below), the "Approved Budget"). The Approved Budget has been thoroughly reviewed by the Debtors, their management, and the Senior Lenders, and the Debtors represent that the Approved Budget is achievable in accordance with the terms of the Cash Collateral Documents, and will allow the Debtors to operate at all times during the Approved Budget Period (as defined below) without the accrual of unpaid administrative expenses. The Agent and the Senior Lenders are relying upon the Debtors' representations above regarding the Debtors' ability to comply with the Approved Budget during the Approved

Budget Period in determining to consent to the Debtors' use of the Cash Collateral during the Approved Budget Period, as provided for in the Cash Collateral Documents.

N.     The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(b)(2).   The ability of the Debtors to continue their businesses and reorganize under chapter 11 of the Bankruptcy Code depends upon the Debtors' use of the Cash Collateral.  The Debtors' estates will suffer immediate and irreparable harm if the requested use of the Cash Collateral is not granted on an interim basis.  The Debtors' use of the Cash Collateral in accordance with the Cash Collateral Documents is necessary, essential, and appropriate for the continued operation of the Debtors' businesses, the management and preservation of their assets and properties, and the avoidance of irreparable harm to the Debtors' estates.  Therefore, entry of this Interim Order in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.     **Motion Granted.**  The Motion is granted on the terms and conditions set forth in this Interim Order.  Any objections or responses to the relief requested in the Motion that have not been previously withdrawn, waived, or settled, and all reservations of rights included in such objections and responses, are hereby overruled on the merits and denied with prejudice or, to the extent applicable, deferred until the hearing on any Successive Interim Order or the Final Order (whichever is earlier).  The rights of all parties to object to entry of any Successive Interim Order and the Final Order are reserved.

2.     **Use of Cash Collateral.**  The Debtors are authorized, pursuant to section 363(c)(2)(B) of the Bankruptcy Code, to use the Cash Collateral through and including the date that is thirty (30) days from entry of the Interim Order; provided, that the Agent and the Senior

Lenders are granted the Adequate Protection (as defined below); provided, further, for the avoidance of doubt, notwithstanding anything herein to the contrary, the Debtors' authorization to use Cash Collateral pursuant to this Interim Order, and the consent of the Senior Lenders with respect thereto, extends solely through the date that is thirty (30) days from entry of this Interim Order (the "Approved Budget Period"), and the Debtors and the Senior Lenders reserve all rights with respect to any proposed use of Cash Collateral beyond such Approved Budget Period. The Debtors shall use the Cash Collateral solely in accordance with this Interim Order, the Approved Budget, and the other Cash Collateral Documents, and the Cash Collateral shall be used exclusively to fund working capital and general corporate purposes of the Debtors during the Approved Budget period, and the costs, fees, and expenses incurred in connection with the administration and prosecution of the Cases. The Debtors' right to use Cash Collateral under this Interim Order shall terminate upon the occurrence of an Event of Default (as defined below), subject only to the Remedies Notice Period. The Agent and the Senior Lenders have consented to the Debtors' use of the Cash Collateral, subject to the terms of this Interim Order, the Approved Budget, and the other Cash Collateral Documents.

3.     **Adequate Protection.**  As adequate protection for the Debtors' use of the Cash Collateral, the Agent and the Senior Lenders are entitled, pursuant to sections 361, 363(c)(2), and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Collateral in an amount equal to the aggregate diminution in the value of their interests in the Collateral, including, without limitation, any such diminution resulting from the Debtors' use of the Cash Collateral, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code or otherwise (collectively, the "Adequate Protection Obligations"). The Agent

and the Senior Lenders are hereby granted the following forms of adequate protection (collectively, the "Adequate Protection"):

(a)     Adequate Protection Liens.  Effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors or any other IP Grantor of security agreements, pledge agreements, financing statements, control agreements, or other agreements or instruments, valid and perfected additional and replacement security interests in and liens on all of the Collateral (collectively, the "Adequate Protection Liens"), which shall be subject and subordinate only to (i) the Permitted Encumbrances and (ii) the Carve-Out, and shall include, subject to entry of any Successive Interim Order or the Final Order (whichever is earlier), a perfected security interest in and lien upon any causes of action arising under sections 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any proceeds of such causes of action (collectively, the "Avoidance Actions").

(b)     Superpriority Claims.   The Adequate Protection Obligations shall constitute allowed claims against the Debtors with priority over any and all administrative expenses, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all

proceeds thereof (collectively, the "Adequate Protection Claims"), subject only to the payment of the Carve-Out.

(c)    Interest Payments.  In the event that the Senior Lenders consent to the Debtors' use of the Cash Collateral following the expiration of this Interim Order, the Senior Lenders reserve the right to request as a form of adequate protection periodic cash payments in an amount equal to the amount of interest otherwise due and payable under the Senior Secured Credit Facility, and the Debtors reserve the right to oppose any such request by the Senior Lenders.

(d)    Fees and Expenses. The Debtors shall pay all reasonable fees and out-of-pocket costs and expenses of the Agent (including, but not limited to, reasonable fees and out-of-pocket costs and expenses of counsel to the Agent) incurred after August 19, 2011 up to an aggregate amount of $50,000 per month (the "Agent Fees and Expenses") promptly upon receipt of invoices for such fees, costs, and expenses (with copies of such invoices provided to the U.S. Trustee and any statutory committee of unsecured creditors appointed in the Cases (the "Committee")) (subparagraphs (c) and (d) of this paragraph 3, the "Adequate Protection Payments"); provided, that if the Agent Fees and Expenses are less than $50,000 in any monthly period, the unused amount may be carried over to future Agent Fees and Expenses periods.  No such fees, costs, and expenses payable pursuant this subparagraph d shall be subject to separate approval by the Court (but the Court shall resolve any dispute as to the reasonableness of any such fees, costs, and expenses), and no recipient of any such payment shall be required to file any interim or final fee applications with respect to the Agent Fees and Expenses.  In the event the Court determines by final, non-appealable order that any Adequate Protection Payment was

improper as a result of application of section 506(b) of the Bankruptcy Code, such Adequate Protection Payments shall be subject to total or partial application to principal (as the Court may determine).

(e)     Right to Credit Bid.  Subject to entry of any Successive Interim Order or the Final Order (whichever is earlier), the Agent and each of the Senior Lenders have the right to credit bid the Prepetition Indebtedness (pursuant to section 363(k) of the Bankruptcy Code, section 1129(b)(2)(B) of the Bankruptcy Code, or otherwise in accordance with applicable law), in whole or in part, in connection with any sale or disposition of any assets of the Debtors, whether under a chapter 11 plan of reorganization or otherwise, and the Debtors shall not oppose any such credit bid.

(f)     Sale Documentation.  Any motions, proposed orders, bidding or sale procedures, asset purchase agreements, term sheets, or other documentation or pleadings relating to any sale of any of the Debtors' assets shall be in form and substance acceptable to the Senior Lenders.  Any bidding procedures proposed and/or approved in connection with any sale of any of the Debtors' assets shall require other bidders to submit bids to the Senior Lenders, with a copy to the Agent, contemporaneously with submission to the Debtors, and the Senior Lenders shall be entitled to participate in the review and evaluation of any such bids by the Debtors; provided, that neither the Agent nor the Senior Lenders shall be entitled to receive the bids of other bidders or participate in the review and evaluation of any such bids if the Senior Lenders deliver written notice to the Debtors, counsel to the Debtors, counsel to any Committee, and the U.S. Trustee stating expressly that the Senior Lenders intend to submit a bid for the Debtors' assets, which notice must be delivered no later than five (5) business days prior to the expiration

of any deadline for submission of bids if the Senior Lenders intend to submit a bid for the Debtors' assets.

(g) _Plan Documentation_. Any chapter 11 plan proposed by any Debtor that does not provide for the payment of the Prepetition Indebtedness in full, in cash, and any disclosure statement, proposed orders, or other documentation or pleadings related to any such chapter 11 plan, shall be in form and substance acceptable to the Senior Lenders.

(h) _Conditions Precedent to Entry of Interim Order_. Prior to entry of the Interim Order, the Debtors shall have delivered to the Senior Lenders, in each case, in form and substance acceptable to the Senior Lenders, (i) a 13-week cash flow forecast, which projects the weekly cash inflows and outflows for the 13 calendar weeks following entry of the Interim Order, (ii) a current corporate organizational chart for the Debtors and any and all non-Debtor affiliates (the "Organizational Chart"), (iii) information regarding the Debtors' current cash management system, (iv) an accounting of all payments and other transfers of value made by any Debtor, ICBC, and any other non-Debtor affiliate to Akin Gump Strauss Hauer & Feld and Rothschild Inc., from January 2011 through the Relief Date, and, together with such accounting, a summary of the services provided by the foregoing professionals to or for the benefit of any Debtor, ICBC, and any other non-Debtor affiliate from January 2011 through the Relief Date, and (v) a schedule setting forth the identity of each of the members of the boards of directors of ICBC, Inner City Media Corporation ("ICMC"), and ICBC Broadcast Holdings, Inc. ("Holdings").

(i) _Milestones_. The Debtors shall take the actions identified below by the following dates: (i) within thirty (30) days of the date of entry of this Interim Order (the

"Process Start Date"), the Debtors shall have filed with the Court a proposed chapter 11 plan (the "Plan") and a corresponding disclosure statement (the "Disclosure Statement"), in each case, in form and substance acceptable to the Senior Lenders, (ii) within sixty (60) days of the Process Start Date, the Court shall have entered an order approving the Disclosure Statement, (iii) within ninety (90) days of the Process Start Date, the Court shall have entered an order confirming the Plan; and (iv) by December 31, 2011, the Plan shall have been consummated if necessary FCC or other governmental approvals have been obtained.

(j)      Schedules and Statements.  By October 17, 2011, the Debtors shall file schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs pursuant to section 521(a) of the Bankruptcy Code and Bankruptcy Rule 1007(b) (collectively, the "Schedules and Statements").

(k)      Bar Date.  Within five (5) business days of filing the Schedules and Statements, the Debtors shall file a motion, in form and substance acceptable to the Senior Lenders, seeking entry of an order, in form and substance acceptable to the Senior Lenders, establishing the earliest possible date permitted under the Bankruptcy Rules and the Local Rules of the Court, as the deadline for filing proofs of claim in the Cases.

(l)      Approved Budget Compliance.  The Debtors shall be authorized to use Cash Collateral in accordance with the Approved Budget during the period covered by the Approved Budget, provided that, at any given time, the Debtors' actual cash disbursements shall not exceed the Approved Budget on a weekly basis, beginning in the second week of the Approved Budget, (a) (i) by more than 5% for the line item "Salaries,

Wages", (ii) by more than 15% for all other line items under the heading "Operating", and (iii) by more than 8% for the line item "Sub-Total Operating Disbursements" and (b) (i) by more than 5% for the line items for Akin Gump Strauss Hauer & Feld LLP, Rothschild Inc. and Rubenstein & Co., and (ii) by more than 15% for all other line items under the heading "Bankruptcy Disbursements", and (iii) by more than 8% for the line item "Sub-Total Bankruptcy Disbursements", as measured on a weekly basis beginning in the second week of the Approved Budget (the "Permitted Variance"). If the amount of Cash Collateral disbursed by the Debtors in any Approved Budget Period is less than the amount of Cash Collateral available for use by the Debtors in the Approved Budget during such period on either a line item or aggregate cumulative disbursements basis, then the Debtor may carry over any such unused amount to future Approved Budget Periods and allocate such unused amounts to the relevant line item calculation and/or the aggregated cumulative disbursement calculation, as applicable. For the avoidance of doubt, the Debtors may also apply and allocate unused amounts available for disbursement listed in the "Contingency" line of the Approved Budget to any other line item in the Approved Budget (other than "Salaries, Wages" and "Employee Benefits").

(m)     Reporting. The Debtors shall deliver to the Senior Lenders, in each case, in form and substance acceptable to the Senior Lenders, (i) on a weekly basis, by Tuesday of each week following entry of the Interim Order, an updated 13-week cash flow forecast for the succeeding 13 calendar weeks and (ii) on a weekly basis, by Thursday after the end of each calendar week following entry of the Interim Order, weekly and cumulative variance reporting on a line item basis, which (A) details the variance, if any, of actual cash disbursements and actual cash receipts from the Approved

Budget and (B) provides an explanation as to any per line item variance greater than 3% (collectively, the "Reporting").

(n)     Disclosure Deliverables.  By October 3, 2011, the Debtors shall deliver to the Senior Lenders (i) copies of all of the Debtors' contracts and leases (A) having a term of one year or greater (as renewed, as applicable) and (B) that may require the Debtors to incur potential aggregate liabilities of $50,000 or greater per annum (collectively, the "Material Contracts"), and any other contracts reasonably requested by the Senior Lenders, (ii) a schedule setting forth information regarding the Debtors' general trade and other payables on an individualized basis, (iii) a schedule setting forth all payments made by the Debtors during the ninety (90) days prior to the Relief Date, and (iv) copies of any formal or informal correspondence with the Federal Communications Commission and any other federal, state, or local government entity during the ninety (90) days prior to entry of the Interim Order regarding the Debtors' financial condition, plans for restructuring, interactions with the Senior Lenders, and any other matters that are material to the Debtors and their businesses.  Notwithstanding the foregoing, all information provided to the Secured Lenders pursuant to the deliverables described in subparagraphs (ii) and (iii) of this paragraph (n) shall remain in all respects subject to further review and revision by the Debtors prior to filing of the Schedules and Statements.

(o)     Monitor.  Within five (5) business days following entry of the Interim Order, the Debtors shall permit an industry professional selected by the Senior Lenders and acceptable to the Debtors (the "Monitor") to remain on-site at the Debtors' premises and have full and timely access to the Collateral, the Debtors' businesses, non-privileged books and records, management, and financial advisors for purposes of monitoring the

Collateral and the Debtors' finances and operations, and the Debtors employees and financial advisors shall cooperate and consult with the Monitor, and promptly provide the Monitor with all non-privileged information reasonably requested by the Monitor, provided, however, that the Debtors shall not be obligated to provide the Monitor with any information they are required to provide to the Agent and Senior Lenders under this Interim Order prior to the deadlines established herein for delivery of such information. The Monitor shall be required to execute a reasonable and customary confidentiality agreement prior to the receipt of any information.

(p)     Chief Restructuring Officer.  Within 30 days after the entry of orders for relief, the Debtors shall appoint a Chief Restructuring Officer (a "CRO").  The Senior Lenders shall provide the Debtors with a list of not less than three (3) qualified candidates for the CRO position within five (5) days after entry of this Interim Order, and the Debtors shall select the CRO from such list.  The Debtors reserve the right to request that the Senior Lenders propose additional candidates in the event the persons on the Senior Lenders' initial list are not available or conflicted.  The scope, terms and conditions of the CRO's corporate authority and retention shall be acceptable to the Senior Lenders in the exercise of their reasonable discretion.  Upon the occurrence of an Event of Default with respect to this provision, the Remedies Notice Period will be reduced from five (5) days to the earlier to occur of (i) three (3) days or (ii) the date upon which the Court enters an order determining whether an Event of Default has or has not occurred under this section.

(q)     Rights of Access and Information.  The Debtors shall (i) provide the Senior Lenders and any consultants or advisors engaged by the Senior Lenders with

reasonably full and timely access to the Collateral and the Debtors' senior management, senior financial personnel, and non-privileged books and records in the possession of the Debtors, including, without limitation, all records under the control of the Debtors relating to (A) any payments and any other transfers of value received by ICMC and Holdings from ICBC from January 2010 through the Relief Date and (B) any payments and other transfers of value made by ICMC and Holdings from January 2010 through the Relief Date to or for the benefit of ICBC, any other non-Debtor affiliate, and any shareholder of ICBC or any other non-Debtor affiliate in its capacity as such, in each case, upon reasonable advance notice during regular business hours, (ii) provide the Senior Lenders and any consultants or advisors engaged by the Senior Lenders with reasonable access to the Stations (as defined in the Senior Secured Credit Facility) and the personnel and non-privileged books and records related to the operations of the Stations, (iii) provide to the Senior Lenders and any consultants or advisors engaged by the Senior Lenders any and all financial reports prepared by the Debtors in the ordinary course of the Debtors' business as reasonably requested by the Senior Lenders or any consultants or advisors engaged by the Senior Lenders, and (iv) work diligently, and meet in person if so requested, with the Senior Lenders to identify those executory contracts and unexpired leases that are necessary for the prospective operations of the Debtors and those that are more appropriately rejected in the Cases.

(r)    <u>Maintenance of Collateral</u>.  The Debtors shall continue to maintain the Collateral in accordance with the Prepetition Loan Documents.

(s)    <u>Other Adequate Protection</u>.  The Prepetition Secured Parties shall be entitled to such other adequate protection as (i) reasonably agreed upon by the Senior

Lenders and the Debtors, and approved by this Court or (ii) otherwise granted by this Court.

4. **Sufficiency of Adequate Protection.** Notwithstanding any other provision of this Interim Order, the grant of Adequate Protection to the Agent and the Senior Lenders pursuant to this Interim Order is without prejudice to the right of the Agent and the Senior Lenders to seek modification of the Adequate Protection so as to provide different or additional adequate protection, and is without prejudice to the right of the Debtors or any other party in interest to contest any such modification. The consent of the Agent and the Senior Lenders to the Debtors' use of the Cash Collateral (a) is limited to the use of the Cash Collateral authorized pursuant to this Interim Order and the other Cash Collateral Documents, and shall not extend to any other use of the Cash Collateral or to any modification or replacement of any of the terms of the Cash Collateral Documents and (b) does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Agent or the Senior Lenders that, absent such consent, their interests in the Collateral would be adequately protected pursuant to this Interim Order.

5. **Perfection of Adequate Protection Liens.**

(a) The Agent and the Senior Lenders are hereby authorized, but not required, in their sole discretion, to file or record (i) financing statements, trademark filings, copyright filings, mortgages, notices of lien, or similar instruments in any jurisdiction or take any other action in order to validate and perfect the Adequate Protection Liens and (ii) any amendments to any financing statements filed or recorded prior to the Relief Date to reflect any name changes, mergers, or any other changes to any of the Debtors' corporate identities (collectively, the "Lien Recording Documents") and the automatic

stay provisions of section 362 of the Bankruptcy Code are hereby modified and vacated to permit the Agent and the Senior Lenders to take such actions. Whether or not the Agent or the Senior Lenders shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien, or similar instruments or otherwise confirm perfection of the Adequate Protection Liens, such Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination (except as provided in this Interim Order or the other Cash Collateral Documents), at the time and on the date of this Interim Order, and this Interim Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the Adequate Protection Liens, effective as of the date of this Interim Order.

(b)    The Agent and the Senior Lenders are hereby authorized, but not required, to file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which any of the Debtors have an interest in real or personal property and, in such event, the subject filing or recording officer is authorized and directed to file or record such certified copy of this Interim Order.

(c)    To the extent that any applicable nonbankruptcy law would otherwise restrict the grant, scope, enforceability, attachment, or perfection of the Adequate Protection Liens, or otherwise would impose filing or registration requirements with respect thereto, such law is preempted to the maximum extent permitted by the Bankruptcy Code, applicable federal law, and the judicial power of this Court; provided, that if the Agent or the Senior Lenders take steps to perfect the Adequate Protection

Liens under otherwise applicable state law, they do so without waiving the benefits of this provision of this Order.

(d)     In the event that any Lien Recording Document which the Agent or the Senior Lenders elect to file in accordance with this paragraph 5 contains any limitations, defects, deficiencies or other information which might otherwise limit or adversely affect the Adequate Protection Liens or any of the Agent's or the Senior Lenders' claims, rights, priorities, or protections afforded under this Interim Order and the other Cash Collateral Documents, such limitations, defects, deficiencies, or other information shall not impair, limit, restrict or adversely affect in any way any of the Adequate Protection Liens or any of the claims, rights, priorities, or protections granted under this Interim Order and the other Cash Collateral Documents.

(e)     The Debtors shall execute and deliver to the Agent and the Senior Lenders all such agreements, financing statements, instruments, and other documents as the Agent or the Senior Lenders may reasonably request to evidence, confirm, validate, or perfect the Adequate Protection Liens.

(f)     Any provision of any lease or other license, contract, or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest or license, the proceeds thereof, or other postpetition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the granting of the Adequate Protection Liens on such leasehold interest or license, or the proceeds of any assignment

or sale thereof by any Debtor, in favor of the Agent and the Senior Lenders in accordance with the terms of this Interim Order.

6. **<u>Limitation on Use of Cash Collateral</u>.** Notwithstanding anything in this Interim Order, the other Cash Collateral Documents, or in any other order by this Court to the contrary, no Cash Collateral, including the Carve-Out, may be used directly or indirectly by the Debtors, any Committee, or any other party to (a) investigate, object, contest, or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under the Prepetition Loan Documents or the Cash Collateral Documents, or the liens or claims granted under the Prepetition Loan Documents or the Cash Collateral Documents, (b) investigate, assert any claims, defenses or causes of action against the Agent, the Senior Lenders, or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys, or advisors, (c) investigate, prevent, hinder, or otherwise delay the Agent's or the Senior Lenders' assertion or enforcement of, or realization on, the Cash Collateral, the Collateral, the Prepetition Loan Documents, the Prepetition Liens, the Prepetition Indebtedness, the Cash Collateral Documents, the Adequate Protection Liens, and the Adequate Protection Claims (except to contest the occurrence and/or continuance of an Event of Default (as defined below)), (d) investigate or seek to modify any of the rights granted to the Agent or the Senior Lenders under the Cash Collateral Documents, (e) pay any professional fees or expenses incurred by any professional in connection with any of the foregoing (except to contest the occurrence and/or continuance of an Event of Default (as defined below)), (f) seek to obtain liens or claims that are senior to, *pari passu* with, or junior to the Prepetition Liens, the Prepetition Indebtedness, the Adequate Protection Liens, or the Adequate Protection Claims, (g) make any payment to any non-Debtor affiliate, including, without limitation, ICBC, or (h) make any other payment that is not authorized by the Cash

Collateral Documents, in each case, without the Senior Lenders' prior written consent (and no such consent shall be implied by any other action, inaction, or acquiescence by the Senior Lenders). The foregoing limitations set forth in clauses (a) through (h) above (collectively, the "Limitations") shall apply in all instances; provided, that subject to paragraph 14 of this Interim Order, notwithstanding any of the foregoing Limitations, any Committee may spend up to an aggregate amount not to exceed $50,000 of the Carve-Out (as defined below) to investigate any potential claims against the Agent or the Senior Lenders and any potential defenses to Prepetition Indebtedness and Prepetition Liens.

    7.  **Carve-Out.**  The Collateral, the Prepetition Liens, the Prepetition Indebtedness, the Adequate Protection Liens, and the Adequate Protection Claims shall be subject in all respects to the Carve-Out (as defined below). For purposes of this Interim Order, the "Carve-Out" means an amount sufficient to satisfy (a) all fees required to be paid to the Clerk of the Bankruptcy Court and statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6), 31 U.S.C. 3717, and 28 U.S.C. § 156(c), and all fees, expenses, and disbursements payable to any professionals retained pursuant to 28 U.S.C. § 156(c) (without regard to the Carve-Out Trigger Notice (as defined below)), (b) subject to the Limitations, all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code, in an aggregate amount not to exceed $100,000 (without regard to the Carve-Out Trigger Notice), and (c) subject to the Limitations and the 13-week professional fee accrual budget[6] prepared and delivered to the Agent and the Senior Lenders, which is attached to this Interim Order as Exhibit 2, all allowed unpaid professional fees, expenses, awards and disbursements of any professionals retained by

---

[6] For the avoidance of doubt, the unused portion of each weekly professional fee and expense accrual shall carry forward to future periods.

the Debtors or any Committee (the "<u>Case Professionals</u>") incurred or earned prior to receipt of a written notice delivered by the Senior Lenders to the Debtors, counsel to the Debtors, the Agent, counsel to the Agent, counsel to any Committee, and the U.S. Trustee, stating expressly that the Carve-Out has been invoked due to an Event of Default under this Interim Order (each, a "<u>Carve-Out Trigger Notice</u>"), and only to the extent that such professional fees and disbursements are and have been previously or are subsequently allowed by the Court, and (d) subject to the Limitations, all allowed unpaid fees and expenses of such Case Professionals incurred subsequent to the receipt by the Debtors of a Carve-Out Trigger Notice, in an aggregate amount not to exceed $250,000 (the "<u>Termination Carve-Out Cap</u>"), in each case, reduced by the amounts of any unapplied retainers held by the respective Case Professional. For the avoidance of doubt, so long as a Carve-Out Trigger Notice has not been delivered, the Carve-Out Cap shall not be reduced by the payment of fees or expenses allowed by the Court (whether allowed before or after delivery of a Carve-Out Trigger Notice) and payable under sections 328, 330 or 331 of the Bankruptcy Code, or 28 U.S.C. § 156(c). In connection with the Carve-Out, the Case Professionals shall make timely applications for allowance of their respective professional fees and disbursements.

       8.    **<u>Remedies Notice Period</u>.** Upon the occurrence and during the continuance of an Event of Default (as defined below), the Debtors' use of the Cash Collateral shall terminate in accordance with paragraph 2 of this Interim Order after the provision by the Senior Lenders to the Debtors of five (5) days' prior written notice of such Event of Default (such five (5) day period, the "<u>Remedies Notice Period</u>"), which written notice shall be served by the Senior Lenders via electronic mail and facsimile upon the Debtors, counsel to the Debtors, the Agent, counsel to the Agent, counsel to any Committee (and in the event no Committee is

appointed, the Top 30 Creditors), and the U.S. Trustee, and which written notice shall be filed with the Court by counsel to the Senior Lenders; provided, that the Debtors' use of the Cash Collateral shall not terminate as provided above if, during the Remedies Notice Period, the Court has determined that an Event of Default has not occurred and/or is not continuing. Upon the expiration of the Remedies Notice Period, unless the Court has determined that an Event of Default has not occurred and/or is not continuing, the Debtors' right to use the Cash Collateral shall terminate in accordance with paragraph 2 of this Interim Order. The Debtors' sole recourse with respect to opposing such termination shall be to contest the occurrence and/or continuation of an Event of Default. During the Remedies Notice Period, the Debtors shall (a) have no right to use the Cash Collateral other than to (i) satisfy payroll obligations and other ordinary course obligations necessary for the Debtors to continue to operate in compliance with the FCC Licenses (as defined in the Senior Secured Credit Facility), in each case, in a manner consistent with the Approved Budget, (ii) fund the Carve-Out, and (iii) contest the occurrence and/or continuance of an Event of Default and (b) be entitled to an emergency hearing before the Court solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing.

9. **Events of Default.** For purposes of this Interim Order, "Event of Default" shall mean:

(a) A Successive Interim Order or the Final Order shall not have been entered by the Court within thirty (30) days after the date on which the Interim Order has been entered.

(b) Any failure of the Debtors to provide any of the Adequate Protection in accordance with the Cash Collateral Documents.

(c)     The occurrence of any event since the Relief Date that has or would reasonably be expected to have a material adverse effect on (i) the condition (financial or otherwise), businesses, operations, or property of the Debtors, including, without limitation, the FCC Licenses (as defined in the Senior Secured Credit Facility), (ii) the ability of any Debtor to fully and timely perform its respective obligations under the Cash Collateral Documents, or (iii) the legality, validity, binding effect, or enforceability of any of the Cash Collateral Documents (each, a "Material Adverse Change"); provided, that (x) the filing of the Cases, (y) any events of default occurring under the Prepetition Loan Documents, and (z) the exercise of any remedies by the Secured Lenders prior to the Relief Date shall not be taken into consideration for purposes of this subparagraph (c).

(d)     Any Debtor or any of its non-Debtor affiliates shall challenge in any action the validity or enforceability of any of the Cash Collateral Documents, the enforceability of the obligations under the Cash Collateral Documents, or the perfection or priority of the Adequate Protection Liens or the Adequate Protection Claims, or any material provision of any Cash Collateral Document shall cease to be valid or binding on any Debtor or any Debtor shall so assert in any pleading filed in any court.

(e)     A trustee or an examiner with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code), shall be appointed in any of the Cases.

(f)     Any lien on any of the Collateral or any claim which is senior to or *pari passu* with the Prepetition Liens, the Prepetition Indebtedness, the Adequate Protection

Liens, or the Adequate Protection Claims shall be granted (other than the Carve-Out) or any Debtor shall file a motion seeking approval of any such lien or claim.

(g)     The Debtors shall make any payment that is not authorized by the Cash Collateral Documents without the prior written consent of the Agent and Senior Lenders.

(h)     The Court shall enter an order granting relief from the automatic stay (i) to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Debtor which have an aggregate value in excess of $1,000,000 or (ii) to permit other actions that could reasonably be expected to result in a Material Adverse Change.

(i)     Any order shall be entered reversing, amending, supplementing, staying for a period in excess of five (5) days, vacating or otherwise modifying in any material respect the Interim Order, any Successive Interim Order, or the Final Order without the prior written consent of the Senior Lenders (and no such consent shall be implied by any other action, inaction, or acquiescence by the Senior Lenders).

(j)     On a line item basis, the Debtors' actual cash disbursements shall vary from the Approved Budget in excess of the Permitted Variance.

(k)     The Debtors shall fail to deliver any of the Reporting.

(l)     A plan shall be confirmed in any of the Cases that does not provide for the indefeasible payment in full of the Adequate Protection Obligations.

(m)     Any Debtor seeking, or the filing of any motion by any Debtor or any other party seeking, authorization for (i) an additional or different use of the Cash Collateral or (ii) any postpetition financing for the Debtors, in each case, without the

prior written consent of the Senior Lender (and no such consent shall be implied by any other action, inaction, or acquiescence by the Senior Lender).

(n)     Any Debtor shall fail to comply with or perform any of the material terms, conditions, or obligations set forth in the Cash Collateral Documents, including, without limitation, (i) any Debtor filing any chapter 11 plan without the prior written consent of the Senior Lenders (and no such consent shall be implied by any other action, inaction, or acquiescence by the Senior Lenders), or (ii) any Debtor filing any motion to approve a sale of all or substantially all of any Debtor's assets without the prior written consent of the Senior Lenders (and no such consent shall be implied by any other action, inaction, or acquiescence by the Senior Lenders).

(o)     Any of the Cases shall be dismissed or converted into a case under chapter 7 of the Bankruptcy Code.

(p)     The commencement, formal participation in, or continuation of any judicial action or proceeding in law or equity, by the Debtors, against the Agent or the Senior Lenders.

10.     **Section 552(b).**  Subject to entry of any Successive Interim Order or the Final Order (whichever is earlier), the Agent and the Senior Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Agent and the Senior Lenders with respect to proceeds, products, offspring, or profits of any of the Collateral.

11.     **Limitations on Charging Expenses Against Collateral.**  Subject to entry of any Successive Interim Order or the Final Order (whichever is earlier), no costs or expenses of administration of any of the Cases or any future proceeding that may result from the

Cases (including, without limitation, liquidation in bankruptcy, the commencement of any action adverse to the Agent or the Senior Lenders or their rights under this Interim Order, any other Cash Collateral Document, the Prepetition Loan Documents, or any other order or other proceedings under the Bankruptcy Code), except to the extent of the Carve-Out, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Senior Lenders (and no such consent shall be implied from any other action, inaction, or acquiescence by the Senior Lenders).

12. **Payments Free and Clear.** Subject to entry of any Successive Interim Order or the Final Order (whichever is earlier), any and all payments or proceeds remitted to the Agent and the Senior Lenders pursuant to the provisions of this Interim Order or any subsequent order of the Court shall be received free and clear (except to the extent of the Carve-Out) of any claim, charge, assessment, or other liability including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) (whether asserted or assessed by, through, or on behalf of, the Debtors) or section 552(b) of the Bankruptcy Code.

13. **Preservation of Rights.**

(a) Unless all Adequate Protection Obligations shall have been paid in full, the Debtors shall not seek, and it shall constitute an Event of Default if any of the Debtors seek, or if there is entered, (i) any modifications or extensions of this Interim Order without the prior written consent of the Agent and the Senior Lenders (and no such consent shall be implied by any other action, inaction, or acquiescence by the Agent or the Senior Lenders), (ii) any order authorizing an additional or different use of the Cash Collateral or any postpetition financing for the Debtors, in each case, without the prior written consent of the Agent and the Senior Lenders (and no such consent shall be

implied by any other action, inaction, or acquiescence by the Agent or the Senior Lenders), or (iii) an order dismissing any of the Cases or converting any of the Cases to cases under chapter 7 of the Bankruptcy Code.  If an order dismissing or converting to chapter 7 any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (A) the Adequate Protection Liens and the Adequate Protection Claims shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Adequate Protection Obligations shall have been paid and satisfied in full, and that such Adequate Protection Liens and Adequate Protection Claims shall, notwithstanding such dismissal or conversion, remain binding on all parties in interest and (B) this Court shall retain jurisdiction for purposes of enforcing the Adequate Protection Liens and the Adequate Protection Claims.

(b)      If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, modification, vacation, or stay shall not affect (i) the validity of any Adequate Protection Obligations incurred prior to the actual receipt of written notice by the Agent or the Senior Lenders, of the effective date of such reversal, modification, vacation, or stay or (ii) the validity or enforceability of the Adequate Protection Liens, the Adequate Protection Claims, or this Interim Order with respect to any Adequate Protection Obligations.  Notwithstanding any such reversal, modification, vacation, or stay, any use of the Cash Collateral by the Debtors or any Adequate Protection Obligations incurred by the Debtors to the Agent or the Senior Lenders prior to the actual receipt by the Agent or the Senior Lenders of written notice of such reversal, modification, vacation, or stay shall be governed in all respects by the

original provisions of this Interim Order, and the Agent and the Senior Lenders shall be entitled to all the rights, remedies, privileges and benefits granted in this Interim Order and the other Cash Collateral Documents with respect to all uses of Cash Collateral and the Adequate Protection Obligations.

(c)     Except as expressly provided in this Interim Order and the other Cash Collateral Documents, the Adequate Protection Liens, the Adequate Protection Claims, the Adequate Protection Obligations, and all other rights and remedies of the Agent and the Senior Lenders granted by this Interim Order and the other Cash Collateral Documents shall survive, and shall not be modified, impaired, or discharged by entry of an order (i) converting any of the Cases to a case under chapter 7 or dismissing any of the Cases, or by any other act or omission or (ii) confirming a chapter 11 plan in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining Adequate Protection Obligations.  The terms and provisions of this Interim Order and the other Cash Collateral Documents shall continue in the Cases, in any successor cases if the Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the Adequate Protection Liens, the Adequate Protection Claims, the Adequate Protection Obligations, and all other rights and remedies of the Agent and the Senior Lenders granted by this Interim Order and the other Cash Collateral Documents shall continue in full force and effect until the Adequate Protection Obligations are indefeasibly paid in full.

(d)     Notwithstanding anything in this Interim Order to the contrary, entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly

or implicitly, or otherwise impair (i) any of the rights of any of the Agent or the Senior Lenders under the Bankruptcy Code or under any nonbankruptcy law, including, without limitation, the right of any of the Agent and the Senior Lenders to (A) request modification of the automatic stay of section 362 of the Bankruptcy Code, (B) request dismissal of any of the Cases, conversion of any of the Cases to a case or cases under chapter 7 of the Bankruptcy Code, or the appointment of a chapter 11 trustee or examiner (including with expanded powers), or (C) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans or (ii) any other rights, claims or privileges (whether legal, equitable or otherwise) of the Agent and the Senior Lenders.

14.    **Release of Claims and Defenses; Related Provisions.**

(a)    Release.  Subject to entry of any Successive Interim Order or the Final Order (whichever is earlier) and the rights of any Committee or any other party in interest as provided in subparagraph (b) of this paragraph 14, the Debtors forever release, waive, and discharge the Agent and the Senior Lenders, together with their respective officers, directors, employees, agents, attorneys, professionals, affiliates, subsidiaries, assigns, and/or successors (collectively, the "Released Parties"), from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, any of the Prepetition Loan Documents, any aspect of the prepetition relationship between the Debtors and the Agent, and the Debtors and the Senior Lenders, in each case, relating to any of the Prepetition Loan Documents or any transaction contemplated thereby, including, without limitation, any claims or defenses as to the extent, validity, priority, or perfection of the Prepetition Liens or Prepetition Indebtedness, "lender liability" claims and causes of action, any actions, claims, or defenses under chapter 5 of the Bankruptcy

Code, or any other claims and causes of action (all such claims, defenses, and other actions described in this paragraph 14, collectively the "Claims and Defenses"). Nothing contained in this subparagraph (a) shall affect the rights of any Committee or any other party in interest to undertake any action, on its own behalf, or on behalf of the Debtors' estates, with respect to any investigation or prosecution of Claims and Defenses that is permitted in subparagraphs (b) and (c) of this paragraph 14.

(b) Challenges. The acknowledgments, admissions, confirmations, and releases contained in this Interim Order, including, without limitation, in paragraph G and subparagraph (a) of this paragraph 14, shall be binding upon the Debtors in all circumstances. Notwithstanding anything contained in this Interim Order to the contrary, and subject to the Limitations, the extent, validity, priority, perfection and enforceability of the Prepetition Indebtedness, and Prepetition Liens, and all acknowledgments, admissions, confirmations, and releases of the Debtors above, are for all purposes subject to the rights of any party in interest, other than a Debtor, to seek to invalidate, or otherwise challenge the Prepetition Indebtedness or the Prepetition Liens, including by properly filing a complaint pursuant to Bankruptcy Rule 7001 or by otherwise properly asserting a contested matter (any of these actions, a "Challenge"); provided, that any such Challenge must be commenced or asserted in this Court within sixty (60) days after entry of any Successive Interim Order or the Final Order (whichever is earlier), if brought by any non-Debtor party in interest. Except to the extent that a Challenge is timely commenced within the time periods set forth in this subparagraph (b) (or such timely asserted Challenge does not result in a final and non-appealable order of this Court that is inconsistent with clauses (i) through (iv) of subparagraph (c) of this paragraph 14), then

any and all Claims and Defenses against the Released Parties shall be, without further notice or order of the Court, deemed to have been forever relinquished, released, and waived as to such Committee and other party, and if such Challenge is timely asserted on or before such date, any and all Claims and Defenses that are not expressly asserted in such Challenge shall be deemed, immediately and without further action, to have been forever relinquished, released, and waived as to such Committee and other party.

(c)    Allowance of Prepetition Indebtedness.    Except to the extent that a Challenge is timely commenced in accordance with subparagraph (b) of this paragraph 14 and such timely asserted Challenge results in a final and non-appealable order of this Court that is inconsistent with clauses (i) through (iv) of this subparagraph (c), then, without the requirement or need to file any proof of claim with respect thereto, (i) the Prepetition Indebtedness shall constitute allowed claims for all purposes in the Cases and any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 proceedings if any of the Cases are converted to a case under chapter 7 of the Bankruptcy Code (each, a "Successor Case"), (ii) the Prepetition Liens shall be deemed legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code), perfected, not subject to subordination, recharacterization, or avoidance for all purposes in the Cases and any Successor Case, (iii) the release of the Claims and Defenses against the Released Parties shall be binding on all parties in interest in the Cases and any Successor Case, and (iv) the Prepetition Indebtedness, the Prepetition Liens, releases of the Claims and Defenses against the Released Parties, and prior payments on account of or with respect to the Prepetition Indebtedness shall not be subject to any other or further claims, cause of

action, objection, contest, setoff, defense, or challenge by any party in interest for any reason, including, without limitation, by any successor to or estate representative of any Debtor. Nothing in this Interim Order shall confer, or be deemed to have conferred, standing upon the Committee or any other party to bring, assert, commence, continue, prosecute or litigate the Claims and Defenses against any Released Party.

15.     **Order Governs.**  In the event of any inconsistency between the provisions of this Interim Order and the other Cash Collateral Documents, the provisions of this Interim Order shall govern.

16.     **Binding Effect; Successors and Assigns.**  The provisions of this Interim Order shall be binding upon all parties in interest in the Cases, including, without limitation, the Agent, the Senior Lenders, any Committee, and all of the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the Agent, the Senior Lenders, any Committee, the Debtors, and each of their respective successors and assigns; provided, that neither the Agent nor the Senior Lenders shall have any obligation to consent to use of Cash Collateral in a chapter 7 case or after appointment of a chapter 11 trustee or other legal representative of the Debtors.

17.     **No Third Party Rights.**  Except as explicitly provided for in this Interim Order, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any other direct, indirect or incidental beneficiary.

18.     **Notice of Final Hearing**.  The Debtors shall promptly serve copies of this Interim Order and a notice of the Final Hearing (the "Final Hearing Notice") to be held on **October 4, 2011 at 11:00 a.m.** to consider entry of the Final Order on (a) the U.S. Trustee; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the Senior Lenders; (d) counsel to the Agent; and (e) counsel to Inner City Broadcasting Corporation.  The Final Hearing Notice shall state that any party in interest objecting to entry of the Final Order shall file written objections with the Court no later than **5:00 p.m. on September 28, 2011**, which objections shall be served so that the same are received on or before such date and time by (a) the Office of the United States Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the agent under the Debtors' prepetition secured term loan; (d) counsel to Yucaipa Corporate Initiatives Fund II, L.P. and Yucaipa Corporate Initiatives (Parallel) Fund II, L.P.; (e) counsel to Fortress Credit Funding I, LP, Fortress Credit Funding II, LP, Drawbridge Special Opportunities Fund Ltd., and ICBC CF LLC; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; and (h) the Federal Communications Commission.

19.     **Effectiveness.**   This Interim Order shall be effective and enforceable immediately upon entry.

20.     **Jurisdiction.**   The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated: September 9, 2011
        New York, New York

                                        _/s/ Shelley C. Chapman_
                                        UNITED STATES BANKRUPTCY JUDGE

**Inner City Media Corporation**
**Consolidated ($000)**

| | 1 W/E 9/9/11 | 2 W/E 9/16/11 | 3 W/E 9/23/11 | 4 W/E 9/30/11 | 5 W/E 10/7/11 | 6 W/E 10/14/11 | 7 W/E 10/21/11 | 8 W/E 10/28/11 | 9 W/E 11/4/11 | 10 W/E 11/11/11 | 11 W/E 11/18/11 | 12 W/E 11/25/11 | 13 W/E 12/2/11 | 13-week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash at beginning of period | 1,578 | 1,511 | 2,100 | 1,844 | 2,446 | 1,838 | 2,180 | 1,536 | 2,033 | 1,570 | 1,201 | 1,801 | 2,069 | 1,578 |
| **Cash Receipts:** | | | | | | | | | | | | | | |
| Ad Revenue Collection | 816 | 860 | 860 | 860 | 867 | 867 | 867 | 867 | 700 | 700 | 700 | 700 | 700 | 10,364 |
| Syndication Profit Payment | - | - | - | - | - | - | - | - | - | - | 1,200 | - | - | 1,200 |
| Other Collections | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | 816 | 860 | 860 | 860 | 867 | 867 | 867 | 867 | 700 | 700 | 1,900 | 700 | 700 | 11,564 |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| **Operating** | | | | | | | | | | | | | | |
| Salaries, Wages | 462 | - | 462 | - | 462 | - | 462 | - | 462 | - | 462 | - | 462 | 3,234 |
| Commissions, Bonus | 213 | - | 109 | - | 70 | - | 339 | - | - | - | 439 | - | - | 1,170 |
| Payroll Taxes | 37 | - | 32 | - | 32 | - | 42 | - | 27 | - | 49 | - | 27 | 246 |
| Employee Benefits | 5 | 154 | 150 | 75 | 11 | 8 | 150 | 75 | 11 | 8 | 150 | - | 86 | 883 |
| Music License Fees, Syndication, Talent | 84 | - | 2 | 2 | 134 | 219 | 2 | 2 | 203 | 218 | 2 | 2 | 97 | 967 |
| National Rep Commission | - | - | - | - | - | 64 | - | - | - | - | 68 | - | - | 132 |
| Rent, Property Taxes, Insurance | - | 16 | 36 | 34 | 149 | 31 | 91 | 34 | 149 | 29 | 12 | 81 | 318 | 980 |
| Insurance Premium | - | - | - | - | 24 | - | - | - | 24 | - | - | - | 24 | 72 |
| Research | - | - | 177 | - | 71 | 15 | 151 | - | 71 | - | 15 | 152 | 71 | 723 |
| Audit, Tax, Legal Fees | - | - | - | - | 10 | 10 | 85 | 15 | 7 | 7 | 7 | 18 | 7 | 166 |
| Other Operating | 30 | 61 | 123 | 11 | 387 | 138 | 164 | 129 | 84 | 101 | 71 | 64 | 81 | 1,444 |
| Contingency | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 325 |
| **Sub-total Operating Disbursements** | 856 | 256 | 1,116 | 147 | 1,375 | 510 | 1,511 | 280 | 1,063 | 388 | 1,300 | 342 | 1,198 | 10,342 |
| **Bankruptcy Disbursements[1,2]** | | | | | | | | | | | | | | |
| Debtor's Counsel (Akin, Gump) | - | - | - | - | - | - | - | - | - | 360 | - | - | - | 360 |
| Debtor's Financial (Rothschild) | - | - | - | - | - | - | - | - | - | 135 | - | - | - | 135 |
| Unsecured Creditors' Committee Professionals | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debtor's Financial (MGBD) | - | - | - | - | - | - | - | - | - | 171 | - | - | - | 171 |
| Public Affairs | - | 15 | - | - | - | 15 | - | - | - | 15 | - | - | - | 45 |
| Noticing Agent | - | - | - | - | 50 | - | - | - | 50 | - | - | - | 25 | 125 |
| First Lien Agent | - | - | - | - | 50 | - | - | - | 50 | - | - | - | 50 | 150 |
| US Trustee | - | - | - | 21 | - | - | - | - | - | - | - | - | - | 21 |
| Utility Deposits | 27 | - | - | - | - | - | - | - | - | - | - | - | - | 27 |
| **Sub-total Bankruptcy Disbursements** | 27 | 15 | - | 21 | 100 | 15 | - | - | 100 | 681 | - | - | 75 | 1,034 |
| **Capital Expenditures** | - | - | - | 90 | - | - | - | 90 | - | - | - | 90 | - | 270 |
| **Total Disbursements** | 883 | 271 | 1,116 | 258 | 1,475 | 525 | 1,511 | 370 | 1,163 | 1,069 | 1,300 | 432 | 1,273 | 11,646 |
| **Weekly Cash Flow** | (67) | 589 | (256) | 602 | (608) | 342 | (644) | 497 | (463) | (369) | 600 | 268 | (573) | (82) |
| **Cash at end of period** | 1,511 | 2,100 | 1,844 | 2,446 | 1,838 | 2,180 | 1,536 | 2,033 | 1,570 | 1,201 | 1,801 | 2,069 | 1,496 | 1,496 |

[1]. The Bankruptcy Disbursements do not incorporate any contingent advisor fees.
[2]. Budget for Unsecured Creditors' Committee Professionals to be determined if and when a Committee is formed.

**Inner City Media Corporation**
**Consolidated ($000)**

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | W/E | W/E | W/E | W/E | W/E | W/E | W/E | W/E | W/E | W/E | W/E | W/E | W/E | 13-week |
| **Projected Week Ending** | | 9/9/11 | 9/16/11 | 9/23/11 | 9/30/11 | 10/7/11 | 10/14/11 | 10/21/11 | 10/28/11 | 11/4/11 | 11/11/11 | 11/18/11 | 11/25/11 | 12/2/11 | Total |
| **Company** | | | | | | | | | | | | | | | |
| Debtor's Counsel (Akin, Gump) | $ | 110.0 $ | 110.0 $ | 110.0 $ | 110.0 $ | 82.5 $ | 82.5 $ | 82.5 $ | 82.5 $ | 82.5 $ | 82.5 $ | 82.5 $ | 82.5 $ | 82.5 $ | 1,182.5 |
| Unsecured Creditors' Counsel | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debtor's Financial (Rothschild) | | - | - | - | 165.0 | - | - | - | - | 165.0 | - | - | - | 165.0 | 495.0 |
| Debtor's Financial (MGBD) | | 27.5 | 71.5 | 55.0 | 55.0 | 55.0 | 38.5 | 38.5 | 38.5 | 38.5 | 27.5 | 27.5 | 27.5 | 27.5 | 528.0 |
| Unsecured Creditors' Financial | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Noticing Agent | | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 6.3 | 6.3 | 6.3 | 6.3 | 137.5 |
| First Lien Agent | | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 12.5 | 162.5 |
| **Total Fees and Expenses** | $ | 162.5 $ | 206.5 $ | 190.0 $ | 355.0 $ | 162.5 $ | 146.0 $ | 146.0 $ | 146.0 $ | 311.0 $ | 128.8 $ | 128.8 $ | 128.8 $ | 293.8 $ | 2,505.5 |

**Professional Fees and Expenses Incurred**

## Exhibit D

**September 2 Draft Budget & Other Operating Detail**

**Inner City Media Corporation**  
**Consolidated ($000)**

DRAFT - Work in Process, Subject to Change

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | W/E | W/E | W/E | W/E | W/E | W/E | W/E | W/E | W/E | W/E | W/E | W/E | W/E | 13-week |
| | 9/9/11 | 9/16/11 | 9/23/11 | 9/30/11 | 10/7/11 | 10/14/11 | 10/21/11 | 10/28/11 | 11/4/11 | 11/11/11 | 11/18/11 | 11/25/11 | 12/2/11 | Total |
| **Cash at beginning of period** | 972 | 906 | 1,604 | 1,348 | 1,950 | 1,433 | 1,775 | 1,132 | 1,629 | 1,256 | 589 | 1,190 | 1,458 | 972 |
| **Cash Receipts:** | | | | | | | | | | | | | | |
| Ad Revenue Collection | 816 | 860 | 860 | 860 | 867 | 867 | 867 | 867 | 700 | 700 | 700 | 700 | 700 | 10,364 |
| Syndication Profit Payment | - | - | - | - | - | - | - | - | - | - | 1,200 | - | - | 1,200 |
| Other Collections | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | 816 | 860 | 860 | 860 | 867 | 867 | 867 | 867 | 700 | 700 | 1,900 | 700 | 700 | 11,564 |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| **Operating** | | | | | | | | | | | | | | |
| Salaries, Wages | 674 | - | 571 | - | 531 | - | 800 | - | 462 | - | 900 | - | 569 | 4,507 |
| Payroll Taxes | 37 | - | 32 | - | 32 | - | 42 | - | 27 | - | 49 | - | 32 | 251 |
| Employee Benefits | 5 | 28 | 150 | 75 | 11 | 8 | 150 | 75 | 11 | 8 | 150 | - | 86 | 757 |
| Music License Fees, Syndication, Talent | 84 | - | 2 | 2 | 134 | 219 | 2 | 2 | 203 | 218 | 2 | 2 | 97 | 967 |
| National Rep Commission | - | - | - | - | - | 64 | - | - | - | - | 68 | - | - | 132 |
| Rent, Property Taxes, Insurance | - | 16 | 36 | 34 | 149 | 31 | 91 | 34 | 149 | 29 | 12 | 81 | 318 | 980 |
| Insurance Premium | - | - | - | - | 24 | - | - | - | - | 24 | - | - | 24 | 72 |
| Research | - | - | 177 | - | 71 | 15 | 151 | - | 71 | - | 15 | 152 | 71 | 723 |
| Audit, Tax, Legal Fees | - | - | - | - | 10 | 10 | 85 | 15 | 7 | 7 | 7 | 18 | 7 | 166 |
| Other Operating | 30 | 61 | 123 | 11 | 347 | 138 | 164 | 129 | 44 | 101 | 71 | 64 | 41 | 1,324 |
| Contingency | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 325 |
| **Sub-total Operating Disbursements** | 855 | 130 | 1,116 | 147 | 1,334 | 510 | 1,510 | 280 | 1,023 | 388 | 1,299 | 342 | 1,270 | 10,204 |
| **Bankruptcy Disbursements**[1] | | | | | | | | | | | | | | |
| Debtor's Professionals | - | 15 | - | - | - | 15 | - | - | - | 911 | - | - | - | 941 |
| Unsecured Creditors' Committee Professionals | - | - | - | - | - | - | - | - | - | 68 | - | - | - | 68 |
| Noticing Agent | - | - | - | - | 50 | - | - | - | 50 | - | - | - | 25 | 125 |
| US Trustee | - | - | - | 21 | - | - | - | - | - | - | - | - | - | 21 |
| Utility Deposits | 27 | - | - | - | - | - | - | - | - | - | - | - | - | 27 |
| Critical Vendor Payments | - | 17 | - | - | - | - | - | - | - | - | - | - | - | 17 |
| **Sub-total Bankruptcy Disbursements** | 27 | 32 | - | 21 | 50 | 15 | - | - | 50 | 979 | - | - | 25 | 1,199 |
| **Capital Expenditures** | - | - | - | 90 | - | - | - | 90 | - | - | - | 90 | - | 270 |
| **Total Disbursements** | 882 | 162 | 1,116 | 258 | 1,384 | 525 | 1,510 | 370 | 1,073 | 1,367 | 1,299 | 432 | 1,295 | 11,673 |
| **Weekly Cash Flow** | (66) | 698 | (256) | 602 | (517) | 342 | (643) | 497 | (373) | (667) | 601 | 268 | (595) | (109) |
| **Cash at end of period** | 906 | 1,604 | 1,348 | 1,950 | 1,433 | 1,775 | 1,132 | 1,629 | 1,256 | 589 | 1,190 | 1,458 | 863 | 863 |

[1]. The Bankruptcy Disbursements do not incorporate any contingent advisor fees.

**Inner City Media Corporation**                                  DRAFT - Work in Process, Subject to Change
**Consolidated**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | W/E | W/E | W/E | W/E | W/E | W/E | W/E | W/E | W/E | W/E | W/E | W/E | W/E | 13-week |
| | 9/9/11 | 9/16/11 | 9/23/11 | 9/30/11 | 10/7/11 | 10/14/11 | 10/21/11 | 10/28/11 | 11/4/11 | 11/11/11 | 11/18/11 | 11/25/11 | 12/2/11 | Total |
| **Other Operating** | | | | | | | | | | | | | | |
| Broadcasting Expenses | - | 2,883 | 961 | 1,061 | 892 | 8,920 | 5,352 | 2,676 | 865 | 8,651 | 5,352 | 2,595 | 865 | 41,073 |
| Advertising / Marketing | 30,000 | - | 110,561 | - | 300,000 | 19,268 | 118,536 | 88,536 | - | 15,268 | 30,536 | 30,536 | - | 743,241 |
| Travel & Entertainment | - | 9,390 | 4,742 | 4,742 | 4,800 | 32,275 | 4,800 | 4,800 | 3,870 | 17,595 | 3,870 | 3,870 | 3,870 | 98,620 |
| Auto Expense | - | 1,279 | - | - | 5,891 | 9,113 | - | - | 5,891 | 9,113 | - | - | - | 31,287 |
| Utilities | - | - | - | - | 20,237 | 20,237 | 13,491 | 13,491 | 20,270 | 20,270 | 13,513 | 13,513 | 20,270 | 155,294 |
| Repairs & Maintenance | - | 1,710 | 1,710 | 1,710 | 3,063 | 13,950 | 3,063 | 3,063 | 2,981 | 13,868 | 2,981 | 2,981 | 2,981 | 54,062 |
| Security | - | 1,975 | 1,975 | 1,975 | 1,975 | 2,633 | 1,975 | 1,580 | 1,580 | 2,112 | 1,580 | 1,580 | - | 22,915 |
| Equipment Rental & Computer Expense | - | 1,979 | 792 | 792 | 4,691 | 7,488 | 5,623 | 5,623 | 4,125 | 6,612 | 4,747 | 4,747 | 4,125 | 51,343 |
| Gifts/Contribution/Dues & Subscriptions | - | 2,015 | 2,015 | 504 | 1,521 | 6,086 | 6,086 | 1,521 | 1,139 | 4,555 | 4,555 | 1,139 | 1,139 | 32,274 |
| Taxes (Franchise, Sales, Use, Other) | - | 38,855 | - | - | - | 14,700 | - | - | - | - | - | - | - | 53,555 |
| Other Disbursements | - | - | - | - | 3,551 | 3,551 | 3,551 | 6,517 | 2,734 | 2,734 | 2,734 | 2,734 | 5,700 | 33,805 |
| **Total Other Operating Disbursements** | 30,000 | 60,086 | 122,756 | 10,783 | 346,620 | 137,561 | 163,134 | 128,202 | 43,456 | 100,246 | 70,401 | 63,696 | 40,531 | 1,317,469 |

## Exhibit E

**Email from Shaya Rochester to Zachary Smith,
dated September 15, 2011**

**From:** Rochester, Shaya [mailto:srochester@akingump.com]
**Sent:** Thursday, September 15, 2011 1:49 PM
**To:** Smith, Zachary
**Subject:** Inner City

Zach – couple of things:

1. I spoke with the UST about the Meyer Suozzi payment.  She did not have any questions.
2. We will make a statement at the next hearing about the payment.
3. As discussed, please send us a short email, confirming that the lenders waive the event of default
4. Please let me know if the lenders are signed off on the $40K payment to the directors.  We will not make that payment without the lenders' consent.  The directors, however, are asking us whether the lenders will consent.
5. Where do things stand with withdrawing the involuntary petition against the non-existent entity? If you are still working out the procedural issues, please extend our response deadline by another 7 days.

If you want to discuss the foregoing, I am going to be in calls throughout the afternoon but should free up around 4:30 PM.  Thanks.

Regards,

**Shaya Rochester**

**AKIN GUMP STRAUSS HAUER & FELD** LLP

One Bryant Park  |  New York, NY 10036-6745  |  USA  |  Direct: +1 212.872.1076  |  Internal: 31076
Fax: +1 212.872.1002  |  srochester@akingump.com  |  akingump.com  |  Bio

_____
IRS Circular 230 Notice Requirement: This communication is not given in the form of

The information contained in this e-mail message is intended only for the personal a

## Exhibit F


**Email from Shaya Rochester to Zachary Smith,**
**dated September 16, 2011**

**From:** Rochester, Shaya [mailto:srochester@akingump.com]
**Sent:** Friday, September 16, 2011 3:10 PM
**To:** Breen, Meghan; 'Smith, Zachary'
**Cc:** 'Greenberg, Scott'; 'Aden Doline, Audrey'; Harris, Adam; Alberino, Scott L.; Sturm, Joshua; 'Chuck Schultz'
**Subject:** RE: Inner City

Megan – below is the information you requested.

Former outside board members for ICMC received the following payments in the last 12 months:

Davis Weinstock
$2,500 – 5/3/11
$2,500 – 6/16/11
$2,500 – 8/1/11
$2,500 – 8/12/11

Craig Browne
$2,500 – 5/3/11
$2,500 – 6/16/11
$2,500 – 8/1/11
$2,500 – 8/12/11

ICMC outside board members were paid $2,500 per meeting attended.  No fees were paid to any "inside" board members.

As you know, the current members of the Restructuring Committee of the ICMC Board are paid in advance on a monthly basis irrespective of the number of meetings attended as follows:

$20K - GENE DAVIS (CHAIRMAN)
$10K - TIM BERNLOHR
$10K - STEVE SCHEIWE

**Shaya Rochester**
**AKIN GUMP STRAUSS HAUER & FELD** L L P

One Bryant Park | New York, NY 10036-6745 | USA | Direct: +1 212.872.1076 | Internal: 31076
Fax: +1 212.872.1002 | srochester@akingump.com | akingump.com | Bio

---

**From:** Breen, Meghan [mailto:Meghan.Breen@srz.com]
**Sent:** Friday, September 16, 2011 1:22 PM
**To:** Rochester, Shaya; Smith, Zachary
**Cc:** Greenberg, Scott; Aden Doline, Audrey; Harris, Adam; Alberino, Scott L.; Sturm, Joshua; Chuck Schultz
**Subject:** RE: Inner City

Shaya -

Our clients would like to see a chart or list comparing monthly fees paid to the former directors to proposed fees to be paid to the current directors.  Please provide as soon as possible.
Thank you.
Meghan

---

**From:** Rochester, Shaya [mailto:srochester@akingump.com]
**Sent:** Thursday, September 15, 2011 6:29 PM
**To:** 'Smith, Zachary'
**Cc:** 'Greenberg, Scott'; 'Aden Doline, Audrey'; Harris, Adam; Breen, Meghan; Alberino, Scott L.; Sturm, Joshua; 'Chuck Schultz'
**Subject:** FW: Inner City

Zach – please see my responses in all caps below.

---

**From:** Smith, Zachary [mailto:Zachary.Smith@cwt.com]
**Sent:** Thursday, September 15, 2011 4:06 PM
**To:** Rochester, Shaya
**Cc:** Greenberg, Scott; Aden Doline, Audrey; Harris, Adam; 'meghan.breen@srz.com'
**Subject:** RE: Inner City

Shaya –

Please let us know if Akin could provide information responsive to the below, in connection with the Debtors' request for Lender consent to payment of $40K on account of, we understand, certain ICMC director

fees (TO BE CLEAR, THE PAYMENT IS ON ACCOUNT OF DIRECTOR FEES THAT ARE PAYABLE IN ADVANCE ON A MONTHLY BASIS TO THE MEMBERS OF THE RESTRUCTURING COMMITTEE ON THE ICMC BOARD OF DIRECTORS):

-How are ICMC directors compensated in the ordinary course of the Debtors' business?  Our understanding has been that ICMC directors are paid a specific amount per meeting.
AS WE DISCUSSED ON THE PHONE, THE DIRECTORS ON THE RESTRUCTURING COMMITTEE ARE COMPENSATED ON A MONTHLY BASIS IRRESPECTIVE OF THE NUMBER OF MEETINGS THAT OCCUR.  THEY ARE NOT PAID ADDITIONAL FEES FOR MEETINGS ATTENDED.  SEE ATTACHED RESOLUTIONS, PAGE 4.

-How does the $40K request break down specifically?  I.e., which directors are included, what amounts are proposed for each,
$20K TO GENE DAVIS.  $10K TO TIM BERNLOHR.  $10K STEVE SCHEIWE.

and for what time period(s)/meeting(s)?
AS NOTED ABOVE, THE FEES ARE PAYABLE IN ADVANCE ON A MONTHLY BASIS IRRESPECTIVE OF THE NUMBER OF MEETINGS THAT OCCUR.  THE FEES ARE PAID IN ADVANCE IN THE MIDDLE OF EACH MONTH.  ACCORDINGLY, THE NEXT PAYMENT WILL COVER THE PERIOD OF 9/16 THROUGH 10/16.

-Have the directors received payment of prepetition director fees up to the statutory cap?  If so, in what amounts?
PRIOR TO THE RELIEF DATE, $20K WAS PAID TO GENE DAVIS; $10K WAS PAID TO TIM BERNLOHR AND $10K WAS PAID STEVE SCHEIWE.  AS OF THE RELIEF DATE, MY UNDERSTANDING IS THAT THE THREE MEMBERS OF THE RESTRUCTURING COMMITTEE WERE NOT OWED ANYTHING BY THE DEBTORS ON ACCOUNT OF PRE-RELIEF DATE DEBT.  THEY ARE NOT CREDITORS.

-We understand from Akin that the requested $40K amount was mistakenly omitted from the "other operating" budget.
THE DIRECTOR FEES WERE NOT INCLUDED IN THE "OTHER OPERATING BUDGET" DATED 9/5.  HOWEVER, THE DIRECTOR FEES WERE INCLUDED IN THE CASH COLLATERAL BUDGET APPROVED BY THE LENDERS.  THE ONLY ISSUE IS THAT THE PAYMENTS WERE INCLUDED IN THE WRONG PERIODS.  AS DISCUSSED, THE WHOLE ISSUE IS SIMPLY A TIMING ISSUE.

I've attached the breakdown of "other operating" costs that was provided to us on 9/5, in response to our inquiry re same.  The "Total Other Operating Disbursements" appears to match the "Other Operating" line item in the cash collateral budget attached to the interim order entered  by the Court.
PLEASE LOOK AGAIN.  THE NUMBERS DO NOT MATCH.  THERE IS A $40K INCREASE IN THE "OTHER OPERATING" LINE ITEM FOR THE WEEKS ENDING 10/7, 11/4 AND 12/2.  THAT INCREASE IS ON ACCOUNT OF THE DIRECTOR FEES THAT WERE NOT INCLUDED IN THE "OTHER OPERATING BUDGET" DATED 9/5.

We do not see a separate line item for director fees in the "Other Operating" budget – is it the case that the entire line item was omitted – also is it the case that no director fees are included in the "Salaries, Wages" line item in the cash collateral budget?
THERE WAS NO SEPARATE LINE ITEM BECAUSE THE "OTHER OPERATING BUDGET" YOU SENT ME IS DATED 9/5/2011 AND DID NOT INCLUDE THE DIRECTOR FEES AT THAT TIME.  THE DIRECTOR FEES WERE SUBSEQUENTLY ADDED AND ARE CORRECTLY INCLUDED IN THE BUDGET THAT WAS ATTACHED TO THE CASH COLLATERAL ORDER.  THE ONLY PROBLEM IS THAT THE TIMING OF THOSE PAYMENTS IS INCORRECT.

Regards,

Zach

Zachary H. Smith
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY 10281
Tel:  +1 212.504.6545
Fax: +1 212.504.6666
zachary.smith@cwt.com
www.cadwalader.com

---

**From:** Smith, Zachary
**Sent:** Thursday, September 15, 2011 3:26 PM
**To:** 'Rochester, Shaya'
**Cc:** Greenberg, Scott; Aden Doline, Audrey; adam.harris@srz.com; meghan.breen@srz.com
**Subject:** RE: Inner City

Shaya –

We will discuss point 3 in your email below with the lenders.

Regarding the requested $40K payment on account of ICMC director fees, we will follow up with our client on this point.  Also, I understand Serene Nakano is under the impression that Akin is requesting UST sign-off on payments to certain employees in excess of the statutory cap, and that Serene also understands from Akin that the Lenders have consented to such excess payments.  Perhaps there is a miscommunication here, but to our knowledge, no such consent has been provided (we do not even know the specific details of any such proposed excess payments), and obviously all rights of the Lenders with respect to any such proposed payments are reserved.

Regarding the involuntary petition, we will be proceeding to file a notice of withdrawal with respect to the involuntary petition against the non-existent entity.  We are awaiting internal signoff on the document itself.  I'm sure it will not be an issue if we need to further extend the response deadline while we finalize and file the notice.  I'll get back to you later today.

Regarding the monitor, we are reviewing the NDA and will provide comments promptly.  Please let us know the mechanics of actually having the Monitor granted access to the Debtors' premises, assuming the NDA is finalized tomorrow.

Regards,

Zach

Zachary H. Smith
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY 10281
Tel:  +1 212.504.6545
Fax: +1 212.504.6666
zachary.smith@cwt.com
www.cadwalader.com

---

**From:** Rochester, Shaya [mailto:srochester@akingump.com]
**Sent:** Thursday, September 15, 2011 1:49 PM
**To:** Smith, Zachary
**Subject:** Inner City

Zach – couple of things:

1.  I spoke with the UST about the Meyer Suozzi payment.  She did not have any questions.
2.  We will make a statement at the next hearing about the payment.
3.  As discussed, please send us a short email, confirming that the lenders waive the event of default
4.  Please let me know if the lenders are signed off on the $40K payment to the directors.  We will not make that payment without the lenders' consent.  The directors, however, are asking us whether the lenders will consent.

5. Where do things stand with withdrawing the involuntary petition against the non-existent entity? If you are still working out the procedural issues, please extend our response deadline by another 7 days.

If you want to discuss the foregoing, I am going to be in calls throughout the afternoon but should free up around 4:30 PM. Thanks.

Regards,

**Shaya Rochester**

**AKIN GUMP STRAUSS HAUER & FELD** LLP

One Bryant Park | New York, NY 10036-6745 | USA | Direct: +1 212.872.1076 | Internal: 31076
Fax: +1 212.872.1002 | srochester@akingump.com | akingump.com | Bio

---

IRS Circular 230 Notice Requirement: This communication is not given in the form of a covered opinion, within the meaning of Circular 230 is

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If

---

IRS Circular 230 Legend: Any advice contained herein was not intended or written to be used, and cannot be used, for the purpose of avoiding U.S. federal, state, or local tax penalties. Unless otherwise specifically indicated above, you should assume that any statement in this email relating to any U.S. federal, state, or local tax matter was written in connection with the promotion or marketing by other parties of the transaction(s) or matter(s) addressed in this email. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

====================
NOTE: The information in this email is confidential and may be legally privileged. If you are not the intended recipient, you must not read, use or disseminate the information; please advise the sender immediately by reply email and delete this message and any attachments without retaining a copy. Although this email and any attachments are believed to be free of any virus or other defect that may affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Cadwalader, Wickersham & Taft LLP for any loss or damage arising in any way from its use.

---

IRS Circular 230 Notice Requirement: This communication is not given in the form of a covered opinion, within the meaning of Circular 230 is

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If
*****************************************************************
U.S. Treasury Circular 230 Notice: Any U.S. federal tax advice included in this
communication was not intended or written to be used, and cannot be used, for the
purpose of avoiding U.S. federal tax penalties.
*****************************************************************

NOTICE

This e-mail message is intended only for the named recipient(s) above. It may
contain confidential information that is privileged or that constitutes attorney
work product.  If you are not the intended recipient, you are hereby notified that
any dissemination, distribution or copying of this e-mail and any attachment(s) is
strictly prohibited.  If you have received this e-mail in error, please immediately
notify the sender by replying to this e-mail and delete the message and any
attachment(s) from your system.  Thank you.
=============================================================================

IRS Circular 230 Notice Requirement: This communication is not given in the form of a covered opinion, within the meaning of Circular 230 is

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If

*****************************************************************
U.S. Treasury Circular 230 Notice: Any U.S. federal tax advice included in this
communication was not intended or written to be used, and cannot be used, for the
purpose of avoiding U.S. federal tax penalties.
*****************************************************************

NOTICE

This e-mail message is intended only for the named recipient(s) above. It may
contain confidential information that is privileged or that constitutes attorney
work product.  If you are not the intended recipient, you are hereby notified that
any dissemination, distribution or copying of this e-mail and any attachment(s) is
strictly prohibited.  If you have received this e-mail in error, please immediately
notify the sender by replying to this e-mail and delete the message and any
attachment(s) from your system.  Thank you.
=============================================================================

## Exhibit G

## Unanimous Written Consent

# UNANIMOUS WRITTEN CONSENT
## OF THE BOARD OF DIRECTORS
## OF INNER CITY MEDIA CORPORATION

The undersigned, being all of the members of the board of directors (the "***Board***") of Inner City Media Corporation, a Delaware corporation (the "***Corporation***"), do hereby consent to and adopt, on this 7th day of September, 2011, the following resolutions, which resolutions shall have the same force and effect as if such resolutions were adopted by unanimous vote of the Board at a duly convened meeting held for such purpose, all in accordance with Section 141(f) of the General Corporation Law of the State of Delaware.

WHEREAS, the Board has determined to explore strategic alternatives for enhancing stockholder value, including a possible restructuring of or other fundamental transaction involving the Corporation (any possible ultimate transaction, a "***Possible Transaction***");

WHEREAS, the Board has determined, in the good faith exercise of its business judgment, that it is advisable and in the best interests of the Corporation and its stockholders to designate a Restructuring Committee of the Board consisting of independent and disinterested directors to, on behalf of the Board, review and evaluate a Possible Transaction and take such further action with respect to a Possible Transaction as shall be authorized by the following resolutions; and

WHEREAS, the Board has discussed and reviewed each member of the Board to identify those directors who are independent and disinterested for purposes of serving on such Restructuring Committee.

## Formation

NOW, THEREFORE, BE IT RESOLVED, that pursuant to Section 141 of the General Corporation Law of the State of Delaware (the "***DGCL***") and Article II, Section 9 of the Bylaws of the Corporation ("***Bylaws***"), the Board hereby establishes a Restructuring Committee of the Board (the "***Restructuring Committee***").

## Appointment

WHEREAS, the Board has determined that none of Eugene Davis, Steve Scheiwe, or Tim Bernlohr has, or is subject to, any interest which, in the opinion of the Board, would interfere with the exercise by such director of his independent judgment as a member of the Restructuring Committee.

NOW, THEREFORE, BE IT RESOLVED, that Eugene Davis, Steve Scheiwe, and Tim Bernlohr are each hereby appointed as the members of the Restructuring Committee, with Eugene Davis to serve as chairman of the Restructuring Committee, and each member shall hold office until his or her successor is duly appointed or qualified or until his or her earlier death, resignation or removal, in accordance with the applicable provisions of the Certificate of Incorporation of the Corporation (the "***Certificate of Incorporation***") and the Bylaws and

1

applicable provisions of the DGCL, with the duties and powers granted to the Restructuring Committee as set forth herein.

**Duties and Powers**

RESOLVED FURTHER, that the Board hereby delegates to the Restructuring Committee the exclusive power and authority of the Board to:

- review and evaluate the terms and conditions and determine the advisability of a Possible Transaction;

- make or accept, reject, or seek to modify the terms and conditions of a Possible Transaction;

- determine whether a Possible Transaction is fair to and in the best interests of the Corporation and its stockholders;

- recommend to the Board (x) whether the Board should approve a Possible Transaction (including documents setting forth the terms thereof), (y) whether the Board should recommend a Possible Transaction to the Corporation's stockholders and (z) what other action, if any, should be taken by the Corporation with respect to a Possible Transaction;

- if the Restructuring Committee deems it appropriate or advisable, negotiate the price, structure, form, terms and conditions of a Possible Transaction and the form, terms and conditions of any definitive agreements in connection therewith;

- obtain any necessary or desirable opinions from legal, financial and other advisors;

- take such other actions related to or arising in connection with a Possible Transaction as the Restructuring Committee deems necessary, appropriate or advisable, including as relates to exploring and negotiating alternatives to such Possible Transaction; and

- provide reports and/or recommendations to the Board in regard to such matters at such time as the Restructuring Committee deems appropriate and consistent with its activities.

**Advisors**

WHEREAS, the Board has determined to retain the services of Akin Gump Strauss Hauer & Feld LLP to serve as independent legal counsel to the Corporation, and Rothschild Inc. as independent financial advisors to the Corporation, each effective immediately; and

WHEREAS, the Board has determined to terminate the services of Skadden, Arps, Slate, Meagher & Flom LLP as the Corporation's legal counsel, and Alvarez & Marsal as the Corporation's restructuring / financial advisors, each effective immediately.

NOW, THEREFORE, BE IT RESOLVED, that Akin Gump Strauss Hauer & Feld LLP ("Akin") is hereby retained by the Corporation to serve as independent legal counsel to the Corporation, and Rothschild Inc. ("Rothschild") is hereby retained by the Corporation as independent financial advisors to the Corporation, each effective immediately.

RESOLVED FURTHER, that the Chairman of the Board is hereby empowered and directed to enter into such arrangements providing for the retention, compensation, reimbursement of expenses, and indemnification of Akin and Rothschild as he determines to be necessary, appropriate or advisable in connection with their retention.

RESOLVED FURTHER, that Skadden, Arps, Slate, Meagher & Flom LLP is hereby terminated as the Corporation's legal counsel, and Alvarez & Marsal is hereby terminated as the Corporation's financial advisors, each effective immediately.

RESOLVED FURTHER, that the Restructuring Committee be, and it hereby is, authorized and empowered to:

- utilize the services of Akin and Rothschild to the extent that the Restructuring Committee deems necessary, appropriate or advisable, to assist it in connection with fulfilling its duties as delegated by the Board; and

- direct and authorize Akin and Rothschild to take, or refrain from taking, such actions as the Restructuring Committee shall determine in its sole discretion.

RESOLVED FURTHER, that the Corporation is hereby authorized and directed to pay all fees, expenses and disbursements of the legal counsel, financial and other advisors, consultants and agents to the Restructuring Committee, upon presentation of statements approved by, and instruction from, the Restructuring Committee.

## Cooperation; Investigations

RESOLVED FURTHER, that the Restructuring Committee be, and it hereby is, authorized to make such investigation of the Corporation, any Possible Transaction and any matters, persons, or entities relating thereto as it, in its sole discretion, deems appropriate to fully carry out the intent and accomplish the purposes of these resolutions.

RESOLVED FURTHER, that the Restructuring Committee be, and it hereby is, authorized and empowered to meet individually or as a group with the directors and officers of the Corporation to solicit the views of such directors and officers regarding the terms and conditions of, or any other matters with respect to, a Possible Transaction and alternatives thereto that the Restructuring Committee deems necessary, appropriate or advisable to assist the Restructuring Committee in its review and evaluation thereof, including the views of the directors and officers concerning any reports, studies or similar information prepared by the Restructuring Committee's legal counsel, financial and other advisors, consultants and agents.

**Compensation and Expenses**

RESOLVED FURTHER, that, in recognition of the responsibilities assumed by the members of the Restructuring Committee and the commitment of time that will be required to properly discharge such responsibilities:

- the Chairman of the Restructuring Committee shall receive a monthly fee equal to $20,000 for his time and efforts as Chairman of the Restructuring Committee, such fee to be paid in accordance with the Corporation's director compensation policies;

- each other member of the Restructuring Committee shall receive a monthly fee equal to $10,000 their time and efforts as members of the Restructuring Committee, such fee to be paid in accordance with the Corporation's director compensation policies.

RESOLVED FURTHER, that the Corporation shall advance, or if not requested to advance, shall promptly reimburse, the members of the Restructuring Committee for all of their reasonable out-of-pocket costs and expenses incurred in connection with their service as members of the Restructuring Committee.

**Indemnification**

RESOLVED FURTHER, that (i) the Corporation shall, to the fullest extent not prohibited by the DGCL and the Corporation's Certificate of Incorporation and Bylaws, indemnify each member of the Restructuring Committee who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, based in whole or in part on the fact that such person is or was a member of the Restructuring Committee ("***Proceeding***") from and against any and all expenses, liabilities, claims, judgments or losses of whatever kind or nature incurred by such member of the Restructuring Committee in connection with such Proceeding, and (ii) the expenses incurred by such member of the Restructuring Committee in connection with any such Proceeding shall be paid by the Corporation promptly upon the incurrence thereof, including in advance of the final disposition of such Proceeding, to the fullest extent not prohibited by the DGCL and the Corporation's Certificate of Incorporation and Bylaws.

**Minutes**

RESOLVED FURTHER, that the Restructuring Committee shall keep minutes of the meetings of the Restructuring Committee, and shall file a copy of such minutes in the corporate minutes of the Corporation at an appropriate time.

**Prior Meeting**

RESOLVED FURTHER, the actions taken by the Board on August 13, 2011, since such actions were taken at a meeting that was not properly or duly convened in accordance with the Corporation's Bylaws since proper advance notice was not given, and was not waived by all members of the Board, are void *ab initio* and of no force or effect.

RESOLVED FURTHER, that the Secretary or any other appropriate officer of the Corporation be, and hereby is, directed to make appropriate notations in the books and records of the Corporation to reflect that any such actions taken at the August 13, 2011 meeting of the Board are void and of no force or effect.

**General**

RESOLVED FURTHER, the foregoing resolutions are not intended to reflect a decision at this time by the Board to enter into a Possible Transaction or to take any other particular course of action.

RESOLVED FURTHER, that the Restructuring Committee be, and it hereby is, authorized to take such further action, at the Corporation's reasonable expense, as the Restructuring Committee, in its sole discretion, shall deem necessary, appropriate or advisable in order to fully carry out the intent and accomplish the purposes of the foregoing resolutions.

RESOLVED FURTHER, that the officers of the Corporation be, and they hereby are, authorized and directed to take all such action and to prepare, execute, acknowledge, file, deliver and record all such documents and instruments by and on behalf of the Corporation, and in its name, or otherwise, as shall be necessary, appropriate or advisable in order to fully carry out the intent and accomplish the purposes of the foregoing resolutions.

RESOLVED FURTHER, that the Secretary or any other appropriate officer of the Corporation be, and hereby is, authorized and empowered to certify and furnish such copies of these resolutions under corporate seal if necessary, as may be requested, and any person receiving such certified copy is and shall be authorized to rely upon the contents thereof.

RESOLVED FURTHER, that all acts of the Authorized Officer and the Directors taken prior to the date hereof in connection with the transactions contemplated by the foregoing resolutions are hereby ratified, approved, adopted, and confirmed as if each such act had been presented to and approved by the Board prior to being taken.

**[Signature Page Follows]**

**IN WITNESS WHEREOF,** the undersigned hereby execute this Unanimous Written Consent of the Board of Directors of Inner City Media Corporation to be effective as of the date first written above.

_____

Eugene Davis

_____

Roscoe Brown

_____

Tim Bernlohr

_____

Steve Scheiwe

_____

Pierre Sutton

**IN WITNESS WHEREOF**, the undersigned hereby execute this Unanimous Written Consent of the Board of Directors of Inner City Media Corporation to be effective as of the date first written above.

_____
Eugene Davis

_____
Roscoe Brown

_____
Tim Bernlohr

_____
Steve Scheiwe

_____
Pierre Sutton

**IN WITNESS WHEREOF,** the undersigned hereby execute this Unanimous Written Consent of the Board of Directors of Inner City Media Corporation to be effective as of the date first written above.

_____
Eugene Davis

_____
Roscoe Brown

_____
Tim Bernlohr

_____
Steve Scheiwe

_____
Pierre Sutton

**IN WITNESS WHEREOF,** the undersigned hereby execute this Unanimous Written Consent of the Board of Directors of Inner City Media Corporation to be effective as of the date first written above.

_____
Eugene Davis

_____
Roscoe Brown

_____
Tim Bernlohr

_____
Steve Scheiwe

_____
Pierre Sutton

**IN WITNESS WHEREOF,** the undersigned hereby execute this Unanimous Written Consent of the Board of Directors of Inner City Media Corporation to be effective as of the date first written above.

_____
Eugene Davis

_____
Roscoe Brown

_____
Tim Bernlohr

_____
Steve Scheiwe

_____
Pierre Sutton

# Exhibit H

**Email from Zachary Smith to Shaya Rochester,
dated September 27, 2011**

**From:** Smith, Zachary
**Sent:** Tuesday, September 27, 2011 11:55 PM
**To:** 'srochester@akingump.com'
**Cc:** 'SAlberino@AKINGUMP.com'; Rapisardi, John; Greenberg, Scott; Aden Doline, Audrey; 'adam.harris@srz.com'; 'meghan.breen@srz.com'
**Subject:** Re: ICMC - revised 13-week forecast

Shaya - the lenders are reviewing the proposed 30-day budget, and will advise as to comments/questions. We look forward to receiving Akin's comments to the draft order.

For the avoidance of doubt, please do note that the director fees remain an open issue, the lenders have not consented at this time to the director fee payments set forth in the proposed budget, and all rights are obviously reserved as to any payments that either have been made (as Scott advised us today), or that are subsequently made, without lender consent. We do not intend to further debate the issue among the attorneys, as Schulte advised Akin in an email of 9/17. It will be more productive for the parties to address and hopefully resolve on the business level.

Regards,

Zach

---

**From:** Rochester, Shaya [mailto:srochester@akingump.com]
**Sent:** Monday, September 26, 2011 09:25 PM
**To:** Greenberg, Scott; Dizengoff, Ira <idizengoff@AkinGump.com>; Muldrow, Trey <tmuldrow@AkinGump.com>; Alberino, Scott L. <SAlberino@AKINGUMP.com>; Sturm, Joshua <jsturm@akingump.com>; Antinelli, Stephen <stephen.antinelli@rothschild.com>; Messer, Marcelo <marcelo.messer@rothschild.com>; slobiondo@mgbd.com <slobiondo@mgbd.com>; 'Chuck Schultz' <cschultz@MGBD.com>; 'neil.augustine@rothschild.com' <neil.augustine@rothschild.com>
**Cc:** Rapisardi, John; Updike, Christopher; Aden Doline, Audrey; Harris, Adam <adam.harris@srz.com>; Breen, Meghan (Meghan.Breen@srz.com) <Meghan.Breen@srz.com>; Smith, Zachary
**Subject:** ICMC - revised 13-week forecast

SUBJECT TO FRE 408
FOR DISCUSSION PURPOSES ONLY

Counsel – attached for your review is a revised version of the 13-week forecast, which will form the basis of the Approved Budget for the Second Interim Cash Collateral Order. We have also included a detailed break out of the "Other Operating" line item in the budget. Please note the following:

1.     The Debtor's tax advisor (Deloitte) has been added at a rate of $175K/month, beginning work on 10/1/11 as a retained professional. Deloitte's fees will be subject to holdback and the first payment will not occur until 12/9/11.

2.     Chief Restructuring Officer has been added at a rate of $30K/month, beginning on 10/1/11. The CRO's fees will not be subject to holdback and will be paid in arrears with the first payment occurring in the week ending 11/4/11.

3.     The week of 12/23/11 was added as the 13th week in the model (please note that period 1 in the attached document will not be included in the Approved Budget attached to the Second Interim Cash Collateral Order)

4.     Addition of $20K to Advertising/Marketing in week ending 10/14/11

5.     Modification of First Lien Agent fees per CWT's request earlier today.

6.     Movement of Commissions, Bonus of $110K from week ending 12/23 to week ending 12/16, thus also causing a $6K increase in Payroll Taxes.

7.     Addition of footnote for Utility Deposits.

8.     Board of Director fees of $20K have been added to week ending 9/30/11. In each successive month, there is a $40K advance payment of board fees made in the second week of each month. We understand that the lenders consider this to be an open issue

If you have any questions, please let us know. Thanks.

**Shaya Rochester**
**AKIN GUMP STRAUSS HAUER & FELD** LLP

One Bryant Park **|** New York, NY 10036-6745 **|** USA **|** Direct: +1 212.872.1076 **|** Internal: 31076
Fax: +1 212.872.1002 **|** srochester@akingump.com **|** akingump.com **|** Bio

## <u>Exhibit I</u>

**Email from Zachary Smith to Scott Alberino,
dated September 28, 2011**

**From:** Smith, Zachary
**Sent:** Wednesday, September 28, 2011 6:04 PM
**To:** 'SAlberino@AKINGUMP.com'; 'srochester@akingump.com'
**Cc:** Rapisardi, John; Greenberg, Scott; Aden Doline, Audrey; 'adam.harris@srz.com'; 'meghan.breen@srz.com'; 'neil.augustine@rothschild.com'; 'idizengoff@AkinGump.com'
**Subject:** Re: ICMC - revised 13-week forecast

SUBJECT TO FRE 408

Scott -

The lenders are agreeable to director fees of $40K/month for September and October, provided that for all future months of the case from November beyond, director fees are $2,500 per meeting per director, with a monthly director's fee cap not to exceed $20,000/month.

Thanks,

Zach

---

**From**: Alberino, Scott L. [mailto:SAlberino@AKINGUMP.com]
**Sent**: Wednesday, September 28, 2011 03:28 PM
**To**: Smith, Zachary; Rochester, Shaya <srochester@akingump.com>
**Cc**: Rapisardi, John; Greenberg, Scott; Aden Doline, Audrey; Harris, Adam <adam.harris@srz.com>; 'meghan.breen@srz.com' <meghan.breen@srz.com>; 'Augustine, Neil' <neil.augustine@rothschild.com>; Dizengoff, Ira <idizengoff@AkinGump.com>
**Subject**: RE: ICMC - revised 13-week forecast

Guys, I need a business resolution on the board fees. I agree and have agreed for some time that a business resolution is what is necessary. We have been talking about this for 2 weeks and I have not even received a proposal from your side on fees. If you have no intent of consenting to payment of any board fees, allow me the courtesy of advising the independents now rather than letting them dangle while they do their job.

As I suggested to Zach, I believe that maintaining the status quo through this budget period is reasonable and appropriate given the CRO process and the fact that there are still moving pieces on many issues. Waiting until every doc is fully baked to get a response from your side on board fees is not constructive as you are leaving the independents without any assurance that they will be compensated for the work they currently are doing and will do over the coming period. If we maintain the status quo through November 7, your guys can reserve rights with respect to future periods and deal with the global issue of board fees then and there (as we should have the plan on file by then).

**Scott L. Alberino**

A K I N   G U M P   S T R A U S S   H A U E R   &   F E L D   L L P

1333 New Hampshire Avenue, N.W. | Washington, DC 20036-1564 | USA | Direct: +1 202.887.4027 | Internal: 24027
Fax: +1 202.887.4288 | Mobile: +1 202.441.2161 | salberino@akingump.com | akingump.com | Bio

---

**From:** Smith, Zachary [mailto:Zachary.Smith@cwt.com]
**Sent:** Tuesday, September 27, 2011 11:55 PM
**To:** Rochester, Shaya
**Cc:** Alberino, Scott L.; Rapisardi, John; Greenberg, Scott; Aden Doline, Audrey; Harris, Adam; 'meghan.breen@srz.com'
**Subject:** Re: ICMC - revised 13-week forecast

Shaya - the lenders are reviewing the proposed 30-day budget, and will advise as to comments/questions. We look forward to receiving Akin's comments to the draft order.

For the avoidance of doubt, please do note that the director fees remain an open issue, the lenders have not consented at this time to the director fee payments set forth in the proposed budget, and all rights are obviously reserved as to any payments that either have been made (as Scott advised us today), or that are subsequently made, without lender consent. We do not intend to further debate the issue among the attorneys, as Schulte advised Akin in an email of 9/17. It will be more productive for the parties to address and hopefully resolve on the business level.

Regards,

Zach

---

**From**: Rochester, Shaya [mailto:srochester@akingump.com]
**Sent**: Monday, September 26, 2011 09:25 PM
**To**: Greenberg, Scott; Dizengoff, Ira <idizengoff@AkinGump.com>; Muldrow, Trey <tmuldrow@AkinGump.com>; Alberino, Scott L. <SAlberino@AKINGUMP.com>; Sturm, Joshua <jsturm@akingump.com>; Antinelli, Stephen <stephen.antinelli@rothschild.com>; Messer, Marcelo <marcelo.messer@rothschild.com>; slobiondo@mgbd.com <slobiondo@mgbd.com>; 'Chuck Schultz' <cschultz@MGBD.com>; 'neil.augustine@rothschild.com' <neil.augustine@rothschild.com>
**Cc**: Rapisardi, John; Updike, Christopher; Aden Doline, Audrey; Harris, Adam <adam.harris@srz.com>; Breen, Meghan (Meghan.Breen@srz.com) <Meghan.Breen@srz.com>; Smith, Zachary
**Subject**: ICMC - revised 13-week forecast

SUBJECT TO FRE 408
FOR DISCUSSION PURPOSES ONLY

Counsel – attached for your review is a revised version of the 13-week forecast, which will form the basis of the Approved Budget for the Second Interim Cash Collateral Order. We have also included a detailed break out of the "Other Operating" line item in the budget. Please note the following:

1.      The Debtor's tax advisor (Deloitte) has been added at a rate of $175K/month, beginning work on 10/1/11 as a retained professional. Deloitte's fees will be subject to holdback and the first payment will not occur until 12/9/11.

2.    Chief Restructuring Officer has been added at a rate of $30K/month, beginning on 10/1/11.  The CRO's fees will not be subject to holdback and will be paid in arrears with the first payment occurring in the week ending 11/4/11.

3.    The week of 12/23/11 was added as the 13th week in the model (please note that period 1 in the attached document will not be included in the Approved Budget attached to the Second Interim Cash Collateral Order)

4.    Addition of $20K to Advertising/Marketing in week ending 10/14/11

5.    Modification of First Lien Agent fees per CWT's request earlier today.

6.    Movement of Commissions, Bonus of $110K from week ending 12/23 to week ending 12/16, thus also causing a $6K increase in Payroll Taxes.

7.    Addition of footnote for Utility Deposits.

8.    Board of Director fees of $20K have been added to week ending 9/30/11.  In each successive month, there is a $40K advance payment of board fees made in the second week of each month.  We understand that the lenders consider this to be an open issue

If you have any questions, please let us know.  Thanks.

**Shaya Rochester**
**AKIN GUMP STRAUSS HAUER & FELD** LLP

One Bryant Park **|** New York, NY 10036-6745 **|** USA **|** Direct: +1 212.872.1076 **|** Internal: 31076
Fax: +1 212.872.1002 **|** srochester@akingump.com **|** akingump.com **|** Bio

## Exhibit J

## Status Letter

# CADWALADER

Cadwalader, Wickersham & Taft LLP
One World Financial Center, New York, NY 10281
Tel +1 212 504 6000  Fax +1 212 504 6666
www.cadwalader.com

New York   London   Charlotte   Washington
Houston   Beijing   Hong Kong   Brussels

September 30, 2011

**VIA ELECTRONIC MAIL (idizengoff@akingump.com; salberino@akingump.com)**

Ira S. Dizengoff, Esq.
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036

Scott L. Alberino, Esq.
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036

Re:     Inner City Media Corporation, et al.

Dear Ira and Scott:

I write to you on behalf of Yucaipa Corporate Initiatives Fund II, L.P., Yucaipa Corporate
Initiatives (Parallel) Fund II, L.P., CF ICBC LLC, Fortress Credit Funding I L.P., and
Drawbridge Special Opportunities Fund Ltd., the lenders (collectively, the "Senior Lenders")
under the Credit Agreement among Inner City Media Corporation ("ICMC") and certain of its
affiliates (collectively, the "Debtors"), Cortland Capital Market Services LLC, as
administrative agent, and the lenders signatory to the Credit Agreement from time to time,
dated as of August 13, 2004 (as amended as of each of September 27, 2004, November 11,
2004, May 5, 2005, October 6, 2006, and June 22, 2007, and as further amended, restated,
modified, or supplemented from time to time).

As you know, on September 9, 2011, the Court entered the "Interim Order (I) Authorizing the
Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Agent and Senior
Lenders, and (III) Granting Related Relief" (the "Interim Cash Collateral Order", see Docket
No. 68).  Pursuant to paragraph 3(p) of the Interim Cash Collateral Order, the Debtors are
required to appoint a chief restructuring officer acceptable to the Senior Lenders (a "CRO") by
October 9, 2011.  The prompt appointment of a CRO is a critical component of the Senior

Ira S. Dizengoff, Esq. and Scott L. Alberino, Esq.
September 30, 2011

Lenders' Adequate Protection.[1]  Accordingly, the Debtors' failure to timely appoint a CRO constitutes an Event of Default under the Interim Cash Collateral Order, subject to an expedited Remedies Notice Period.  See Interim Cash Collateral Order, ¶¶ 3(p) and 9(b).

In accordance with the Interim Cash Collateral Order, on September 13, 2011, the Senior Lenders provided the Debtors with a list of three qualified candidates for the position of CRO. Since then, Cadwalader and Schulte have made repeated inquiries to Akin regarding the status of the Debtors' discussions with the CRO candidates.  On numerous occasions, Akin represented to Cadwalader and Schulte that the Debtors' interviews with the CRO candidates were in process.  However, late in the evening on September 28, 2011, the Senior Lenders were advised by the CRO candidates that, to date, no interviews with the Debtors had been scheduled.  After having received numerous assurances that the CRO selection process was well underway, the Senior Lenders were understandably dismayed to learn that – with less than ten days to appoint a CRO – the Debtors have yet to conduct a single interview for the CRO position.

The Debtors' delay in selecting a CRO is particularly disconcerting given the broader lack of progress in the Debtors' chapter 11 cases and certain other recent developments.  In the three weeks since the Debtors' first day hearing, the Debtors have unnecessarily prolonged negotiations on the restructuring term sheet by failing to meaningfully address any of the outstanding business issues.  Thus, the Debtors' recent request for a thirty-day extension of the Interim Cash Collateral Order's milestone of October 9, 2011 for filing a chapter 11 plan and corresponding disclosure statement, is completely unacceptable, as the Debtors have chosen to squander the time already afforded them.

Additionally, as you are aware, the Senior Lenders have made multiple requests for an accounting of the cash on hand at Inner City Broadcasting Corporation ("ICBC") as of August 19, 2011, the date the Senior Lenders filed involuntary chapter 11 petitions against the Debtors.  Specifically, the Senior Lenders have requested:  (i) an accounting of the cash on hand held by ICBC as of August 19, 2011, (ii) representations as to the sources of that cash, and (iii) representations as to whether ICBC obtained any of that cash from the Debtors during the six-year period preceding the commencement of the involuntary chapter 11 cases. However, to date, the Senior Lenders have not received any of the requested information regarding ICBC.  The Senior Lenders have advised counsel to ICBC that the Senior Lenders

---

[1] Capitalized terms used but not defined in this letter have the meanings ascribed to such terms in the Interim Cash Collateral Order.

C A D W A L A D E R

will seek discovery through a Bankruptcy Rule 2004 investigation or related inquiry if ICBC does not provide such information on or before October 3, 2011.

As the Senior Lenders have conveyed previously to the Debtors, transparency with respect to ICBC's cash position is essential to the global settlement contemplated in the restructuring term sheet. Accordingly, the Debtors should be equally motivated to obtain disclosure from ICBC. Nevertheless, the Debtors have consistently demonstrated ambivalence toward the issue, and made plain that the burden of obtaining further clarity from ICBC lies solely with the Senior Lenders.

Finally, early in the evening on September 28, 2011, the Senior Lenders consented to the payment of certain fees to the "professional" directors of ICMC, notwithstanding the Debtors' having been less than forthright regarding such fees during the parties' negotiation of the Interim Cash Collateral Order. Although the Senior Lenders expressed concern as to the reasonableness of the director fees, the Senior Lenders ultimately decided to approve the expense with the understanding that the directors had been working diligently to advance the Debtors' chapter 11 cases by, among other things, overseeing the selection of a CRO. However, within hours of consenting to the payment of certain of the director fees, the Senior Lenders learned of the Debtors' failure to conduct any interviews for the CRO position. Thus, it appears as though the Senior Lenders' concerns regarding the director fees were valid – and begs the question as to exactly what the "professional" directors have done to warrant compensation of $40,000 per month.

Make no mistake – the Senior Lenders' willingness to consent to use of their Cash Collateral is premised on the Debtors' expeditious pursuit of confirmation of a consensual chapter 11 plan. The Senior Lenders are unwilling to fund the chapter 11 cases indefinitely, and will not stand idly by if the Debtors continue to obstruct the forward progress of the cases. Please be advised that, if the current pattern of delay continues, the Senior Lenders intend to object to the Debtors' professional fees, and any additional expense incurred due to the Debtors' failure to cooperate will reduce the amount of the recovery to ICMC's existing equityholders. Further, the Senior Lenders expressly reserve all of their rights under the Interim Cash Collateral Order.

The Senior Lenders are frustrated and disappointed by the lack of progress in the chapter 11 cases, and hope sincerely that the Debtors will immediately remedy the situation so that the cases can proceed on a consensual path. To ensure that remedial action is taken without delay, the Senior Lenders request that the Debtors provide the following information by no later than the close of business today: (i) a detailed status update regarding the Debtors' efforts to select a CRO and (ii) minutes from each of the Debtors' board meetings since the commencement of the chapter 11 cases. Additionally, as the draft plan and corresponding disclosure statement

# CADWALADER

circulated to Akin on September 28, 2011 are entirely consistent with the restructuring term sheet previously reviewed by Akin, the Senior Lenders expect to receive the Debtors' comments on the plan and disclosure statement by no later than Monday, October 3, 2011, with the intention of filing both documents with the Court by October 9, 2011.

Time is of the essence. To that end, please advise your client to respond promptly to the Senior Lenders' request for information and comments on the plan and disclosure statement, and to pursue resolution of any open business issues without further delay.

Very truly yours,

John J. Rapisardi

JJR

cc:  Shaya Rochester, Esq. (srochester@akingump.com)
     Scott J. Greenberg, Esq. (scott.greenberg@cwt.com)
     Zachary H. Smith, Esq. (zachary.smith@cwt.com)
     Adam C. Harris, Esq. (adam.harris@srz.com)
     Harold D. Israel, Esq. (hisrael@kayescholer.com)

**<u>Exhibit K</u>**

**Letter from Scott Greenberg to Thomas Slome,
dated September 26, 2011**

# CADWALADER

Cadwalader, Wickersham & Taft LLP
One World Financial Center, New York, NY 10281
Tel +1 212 504 6000  Fax +1 212 504 6666
www.cadwalader.com

New York  London  Charlotte  Washington
Houston  Beijing  Hong Kong  Brussels

September 26, 2011

**VIA ELECTRONIC MAIL (tslome@msek.com)**

Mr. Thomas R. Slome, Esq.
Meyer, Suozzi, English and Klein, P.C.
990 Stewart Avenue
Suite 300
Garden City, New York 11530

Re: *In re Inner City Media Corporation, et al.*, Case No. 11-13967 (Bankr. S.D.N.Y.)

Dear Mr. Slome:

We are writing in reference to the chapter 11 cases of Inner City Media Corporation ("ICMC") and its affiliated debtors (collectively, the "Debtors"). As you are aware, the Senior Lenders have made multiple requests for an accounting of the cash on hand at Inner City Broadcasting Corporation ("ICBC") as of August 19, 2011, the date the Senior Lenders filed involuntary chapter 11 petitions against the Debtors. Specifically, the Senior Lenders have requested: (i) an accounting of the cash on hand held by ICBC as of August 19, 2011; (ii) representations as to the sources of that cash; and (iii) representations as to whether ICBC obtained any of that cash from the Debtors during the six-year period preceding the commencement of the involuntary chapter 11 cases. The information requested above is necessary in connection with the global settlement contemplated in the term sheet circulated among the parties in interest and as will be reflected in the Debtors' plan of reorganization (the "Plan") which will be filed with the Bankruptcy Court in the coming weeks.

To date, we have not received any of the above referenced information. As a matter of professional courtesy, we will give ICBC an additional week to provide the Senior Lenders with this information. If ICBC does not comply with this request on or before October 3, 2011, we will be forced to seek discovery through a Rule 2004 investigation or related inquiry.

Very truly yours,

Scott J. Greenberg, Esq.

**C A D W A L A D E R**

Mr. Thomas R. Slome, Esq.
September 26, 2011

cc:    Ira S. Dizengoff, Esq. (idizengoff@akingump.com)
       Scott L. Alberino, Esq. (salberino@akingump.com)
       Shaya Rochester, Esq. (srochester@akingump.com)
       John J. Rapisardi, Esq. (john.rapisardi@cwt.com)